United States District Court
Northern District of Texas
Lubbock Division

| | |
|---|---|
| State of Texas,<br><br>    *Plaintiff*,<br><br>v.<br><br>Merrick Garland; United States Department of Justice; Charlotte A. Burrows; Jocelyn Samuels; Keith E. Sonderling; Andrea R. Lucas; Christopher W. Lage; Equal Employment Opportunity Commission; Alejandro Mayorkas; United States Department of Homeland Security; Tae D. Johnson; U.S. Immigrations and Customs Enforcement; Peter E. Mina; Office for Civil Rights and Civil Liberties; Deanne Criswell; Federal Emergency Management Agency; and Joseph R. Biden, Jr.,<br><br>    *Defendants*. | No. 5:23-cv-34-H |

## AMENDED COMPLAINT

On December 23, 2022, only 201 of the Members of the House of Representatives were present in the House's chamber. As that was less than half of the Members, a quorum was not present. The House therefore enjoyed only two powers: it could "adjourn from day to day" and "compel the attendance of absent Members." It was constitutionally unauthorized to do anything else.

The House nevertheless purported to accept the Senate's amendments to the Consolidated Appropriations Act of 2023 on that day. It did so under a House Rule that allowed absent members to vote by proxy. But the Constitution defines absent members as excluded from "a Quorum to do Business" and therefore unauthorized to vote to enact legislation—by "proxy" or otherwise. Though President Biden signed the Consolidated Appropriations Act, his signature was a nullity because the act never "passed the House of Representatives."

The Court should declare that the Consolidated Appropriations Act has not been enacted and is not law.

## I. Parties

1. The State of Texas is the plaintiff. It is a sovereign State of the United States of America.

2. Defendant Merrick Garland is Attorney General of the United States. He is sued in his official capacity.

3. Defendant United States Department of Justice is a cabinet-level executive agency of the federal government.

4. Defendants Charlotte A. Burrows, Jocelyn Samuels, Keith E. Sonderling, and Andrea R. Lucas are members of the Equal Employment Opportunity Commission. They are sued in their official capacities.

5. Defendant Christopher W. Lage is the official exercising the authority of the General Counsel of the Equal Employment Opportunity Commission. He is sued in his official capacity.

6. Defendant Equal Employment Opportunity Commission is an independent agency of the federal government.

7. Defendant Alejandro Mayorkas is Secretary of the United States Department of Homeland Security. He is sued in his individual capacity.

8. Defendant United States Department of Homeland Security is a cabinet-level executive agency of the federal government.

9. Defendant Tae D. Johnson is the Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

10. Defendant U.S. Customs and Border Enforcement is a federal executive agency that is a component of the Department of Homeland Security.

11. Defendant Peter E. Mina is the official exercising the authority of the Officer for Civil Rights and Civil Liberties of the Department of Homeland Security. He is sued in his official capacity.

12. Defendant Office of Civil Rights and Civil Liberties is a federal executive agency that is a component of the Department of Homeland Security.

13. Defendant Deanne Criswell is the Administrator of the Federal Emergency Management Agency. She is sued in her individual capacity.

14. Defendant Federal Emergency Management Agency is a federal executive agency that is a component of the Department of Homeland Security.

15. Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

## II. Jurisdiction and Venue

16. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361. Federal law grants the Court the power to render the injunctive and declaratory relief Texas seeks. 28 U.S.C. §§ 1361, 2201, 2202; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

17. This district is a proper venue because the State is located here and a substantial part of the events or omissions giving rise to its claim occurred here.

### III. Factual Background

**A. The Consolidated Appropriations Act passes with less than a quorum of Representatives voting on it.**

18. The Consolidated Appropriations Act, 2023, began life as H.R. 2617. It was first passed by the House of Representatives in September 2021. 167 Cong. Rec. H5497–98 (Sept. 28, 2021). The Senate passed a different version of the Act in November 2022. *Id.* at S6704 (Nov. 15, 2022). Because the versions passed by the House and the Senate were not identical, the differences between the two had to be resolved before the bill was considered passed by Congress.

19. The Senate assented to the House's amendments to the bill on December 22, 2022. *Id.* at S10077 (Dec. 22, 2022). The vote was 68 yea, 29 nay, and 3 who were absent from the Senate chamber not voting.

20. Members of the House met the next day to consider the Senate's amendments to the bill. The House did not have a quorum; only 201 of the Representatives were present. Those present nevertheless proceeded to vote on accepting the Senate's amendments. The final tally, according to the Clerk of the House, was 225 yea, 201 nay, and 1 present. *Id.* at H10073 (Dec. 23, 2022). The extra 226 votes were cast by Representatives whom absent Representatives had appointed as proxies. *Id.* H10073–74. The votes of those physically present were 88 yea and 113 nay.

21. The appointing Representatives acted under a rule originally promulgated during the 116th Congress. *See* H. Res. 8, § 3(s), 117th Cong., adopted Jan. 4, 2021 (citing H. Res. 965, 116th Cong., adopted May 15, 2020). That rule allowed Members to "designate[] another Member as a proxy" to "cast the vote" of the designating Member if "a public health emergency due to a novel coronavirus is in effect[.]". H. Res. 965 at § 1(a).

22. According to that same rule, a "Member whose vote is cast or whose presence is recorded by a designated proxy . . . shall be counted for the purpose of establishing a quorum under the rules of the House." *Id.* § 3(b). The rule did not mention that the

Constitution permits a minority of the House only to "adjourn from day to day" and "compel the attendance of absent Members. . . ." U.S. Const. art. I, § 5, cl. 1.

23. The week after the House members voted on H.R. 2617, President Biden signed it. It was enrolled as Public Law 117-328 on December 29, 2022.

**B.   The Consolidated Appropriations Act's Contents.**

24. Among the many portions of the Act are two that directly affect Texas. One imposes new legal obligations on employers; one is the creation of new programs permitting the release of illegal aliens into the interior of the country.

    **1.   Amendments to Title VII.**

25. One portion of the Act amends Title VII to open States to lawsuits to which they have never before been subjected.

26. Epitomizing the impulse to give legislation a name that will discourage legislators from voting against it, Division II of the Act is dubbed the "Pregnant Workers Fairness Act." Pub. L. 117-328, Div. II, § 101. It requires covered employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless" doing so would "impose an undue hardship on the operation of the business" and prohibits "deny[ing] employment opportunities," "requiring a qualified employee to take leave," and "tak[ing] adverse action" based on the employee's need for an accommodation. *Id.* § 103(1), (3)–(5). It imposes the same definitions of "reasonable accommodation" and "undue hardship" as are used in the Americans with Disabilities Act. *Id.* § 102(7).

27. A violation of these new requirements allows for the same remedies using the same procedures as under Title VII of the Civil Rights Act of 1964, *id.* § 104(a). States are among the covered employers subject to those procedures and remedies. *Id.* § 102(2)(B)(iii) (citing 42 U.S.C. § 2000e-16c(a)). That includes the requirement to respond to charges of discrimination filed with the EEOC, investigation by the EEOC,

potential lawsuits by the Attorney General, and private actions by allegedly aggrieved individuals. 42 U.S.C. § 2000e-5; 29 C.F.R. §§ 1601.15–17, 1601.23–25, 1601.28–29.

28. The State of Texas accommodates the reasonable needs of its pregnant employees as a matter of course. The Act, however, purports to subject it to the costs, hassles, and attendant risks of administrative proceedings, investigations, and lawsuits, by both private individuals and the federal government, should either an individual or the federal government feel that the State should indulge unreasonable demands.

29. This new obligation is, indeed, likely without Constitutional warrant. The federal government's power to abrogate a State's sovereign immunity is limited by the Fourteenth Amendment to the equal-protection and due-process ills that Amendment was enacted to combat. A lack of workplace accommodations for pregnant employees is not among them. The attempt to abrogate Texas's sovereign protection from being sued without its consent is a direct stripping of a sovereign power it is entitled to enjoy as one of the United States.

**2.   New programs for State spending on illegal aliens.**

30. The Act also creates a program that encourages illegal aliens to seek additional spending from States.

31. The Act allocates $20 million to a case-management pilot program for the Department of Homeland Security's "Alternatives to Detention Program," Pub. L. 117-328, Div. F, Title I, which releases illegal aliens whom ICE would otherwise detain into the interior of the United States based on a promise to appear at future immigration-court proceedings. *See* U.S. Immig. & Customs Enforcement, *Alternatives to Detention*, http://www.ice.gov/features/atd (visited Feb. 13, 2022); Dept. of Homeland Security, *DHS Case Management Pilot Program*, http://www.dhs.gov/dhs-cmpp (visited Feb. 13, 2022). That program is chaired by DHS's Officer for Civil Rights and Civil Liberties. Pub. L. 116-260, Div. F, Title I.

32. The program operates by funding grants, the awarding of which is administered by FEMA, to nonprofits and local governments. *Id.* One of the program's services is connecting program participants—that is, illegal aliens who have been released into the United States—with social services. *Id.* These include housing assistance, access to counsel, childcare, transportation, healthcare, and schooling. Exh. A (solicitation for grant applications). In November 2022, the program's board announced that Houston would serve as one of its first two sites and named BakerRipley, a nonprofit corporation, as the lead local service provider. http://www.cmpp.org (visited Feb. 13, 2023).

33. ICE is required to "ensure that any individual released from ICE custody on parole, bond, or into the ATD program who resides in an area covered by the pilot program is made aware of these case management services and is referred for services unless they formally decline such services in writing[.]" It must also "provide relevant contact and case file information for such individuals to the grantee servicing the area where such individuals reside." Cong. Rec. H8472 (Dec. 1, 2020).

34. The services to which local providers are expected to connect illegal aliens include education resources, such as facilitating and confirming enrollment in public schools, and healthcare, such as medical and mental health services administered by local public-health authorities and Texas state hospitals. Exh. A. While nominally charged with assisting program participants with preparing to reintegrate into their home countries, one of the leading performance metrics for service providers is the number of participants who were "*provided legal orientation and obtained referrals*" (emphasis in original), Exh. A at 5. And there is an entirely separate set of performance metrics for "legal access," including the number of participants that secured legal counsel, the number who secured that counsel thanks to the pilot program, the number and types of immigration relief applied for, and the number and types of immigration relief received. Exh. A at 5–6. There is no such separate set of metrics for any of the other types of services that local providers are expected to provide.

35. The pilot program causes Texas and its local governments to spend additional monies on services to illegal aliens they would not otherwise spend. For example, Texas estimates that it spends millions of dollars each year to furnish healthcare to illegal aliens—$80 million in Emergency Medicaid funding in Fiscal Year 2019. When it last estimated the amount that public hospital districts spend on uncompensated care for illegal aliens in Fiscal Year 2008, it calculated $716.8 million.

36. And Texas spends millions of dollars per year on educating illegal aliens and their children. The exact number is unknown, but Texas does know the amounts for a particular subset of these aliens: unaccompanied children released to sponsors in Texas. Given that these children almost universally qualify for classes in English as a second language, the cost to Texas and its public schools of educating those children in the 2020-21 school year was at least $176 million—"at least" because that shows the cost only of educating the children released to the custody of sponsors *that year*, not the cost of educating children released in previous years who remain in Texas.

37. This is in addition to the general increase in spending that results from creating incentives for additional illegal aliens to enter the United States in general and to relocate to Texas in particular. Lowering the opportunity cost of illegally immigrating to the United States by easing access to social services encourages additional illegal immigration. It does so even for those who ultimately do not receive the benefit of the program that eases that access; the existence of the program directly lowers the risk of illegally immigrating by increasing the chances that doing so will result in additional income, and it indirectly lowers the risk by signaling that the federal government's priorities have shifted from deterring such immigration to facilitating a transition into living in the United States.

38. These incentives are no surprise to the Defendants. Federal law recognizes that, even for legal immigrants, access to social services should be restricted so that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather

rely on their own capabilities and . . . the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2).

39. In addition to those direct economic harms, the program also harms Texas's quasi-sovereign interests in the health and well-being, both physical and economic, of its residents and in its rightful status within the federal system. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). The increase in illegal immigration promoted by the DHS pilot program will increase the amount of crime committed in Texas and reduce the wages paid to Texans—injuries to both their physical and economic well-being. Texas cannot use its sovereign lawmaking powers to combat these injuries because its powers over immigration are limited and the federal government that is supposed to protect the State's interest is not. *See Texas v. United States*, 524 F. Supp. 3d 598, 607, 694 (S.D. Tex. 2021).

### C. The Quorum Clause of the Federal Constitution.

40. The Quorum Clause states that:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and *a Majority of each shall constitute a Quorum to do Business*; but a smaller Number may adjourn from day to day, and may be authorized *to compel the Attendance of absent Members*, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, § 5, cl. 1 (emphasis added).

41. The Quorum Clause's text, the structure of the Constitution, and the longstanding—and until three years ago, unbroken—practice of Congress to conduct its business in-person collectively reinforce that the Constitution forbids proxy voting.

### 1. The text of the Quorum Clause requires physical presence.

42. Only with a quorum may either House "do Business." In context, that necessitates physically present Members. The power to "compel the Attendance of absent Members," would make little sense if the Constitution did not require physical attendance.

43. Supreme Court precedent supports this construction of the Quorum Clause. The Court has held that to constitute a "Quorum" necessary to "do Business," the Constitution requires "the *presence* of a majority, and when that majority are present the power of the house arises." *United States v. Ballin*, 144 U.S. 1, 6 (1892) (emphasis added). And "presence" means that the members must be "actually and physically present." *Christoffel v. United States*, 338 U.S. 84, 89 (1949). *See also United States v. Reinecke*, 524 F.2d 435, 439–40 (D.C. Cir. 1975) (applying *Christoffel*).

44. At the Founding, "present" meant "[n]ot absent; face to face; being at hand." 2 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773) ("Johnson's Dictionary"). "Congress" at that time signified "[a] meeting," meaning an "assembly" or coming "face to face." 1 Johnson's Dictionary. The first American dictionary similarly defined "presence" as "A being in company near or before the face of another." 2 Noah Webster, An American Dictionary of the English Language (1828).

### 2. The structure of the Constitution supports the text's meaning.

45. Other clauses of the Constitution confirm that Members must be physically present for purposes of a quorum to vote on legislation.

46. Article I, § 4 requires Congress to "assemble" at least once per year, where "assemble" meant "[t]o bring together into one place" or "congregated." 1 Johnson's Dictionary; *see also* U.S. Const. art. I, § 5, cl. 4 (no adjournment "to any other Place than that in which the two Houses shall be sitting"); U.S. Const. art. II, § 3 (discussing convening and adjourning Congress).

47. Article I, § 6 grants certain privileges to Members, but those privileges require physical presence. Specifically, Members are privileged from arrest "during their

Attendance at the Session of their respective Houses, and in going to and returning from the same." U.S. Const. art. I, § 6, cl. 1. This privilege—which refers to "going" to the House and "returning" home—would be surplusage if Members could stay home to vote.

48. The Yeas and Nays Clause discusses counting the votes "of those Present." U.S. Const. art. I, § 5, cl. 3. Similarly, the impeachment power requires that Senate votes be by two thirds of the "Members present" in a proceeding where "the Chief Justice shall preside." U.S. Const. art. I, § 3, cl. 6.

49. Neighboring language refers to "presence," too, in a manner that would rob it of meaning if proxy voting were allowed. *E.g.*, U.S. Const. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur[.]"); U.S. Const. amend. XII ("the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted").

### 3. Historical practice supports the text's meaning and the Constitution's structure.

50. Particularly when interpreting questions concerning "the allocation of power between the two elected branches of [the federal] Government," courts "*put significant weight upon historical practice.*" *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (emphasis in original). "Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions" regarding the separation of powers, and "a practice of at least twenty years duration … 'is entitled to great regard in determining the true construction'" of such a question. *The Pocket Veto Case*, 279 U.S. 655, 689–690 (1929) (quoting *State v. South Norwalk*, 58 A. 759, 761 (Conn. 1904)). The historical practice here leads to a single conclusion: The Quorum Clause requires physical presence.

51. For 231 years, Congress operated with in-person quorum calls and voting—as had the Continental Congress. And in the Continental Congress, "the representatives of the States ha[d] been almost continually assembled, and [] the members from the most

distant States [were] not chargeable with greater intermissions of attendance than those from the States in the neighborhood of Congress." Federalist No. 14 (Madison).

52. This personal attendance is unsurprising; the Founders rejected proxy voting multiple times. During debates over the Articles of Confederation, Benjamin Franklin proposed proxy voting. His proposal would have allowed those "necessarily absent" to "be allowed to appoint" a "Proxy, who may vote for him." Proposed Articles of Confederation, Art. VIII (July 21, 1775), *reprinted in* The Papers of Benjamin Franklin, vol. 22 (Yale 1982). The proposal was rejected. *See* Articles of Confederation art. V. Likewise, delegates at the Constitutional Convention rejected proposals that would have allowed Representatives to "vote by proxy"—but only after James Madison added language giving Congress the power to compel absent Members' attendance. *See, e.g.*, Records of the Federal Convention of 1787 (Farrand's Records), vol. 3, 620, 622.

53. In-person voting continued for more than two centuries. During the Yellow Fever epidemic, Thomas Jefferson urged President Washington to keep Congress sitting in Philadelphia, then the capital, even if it meant meeting "in the open f[ie]lds." T. Jefferson, Letter to George Washington (Oct. 17, 1793), Natl. Archives. In the aftermath of that epidemic, the Third Congress enacted a law—still in force today—stating that "[w]henever Congress is about to convene, and from the prevalence of contagious sickness, or the existence of other circumstances, it would, in the opinion of the President, be hazardous to the lives or health of the members to meet at the seat of Government," the President could "convene Congress at such other place as he may judge proper." Acts of the Third Congress of the United States, Sess. I, ch. 17 (April 3, 1794), *codified at* 2 U.S.C. § 27. What it did not do was enact legislation that would allow Members to vote by proxy in future public-health emergencies.

54. This reluctance to embrace proxy voting continued into the 19th Century. Days after the attack on Fort Sumter, President Lincoln "summoned" the "Senators and

Representatives . . . to assemble at their respective Chambers" on the coming Fourth of July. A. Lincoln, Proclamation (Apr. 15, 1861).

55. In the 20th Century, Congress assembled during the 1918 Spanish Flu pandemic. 57 Cong. Rec. 1, 10 (Dec. 2, 1918). Throughout the Cold War, Congress stood ready in the event of a nuclear attack to continue doing business in person in a secret congressional bunker hidden in West Virginia. *The Secret Bunker Congress Never Used*, Natl. Public Radio (Mar. 26, 2011). And into the 21st Century, following the September 11 attacks that had targeted the U.S. Capitol, Congress considered scenarios to address the continuity of Congress, most directly with expedited election of Members to the House in extraordinary circumstances. It did not, however, seriously consider or adopt proxy voting. *See, e.g.*, R. Eric Petersen and Sula P. Richardson, Cong. Res. Serv., RL32958, *Continuity of Congress: Enacted and Proposed Federal Statutes for Expedited Election to the House in Extraordinary Circumstances* (Aug. 9, 2005).

56. Texas does not dispute—indeed, does not wish to dispute—that it is "within the competency of the [H]ouse to prescribe any method which shall be reasonably certain to ascertain the fact" of a "presence of a majority." *Ballin*, 144 U.S. at 6. But the House's authority to decide the method by which it *determines* whether a majority of Members is present does not permit it select a method that *invents* such a fact. A House of Congress "may not by its rules ignore constitutional restraints or violate fundamental rights." *Id.* at 5. By allowing proxy voting and purporting to enact legislation of nationwide importance through that mechanism, however, Congress has done just that—"ignore[d] constitutional restraints" on its authority and transgressed the Constitution.

### iv. Claims for Relief

57. To the extent Texas's claims for relief are or may be inconsistent, it pleads them in the alternative.

## A. Count I: Declaration on Violation of the Quorum Clause

58. Article I, Section 5, Clause 1 requires that a majority of the Members of either House of Congress be actually present in order for there to be a "Quorum to do Business." Absent a majority of actually present Members, the House is forbidden by the Constitution to vote on legislation or to conduct any other "Business."

59. As described above, this reading of the Quorum Clause is confirmed by the clause's plain text, the structure of the Constitution, and centuries of consistent historical precedent. Even in times of national crisis and grave danger to the safety of the assembled Members, Congress has never before authorized proxy voting by its Members, much less purported to have passed a law when a quorum could be achieved only by pretending that absent members were present.

60. The legislation that Texas challenges passed the House without a quorum. It therefore violates the Quorum Clause. Texas is entitled to a declaration to that effect.

## B. Count II: Injunctive Relief

61. Texas is entitled to both preliminary and permanent injunctions preventing the Defendants from enforcing the Act's unconstitutional requirements. Each of the factors governing the award of injunctive relief favor Texas.

### 1. Texas is likely to prevail on the merits.

62. Texas is likely to prevail when this case reaches final judgment. The Constitutional violation is clear: The President signed a bill that was not passed by a majority of a quorum of the House. The bill was never enacted into law because it failed one of the requirements for doing so. A portion of what was illegally enrolled as a law purports to subject Texas to suit for new legal obligations; another part authorizes spending on a program that injures Texas by drawing more illegal immigrants to the State.

63. The legal violation and the injury are clear. The remedy is to stop the federal government from carrying those illegalities into effect.

### 2. Texas is suffering irreparable harm.

64. The financial injuries Texas is suffering are irreparable. Texas cannot compel the federal government to reimburse it; sovereign immunity protects that government from attempts to hold it to account in the courts.

65. The harm to Texas's sovereign interest is likewise irreparable. Once a lawsuit is brought against Texas and it has to appear to defend itself, it has lost the protection of sovereign immunity that it is entitled to enjoy.

66. The injuries to Texas's quasi-sovereign interests are irreparable, too. The damage to its law-enforcement and public-safety interests cannot be remedied after the fact.

### 3. Balance of hardships and public interests.

67. Because there are governments on both sides of this case, the balance of hardships and the public interest merge. That merger makes clear that Texas enjoys the greater equity here.

68. One the one hand, Texas is irreparably harmed by the Defendants' enforcement of an unconstitutional law. It can never recover for the injuries that federal enforcement causes, and intrusions upon its sovereign power are irremediable by definition.

69. On the other hand, the Defendants suffers no injury if their behavior is enjoined. Not only is it always in the public interest to enforce the law—here, enforcing the Constitution when it conflicts with a mere statute—one of the purported injuries, a private plaintiff's inability to sue the State, would not even be to the federal government and would in any case be remedied by a future award of damages.

### 4. Conclusion: Texas is entitled to an injunction.

70. Texas is therefore entitled to a decree enjoining the Defendants from enforcing the Pregnant Workers Fairness Act against it. It is further entitled to a decree enjoining the

Defendants from continuing to fund grants through and otherwise operate DHS's pilot program.

### v. Prayer for Relief

Texas respectfully requests that the Court:

1. Declare that the Consolidated Omnibus Act, 2023, was adopted in violation of the Constitution and is therefore unlawful.

2. Issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Pregnant Workers Fairness Act against Texas.

3. Issue preliminary and permanent injunctive relief enjoining the Defendants from continuing to fund grants through and otherwise operate DHS's pilot program.

4. Award such other relief as the Court deems equitable and just.

Dated February 15, 2023.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

Respectfully submitted.

/s/ Aaron F. Reitz
Aaron F. Reitz
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
aaron.reitz@oag.texas.gov

Leif A. Olson
Chief, Special Litigation Division
Texas Bar No. 24032801
leif.olson@oag.texas.gov

J. Aaron Barnes
Special Counsel
Texas Bar No. 24099014
aaron.barnes@oag.texas.gov

Ethan Szumanski
Assistant Attorney General
Texas Bar No. 24123966
ethan.szumanski@oag.texas.gov

Texas Public Policy Foundation
901 Congress Ave.

Robert Henneke
Texas Bar No. 24026058

Austin, Texas 78701
(512) 472-2700

rhenneke@texaspolicy.com

CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com

MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com

NATE CURTISI
Arizona Bar No. 033342
ncurtisi@texaspolicy.com

**Counsel for the State of Texas**