UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS,

    *Plaintiff*,

v.

MERRICK GARLAND, *et al.*,

    *Defendants*.

No. 5:23-cv-34-H

## BRIEF SUPPORTING MOTION FOR PRELIMINARY INJUNCTION

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100


Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700

AARON F. REITZ
Deputy Attorney General for Legal Strategy
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
leif.olson@oag.texas.gov

J. AARON BARNES
Special Counsel
aaron.barnes@oag.texas.gov

ETHAN SZUMANSKI
Assistant Attorney General
ethan.szumanski@oag.texas.gov

ROBERT HENNEKE
rhenneke@texaspolicy.com

CHANCE WELDON
cweldon@texaspolicy.com

MATTHEW MILLER
mmiller@texaspolicy.com

NATE CURTISI
ncurtisi@texaspolicy.com

**Counsel for the State of Texas**

## TABLE OF CONTENTS

Table of Contents ...................................................................................... 2

Table of Authorities ................................................................................. 4

Introduction ............................................................................................ 11

Background .............................................................................................. 12

    I.     The Consolidated Appropriations Act. ................................................. 12

    II.    The Act's contents. ................................................................................. 13

        A.    Amendments to Title VII. ................................................................. 13

            1.    The law before the Act's amendments. .............................................. 13

            2.    The law after the Act's amendments. ................................................. 14

        B.    Pilot program permitting the release of illegal aliens. ............................ 16

Argument ................................................................................................. 18

    I.     This is a justiciable controversy. ............................................................. 18

        A.    Texas has standing. ............................................................................. 18

            1.    Texas has standing to challenge the amendments to Title VII. ........... 19

            2.    Texas has standing to challenge the pilot program. ............................. 21

        B.    The political question doctrine does not preclude judicial review. .... 24

            1.    The Quorum Clause is not a textually demonstrable constitutional commitment to Congress because it contains no grant of authority. ........ 24

            2.    The Quorum Clause restrains Congress's authority to determine a majority, meaning any textual commitment under the rulemaking clause does not preclude judicial review. ........................................................... 26

        C.    The Enrolled Bill Doctrine does not preclude judicial review. ........... 28

        D.    The Speech or Debate Clause does not preclude judicial review. ....... 31

    II.    Texas is likely to succeed on the merits. .................................................. 33

        A.    The Quorum Clause requires physical presence. ............................... 33

            1.    The text of the Quorum Clause requires physical presence. ............... 33

            2.    Contemporaneous sources support the text's plain meaning. ............. 36

            3.    The Constitution's structure supports the text's plain meaning. ....... 37

            4.    Historical practice further supports the text's plain meaning. ............ 38

B.    The Consolidated Appropriations Act passed when the majority of House Members were physically absent. ........................................................ 41

C.    Texas is suffering irreparable harm. .................................................... 42

D.    The balance of the equities and public interest favor an injunction. ... 43

Conclusion ......................................................................................................... 44

## Table of Authorities

### Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
  458 U.S. 592 (1982) ............................................................................. 19

*American Trucking Assns. v. Alviti*
  14 F.4th 76 (1st Cir. 2021) .................................................................. 31

*Baker v. Carr*
  369 U.S. 186 (1962) ............................................................................. 24

*Barker v. Conroy*
  921 F.3d 1118 (D.C. Cir. 2019) ..................................................... 26, 27

*Benisek v. Lamone*
  138 S. Ct. 1942 (2018) ........................................................................ 42

*Brown & Williamson Tobacco Corp. v. Williams*
  62 F.3d 408 (D.C. Cir. 1995) ......................................................... 31, 32

*BST Holdings, LLC v. OSHA*
  17 F.4th 604 (5th Cir. 2021) .............................................................. 43

*Christoffel v. United States*
  338 U.S. 84 (1949) ......................................................................... 37, 40

*Clapper v. Amnesty Intl. USA*
  568 U.S. 398 (2013) ....................................................................... 19, 21

*Comer v. Murphy Oil USA*
  585 F.3d 855 (5th Cir. 2009) ............................................................. 27

*Common Cause v. Biden*
  909 F.Supp.2d 9 (D.D.C. 2012); ....................................................... 27

*Davis v. Passman*
  544 F.2d 865 (5th Cir. 1977) ............................................................. 32

*Dennis Melancon, Inc. v. City of New Orleans*
  703 F.3d 262 (5th Cir. 2012) ............................................................. 42

*Doe v. McMillan*
  412 U.S. 306 (1973) ............................................................................ 31

*Dombrowski v. Eastland*
  387 U.S. 82 (1967) .............................................................................. 32

*EEOC v. LHC Grp., Inc.*
 773 F.3d 688 (5th Cir. 2014) ...............................................................14

*Fitzpatrick v. Bitzer*
 427 U.S. 445 (1976) .......................................................................... 20

*Flast v. Cohen*
 392 U.S. 83 (1968) ..............................................................................18

*Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*
 527 U.S. 627 (1999) ............................................................................21

*Gonzales v. Marriott Intl., Inc.*
 142 F. Supp. 3d 961 (C.D. Cal. 2015) ................................................ 13

*Gravel v. United States*
 408 U.S. 606 (1972) ..................................................................... 31, 32

*Hubbard, In re*
 803 F.3d 1298 (11th Cir. 2015) ..........................................................32

*Humana, Inc. v. Jacobson*
 804 F.2d 1390 (5th Cir. 1986) .......................................................... 42

*Interox Am. v. PPG Indus., Inc.*
 736 F.2d 194 (5th Cir.1984) ............................................................. 42

*Kilbourn v. Thompson*
 103 U.S. 168 (1880) .......................................................................... 31

*Lee v. City of Los Angeles*
 908 F.3d 1175 (9th Cir. 2018) ........................................................... 31

*Lyons v. Woods*
 153 U.S. 649 (1894) .......................................................................... 30

*Marbury v. Madison*
 5 U.S. (1 Cranch) 137 (1803). .......................................................... 28

*Marshall Field & Co. v. Clark*
 143 U.S. 649 (1892) .....................................................................29, 30

*Modoc Lassen Indian Housing Auth. v. U.S. Dept. of Housing & Urban Dev.*
 881 F.3d 1181 (10th Cir. 2017) ........................................................ 44

*Nelson v. NASA*
 530 F.3d 865 (9th Cir. 2008)
 *rev'd on other grounds*, 562 U.S. 134 (2011) ...................................... 44

*Nixon v. United States*
  506 U.S. 224 (1993) ................................................................24, 25, 27

*Nken v. Holder*
  556 U.S. 418 (2009) ...........................................................................43

*NLRB v. Noel Canning*
  573 U.S. 513 (2014) .....................................................................38, 41

*OneSimpleLoan v. U.S. Secretary of Education*
  496 F.3d 197 (2d Cir. 2007) ......................................................... 28

*Plyler v. Doe*
  457 U.S. 202 (1982) ...........................................................................23

*Powell v. McCormack*
  395 U.S. 486 (1969).............................................................24, 26, 27, 28

*Public Citizen v. U.S. District Court for the District of Columbia*
  486 F.3d 1342 (D.C. Cir. 2007) ................................................... 28

*Seminole Tribe of Fla. v. Florida*
  517 U.S. 44 (1996) .............................................................................21

*Shackelford v. Deloitte & Touche, LLP*
  190 F.3d 398 (5th Cir.1999) ...........................................................14

*State v. South Norwalk*
  58 A. 759 (Conn. 1904) ...................................................................39

*Tenney v. Brandhove*
  341 U.S. 367 (1951)...........................................................................32

*Texas v. Becerra*
  577 F. Supp. 3d 527 (N.D. Tex. 2021) ....................................... 42

*Texas v. EEOC*
  933 F.3d 433 (5th Cir. 2019)..................................................... 19, 21

*Texas v. EPA*
  829 F.3d 405 (5th Cir. 2016)........................................................ 42

*Texas v. United States (Texas DACA)*
  50 F.4th 498 (5th Cir. 2022) ...........................................................19

*Texas v. United States (Texas DAPA)*
  809 F.3d 134 (5th Cir. 2016) ...........................................................43

*Texas v. United States*
   809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015)...................................19

*The Pocket Veto Case*
   279 U.S. 655 (1929)............................................................................................39

*Tomiwa v. PharMEDium Servs., LLC*
   No. 4:16-CV-3229, 2018 WL 1898458 (S.D. Tex. Apr. 20, 2018)....................14

*Torres v. Tex. Dept. of Public Safety*
   142 S. Ct. 2455 (2022) ..................................................................................20, 21

*TransUnion LLC v. Ramirez*
   141 S. Ct. 2190 (2021) .......................................................................................19

*U.S. Term Limits, Inc. v. Thornton*
   514 U.S. 779 (1995) ........................................................................................... 26

*United States v. Ballin*
   144 U.S. 1 (1892)......................................................................................... passim

*United States v. Brewster*
   408 U.S. 501 (1972)............................................................................................32

*United States v. Munoz-Flores*
   495 U.S. 385 (1990) ........................................................................................... 30

*United States v. Palomares*
   52 F.4th 640 (5th Cir. 2022) .........................................................................34, 38

*Valley v. Rapides Parish Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ...........................................................................43

*Vander Jagt v. O'Neill*
   699 F.2d 1166 (D.C. Cir. 1982) ........................................................................ 26

*Villareal v. J.E. Merit Constrs., Inc.*
   895 F. Supp. 149 (S.D. Tex. 1999) ....................................................................14

*Wages & White Lion Invs., L.L.C. v. FDA*
   16 F.4th 1130 (5th Cir. 2021) ..................................................................... 42, 44

*Wallace v. Methodist Hosp. Sys.*
   271 F.3d 212 (5th Cir. 2001)..............................................................................14

*Wyoming ex rel. Crank v. United States*
   539 F.3d 1236 (10th Cir. 2008) .........................................................................19

*Young v. United Parcel Service, Inc.*
   575 U.S. 206 (2015) ........................................................................................... 13

**Statutes**

2 U.S.C. § 27 ...................................................................................................... 40

42 U.S.C. § 12112 ............................................................................................... 14

42 U.S.C. § 1395dd ............................................................................................ 22

42 U.S.C. § 2000e ............................................................................................... 13

42 U.S.C. § 2000e-16c ....................................................................................15, 20

42 U.S.C. § 2000e-2 ........................................................................................... 13

42 U.S.C. § 2000e-5 .......................................................................................15, 20

8 U.S.C. § 1601(2) .............................................................................................. 23

Consolidated Appropriations Act, 2021
   Pub. L. 116-260 (Dec. 27, 2020) ...................................................................... 16

Consolidated Appropriations Act, 2023
   Pub. L. 117-328 (Dec. 29, 2022) ................................................................. passim

Tex. Health & Safety Code § 311.043 .................................................................. 22

Tex. Health & Safety Code § 61.001 *et seq.* ......................................................... 22

Tex. Labor Code § 21.106 .................................................................................... 20

**Regulations**

29 C.F.R. § 1601 ............................................................................................15, 20

29 C.F.R. part 1630, App. ................................................................................... 14

42 C.F.R. § 440.255 ............................................................................................ 22

**Constitutional Provisions**

Impeachment Clause
   U.S. Const. art. I, § 3, cl. 6 ..........................................................................25, 38

Journal Clause
   U.S. Const. art. I, § 5, cl.3 ............................................................................... 29

Quorum Clause
   U.S. Const. art. I, § 5, cl. 1 ........................................................................ passim

Rulemaking Clause
   U.S. Const. art I, § 5, cl. 2 ............................................................................... 26

Speech or Debate Clause
U.S. Const. art. I, § 6, cl. 1 ..................................................................... 31, 32, 38

Treaty Clause
U.S. Const. art. II, § 2, cl. 2 ...................................................................................38

Twelfth Amendment
U.S. Const., amend. XII..........................................................................................38

U.S. Const. art. I, § 5, cl. 3 ....................................................................................38

U.S. Const. art. I, § 5, cl. 4 ....................................................................................38

U.S. Const. art. II, § 3 ............................................................................................38

**Other Authorities**
Articles of Confederation art. V ............................................................................39

Dept. of Homeland Security
*DHS Case Management Pilot Program*, http://www.dhs.gov/dhs-cmpp (visited
Apr. 4, 2022)...................................................................................................16

Elliot, Jonathan
Elliot's Debates: Debates in the Federal Convention of 1787 as Reported by
James Madison 408 (1989)...............................................................................36

Jefferson, Thomas
Letter to George Washington (Oct. 17, 1793), Natl. Archives............................39

Johnson, Samuel
A Dictionary of the English Language (6th ed. 1785) ...................................34, 35

National Public Radio
*The Secret Bunker Congress Never Used* (Mar. 26, 2011)....................................40

Proposed Articles of Confederation, Art. VIII (July 21, 1775)
*reprinted in* 22 The Papers of Benjamin Franklin (Yale 1982) ...........................39

Quinn, Joseph R.
*COVID-19, Constitutions, and a Connected World: Assessing the Constitutionality
of Remote Voting in Legislatures*
100 Neb. L. Rev. 549 (2021) .............................................................................27

Records of the Federal Convention of 1787 (Farrand's Records) .........................39

Rodriguez-Sanchez, Jose Ivan
*Undocumented Immigrants in Texas: A Cost-Benefit Assessment*
Baker Institute for Public Policy (May 8, 2020) ...................................18, 22, 23

*The Federalist* No. 14 (Madison) .................................................................39

*The Federalist* No. 58 (Madison) .................................................................36

U.S. Immigration & Customs Enforcement
    *Alternatives to Detention*, http://www.ice.gov/features/atd (visited Apr. 4,
    2022) ..............................................................................................................16

Webster, Noah
    American Dictionary of the English Language (1828) ........................... 34, 35, 38

**Congressional Materials**
Congressional Record, vol. 166 ....................................................................17

Congressional Record, vol. 167 .............................................................. 12, 41

Congressional Record, vol. 57 ................................................................... 40

House Res. 8, 117th Cong. (2021) ............................................................ 12, 41

House Res. 965, 116th Cong. (2020) ..................................................12, 13, 41, 42

Petersen, R. Eric, and Sula P. Richardson
    *Continuity of Congress: Enacted and Proposed Federal Statutes for Expedited*
    *Election to the House in Extraordinary Circumstances*
    Cong. Res. Serv. RL32958 (Aug. 9, 2005) .......................................... 40

## Introduction

The Consolidated Appropriations Act, 2023, is unconstitutional. The Constitution requires that a majority of the Members of either House of Congress be physically present in order for there to be a "Quorum to do Business." Absent a majority of physically present Members, the House is forbidden by the Constitution to vote on legislation or to conduct any other "Business." This reading of the Quorum Clause is confirmed by the clause's plain text, the structure of the Constitution, and centuries of consistent historical precedent. Even in times of national crisis and grave danger to the safety of the assembled Members, Congress has never before authorized proxy voting by its Members, much less purported to have passed a law when a quorum could be achieved only by pretending that absent members were present.

Nonetheless, on December 23, 2022, only 201 of the Members of the House of Representatives were present in the House's chamber to vote on the Consolidated Appropriations Act. Under a rule that allowed absent members to vote by proxy, the House nonetheless purported to accept the Senate's amendments to the Act. This was a constitutional mistake.

The Constitution defines absent members as excluded from "a Quorum to do Business" and therefore unauthorized to vote to enact legislation—by "proxy" or otherwise. And because less than half of all the Members were present, there was no quorum. The House therefore enjoyed only two powers: it could "adjourn from day to day" and "compel the attendance of absent Members." It was constitutionally unauthorized to do anything else.

Therefore, the Court should declare that the Consolidated Appropriations Act is unlawful and violative of the Quorum Clause, and it should grant a preliminary injunction preventing the Defendants from enforcing this unconstitutional Act.

## Background

### I.   The Consolidated Appropriations Act.

The Consolidated Appropriations Act, 2023, began life as H.R. 2617. After the House of Representatives first passed the Act in September 2021, 167 Cong. Rec. H5497–98 (Sept. 28, 2021), the Senate passed a different version of it in November 2022. *Id.* at S6704 (Nov. 15, 2022). Because the House and the Senate passed different versions, Congress needed to resolve the differences between the two before the bill was considered passed.

As part of this process, the House agreed to several of the Senate's amendments to the Act while also adding an additional amendment to the Senate's version. *Id.* at H9745–52, 9790–803 (Dec. 14, 2022). The Senate then assented to the House's additional amendments on December 22, 2022. *Id.* at S10077 (Dec. 22, 2022). The vote was 68 yea, 29 nay, and 3 absent from the Senate chamber who did not vote.

Members of the House met the next day to consider the Senate's amendments to the bill, but only 201 of the Representatives were present, making it less than a quorum. Those present nevertheless proceeded to vote on accepting the Senate's amendments. According to the Clerk of the House, the final tally was 225 yea, 201 nay, and 1 present. *Id.* at H10073 (Dec. 23, 2022. The extra 226 votes were cast by Representatives who were appointed as proxies for absent Representatives. *Id.* H10073–74. The votes of those physically present were 88 yea and 113 nay.

The appointing Representatives acted under a rule originally promulgated during the 116th Congress. *See* H. Res. 8, § 3(s), 117th Cong. (2021) (citing H. Res. 965, 116th Cong. (2020)). That rule allowed Members to "designate[] another Member as a proxy" to "cast the vote" of the designating Member if "a public health emergency due to a novel coronavirus is in effect[.]" H. Res. 965 at § 1(a). According to that same rule, a "Member whose vote is cast or whose presence is

recorded by a designated proxy . . . shall be counted for the purpose of establishing a quorum under the rules of the House." *Id.* § 3(b). The rule did not, however, mention that the Constitution permits a minority of the House only to "adjourn from day to day" and "compel the attendance of absent Members. . . ." U.S. Const. art. I, § 5, cl. 1.

The week after the House members voted on H.R. 2617, President Biden signed it. It was enrolled as Public Law 117-328 on December 29, 2022.

## II.    The Act's contents.

Among the many portions of the Act, two directly affect Texas. One imposes new legal obligations on employers under Title VII, and the other involves a pilot program permitting the release of illegal aliens into the interior of the country.

### A.    Amendments to Title VII.

#### 1.    The law before the Act's amendments.

As a matter of course, Texas accommodates the reasonable needs of its pregnant employees. Before the new requirements of this Act, however, neither state nor federal law subjected it to a legal obligation to do so that is enforceable through litigation. For example, the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, makes it unlawful for an employer to discriminate against employees or applicants "because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. §§ 2000e-2(a), 2000e(k). It does not, however, "expressly mandate that employers make reasonable accommodations for pregnant workers," *Gonzales v. Marriott Intl., Inc.*, 142 F. Supp. 3d 961, 978 (C.D. Cal. 2015), instead requiring such accommodations only if the employer furnishes them to others that are "similar in their ability or inability to work," *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015).

Similarly, the ADA does not require employers to provide accommodations to pregnant employees. The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability" by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation." 42 U.S.C. § 12112(b)(5)(A). The ADA also makes it unlawful to discriminate against these qualified individuals by "denying [them] employment opportunities . . . if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." *Id.* § 12112(b)(5)(B). The definition of "impairment" under the ADA, though, does not include pregnancy, which is among the conditions "that are not the result of a physiological disorder." 29 C.F.R. part 1630, App. Thus, absent unusual circumstances, pregnancy and related medical conditions do not constitute a physical impairment under the ADA. *See, e.g., Villareal v. J.E. Merit Constrs., Inc.*, 895 F. Supp. 149, 152 (S.D. Tex. 1999).Chapter 21 of the Texas Labor Code, the State law covering employment discrimination, employs the same standards. . *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 n.10 (5th Cir. 2001) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir.1999)); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014); *Tomiwa v. PharMEDium Servs., LLC*, No. 4:16-CV-3229, 2018 WL 1898458, at *5 (S.D. Tex. Apr. 20, 2018).

### 2.   The law after the Act's amendments.

The Act, however, directly affects Texas by altering this long-standing status quo. Epitomizing the impulse to give legislation a name that will discourage legislators from voting against it and affected parties from challenging it, that

portion of the Act, dubbed the "Pregnant Workers Fairness Act," amends Title VII to open Texas to lawsuits to which is has never before been subjected. *See* Pub. L. 117-328, Div. II, § 101.

These new amendments to Title VII require Texas to provide accommodations to pregnant employees that were not previously mandated by federal or state law. For instance, the Act now requires covered employers to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless" doing so would "impose an undue hardship on the operation of the business." *Id.* § 103(1). It also prohibits "deny[ing] employment opportunities," "requiring a qualified employee to take leave," and "tak[ing] adverse action" based on the employee's need for an accommodation. *Id.* § 103(3)–(5). Further, the Act imposes the same definitions of "reasonable accommodation" and "undue hardship" as are used in the Americans with Disabilities Act. *Id.* § 102(7).

These new requirements have never before been part of the law. Thus, an accusation that an employer has violated these new requirements opens the employer to the same procedures as Title VII of the Civil Rights Act of 1964. *Id.* § 104(a). And because States are among the covered employers subject to those procedures and remedies, *id.* § 102(2)(B)(iii) (citing 42 U.S.C. § 2000e-16c(a)), Texas must now respond to charges of discrimination filed with the EEOC, investigations by the EEOC, lawsuits by the Attorney General, and private actions by allegedly aggrieved individuals. 42 U.S.C. § 2000e-5; 29 C.F.R. §§ 1601.15–17, 1601.23–25, 1601.28–29.

This attempt to regulate the Texas and its state agencies as employers also purports to waive Texas's sovereign immunity: "A State shall not be immune under the 11th Amendment to the Constitution from an action in a Federal or State court of competent jurisdiction for a violation of this division." Pub. L. 117-328, Div. II,

§ 106. The Act thus subjects Texas to the costs, hassles, and attendant risks of administrative proceedings, investigations, and lawsuits that would arise from when private individuals or the federal government believe that the State engaged in such unreasonable demands.

**B.    Pilot program permitting the release of illegal aliens.**

The amendments to Title VII are not the only portion of the Act that directly affects Texas. The Act also creates a program that encourages illegal aliens to seek additional spending from States. Specifically, the Act allocates $20 million to a case-management pilot program for the Department of Homeland Security's "Alternatives to Detention Program". Pub. L. 117-328, Div. F, Title I. This pilot program releases illegal aliens whom U.S. Immigration and Customs Enforcement would otherwise detain into the interior of the United States based on a promise to appear at future immigration-court proceedings. *See* U.S. Immig. & Customs Enfmt., *Alternatives to Detention*, http://www.ice.gov/features/atd (visited April 4, 2023); Dept. of Homeland Security, *DHS Case Management Pilot Program*, http://www.dhs.gov/dhs-cmpp (visited April 4, 2023).

The program is chaired by DHS's Officer for Civil Rights and Civil Liberties, and it operates by funding grants to nonprofits and local governments, the awarding of which is administered by FEMA. Consolidated Appropriations Act, 2021, Pub. L. 116-260, Div. F, Title I (Dec. 27, 2020). One of the program's services is connecting illegal aliens who have been released into the United States with social services. *Id.* These services include housing assistance, access to counsel, childcare, transportation, healthcare, and schooling. *See* Appx. 5–6 (solicitation for grant applications). In November 2022, the program's board announced that Houston would serve as one of its first two sites and named BakerRipley, a nonprofit

16

corporation, as the lead local service provider. CMPP, http://www.cmpp.org (last visited April 4, 2023).

Moreover, as part of this program, ICE is required to "ensure that any individual released from ICE custody on parole, bond, or into the ATD program who resides in an area covered by the pilot program is made aware of these case management services and is referred for services unless they formally decline such services in writing[.]" 166 Cong. Rec. H8472 (Dec. 21, 2020). It must also "provide relevant contact and case file information for such individuals to the grantee servicing the area where such individuals reside." *Id.*

The services to which local providers are expected to connect illegal aliens include education resources, such as facilitating and confirming enrollment in public schools, and healthcare, such as medical and mental health services administered by local public-health authorities and Texas state hospitals. *See* Appx. 4. And while nominally charged with assisting illegal aliens in reintegrating into their home countries, one of the leading performance metrics for service providers is the number of participants who were "*provided legal orientation and obtained referrals.*" *See* Appx. 7 (emphasis in original). In fact, there is an entirely separate set of performance metrics for "legal access," including the number of participants that secured legal counsel, the number who secured that counsel thanks to the pilot program, the number and types of immigration relief applied for, and the number and types of immigration relief received. *See* Appx. 7–8. Yet, there is no such separate set of metrics for any of the other types of services that local providers are expected to provide.

Because of this pilot program, Texas and its local governments spend additional monies on services to illegal aliens they would not otherwise spend. In fact, it is estimated that undocumented immigrants cost Texas around $2 billion for the sum of healthcare, education, and incarceration costs. *See* Jose Ivan Rodriguez-

17

Sanchez, Ph.D., *Undocumented Immigrants in Texas: A Cost-Benefit Assessment*, Baker Institute for Public Policy, at 23 (May 8, 2020), https://doi.org/10.25613/bzsr-dm28.

These costs are in addition to the general increase in spending that results from creating incentives for additional illegal aliens to enter the United States in general and to relocate to Texas in particular. Indeed, the pilot program encourages additional illegal immigration by lowering the opportunity cost of illegally immigrating to the United States and easing access to social services. The existence of the program also directly lowers the risk of illegally immigrating by increasing the chances that doing so will result in additional income, and it indirectly lowers the risk by signaling that the federal government's priorities have shifted from deterring such immigration to facilitating a transition into living in the United States. Because of these harms, Texas seeks this Court's intervention to enjoin the Defendants from enforcing the unconstitutional Act that inflicts these injuries.

**ARGUMENT**

## I.    This is a justiciable controversy.

Generally, the only times a case will not rise to the level of a justiciable controversy will be, among other things, when (1) "the parties seek adjudication of only a political question," or (2) "there is no standing to maintain the action." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Here, Texas's challenge does not implicate the political question doctrine, nor does it indicate a lack of standing. Accordingly, Texas has established justiciable controversy.

### A.    Texas has standing.

To establish standing, plaintiffs must show three things: "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would

18

likely be redressed by judicial relief." *Texas v. United States (Texas DACA)*, 50 F.4th 498, 513 (5th Cir. 2022) (alterations in original) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)); *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019); *Clapper v. Amnesty Intl. USA*, 568 U.S. 398, 409 (2013). Here, Texas will suffer injuries to its sovereign interests and financial interests because the Consolidated Appropriations Act imposes new legal obligations on Texas as an employer under Title VII and bolsters immigration pilot programs that increases the connection of illegal aliens to Texas's resources. Accordingly, Texas has standing.

### 1.    Texas has standing to challenge the amendments to Title VII.

Because the Act's amendments to Title VII now require accommodations that neither federal nor Texas law required previously, Texas is vulnerable to lawsuits to which it was not vulnerable before. This means that Texas will suffer concrete injuries that are traceable to the Act's new amendments and redressable by this Court. Accordingly, Texas has standing to challenge the Act's new amendments to Title VII.

Texas has a sovereign interest in "the power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Because of this sovereign interest, Texas may have standing based on "(1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), as revised (Nov. 25, 2015) (internal footnotes omitted). In particular, when a federal law preempts state law, the injury-in-fact prong of the standing analysis is sufficiently satisfied. *See Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *see also DACA*, 50 F.4th at 516.

In this case, the Act directly inflicts injury on Texas by opening Texas up to additional lawsuits and attempting to abrogate its sovereign immunity. *First*, the Act spurs additional lawsuits against Texas because the Act extends the protections afforded to pregnant employees. For instance, while the PDA, the ADA, and the TCHRA all provided accommodations to pregnant employees, those previous accommodations only arose if the employer gave accommodations to those "similar in their ability or inability to work," *See Young*, 575 U.S. at 229; Tex. Labor Code § 21.106(b), and these previous protections did not include pregnancy as a disability or impairment under the ADA or the TCHRA. But now, the Act imposes the same definitions of "reasonable accommodation" and "undue hardship" as used in ADA. Pub. L. 117-328, Div. II, § 102(7). This means that a violation of these new requirements allows for the same remedies using the same procedures as Title VII of the Civil Rights Act of 1964, *id.* § 104(a). And because States are among the covered employers subject to those procedures and remedies, *id.* § 102(2)(B)(iii) (citing 42 U.S.C. § 2000e-16c(a)), Texas is now burdened with responding to charges of discrimination filed with EEOC, investigations by the EEOC, lawsuits by the Attorney General, and private actions by allegedly aggrieved individuals. 42 U.S.C. § 2000e-5; 29 C.F.R. §§ 1601.15–17, 1601.23–25, 1601.28–29.

*Second*, the Act unlawfully attempts to abrogate Texas's immunity by stating, "A State shall not be immune under the 11th Amendment to the Constitution from an action in a Federal or State court of competent jurisdiction for a violation of this division." Pub. L. 117-328, Div. II, § 106. This new obligation is likely without constitutional warrant. According to the Supreme Court, "Congress may . . . enact laws abrogating [a State's] immunity under the Fourteenth Amendment." *Torres v. Tex. Dept. of Pub. Safety*, 142 S. Ct. 2455, 2462 (2022) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). But the Court "declined to acknowledge additional waivers of sovereign immunity under Congress' Article I powers or to find Article

I authority to abrogate immunity." *Torres*, 142 S. Ct. at 2462 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) and *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627 (1999)).

The Defendants' attempt to abrogate Texas's immunity in this case violates this precedent. The Consolidated Appropriations Act was not passed pursuant to the Fourteenth Amendment. And even if it had been, the abrogation attempt here would still not pass constitutional muster. Congress may abrogate a State's immunity only if it acts "pursuant to a valid exercise of power." *Seminole Tribe*, 517 U.S. at 55. This Act, however, was passed in violation of Article I's Quorum Clause, meaning that any "exercise of power" employed by Congress and the Defendants was anything but "valid."

The Defendants' attempted abrogation would be a direct stripping of a sovereign power Texas is entitled to enjoy as one of the United States. That attempt to regulate Texas and its agencies as employers and waive Texas's sovereign immunity imposes direct injuries on Texas, including administrative burdens, legal risks, investigations, and future lawsuits by both private individuals and the federal government. This invasion of Texas's sovereign interests and the imposition of the many accompanying costs and burdens would not have occurred absent the Act, making Texas's injuries "fairly traceable to the challenged action." *See Texas v. EEOC*, 933 F.3d at 446 (quoting *Clapper*, 568 U.S. at 409). And Texas's injuries are redressable because the Court can declare the Act unconstitutional and enjoin the Defendants from enforcing the new amendments to Title VII against Texas. Accordingly, Texas has standing to challenge the new amendments.

### 2. Texas has standing to challenge the pilot program.

Texas also suffers concrete injuries from the pilot program that are traceable to the Act and redressable by this Court. Specifically, Texas and its local

governments spend additional monies on services to illegal aliens they would not otherwise spend in the areas of healthcare, education, and law enforcement.

Consider Texas's healthcare costs. Texas estimates that it spends millions of dollars each year to furnish healthcare to illegal aliens—$80 million in Emergency Medicaid funding in Fiscal Year 2019. When it last estimated the amount that public hospital districts spent on uncompensated care for illegal aliens in Fiscal Year 2008, it calculated $716.8 million. A recent study further estimated that Texas spent a total of $122.1 million in health care costs for undocumented immigrants in fiscal year 2018. *See* Rodriguez-Sanchez at 20. These injuries are not merely speculative; they are mandatory. Indeed, both federal law and Texas law require Texas to incur these costs. For instance, both Medicare and Medicaid require the provision of emergency services as a condition of participation, regardless of a recipient's lawful-presence status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. Similarly, Texas law requires local governments to provide healthcare for the indigent, *see* Tex. Health & Safety Code §§ 61.001 *et seq.*, and it requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* § 311.043.

Next, consider Texas's education costs. Texas spends millions of dollars per year on educating illegal aliens and their children. In the 2020–21 school year alone, the cost to Texas and its public schools of educating unaccompanied children released to sponsors in Texas was at least $176 million. This number represents only the minimum amount (hence, using the phrase "at least") because it only shows the cost of educating the children released to the custody of sponsors *that year*, not the cost of educating children released in previous years who remain in Texas. Indeed, one estimate has Texas paying around $1.52 billion to educating undocumented immigrants that live in the state. *See* Rodriguez-Sanchez at 15, 23. And like healthcare costs, these education costs are unavoidable because the

Supreme Court has held that States are constitutionally obligated to provide free education to children of unlawfully present aliens. *Plyler v. Doe,* 457 U.S. 202 (1982).

Now, turn to Texas's law enforcement costs. Based on estimates, Texas spent $374.2 million in incarceration costs for undocumented immigrants in fiscal year 2018. *See* Rodriguez-Sanchez at 22–23. Combining these incarceration costs with the other costs means that Texas incurs costs regarding undocumented immigrants to the tune of around $2 billion. *See* Rodriguez-Sanchez at 23.

But even more injurious to Texas is that these costs are in addition to the general increase in spending that results from creating incentives for more illegal aliens to enter the United States and to relocate to Texas. Specifically, the pilot program lowers the opportunity cost of illegally immigrating to the United States, eases access to social services, and encourages additional illegal immigration. This is true even for those who ultimately do not receive the benefit of the program that eases that access because the existence of the program (1) directly lowers the risk of illegally immigrating by increasing the chances that doing so will result in additional income and (2) indirectly lowers the risk by signaling that the federal government's priorities have shifted from deterring such immigration to facilitating a transition into living in the United States.

But these incentives are no surprise to the Defendants. Indeed, federal law recognizes that, even for legal immigrants, access to social services should be restricted so that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and . . . the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2). Despite this federal recognition, however, the pilot program, the additional funding provided by the Act, and the corresponding

incentives cause illegal immigrants to rely on the resources of Texas and its citizens, not on "their own capabilities."

Thus, by enjoining the enforcement of the pilot program in Texas, less unlawful aliens would be released, and less aliens would be connected to social services. This would decrease the financial burdens and direct injuries imposed on Texas. Hence, such concretely imposed costs and injuries suffered by Texas are traceable to the unconstitutionality of the Act and redressable by this Court. Accordingly, Texas has established standing to challenge the pilot program.

**B.    The political question doctrine does not preclude judicial review.**

Supreme Court precedent makes clear that "federal courts will not adjudicate political questions" because of the separation of powers principles in our system of government. *Powell v. McCormack*, 395 U.S. 486, 518 (1969). A nonjusticiable political question is present when, among other things, there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Nixon v. United States*, 506 U.S. 224, 228 (1993); *Baker v. Carr*, 369 U.S. 186, 217 (1962). Even in that instance, however, the Supreme Court explained that such a textually demonstrable constitutional commitment may not "ignore constitutional restraints." *See, e.g.*, *United States v. Ballin*, 144 U.S. 1, 5 (1892). Here, the Quorum Clause is not a "textually demonstrable constitutional commitment" to Congress. Instead, it is a "constitutional restraint" that Congress may not ignore. Thus, the political question doctrine does not apply.

**1.    The Quorum Clause is not a textually demonstrable constitutional commitment to Congress because it contains no grant of authority.**

Courts determine whether there is "a textually demonstrable constitutional commitment of the issue" to Congress by interpreting the text at issue to answer two initial questions: (1) whether there is a textual commitment in the first place,

and (2) to what extent the issue is textually committed. *Nixon*, 506 U.S. at 228 (citing *Baker*, 369 U.S. at 217, and *Powell*, 395 U.S. at 519). This means that courts must identify the *existence* of any authority before determining the *scope* of any authority conferred under the Quorum Clause.

Indeed, this is the analysis the Supreme Court employed in *Nixon*. There, the Court first examined the "language and structure" of the clause which stated, in relevant part, "The Senate shall have the sole Power to try all Impeachments." U.S. Const. art. I, § 3, cl. 6. By looking to this text and structure, the Court explained that this sentence was "a grant of authority" to Congress. *Nixon*, 506 U.S. at 229. Then, only after identifying this "grant of authority," the Court defined the scope of this authority when it stated that "the word 'sole' indicates that this authority is reposed in the Senate and nowhere else." *Id.*

Applying *Nixon*'s analytical framework to this case, it is evident that the Quorum Clause does not confer authority or discretion on any political branch. Under that clause, "a Majority of each shall constitute a Quorum to do Business." U.S. Const. art. I, § 5, cl. 1. The text does not specify any level of discretion in determining what constitutes a quorum. Instead, by using the word "shall," it speaks in absolutes and demonstrates a sharp departure from the discretionary language contained in the remainder of the Clause. *Id.* ("[B]ut a smaller Number *may* adjourn from day to day, and *may* be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House *may* provide." (emphasis added)).

Moreover, unlike *Nixon*, where the applicable provision specifically identified the Senate as the sole holder of the "Power to try all Impeachments," *see Nixon*, 506 U.S. at 229, the Quorum Clause identifies no such holder of authority to determine the existence of a quorum; it only specifies the power to "adjourn from

day to day" and "compel the Attendance of absent Members," *see* U.S. Const. art. I, § 5, cl. 1.

The Quorum Clause thus confers neither authority nor discretion on any coordinate political branch to determine a quorum but rather is firmly rooted in rigid, inflexible language. Accordingly, it is not a "textually demonstrable constitutional commitment" that invokes the political question doctrine.

> **2.** **The Quorum Clause restrains Congress's authority to determine a majority, meaning any textual commitment under the rulemaking clause does not preclude judicial review.**

Like the Quorum Clause, the Rulemaking Clause also does not preclude judicial review. While that clause commits to each house of Congress the authority to "determine the Rules of its Proceedings," U.S. Const. art I, § 5, cl. 2, it "gives Congress no license to adopt unconstitutional rules." *Barker v. Conroy*, 921 F.3d 1118, 1126 (D.C. Cir. 2019); *see Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173 (D.C. Cir. 1982) ("Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity."). *See also Ballin*, 144 U.S. at 5 (Congress "may not by its rules ignore constitutional restraints or violate fundamental rights").

The scope of any authority textually committed to Congress is restrained by the text of the Constitution, meaning that "Congress may not alter or add to . . . the Constitution" with its rulemaking authority. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 796 (1995). For example, in *Powell v. McCormack*, the Supreme Court addressed the "scope of any 'textual commitment'" under art. I, § 5, cl. 1, under which "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." 395 U.S. at 521. The Court held that the scope of this Clause's textual commitment to Congress was limited to the power to adjudge the

"qualifications" set forth for members of Congress elsewhere in the Constitution. *See* 395 U.S. at 518–22.

The Court later clarified this holding in *Nixon*. There, the Court explained that *Powell* rested on the "fixed meaning" of the applicable constitutional language. *Nixon*, 506 U.S. at 237. And even though the constitutional provision was a "textual commitment," it was not unreviewable because such unreviewable authority would be defeated by the existence of a separate limiting constitutional provision. *Id.* Therefore, the Court determined that "courts possess power to review either legislative or executive action that transgresses identifiable textual limits." *Id.* at 238. Lower courts further distilled this precedent and explained that, "to present a justiciable challenge to congressional procedural rules, Plaintiffs must identify a separate provision of the Constitution that limits the rulemaking power." *See, e.g.*, *Common Cause v. Biden*, 909 F.Supp.2d 9, 27-27 (D.D.C. 2012); *Barker*, 921 F.3d at 1126 (Establishment Clause is a constitutional restraint on Congress and made a claim justiciable); *see also Comer v. Murphy Oil USA*, 585 F.3d 855, 874 (5th Cir. 2009) ("Congress alone has the authority to pass legislation, but the courts have authority to assess the constitutionality of a statute").

Here, the Quorum Clause presents such a constitutional limitation.[1] For starters, the text Quorum Clause leaves no leeway in deciding what constitutes a majority because it uses fixed language like "shall" in stating what rises to the level of a majority under the Constitution. *See* U.S. Const. art. I, § 5, cl. 1. And as discussed below, the Quorum Clause's requirement of physical presence is cemented in its text, history, and structure—prohibiting Congress from breaking

---

[1]    *See* Joseph R. Quinn, *COVID-19, Constitutions, and a Connected World: Assessing the Constitutionality of Remote Voting in Legislatures*, 100 Neb. L. Rev. 549, 560 (2021) ("[T]he quorum requirement . . . supplies the strongest argument that the Constitution expressly limits Congress's power to promulgate remote voting rules.").

free of the concrete constitutional restraints that the Quorum Clause sets. *See Ballin*, 144 U.S. at 5. While "[o]ur system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch[,] [t]he alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Powell*, 395 U.S. at 549. It is, in other words, "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

### C.    The Enrolled Bill Doctrine does not preclude judicial review.

In addition to, and as part of, the political question doctrine, the enrolled bill rule also does not prevent this Court from righting the constitutional wrong perpetrated by the Consolidated Appropriations Act in this case. The so-called "enrolled bill rule" has been used by courts across the nation to preclude judicial review of certain constitutional challenges to statutes. *See, e.g.*, *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1343–44 (D.C. Cir. 2007) (enrolled bill rule precluded judicial review of claims that a statute was unconstitutional for failing the bicameral-passage requirement); *OneSimpleLoan v. U.S. Secy. of Educ.*, 496 F.3d 197, 198 (2d Cir. 2007) (enrolled bill doctrine precluded judicial review of claims that statute was enacted in violation of the Bicameralism, Presentment, and Appropriations Clauses). Supreme Court precedent, however, clarifies that the enrolled bill rule only makes such bills exempt from factual, not legal, disputes when the claim at issue turns on a potential violation of binding constitutional requirements. Here, the Quorum Clause is such a constitutionally binding requirement that makes this case justiciable.

This doctrine was born in 1892 in *Marshall Field & Co. v. Clark*. The Supreme Court there was tasked with determining the "nature of the evidence" that a court

may consider when deciding "whether a bill, originating in the house of representatives or the senate, and asserted to have become a law, was or was not passed by congress." 143 U.S. 649, 670 (1892). Several importers argued that the Tariff Act of October 1, 1890, "was not a law of the United States" when the enrolled bill omitted a section of the bill that was actually passed by Congress and approved by the President. *See id.* at 662–69. The Journal Clause, they argued, made congressional journals "the best, if not conclusive, evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress." *Id.* at 670 (citing U.S. Const. art. I, § 5, cl.3).

The Court rejected this argument and interpretation of the Journal Clause and instead determined that, when a bill is enrolled, "its authentication as a bill that has passed Congress should be deemed complete and unimpeachable." *Id.* at 670–72. But the Court clarified that, while courts must accept an enrolled bill as having passed Congress, court are still left to determine whether such an enrolled bill "is in conformity with the Constitution." *Id.* at 672. In essence, the "nature of the evidence" inquiry at issue in *Marshall Field* drew a distinction between whether a statute was *factually* or *legally* passed. After all, the precise issue in *Marshall Field* rested on the "nature of the evidence," and the importers' primary contention was that the applicable statute was not "a law of the United States if it had not *in fact* been passed by Congress." *Id.* at 669–70 (emphasis added).

This legal-factual dichotomy is further supported in subsequent Supreme Court precedents. For example, in *Ballin*, which the Court decided the same day as *Marshall Field*, it appeared that the Court broke away from *Marshall Field*'s legal moorings when it looked beyond the enrollment of the act to the congressional journals, but the Court was determining whether the statute at issue was "*legally* passed" with a quorum. *Ballin*, 144 U.S. at 3 (emphasis added). In answering this question, the Court assumed, without deciding, that it may look to the journal to

determine "whether a law has been *legally* enacted," but if it does so, it must assume that the journal "speak[s] the truth." *Id*. at 4. *Ballin*'s acknowledgement of *Marshal Field*, stating that it was "unnecessary to add anything here to [*Marshall Field*'s] general discussion," *id*. at 3–4, shows that while Congress's journals are *factually* indisputable, they are not *legally* indisputable in determining the constitutionality of a statute. And the Court echoed this two years later in *Lyons v. Woods*, holding that "[t]he question whether a seeming act of a legislature has become a law in accordance with the fundamental law is a judicial one, to be tested by the courts and judges, and not a question of fact, to be tried by a jury." 153 U.S. 649, 663 (1894). The Court more recently in *United States v. Munoz-Flores* interpreted *Marshall Field* as not concerning "any constitutional requirement binding Congress" because "the Constitution left it to Congress to determine how a bill is to be authenticated as having passed." 495 U.S. 385, 387 (1990) (citing 143 U.S. at 670–72). In a case like *Munoz-Flores*, however, where "a constitutional provision *is* implicated, *Field* does not apply." *Id*. (emphasis in original). Whether "a bill becomes a 'law' . . . does not answer the question whether that 'law' is *constitutional*." *Id*. at 397 (emphasis in original). This is because, "[t]o survive this Court's scrutiny, the 'law' must comply with all relevant constitutional limits." *Id*. "A law passed in violation of the Origination Clause would thus be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment." *Id*.

Here, like *Munoz-Flores*, this case neither presents a political question nor invokes the Enrolled Bill Doctrine because the Quorum Clause is a "constitutional requirement binding Congress." *See id*. at 391 n.4. This entire lawsuit centers on Congress transgressing that limit. The Court's power to decide this suit is unabated.

**D.   The Speech or Debate Clause does not preclude judicial review.**

Under the Speech or Debate Clause, "Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. This Clause "confers on Members of Congress immunity for all actions within the legislative sphere." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995) (quoting *Doe v. McMillan*, 412 U.S. 306, 312–13 (1973) (cleaned up). This immunity broadly applies to "legislative acts," *Doe*, 412 U.S. at 311–12, which generally include those things "done in a session of the House by one of its members in relation to the business before it," *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880); *see Gravel v. United States*, 408 U.S. 606, 624 (1972). Moreover, this Clause covers matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

But while legislative *immunity* protects "Members of Congress," the distinct, but closely related, concept of legislative *privilege* protects "materials held by Congress" that fall within the legitimate legislative sphere. *See id.* at 416–17; *see also Am. Trucking Assns. v. Alviti*, 14 F.4th 76 (1st Cir. 2021) (describing protection from "civil and criminal liability for their legislative acts" as "immunity" and protection from "having evidence of their legislative acts introduce in a proceeding" as "evidentiary privilege"); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) (indicating that legislative immunity and legislative are different but nonetheless "corollary"). Indeed, "[t]he immunities of the Speech or Debate Clause . . . protect the integrity of the legislative process by insuring the

independence of *individual legislators*." *United States v. Brewster*, 408 U.S. 501, 507 (1972) (emphasis added).

Here, none of the Defendants are congressmembers. They thus enjoy no legislative immunity, even though the information or materials in their possession may be privileged. *See Brown & Williamson*, 62 F.3d at 415–17; *see also In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) ("the *privilege* extends to discovery requests, even when the lawmaker is not a named party in the suit") (emphasis added).

But even if the Speech or Debate Clause applied here—it does not— "[l]egislators ought not to stand above the law they create but ought generally to be bound by it as are ordinary persons." *Davis v. Passman*, 544 F.2d 865, 881 (5th Cir. 1977) (quoting *Gravel*, 408 U.S. at 615). "If legislators are bound by the law they create, they are even more clearly bound by the United States Constitution." *Id*. And because "[t]he very premise upon which the Constitution stands is the equality of all persons before the law," "[e]xceptions to that premise must be limited, guarded, and sparingly employed." *Id*.

Here, Texas's challenges against the Defendants center on the Act being constitutionally unsound. This Court, therefore, has power to determine the constitutional question of whether the Act's passage ran afoul of the Quorum Clause's express limitations. And while the Act may be somewhat related to legislative activity, "[m]alfeasance . . . does not fall within the legislative sphere simply because it is associated with congressional duties." *See Brown & Williamson*, 62 F.3d at 415. Likewise, "congressional complicity in a scheme to [do something unlawful] will undo any claim of immunity raised in a prosecution or civil action." *See id*. at 415–16 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 84–85 (1967)). Indeed, the Speech or Debate Clause only extends to "the sphere of *legitimate* legislative activity." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (emphasis added). Accordingly, the Speech or Debate Clause does not preclude this Court from

finding the Act in violation of the Quorum Clause and enjoining the Defendants from enforcing it.

## II.   Texas is likely to succeed on the merits.

The Quorum Clause requires the House and Senate to have "a Quorum to do Business;" the quorum required is a "Majority." Nevertheless, the House has been passing bills without a majority of congresspersons physically present since May 2020. That procedure violates the Quorum Clause of the Constitution. Therefore, the Court should declare that laws passed in such a manner—specifically, the Consolidated Appropriations Act here—are unconstitutional.

### A.   The Quorum Clause requires physical presence.

The Constitution forbids proxy voting. The Quorum Clause states:

> Each house shall be the Judge of the Elections, Returns and Qualifications of its own Members, and *a Majority of each shall constitute a Quorum to do Business*; but a smaller Number may adjourn from day to day, and may be authorized *to compel the Attendance of absent Members*, in such Manner, and under such Penalties as each House may provide.

U.S. Const. art. I, § 5, cl. 1 (emphasis added).

For 231 years—from 1789 to 2020—neither chamber of the legislature viewed the Quorum Clause as requiring anything less than physical presence for members of Congress. This makes perfect sense as the text, structure, and longstanding practice of Congress regarding the Quorum Clause plainly requires physical presence to conduct business.

#### 1.   The text of the Quorum Clause requires physical presence.

The text of the Quorum Clause is unequivocal. Only with a quorum may either legislative chamber "do Business," and a "Majority of each" chamber "constitute[s] a Quorum." U.S. Const. art. I, § 5, cl. 1. In context, this means

Members must be physically present. Otherwise, the power "to compel the Attendance of absent members" would be a meaningless phrase. *See United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022) ("The canon against surplusage is the interpretive principal that courts prefer interpretations that give independent legal effect to every word and clause in a statute."). Using founding era dictionaries, the only reasonable meaning of the operative words of the clause is that the Constitution required a physically present quorum.

A "quorum" is "A bench of justices; such a number of any officers as is sufficient to do business." Quorum, 2 Samuel Johnson, A Dictionary of the English Language (6th ed. 1785) ("Johnson's Dictionary"). Noah Webster's dictionary gives a similar definition and even uses a constitutional quorum as an example: "A bench of justices, or such a number of officers as is competent by law or constitution to transact business; as a quorum of the house of representatives. A constitutional quorum was not present." Noah Webster, American Dictionary of the English Language (1828) ("Webster's 1828 Dictionary"). Even Webster's example required officers to be "present."

Likewise, "Attendance" meant physical presence. In Johnson's Dictionary, all four definitions for that term required physically carrying out the act: "1. The act of waiting on another; or of serving; 2. Service; 3. The persons waiting; a train; 4. Attention; regard." 1 Johnson's Dictionary. Webster was the same: "1. The act of waiting on, or serving; 2. A waiting on; a *being present on business of any kind*; as, the attendance of witnesses of persons in court; attendance of members of the legislature; 3. Service; ministry; 4. The persons attending; a train; a retinue; 5. Attention; regard; careful application of the mind." Webster's 1828 Dictionary (emphasis added). None of the provided definitions allows "attendance" to be construed in a way where another party could perform on a person's behalf.

Moreover, "Compel" and "absent" also mean the same things they do today. Johnson gave the primary meaning of "compel" as "[t]o force to some act; to oblige; to constrain; to necessitate; to urge irresistibly;" Webster, "[t]o drive or urge with force, or irresistibly; to constrain; to oblige; to necessitate, either by physical or moral force[.]" 1 Johnson's Dictionary; Webster's 1828 Dictionary.[2] Johnson's primary definition of "absent" is simply "[n]ot present;" Webster adds to that "not in company; at such a distance as to prevent communication. It is used also for being in a foreign country." 1 Johnson's Dictionary; Webster's 1828 Dictionary"Webster.[3] These definitions establish that the plain meaning of the Quorum Clause was substantially the same in 1787 as it would be today. Each chamber needs a majority of the members physically present to conduct official business. If a chamber does not have enough members for a quorum, it is empowered to force absent members to attend in whatever manner it deems appropriate. There is no level of ambiguity or lack of clarity that could overcome the plain meaning of the words the Founders used when they wrote the Quorum Clause.

---

[2]   The remaining definitions emphasize this sense of a mandatory physical assemblage. *See* 1 Johnson's Dictionary ("2. To take by force or violence; to ravish from; to seize. This signification is uncommon and harsh; 3. To gather together, and unite in a company. A Latinism, *compellere gregem*; 4. To seize; to overpower"); Webster's 1828 Dictionary ("2. To force; to take by force, or violence; to seize; 3. To drive together; to gather; to unite in a crowd or company. A Latinism, *compellere gregem*; 4. To seize; to overpower; to hold; 5. To call forth, Latin *compeller*").

[3]   The remaining definitions emphasize that non-physical uses of "absent" are idiomatic and would make no sense when placed alongside "compel." *See* Absent, 1 Johnson's Dictionary ("2. Absent in mind, inattentive; regardless of the present object"); Absent, Webster's 1828 Dictionary ("2. Heedless; inattentive to persons present, or to subjects of conversations in company; 3. In familiar language, not at home; as, the master of the house is absent in other words, he does not wish to be disturbed by company").

### 2.    Contemporaneous sources support the text's plain meaning.

In support of the Quorum Clause's text, then-current debates and case law demonstrate that constitutional requirement of physical presence. The debates surrounding the Constitution's ratification recognized that the Quorum Clause stood as a safeguard to our republican form of government. Some delegates argued for a smaller requirement in order to avoid "great delay." Jonathan Elliot, 3 Elliot's Debates: Debates in the Federal Convention of 1787 as Reported by James Madison 408 (1989). Other delegates wanted each chamber to be able to set their own quorum or fix the number low, recognizing that "the future increase of members would render a majority of the whole extremely cumbersome." *Id*. at 408–09.

The rest of the convention, however, noted that being cumbersome was the entire point of a quorum requirement, calling it a "valuable and necessary part" of the Constitution. *Id*. at 408. "In this extended Country, embracing so great a diversity of interests it would be dangerous to the distant parts to allow a small number of members of the two Houses to make laws." *Id*. Even an emergency, such as if part of the country was "in need of immediate aid," would not justify a lower quorum. *Id*. at 409. The people must have "confidence . . . that no law or burden could be imposed on them, by a few men." *Id*. The only remedy to this inconvenience or threat by some members to not attend was "by giving to each House an authority to require the attendance of absent members." *Id*.

Likewise, the Federalist Papers further indicated that the Quorum Clause requires physical presence. James Madison responded in *Federalist No. 58* to the criticism that the quorum requirement was too low. He recognized the "inconveniences" of both a proposed quorum—a bare majority—and a higher quorum, noting that the quorum serves as an "obstacle to generally hasty and partial measures." *The Federalist No. 58* (Madison). Such an argument makes sense only if the Quorum Clause serves as an actual obstacle and inconvenience. If each Member

could merely assign his or her vote by proxy, it would serve as no meaningful obstacle at all.

In line with these contemporaneous debates, the Supreme Court has long assumed the Quorum Clause required physical presence. In *Ballin*, the Court explained the Quorum Clause's effect: "All that the Constitution requires is the presence of a majority, and when that majority are present the power of the house arises." 144 U.S. at 6. Indeed, the dispositive fact in *Ballin* was "that at the time of the roll-call *there were present* 212 members of the house, more than a quorum." *Id.* at 4 (emphasis added).

The Court took it a step further in *Christoffel v. United States*, 338 U.S. 84 (1949). It there considered whether someone testifying before a committee of the House of Representatives could be convicted of perjury when it was unclear whether a quorum of the committee was present. The answer was unmistakable: No. "It appears to us plain that even the most highly privileged business must be suspended in the absence of a quorum in the House itself." 338 U.S. at 87. To convict, "the jury had to be satisfied beyond a reasonable doubt that there was '*actually and physically present*' a majority of the committee." *Id.* at 89. That there had been a quorum when the committee began was not enough. *Id.* at 90. Physical presence was a prerequisite to official business then, and it still is now.

### 3.    The Constitution's structure supports the text's plain meaning.

Like the text and contemporaneous debates, multiple other provisions of the Constitution lead to the conclusion that physical presence is necessary for the House of Representatives to pass bills. Article I, Section 4 requires Congress to "assemble" at least once per year. Again, this could only mean a physical meeting. "Assemble" means "to collect a number of individuals or particulars into *one place*, or body; to bring or call together; to convene; to congregate." Webster's 1828

Dictionary; *see* also U.S. Const. art. I, § 5, cl. 4 (no adjournment "to any other Place than that in which the two Houses shall be sitting"); *id.* art. II, § 3 (discussing convening and adjourning Congress).

The Speech or Debate Clause grants certain privileges to Members, but those privileges require physical presence. Members are privileged from arrest, for example, but only "during their Attendance at the Session of their respective Houses." U.S. Const. art. I, § 6, cl. 1. This privilege extends to "going to and returning" from the Session. *Id.* If the Constitution did not require physical presence, such a phrase would be meaningless surplusage. *See Palomares*, 52 F.4th at 644. Likewise, in the same section as the Quorum Clause, the Constitution discusses roll-call votes when one-fifth "of those present" call for it. U.S. Const. art. I, § 5, cl. 3. The same applies to impeachment, where the Senate is required to convict with two-thirds "of the Members present." U.S. Const. art. I, § 3, cl. 6.

The portions of the Constitution outside of Article I also point to physical presence as a requirement to conduct business. The Treaty Clause allows the President to make Treaties, "provided two thirds of the Senators *present* concur." U.S. Const. art. II, § 2, cl. 2 (emphasis added). The 12th Amendment requires the Electoral College votes to be counted by the President of the Senate "in the presence of the Senate and House of Representatives."

Our Constitution expects a physical presence for the Legislature to conduct business. Proxy voting, where a small handful of congressmembers could control the outcome of a bill, is anathema to it.

### 4.    Historical practice further supports the text's plain meaning.

When considering "the allocation of power between" the Legislature and the Executive, courts *"put significant weight upon historical practice." NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (emphasis in original). The historical practice

concerning the Quorum Clause is 231 years of in-person quorum calls and voting. Even before the ratification of the Constitution, in-person attendance was the norm in the Continental Congress. *See The Federalist* No. 14 (Madison). This "long settled and established practice" is given "great weight in a proper interpretation of constitutional provisions." *The Pocket Veto Case*, 279 U.S. 655, 689-690 (1929) (quoting *State v. South Norwalk*, 58 A. 759, 761 (Conn. 1904)). Such unyielding practice can only lead to one appropriate conclusion: The Quorum Clause requires physical presence to pass laws.

In fact, the United States rejected proxy voting by the legislature in both the Articles of Confederation and the Constitution. During debates over the Articles of Confederation, Benjamin Franklin proposed proxy voting. His proposal would have allowed those "necessarily absent" to "be allowed to appoint" a "Proxy, who may vote for him." Proposed Arts. of Confed., Art. VIII (July 21, 1775), *reprinted in* 22 The Papers of Benjamin Franklin (Yale 1982). The proposal was rejected. *See* Arts. of Confed. art. V. Likewise, delegates at the Constitutional Convention rejected proposals that would have allowed Representatives to "vote by proxy"—but only after James Madison added language giving Congress the power to compel absent Members' attendance. *See, e.g.*, 3 Records of the Federal Convention of 1787 (Farrand's Records), 620, 622.

This mandate that official congressional business be conducted in person was unbroken through epidemics, wars, and other national disasters. During the 1793 Yellow Fever epidemic, Thomas Jefferson urged President Washington to keep Congress sitting in Philadelphia, then the capital, even if it meant meeting "in the open f[ie]lds." T. Jefferson, Ltr. to G. Washington (Oct. 17, 1793), Natl. Archives. In the aftermath of that epidemic, the Third Congress enacted a law—still in force today—stating that "[w]henever Congress is about to convene, and from the prevalence of contagious sickness, or the existence of other circumstances, it would,

in the opinion of the President, be hazardous to the lives or health of the members to meet at the seat of Government," the President could "convene Congress at such other place as he may judge proper." Acts of the Third Congress of the United States, Sess. I, ch. 17 (April 3, 1794), *codified at* 2 U.S.C. § 27. What it did not do was enact legislation that would allow Members to vote by proxy in future public-health emergencies—and, indeed, Congress assembled in person during the 1918 Spanish Flu pandemic. 57 Cong. Rec. 1, 10 (Dec. 2, 1918).

As with the Yellow Fever epidemic threescore and eight years before, the Civil War did not break Congress's resolve to meet in person. Days after the attack on Fort Sumter, President Lincoln "summoned" the "Senators and Representatives . . . to assemble at their respective Chambers" on the coming Fourth of July. A. Lincoln, Proclamation (Apr. 15, 1861). Throughout the Cold War, Congress stood ready in the event of a nuclear attack to continue doing business in person in a hidden bunker in West Virginia. Natl. Public Radio, *The Secret Bunker Congress Never Used* (Mar. 26, 2011). And following the September 11 attacks that targeted the U.S. Capitol, Congress considered scenarios to address the continuity of Congress, such as expedited election of Members to the House in extraordinary circumstances. It did not, however, seriously consider or adopt proxy voting. *See, e.g.*, R. Eric Petersen and Sula P. Richardson, *Continuity of Congress: Enacted and Proposed Federal Statutes for Expedited Election to the House in Extraordinary Circumstances*, Cong. Res. Serv. RL32958 (Aug. 9, 2005).

✶✶

Each chamber of Congress has latitude to decide the method by which it *determines* whether a majority is present, but the Constitution does not allow it to *invent* a majority where none exists. *Ballin* and *Christoffel* describe this as the authority to "prescribe any method which shall be reasonably certain" to establish the "presence of a majority," *Ballin*, 144 U.S. at 6—but what Congress cannot do

40

is entirely sidestep the Constitution. Even when its houses are determining their internal procedures, Congress "may not by its rules ignore constitutional restraints or violate fundamental rights." *Id.* at 5.

These constraints serve as the bulwark against lost liberty. "[T]he Constitution's core, government-structuring provisions are no less critical to preserving liberty than are the later adopted provisions of the Bill of Rights." *Noel Canning*, 573 U.S. at 570–71 (Scalia, Roberts, Thomas, and Alito, concurring). In fact, "[s]o convinced were the Framers that liberty of the person inheres in structure that at first they did not consider a Bill of Rights necessary." *Id.* By allowing proxy voting and perpetrating unconstitutional legislation of profound through that mechanism, Congress has ignored constitutional restraints on its authority and transgressed the Constitution.

## B. The Consolidated Appropriations Act passed when the majority of House Members were physically absent.

Despite these constitutional commands, only 201 of the 435 voting House members were physically present when the House convened to consider the Senate's original amendments to the bill. Their vote was 88 yea and 113 nay. The final tally according to the Clerk of the House, however, was 225 yea, 201 nay, and 1 present. 167 Cong. Rec. H10073 (Dec. 23, 2022). The extra 226 votes were cast by Representatives whom absent Representatives had appointed as proxies. *Id.* at H10073–74.

The appointing Representatives acted under a rule originally promulgated during the 116th Congress. *See* H. Res. 8 § 3(s), 117th Cong. (Jan 4, 2021) (citing H. Res. 965, 116th Cong. (May 15, 2020)). That rule allowed a Member to designate another Member as a proxy to cast the vote of the designating Member "if a public health emergency due to a novel coronavirus is in effect[.]" H. Res. 965 at § 1(a). The same rule was used to establish enough Members to constitute a quorum under

the rules of the House. *Id.* But such a rule does not undo the fact that 226 Representatives were physically absent rather than physically present, making it unconstitutional to count them toward the number necessary for a quorum. And because the Act rests on these constitutional violations, it is unconstitutional. This Court should, therefore, enjoin its enforcement.

### C.   Texas is suffering irreparable harm.

When showing "irreparable injury," "it is not necessary to demonstrate that harm is inevitable and irreparable." *Texas v. Becerra*, 577 F. Supp. 3d 527, 554 (N.D. Tex. 2021) (quoting *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)). Instead, Texas needs to show only that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* (quoting *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018)). In certain cases, a "substantial financial injury" is "sufficient to show irreparable injury." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). But generally, it is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)).

Here, Texas suffers both substantial financial injuries and injuries that cannot be undone through monetary means. As discussed above, Texas incurs, and will continue to incur, millions of dollars in costs from the new amendments to Title VII and the pilot program under the Act. But because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," Texas cannot compel the federal government to reimburse it. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (granting stay). Moreover, the harm to Texas's sovereign interest is likewise irreparable. Once Texas has to appear to defend itself against a lawsuit brought under the new amendments to Title VII, it

has lost the protection of sovereign immunity that it is entitled to enjoy. And no amount of money can restore such sovereign immunity. Accordingly, the many injuries to Texas's financial and sovereign interests are irreparable and should be protected with an injunction from this Court.

**D.   The balance of the equities and public interest favor an injunction.**

When the government is a party, the balance-of-equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States (Texas DAPA)*, 809 F.3d 134, 187 (5th Cir. 2016). The Court must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

While Texas will suffer irreparable harm if the Act is not enjoined, the federal government and the public interest will not be harmed by a preliminary injunction. An injunction costs the Defendants neither money nor immunity. Instead, they save administrative, legal, financial, or other costs associated with enforcing the Act. Moreover, even if the Defendants did have an interest in enforcing the Act—it is unconstitutional, so they do not—that interest would be "illegitimate" as the federal government has no interest "in enforcing an unlawful" statute. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). In contrast, the Act imposes unrecoverable financial costs on Texas and intrudes on Texas's sovereignty. As it is our "constitutional structure that safeguards our collective liberty," "maintaining our constitutional structure" serves the public interest. *Id.*

The financial burden likewise falls on Texas and its citizens. The increased spending will never be recouped, because "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. NASA*, 530 F.3d 865,

882 (9th Cir. 2008) *rev'd on other grounds*, 562 U.S. 134 (2011). Texas is barred by sovereign immunity from collecting money damages from the Defendants. *Wages & White Lion*, 16 F.4th at 1142; *see also Modoc Lassen Indian Hous. Auth. v. U.S. Dept. of Housing & Urban Dev.*, 881 F.3d 1181, 1195 (10th Cir. 2017). And thanks to the DHS's release of illegal immigrants, the millions spent will never be recovered.

Further, the absence of a preliminary injunction will perpetuate the harms done to Texas's sovereign interests. Texas would be continuously subjected to the costs, hassles, harms, and attendant risks of administrative proceedings, investigations, and lawsuits that comes from both private individuals and the federal government. Meanwhile, the federal government is not harmed. Accordingly, the balance of equities and the public interest weigh heavily in favor of Texas and against the Defendants.

## Conclusion

Texas respectfully requests that the Court enjoin the Defendants from enforcing the Consolidated Appropriations Act, 2023.

Dated April 4, 2023.                    Respectfully submitted.

Ken Paxton                              Aaron F. Reitz
Attorney General of Texas               Deputy Attorney General for Legal Strategy
                                        Texas Bar No. 24105704
Brent Webster                           aaron.reitz@oag.texas.gov
First Assistant Attorney General
                                        */s/ Leif A. Olson*
Grant Dorfman                           Leif A. Olson
Deputy First Assistant Attorney         Chief, Special Litigation Division
General                                 Texas Bar No. 24032801
                                        leif.olson@oag.texas.gov
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station         J. Aaron Barnes
Austin, Texas 78711-2548                Special Counsel
(512) 463-2100                          Texas Bar No. 24099014
                                        aaron.barnes@oag.texas.gov

ETHAN SZUMANSKI
Assistant Attorney General
Texas Bar No. 24123966
ethan.szumanski@oag.texas.gov

Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700

ROBERT HENNEKE
Texas Bar No. 24026058
rhenneke@texaspolicy.com

CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com

MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com

NATE CURTISI
Arizona Bar No. 033342
ncurtisi@texaspolicy.com

**Counsel for the State of Texas**

### CERTIFICATE OF SERVICE

I certify that on April 4, 2023, this brief and its appendix were filed through the Court's CM/ECF system, which served it upon all counsel of record.

/s/ LEIF A. OLSON