**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

---

**STATE OF TEXAS**,

                    Plaintiff,

        v.

**MERRICK GARLAND**, in his official capacity as
Attorney General, *et al.*,

                    Defendants.

---

Case No. 5:23-cv-00034-H

**DEFENDANTS' COMBINED
OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................3

I.      The House of Representatives Rules to Establish a Quorum ..............................3

II.     Consolidated Appropriations Act, 2023 ...............................................................6

        A.      Continued Funding of the Department of Homeland Security's Alternatives
                to Detention Case Management Pilot Program ..........................................8

        B.      The Pregnant Workers Fairness Act ........................................................10

III.    The Instant Lawsuit .............................................................................................11

LEGAL STANDARDS ...................................................................................................12

I.      Preliminary Injunction ........................................................................................12

II.     Motion to Dismiss ...............................................................................................13

ARGUMENT ...................................................................................................................13

I.      Dismissal Is Warranted on Threshold Jurisdictional and Justiciability Grounds. ...................13

        A.      Texas Lacks Standing. ...............................................................................13

                1.      Texas Lacks Standing to Challenge the Act's Continued Funding of the
                        CMPP. ...........................................................................................14

                        a.      Texas Fails to Establish an Imminent Injury to Obtain
                                Prospective Relief. ..........................................................14

                        b.      No Harm Is Fairly Traceable to Continued Funding of the
                                CMPP. ..............................................................................18

                        c.      Texas Cannot Establish Redressability by Seeking Overbroad
                                Relief. ...............................................................................21

                2.      Texas Lacks Standing to Bring a Pre-enforcement Challenge to
                        the PWFA. ......................................................................................22

                3.      Texas Lacks Standing to Seek a Declaration that the Act was
                        Unconstitutionally Enacted or to Enjoin the Entire Act. ................26

        B.      This Case Presents a Nonjusticiable Question Regarding the Validity of an
                Enrolled Bill. ............................................................................................30

C. The Case Should Be Dismissed for Lack of Venue. ........................................35

D. The Court Lacks Jurisdiction to Enter Relief Against the President. .........................35

II. The Extraordinary Remedy of a Preliminary Injunction Is Not Warranted. ...........................36

A. The Consolidated Appropriations Act, 2023 Was Lawfully Enacted. ........................36

 1. The Quorum Clause Does Not Require Physical Presence. ...........................38

 2. The House Has Broad Authority to Craft Rules for Establishing a Quorum. .......................................................................44

 3. The Supreme Court Has Recognized the Power to Pass Legislation Absent a Majority of Members Physically Present....................................48

 4. The House Had a Quorum, and Therefore the Constitutional Power to Act, When It Passed the 2023 Consolidated Appropriations Act. .............52

B. Texas Has Not Shown Irreparable Harm. .................................................57

C. A Preliminary Injunction Would Be Contrary to the Public Interest. .........................61

D. Texas Failed to Meet the Requirements of Federal Rule of Civil Procedure 65. ..............................................................................64

E. Any Relief Granted Must Be Appropriately Limited. ....................................65

CONCLUSION ..............................................................................................65

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine,*
  527 U.S. 706 (1999) ........................................................................................................24

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982) ........................................................................................................15

*Antares Mar. Pte Ltd. v. Bd. of Comm'rs of Port of New Orleans,*
  No. CV 18-12145, 2020 WL 7022752 (E.D. La. Nov. 30, 2020) .......................................41

*Aransas Project v. Shaw,*
  775 F.3d 641 (5th Cir. 2014) ...........................................................................................59

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ...................................................................................... 16, 21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................................13

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ........................................................................................................22

*Baker v. Carr,*
  369 U.S. 186 (1962) ........................................................................................................34

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017) ...........................................................................................14

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
  531 U.S. 356 (2001) ........................................................................................................25

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................................20

*Bowen v. Kendrick,*
  483 U.S. 1304 (1987) ......................................................................................................64

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021) ...........................................................................................15

*Braniff Airways, Inc. v. Civil Aeronautics Bd.,*
  379 F.2d 453 (D.C. Cir. 1967) .........................................................................................53

*BST Holdings, LLC v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ...........................................................................................63

*California v. Texas,*
    141 S. Ct. 2104 (2021) .................................................................................. 19, 23

*Chamber of Commerce of the U.S. v. NLRB,*
    879 F. Supp. 2d 18 (D.D.C. 2012) ............................................................ 53

*Chiafalo v. Washington,*
    140 S. Ct. 2316 (2020) .............................................................................. 42, 48

*Christoffel v. United States,*
    338 U.S. 84 (1949) ........................................................................................ 46

*City of L.A. v. Lyons,*
    461 U.S. 95 (1983) ........................................................................................ 15

*Civelli v. J.P. Morgan Sec., LLC,*
    57 F.4th 484 ................................................................................................... 53

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................. *passim*

*Comer v. Murphy Oil USA,*
    607 F.3d 1049 (5th Cir. 2010) ................................................................... 53

*Cook Cnty. v. McAleenan,*
    417 F. Supp. 3d 1008 (N.D. Ill. 2019) .................................................... 16

*Crane v. Johnson,*
    783 F.3d 244 (5th Cir. 2015) ................................................................ 17, 18

*Ctr. for Biological Diversity v. EPA,*
    937 F.3d 533 (5th Cir. 2019) ..................................................................... 16

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................. *passim*

*Dalton v. Little Rock Fam. Plan. Servs.,*
    516 U.S. 474 (1996) ..................................................................................... 65

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
    710 F.3d 579 (5th Cir. 2013) ..................................................................... 57

*Daves v. Dallas Cnty., Tex.,*
    22 F.4th 522 (5th Cir. 2022) ...................................................................... 36

*Davis v. Federal Election Commission,*
    554 U.S. 724 (2008) ..................................................................................... 27

*Dep't of Homeland Sec. v. New York,*
   140 S. Ct. 599 (2020)................................................................................................65

*Dickson v. Ford,*
   521 F.2d 234 (5th Cir. 1975)....................................................................................34

*Dillon v. Gloss,*
   256 U.S. 368 (1921)..................................................................................................52

*E.T. v. Paxton,*
   19 F.4th 760 (5th Cir. 2021).....................................................................................63

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022).....................................................................................18

*EEOC v. Bd. of Sup'rs for Univ. of La. Sys.,*
   559 F.3d 270 (5th Cir. 2009).....................................................................................24

*El Paso Cnty. v. Trump,*
   982 F.3d 332 (5th Cir. 2020)............................................................................... 19, 21

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
   762 F.2d 464 (5th Cir. 1985).....................................................................................57

*Florida v. Mellon,*
   273 U.S. 12 (1927)....................................................................................................15

*Foley v. Biden,*
   No. 4:21-CV-01098-O, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021) ................................36

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992)..................................................................................................35

*Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs,*
   701 F. App'x 352 (5th Cir. 2017)..............................................................................59

*FTC v. Standard Oil Co. of Cal.,*
   449 U.S. 232 (1980)..................................................................................................60

*Galveston Open Gov't Project v. Dep't of Hous. & Urb. Dev.,*
   17 F. Supp. 3d 599 (S.D. Tex. 2014) .........................................................................18

*Ghedi v. Mayorkas,*
   16 F.4th 456 (5th Cir. 2021)................................................................................ 15, 16

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018)......................................................................................26, 58, 65

*Glass v. Paxton,*
    900 F.3d 233 (5th Cir. 2018) ...................................................................................15

*Holland Am. Ins. Co. v. Succession of Roy,*
    777 F.2d 992 (5th Cir. 1985) ...................................................................................57

*Holz v. United States,*
    No. 3:08-CV-1568-P, 2009 WL 10704725 (N.D. Tex. Sept. 28, 2009) .................13

*Humana Inc. v. Jacobson,*
    804 F.2d 1390 (5th Cir. 1986) .................................................................................57

*Hurtado v. United States,*
    410 U.S. 578 (1973) .................................................................................................41

*In re Actos (Pioglitazone) Prod. Liab. Litig.,*
    No. 12-CV-00064, 2014 WL 107153 (W.D. La. Jan. 8, 2014) ...............................41

*In re Broiler Chicken Antitrust Litig.,*
    No. 1:16-CV-08637, 2020 WL 3469166 (N.D. Ill. June 25, 2020) .........................41

*In re Gee,*
    941 F.3d 153 (5th Cir. 2019) ..........................................................................*passim*

*John Doe #1 v. Veneman,*
    380 F.3d 807 (5th Cir. 2004) ...................................................................................65

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ...................................................................................12

*K.P. v. LeBlanc,*
    729 F.3d 427 (5th Cir. 2013) ...................................................................................27

*Kimel v. Fla. Bd. of Regents,*
    528 U.S. 62 (2000) ...................................................................................................25

*Latitude Sols., Inc. v. DeJoria,*
    922 F.3d 690 (5th Cir. 2019) ...................................................................................26

*Lewis v. Casey,*
    518 U.S. 343 (1996) ...........................................................................................26, 29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) .................................................................................................14

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................*passim*

*Lyons v. Woods,*
153 U.S. 649 (1894) .......................................................................................................33

*Machete Prods., LLC v. Page,*
809 F.3d 281 (5th Cir. 2015) ............................................................................... 13, 22

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) .................................................................................................*passim*

*Martin, Mason, Stutz, L.L.P. v. Columbia Sussex Corp.,*
No. 3:08-CV-2190-O, 2009 WL 10704844 (N.D. Tex. Apr. 21, 2009) ...........................13

*Maryland v. King,*
133 S. Ct. 1 (2012) ......................................................................................................63

*Massachusetts v. Mellon,*
262 U.S. 447 (1923) ....................................................................................................15

*McCarthy v. Pelosi,*
5 F.4th 34 (D.C. Cir. 2021) ..................................................................................... 6, 56

*Melgoza v. Hardin,*
No. 1:21-CV-00006-H, 2021 WL 9274497 (N.D. Tex. Apr. 14, 2021) ...........................31

*Miss. State Democratic Party v. Barbour,*
529 F.3d 538 (5th Cir. 2008) .......................................................................................23

*Mississippi v. Johnson,*
71 U.S. 475 (1866) ......................................................................................................35

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) .................................................................................................*passim*

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott,*
647 F.3d 202 (5th Cir. 2011) ................................................................................. 26, 28

*Nev. Dep't of Hum. Res. v. Hibbs,*
538 U.S. 721 (2003) ....................................................................................................25

*New Process Steel, LP v. NLRB,*
560 U.S. 674 (2010) ....................................................................................................52

*Newdow v. Roberts,*
603 F.3d 1002 (D.C. Cir. 2010) ...................................................................................35

*Nguyen v. United States,*
539 U.S. 69 (2003) ......................................................................................................53

*Nixon v. United States,*
   506 U.S. 224 (1993) ........................................................................... 34, 35, 52

*Nken v. Holder,*
   556 U.S. 418 (2009) ...................................................................................... 61

*Norris v. Hearst Tr.,*
   500 F.3d 454 (5th Cir. 2007) ....................................................................... 13

*OCA-Greater Houston v. Texas,*
   867 F.3d 604 (5th Cir. 2017) ....................................................................... 65

*OneSimpleLoan v. U.S. Sec'y of Educ.,*
   496 F.3d 197 (2d Cir. 2007) ................................................................... 31, 33

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs,*
   492 F. Supp. 3d 701 (E.D. Tex. 2020) ........................................................ 59

*Planned Parenthood of Central Michigan v. Danforth,*
   428 U.S. 52 (1976) ................................................................................... 27, 29

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock,*
   542 F. Supp. 3d 465 (N.D. Tex. 2021) ................................................... 25, 65

*Powell v. McCormack,*
   395 U.S. 486 (1969) ...................................................................................... 34

*Principality of Monaco v. Mississippi,*
   292 U.S. 313 (1934) ...................................................................................... 24

*Printz v. United States,*
   521 U.S. 898 (1997) ...................................................................................... 63

*Pub. Citizen v. Clerk, U.S. Dist. Ct. for D.C.,*
   451 F. Supp. 2d 109 (D.D.C. 2006) ....................................................... 32, 33

*Pub. Citizen v. U.S. Dist. Ct. for D.C.,*
   486 F.3d 1342 (D.C. Cir. 2007) ............................................................*passim*

*Sampson v. Murray,*
   415 U.S. 61 (1974) ........................................................................................ 60

*Scott v. Schedler,*
   826 F.3d 207 (5th Cir. 2016) ........................................................... 21, 64, 65

*Simon v. Eastern Kentucky Welfare Rights Organization,*
   426 U.S. 26 (1976) ................................................................................... 20, 21

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ..........................................................................................15

*South Dakota v. Wayfair, Inc.,*
  138 S. Ct. 2080 (2018) ......................................................................................46

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ..........................................................................................14

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ............................................................................................30

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .....................................................................................22, 23

*Sw. Airlines Co. v. Roundpipe, LLC,*
  375 F. Supp. 3d 687 (N.D. Tex. 2019) ..............................................................60

*Tashjian v. Republican Party of Conn.,*
  479 U.S. 208 (1986) ..........................................................................................43

*Tex. State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022) ........................................................................22, 23

*Texas Gen. Land Off. v. Biden,*
  No. 6:21-CV-00052, 2022 WL 3086333 (S.D. Tex. Aug. 3, 2022) ..................36

*Texas v. Becerra,*
  No. 5:22-CV-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23, 2022) ................23

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) ............................................................................24

*Texas v. Travis Cnty.,*
  272 F. Supp. 3d 973 (W.D. Tex. 2017) .............................................................24

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) .............................................................................14

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) .............................................................................18

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ...............................24

*The Pocket Veto Case,*
  279 U.S. 655 (1929) ..........................................................................................48

*U.S. Navy SEALs 1-26 v. Biden,*
   578 F. Supp. 3d 822 (N.D. Tex. 2022) ................................................................36

*United States v. Ballin,*
   144 U.S. 1 (1892) ...........................................................................................*passim*

*United States v. Farmer,*
   583 F.3d 131 (2d Cir. 2009) ..............................................................31, 32, 34

*United States v. Gonzalez-Arenas,*
   496 F. App'x 866 (10th Cir. 2012) ...............................................................32

*United States v. Miss. Dep't of Pub. Safety,*
   321 F.3d 495 (5th Cir. 2003) ..........................................................................25

*United States v. Munoz-Flores,*
   495 U.S. 385 (1990) .......................................................................31, 33, 34

*United States v. Small,*
   487 F. App'x 302 (7th Cir. 2012) ................................................................32

*United States v. Texas,*
   143 U.S. 621 (1892) ..........................................................................................24

*Veasey v. Abbott,*
   870 F.3d 387 (5th Cir. 2017) ..........................................................................63

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
   529 U.S. 765 (2000) ..........................................................................................21

*Walters v. Nat'l Ass'n of Radiation Survivors,*
   468 U.S. 1323 (1984) ........................................................................................64

*West Virginia v. United States,*
   479 U.S. 305 (1987) ..........................................................................................24

*White v. Carlucci,*
   862 F.2d 1209 (5th Cir. 1989) ........................................................................57

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..........................................................................................*passim*

*Young v. Vannerson,*
   612 F. Supp. 2d 829 (S.D. Tex. 2009) .......................................................13

*Zimmerman v. City of Austin,*
   881 F.3d 378 (5th Cir. 2018) .....................................................................22, 23

**STATUTES**

1 U.S.C. § 106 ................................................................................................................7

8 U.S.C. § 1225 ..............................................................................................................8

8 U.S.C. § 1226 ..............................................................................................................5

8 U.S.C. § 1231 ..............................................................................................................5

8 U.S.C. § 1601 ............................................................................................................16

28 U.S.C. § 1 ..........................................................................................................54, 55

28 U.S.C. § 46 ..............................................................................................................53

28 U.S.C. § 1391 ..........................................................................................................35

42 U.S.C. § 2000e-5 .....................................................................................................11

Consolidated Appropriations Act, 2021,
   Pub. L. No. 116-260, 134 Stat. 1182 (2020) ................................................*passim*

Consolidated Appropriations Act, 2022,
   Pub. L. No. 117-103, 136 Stat. 49 (2022) ...............................................................9

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, 136 Stat. 4488 (2022) ................................................*passim*

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 5 ..............................................................................................*passim*

U.S. Const. art. I, § 6 ...................................................................................................44

U.S. Const. art. II, § 2 ..................................................................................................63

U.S. Const. art. II, § 3 ..................................................................................................63

**RULES**

Fed. R. Civ. P. 12 ........................................................................................................13

Fed. R. Civ. P. 65 ...................................................................................................13, 64

**REGULATIONS**

29 C.F.R. § 1601.28 .....................................................................................................11

29 C.F.R. § 1601.29 .....................................................................................................11

## OTHER AUTHORITIES

1 Noah Webster, *American Dictionary of the English Language* (1828)............................................39, 40, 43

2 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911)...............................................39, 40, 55

2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ........................................38, 40, 41

166 Cong. Rec. H8472 (daily ed. Dec. 21, 2020).............................................................................8

168 Cong. Rec. H5 (daily ed. Jan. 10, 2022)...................................................................................5

168 Cong. Rec. H10528 (daily ed. Dec. 23, 2022).................................................................*passim*

*About the Congressional Record*, Congress.gov,
    https://www.congress.gov/help/congressional-record...........................................................44

Articles of Confederation (1777),
    https://perma.cc/778H-JJ76............................................................................................56

*Cannon's Precedents of the House of Representatives*
    https://perma.cc/LY3V-ZULL .....................................................................................*passim*

Cong. Globe, 37th Cong., 1st Sess. 210 (1861) .................................................................................5

Cong. Research Serv., *Judicial Nomination Statistics & Analysis: U.S. Circuit &*
    *District Courts, 1977-2022* (Apr. 3, 2023),
    https://perma.cc/2SK5-SB9L...................................................................................... 49, 51

Congressional Budget Office, *The Effects of the Partial Shutdown Ending in January 2019*,
    https://perma.cc/2WPE-Y57A.........................................................................................62

Court of Appeal, Fifth Circuit, State of Louisiana, *Zoom Webinar Instructions* (Apr. 28, 2020),
    https://perma.cc/CV8Y-YR77.........................................................................................41

*Deschler's Precedents of the House of Representatives*
    https://perma.cc/LY3V-ZULL .....................................................................................*passim*

EEOC, *What You Should Know About the Pregnant Workers Fairness Act*,
    https://www.eeoc.gov/wysk/what-you-should-know-about-pregnant-workers-fairness-act ........24

F. Riddick & A. Frumin, *Riddick's Senate Procedure: Precedents and Practices*,
    https://perma.cc/5GBT-CBEV.................................................................................... 3, 49

*Fighting for Fairness: Examining Legislation to Confront Workplace Discrimination: Hearing Before*
    *the Subcomm. on Civ. Rights & Human Serv. & Subcomm. on Workforce Protections of the*
    *H. Comm. on Educ. & Lab.*, 117th Cong. (2021).................................................................25

Franklin, Proposed Articles of Confederation, On or Before 21 July 1775,
    https://perma.cc/J2N4-LPW4.........................................................................................55

H.R. Rep. No. 117-27 (2021) ........................................................................................10, 25, 61

H.R. Res. 5, 109th Cong. (2005) ..................................................................................5, 47, 49

H.R. Res. 965, 116th Cong. (2020) ................................................................................... 6, 56

*Hinds' Precedents of the House of Representatives*
    https://perma.cc/LY3V-ZULL ................................................................................*passim*

House Rule XX.7, Rules of the U.S. House of Representatives, 117th Cong. (2022),
    https://perma.cc/Z5TR-GZPP ..............................................................................*passim*

James Barclay, *Complete and Universal English Dictionary* (1792) ....................................38

*Jefferson's Manual,*
    https://perma.cc/4277-BT48 ....................................................................4, 5, 49, 56

John Ash, *New and Complete Dictionary of the English Language* (1795) .................... 38, 40

Johnson, et al., *House Practice: A Guide to the Rules, Precedents, and Procedures*
    *of the House* (2017) ......................................................................................4, 48, 49

Press Release, Dear Colleague to All Members on Extension of Remote Voting
    'Covered Period,' Speaker of the House (Nov. 10, 2022),
    https://web.archive.org/web/20221110173739/https://www.speaker.gov/
    newsroom/111022-1 ....................................................................................................6

Press Release, U.S. Supreme Court (Apr. 13, 2020),
    https://perma.cc/35SP-NNWL ....................................................................................54

Thomas Sheridan, *A Complete Dictionary of the English Language* (1790) ....................38

*The Federalist No. 58* (J. Madison) ................................................................................42

The White House, Bill Signed: H.R. 2617 (Dec. 29, 2022),
    https://perma.cc/8BM5-289P ........................................................................................7

Timothy Cunningham, *A New and Complete Law Dictionary* (1764) ...........................38

U.S. Senate, The First Unanimous Consent Agreement,
    https://perma.cc/WT8Z-N3LZ ....................................................................................49

*Whereas: Stories from the People's House - Sick Days*, U.S. House of Representatives:
    Hist., Art & Archives (Dec. 17, 2018),
    https://perma.cc/2KPM-9RNQ .............................................................................. 4, 49

William McKay & Charles W. Johnson, *Parliament and Congress* (2010) ....................49

## INTRODUCTION

On December 23, 2022, the U.S. House of Representatives passed the Consolidated Appropriations Act, 2023, a $3 trillion appropriations bill which funds the government for the 2023 fiscal year and enacts several pieces of permanent legislation.  Texas concedes that a majority of the House—the number necessary to establish a quorum, *see* U.S. Const. art. I, § 5, cl. 1—voted on the legislation.  Texas also acknowledges that a majority of the participating Members voted in favor of passage.  As the House properly determined, a quorum existed, and the Act passed.  Texas nonetheless invites this Court to enjoin the Act because a majority of Members was not physically present during the vote.  The Court should reject that invitation, which would require an unprecedented second-guessing of House procedures, in direct conflict with the Constitution's text, which empowers each chamber to "determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  Interfering with a co-equal branch's authority to set the rules governing its proceedings would ignore century-old Supreme Court precedent recognizing that the "[C]onstitution has prescribed no method of making [the] determination [as to whether a quorum exists]" and therefore it is "within the competency of the [H]ouse to prescribe any method which shall be reasonably certain to ascertain the fact."  *United States v. Ballin*, 144 U.S. 1, 6 (1892).  And it would violate bedrock justiciability doctrines that prevent a court from evaluating the validity of an enrolled bill passed by the House and Senate and signed by the President.  Such judicial interference, months after passage and midway through the fiscal year, would be an extraordinary encroachment on the business of the legislative and executive branches.

Texas's requested injunction should be denied for another reason: Texas appears to be seeking to enjoin the entirety of the $3 trillion appropriations law on the basis of allegations that just two sections of the 1,600-page law cause it harm.  Other than these two sections—a provision funding the third year of a Department of Homeland Security ("DHS") program and the enactment of the Pregnant Workers Fairness Act—Texas does not allege, let alone demonstrate, that the Act is

1

responsible for any Article III injury. Because Texas lacks standing to challenge any other portion of the Act, and because any relief granted by this Court must be narrowly tailored to the injuries alleged, the Court must deny Texas's request for an injunction of the entire Act. To do otherwise would cause an unprecedented, court-ordered government shutdown, which would affect every American, have long-lasting effects on the economy, and cause damage to our foreign relations.

Even a narrower injunction is improper here. As to the two portions of the Act that Texas alleges cause it harm, Texas has not established any imminent, redressable injury in fact. Texas challenges a DHS program that—contrary to Texas's allegations—does not release any immigrant into the country. And Texas can only speculate as to the actual effects of that program, as none of the funds appropriated in the challenged Act have been disbursed. Texas also challenges the enactment of the Pregnant Workers Fairness Act, even though that law is not yet in effect. Rather than expressing any intent to engage in a course of conduct that would violate the law, which is necessary to bring a pre-enforcement challenge, Texas instead claims that it "accommodates the reasonable needs of its pregnant employees as a matter of course." Am. Compl. ¶ 28, ECF No. 4. Moreover, pursuant to the enrolled bill and political question doctrines, the Court must refrain from reaching the merits of this dispute, which, as described above, would require second-guessing the House's determination that a quorum existed when the Act was passed—a conclusion no court has ever before reached.

If the Court nonetheless reaches the merits, the Court should dismiss Texas's complaint and deny its request for an injunction. Congress's passage of the Act was constitutional. The Constitution defines a quorum as a "Majority," but it does not require physical presence or otherwise specify how Members must participate to be counted in the quorum. Pursuant to the Rulemaking Clause, such questions of legislative procedure are left to the House and Senate to decide. For more than a century, both chambers have long conducted business—including passing legislation—without a majority of Members physically present. Pursuant to House and Senate rules, a quorum established at the start

2

of a session is presumed to exist throughout the session, such that legislation is frequently passed, and Article III judges and other nominees confirmed, by unanimous consent, with just a handful of Members on the floor—a practice that the Supreme Court recognized as a valid exercise of legislative authority in *NLRB v. Noel Canning*, 573 U.S. 513 (2014). Against that backdrop, there is little doubt that the House was empowered to pass the 2023 Act when more than 400 Members—both in person and via proxies specific to the appropriations bill—participated in the vote.

The Court should deny Texas's motion for a preliminary injunction and dismiss this lawsuit.

## BACKGROUND

### I.    The House of Representatives' Rules to Establish a Quorum

The Quorum Clause provides that "a Majority of each [House] shall constitute a Quorum to do Business." U.S. Const. art. I, § 5, cl. 1. The Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings." *Id.* art. I, § 5, cl. 2. While the Quorum Clause states that a "Majority" of Members establishes a quorum, it does not specify how or when a "Majority" is to be determined, or what constitutes legislative "Business" such that a quorum is required to act. Since the Founding, the House and Senate have addressed these unanswered questions through rules governing each chamber, pursuant to their authority to "determine the Rules" of their "Proceedings." *Id.*

*Presumption of a Quorum and Unanimous Consent.* By the late 1800s, it was settled practice that a quorum is "presumed always to be present unless a point of no quorum is made." *Deschler's*[1], ch. 20, § 1.3; *see also id.* § 2.1; 6 *Cannon's* § 624.[2] In accord with this presumption, the House

---

[1] The multi-volume precedents of the House comprise the decisions of past Speakers and Chairs on parliamentary questions that have arisen under the House Rules. *See Hinds' Precedents of the House of Representatives (Hinds')* (covering 1789-1907), *Cannon's Precedents of the House of Representative (Cannon's)* (covering 1907-1936), and *Deschler's Precedents of the House of Representatives (Deschler's)* (covering 1936-2013), https://perma.cc/LY3V-ZULL.

[2] The Senate embraces the same presumption. *See* F. Riddick & A. Frumin, *Riddick's Senate Procedure: Precedents and Practices* 1038, https://perma.cc/5GBT-CBEV ("*Riddick's*") ("Until a point of no quorum has been raised, the Senate operates on the assumption that a quorum is present, and even if only a few Senators are present, a measure may be passed or a nomination agreed to.").

may act by unanimous consent, that is, by a single Member requesting that the House take "some action that is not in dispute and to which no Member has any objection." Johnson, et al., *House Practice: A Guide to the Rules, Precedents, and Procedures of the House*, ch. 54, § 1 (2017) ("*House Practice*"). This practice "of allowing some actions to be taken by unanimous consent began in the 1830s . . . ." *Id.*; *see also* 4 *Hinds'* § 3155 (as early as 1832). Today, unanimous consent "is applied across a wide range of House business," including to "adopt or pass a measure." *House Practice*, ch. 54, § 7; *see also Jefferson's Manual*, § 528a, https://perma.cc/4277-BT48 (unanimous consent may be used to consider a Senate amendment to a House bill). As a result, legislation often passes with just a few Members physically present on the House floor. During prior pandemics, the House passed legislation by unanimous consent. In one case during the 1918 flu, it did so with fewer than 50 Members physically present, far short of a majority. *See Whereas: Stories from the People's House - Sick Days*, U.S. House of Representatives: Hist., Art & Archives (Dec. 17, 2018) ("*Sick Days*"), https://perma.cc/2KPM-9RNQ.

*Calculating a Quorum.* Establishing a quorum requires each House to determine, of the total number of Members, how many are participating such that they can be counted towards the requisite majority? The Quorum Clause specifies no rules for making that determination, and over time, pursuant to the Rulemaking Clause, the House has modified its rules as to both the denominator (how many Members constitute the "total" of which a majority must be participating) and the numerator (which Members count towards establishing the majority).

As to the numerator, a quorum originally included only Members voting on a measure. Accordingly, Members could prevent a quorum by declining to vote, despite otherwise participating in the House's legislative business at the time. 4 *Hinds'* §§ 2898–2903. In 1890, the Speaker prevented this quorum-busting technique by construing a quorum to include Members "present but not voting." *Id.* § 2895; *see Ballin*, 144 U.S. at 5 (upholding the procedure); *see also* House Rule XX.4(b) (current version of the rule).

As to the denominator, when several States seceded during the Civil War, the Speaker began interpreting a quorum as a majority of "chosen"—rather than possible—Members, substantially reducing the denominator and, therefore, the number of Members needed for a quorum.  Cong. Globe, 37th Cong., 1st Sess. 210 (1861); 4 *Hinds'* § 2885.  Similarly, in response to the September 11 attacks, the House enacted a provisional quorum rule, which allows the Speaker—if a majority of Members does not respond to a series of quorum calls after a catastrophic event—to report that the "inability of the House to establish a quorum is attributable to catastrophic circumstances."  House Rule XX.5(c)(4)(A); *see also* H.R. Res. 5, 109th Cong. (2005).  To ensure that legislative business can continue in the face of a national emergency, the number of Members needed for a quorum is then reduced to exclude those Members incapable of attending.  House Rule XX.5(c)(1).

*Quorum Not Required for Debate.*  Prior to the 1970s, a quorum was required for debate and other non-voting matters.  *See* 5 *Deschler's*, ch. 20, § 10; *see also Jefferson's Manual*, § 310.  Since then, the House has determined that "Business" is a "term of art which does not encompass all activities," and it has been defined now to exclude debate.  5 *Deschler's*, ch. 20, § 10.  Today, pursuant to House Rule XX.7(a), a Member may require a quorum call only immediately prior to a vote.  House Rule XX.7, Rules of the U.S. House of Representatives, 117th Cong. (2022) (House Rules), https://perma.cc/Z5TR-GZPP; *see also Jefferson's Manual*, § 1027.

*House Rules for the 117th Congress.*  Procedures for establishing a quorum and voting are contained in the House Rules, House Resolutions, the House precedents, and Jefferson's Manual.

At the start of each session of Congress, the House determines that a majority quorum necessary "to do Business" has been established.  U.S. Const. art. I, § 5, cl. 1; *Jefferson's Manual* §§ 53, 54, 310; *see also* 168 Cong. Rec. H5 (Jan. 10, 2022) (ordering a call of the House to ascertain existence of a quorum).  Once established, the quorum "presumed always to be present unless a point of no quorum is made."  *Deschler's*, ch. 20, §§ 1.3, 2.1; *see also* 6 Cannon's § 624; House Rule XX.7(a), (c).

"In response to the COVID-19 pandemic, the House of Representatives adopted a Resolution enabling Members who are unable to attend proceedings in person" to participate—"to cast their votes and mark their presence"—"by proxy." *McCarthy v. Pelosi*, 5 F.4th 34, 36 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 897 (2022). Under that Resolution, the Speaker could "designate a period . . . during which a Member who is designated by another Member as a proxy . . . may cast the vote of such other Member or record the presence of such other Member in the House." H.R. Res. 965, 116th Cong. (2020) § 1(a).[3] The Resolution further provided that "[a]ny Member whose vote is cast or whose presence is recorded by a designated proxy . . . shall be counted for the purpose of establishing a quorum." *Id.* § 3(b). To designate a proxy, a Member submitted to the Clerk of the House a "signed letter . . . specifying by name the Member who is [so] designated." *Id.* § 2(a)(1). "[A] Member acting as a proxy must 'obtain an exact instruction' in writing that is specific to a particular vote or quorum call." *McCarthy*, 5 F.4th at 37 (quoting H.R. Res. 965 § 3(c)(1), (c)(6)). From May 20, 2020 through December 25, 2022, the House permitted proxy voting pursuant to the Resolution.[4]

House votes commence with a voice vote. House Rule I.6. After that, any Member, with the support of "one fifth of those [Members] present," may demand that the "Yeas and the Nays . . . be entered on the Journal" in a record vote. U.S. Const. art. I, § 5, cl. 3; *see* House Rule XX.1(b).

## II.   Consolidated Appropriations Act, 2023

After the Consolidated Appropriations Act, 2023 (the "Act") passed the Senate with bipartisan support, the bill passed the House of Representatives, also with bipartisan support, on December 23, 2022. Two hundred and twenty-five Members voted in favor of the bill, 201 voted against it, one Member was marked as "present," and four were recorded as "not voting." 168 Cong. Rec. H10528

---

[3] This Resolution was carried forward to the 117th Congress by section 3 of H. Res. 8 (117th Cong.).
[4] *See* H.R. Res. 965 § 1(b)(1)–(2) (permitting extension); Press Release, Dear Colleague to All Members on Extension of Remote Voting 'Covered Period,' Speaker of the House (Nov. 10, 2022), https://web.archive.org/web/20221110173739/https://www.speaker.gov/newsroom/111022-1.

(Dec. 23, 2022). "Pursuant to section 3(b) of H. Res. 965, . . . Members casting their vote or recording their presence by proxy [were] counted for the purpose of establishing a quorum under the rules of the House." *Id.* at H10529. The bill then became an enrolled bill,[5] *id.*, and it was sent to the President. President Biden signed the bill into law on December 29, 2022.[6]

The Act is an omnibus law that appropriates $3 trillion to fund all three branches of the federal government for fiscal year 2023.[7] The Act funds, among many other things, the activities and personnel of the Department of Defense (including service members' salaries), the veterans' health care system, nuclear weapons activities, DHS and its components such as U.S. Customs and Border Protection, the Federal Aviation Administration, food assistance programs, and programs for farm production and rural development. *See* Pub. L. No. 117-328, 136 Stat. 4488, 4566–622, 4638, 4725–59, 4951–53, 5101–08, 5202–03 (2022); App96–99 (Decl. of Kelly Kinneen ¶ 4). The Act funds foreign policy priorities, such as assistance to allies. *See, e.g.*, 136 Stat. at 4985–97; App98–99 (Kinneen Decl. ¶¶ 4.k, 5). The Act further provides billions in grants to States, including Texas. *See, e.g.*, 136 Stat. at 4871, 4887; *see also* App104–105 (Kinneen Decl. ¶¶ 27–28). The Act also enacted permanent legislation, such as the Electoral Reform Act of 2022, the Presidential Transition Improvement Act, and the Fairness for 9/11 Families Act. *See* 136 Stat. at 5233–46, 6106–11.

---

[5] When a bill passes either the House of Representatives or the Senate, it is printed and the printed copy is then referred to as an "engrossed bill." 1 U.S.C. § 106. The engrossed bill is then signed by the Clerk of the House or the Secretary of the Senate, sent to the other chamber to be dealt with by that chamber, and, if passed, it is returned by the Clerk or Secretary. *Id.* When such a bill passes both Houses of Congress, it is then printed and called an "enrolled bill." *Id.* The enrolled bill is signed by the presiding officers of each House and is sent to the President. *Id.*

[6] The White House, Bill Signed: H.R. 2617 (Dec. 29, 2022), https://perma.cc/8BM5-289P.

[7] The $3 trillion total in budget authority consists of $1.7 trillion in discretionary appropriations and $1.31 trillion in mandatory appropriations. *See* App101 (Kinneen Decl. ¶ 10).

### A. Continued Funding of the Department of Homeland Security's Alternatives to Detention Case Management Pilot Program

One domestic program funded by the Act is the Department of Homeland Security's Alternatives to Detention Case Management Pilot Program ("CMPP"). 136 Stat. at 4726. This program does not, as Texas claims, "permit[] the release of illegal aliens into the interior of the country." Am. Compl. ¶ 24; *see also* Br. 16, 24, 44. Indeed, the CMPP does not direct or affect the detention or release of a single noncitizen. App3 (Decl. of Sean Dandridge ¶ 7). Rather, the program awards grants to selected nonprofit organizations and localities to provide voluntary case management services to noncitizens already enrolled in one of the U.S. Immigration and Customs Enforcement's ("ICE") Alternatives to Detention programs. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1449 (2020) (hereinafter, "2021 Appropriations Act"); App67 (Decl. of Peter Mina ¶ 3). Case management services include "mental health services; human and sex trafficking screening; legal orientation programs; cultural orientation programs; connections to social services; and for individuals who will be removed, reintegration services." 134 Stat. at 1449.

If ICE exercises its discretion under the Immigration and Nationality Act ("INA") to release or not detain noncitizens,[8] ICE provides to DHS's Office for Civil Rights and Civil Liberties ("CRCL") a list of noncitizens who are qualified to receive case management services under the pilot program, unless the noncitizens decline such services. App3 (Dandridge Decl. ¶ 5); 166 Cong. Rec. H8472 (daily ed. Dec. 21, 2020) (explanatory statement of the Consolidated Appropriations Act, 2021). CRCL then provides the noncitizens' names to the selected nonprofit organizations and local

---

[8] The Act does not authorize ICE to release any noncitizens from detention, nor does ICE release any noncitizens from detention under the CMPP. *See* 136 Stat. at 4726; App3 (Dandridge Decl. ¶ 7). ICE's authority to detain and release noncitizens is found exclusively in the Immigration and Nationality Act and applicable regulations, which authorize ICE, in its discretion, to release certain categories of noncitizens and to impose conditions on that release to protect public safety and ensure that the noncitizens will appear for immigration proceedings. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a), 1231(a). These statutory and regulatory provisions are not at issue.

governments so those entities can contact the noncitizens to provide them with case management services. App69 (Mina Decl. ¶ 11).

Congress directed DHS to create the CMPP and provided $5 million in funding in the 2021 Appropriations Act.[9]  134 Stat. at 1449.  Congress then provided $15 million for the program in the appropriations law for fiscal year 2022.  *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 312 (2022) (hereinafter, "2022 Appropriations Act").  For its third year of funding, Congress provided an additional $20 million for the CMPP in the challenged Act.  136 Stat. at 4726.

All CMPP awards must be administered by a National Board.  *See* 134 Stat. at 1449; App67 (Mina Decl. ¶ 5).  The Federal Emergency Management Agency ("FEMA") is responsible for awarding the initial grant of CMPP funds to the National Board.  *See* 134 Stat. at 1449.  The National Board is composed of three nonprofit organizations and DHS's Officer for Civil Rights and Civil Liberties, who is the chair of the Board.  App67 (Mina Decl. ¶ 4).

In June 2022, FEMA issued a Notice of Funding Opportunity ("NOFO"), which started the grant award process for the $5 million allocated to the CMPP under the 2021 Appropriations Act—a separate law not challenged here.  App7 (Decl. of Robert Farmer ¶ 8).  Consistent with the requirement in the 2021 Act, the NOFO identified the National Board as the only eligible applicant.  *Id.*

The National Board applied for and was granted the $5 million allocated to the CMPP for fiscal year 2021.  App7 (Farmer Decl. ¶ 9).  The National Board then invited nonprofit organizations and local governments to apply for grant money, considered the applications, and voted on the

---

[9] As the CMPP was created by the 2021 Appropriations Act, *see* 134 Stat. at 1449, Texas's allegations that the CMPP is a "new" program that was "create[d]" by the Consolidated Appropriations Act, 2023, *see* Am. Compl. ¶¶ 24, 30, are incorrect.  These incorrect allegations also are belied by Texas's own citations to the 2021 Appropriations Act and the Congressional Record from 2020, *see id.* ¶¶ 31, 33, as well as its exhibit, which is the CMPP's first grant solicitation that references a section of the 2021 Appropriations Act as its source of funding, *see id.* at Ex. A.  Moreover, Texas repeatedly refers to the Act's purported "creation" of multiple "programs" regarding immigration, *see id.* ¶¶ 24, 30 (heading), but the Amended Complaint and motion contain allegations related only to the CMPP.

nonprofit organizations or local governments to receive funding and the amount of the funding. App67–68 (Mina Decl. ¶¶ 6–9).   In November 2022, the National Board selected two nonprofit organizations, BakerRipley in Houston, and the International Rescue Committee in New York, to each receive a grant of more than $2 million.  App68–69 (Mina Decl. ¶ 10).  The grants do not automatically renew.  *Id.*

In April 2023, FEMA issued the NOFO for the money allocated to the CMPP under the 2022 Appropriations Act—a separate law not challenged here.  App7 (Farmer Decl. ¶ 11).  The National Board has not yet been granted the money from the 2022 Appropriations Act, *id.*, nor has the National Board solicited grant applications from nonprofit organizations or local governments, App69 (Mina Decl. ¶ 12).  No grants have been awarded from the money allocated to the CMPP from the 2022 Appropriations Act.  App8 (Farmer Decl. ¶ 13); App69 (Mina Decl. ¶ 12).

FEMA has not yet issued a NOFO for the money allocated to the CMPP under the 2023 Act. App8 (Farmer Decl. ¶ 12).  Accordingly, the money has not yet been granted to the National Board. *See* App8 (Farmer Decl. ¶ 13).  The National Board has not solicited applications for grants or awarded any grants from the funds allocated to the CMPP under the Act.  App69 (Mina Decl. ¶ 12).  DHS has until September 30, 2024, to award the $20 million in grant funds appropriated in the Act.  136 Stat. at 4726; App8 (Farmer Decl. ¶ 12).

## B. The Pregnant Workers Fairness Act

The Act also strengthens federal protections for pregnant workers.  *See* 136 Stat. 4459, 6084–89.  A section of the Act titled the Pregnant Workers Fairness Act ("PWFA") ensures that employers reasonably accommodate employees experiencing limitations relating to pregnancy, childbirth, or related medical conditions.[10]  *Id.*  Under the PWFA, it is an unlawful employment practice for covered

---

[10] The Act does not, as Texas claims, "amend[] Title VII," Am. Compl. ¶ 25; *see also* Br. 13, 15, 19, 21; rather, the PWFA is a freestanding law, *see* H.R. Rep. No. 117-27, pt. 1, at 59 (2021) (noting that the PWFA is "stand-alone legislation that does not amend any law").

entities, which include state employers, to refuse to "make reasonable accommodations to the known limitations related to pregnancy, childbirth, or related medical conditions of a qualified employee," unless they can show that "the accommodation would impose an undue hardship." *Id.* at 6085.

The PWFA is not yet in effect and will take effect on June 27, 2023. *See id.* at 6089. Once it is in effect, the PWFA authorizes the Equal Employment Opportunity Commission ("EEOC"), the Attorney General, and private individuals to seek redress for any statutory violations using the same procedures as set forth in Title VII of the Civil Rights Act of 1964. *See id.* at 6085–86. Therefore, as with Title VII claims, the EEOC may investigate state employers, but the Attorney General is the only federal government official who may directly sue state employers to enforce the PWFA. *See id.*; 42 U.S.C. §§ 2000e-5(b), 2000e-5(f)(1); 29 C.F.R. § 1601.29. Depending on the circumstances, either the EEOC or the Attorney General, however, may issue individuals "right-to-sue" letters, allowing those individuals to sue a state employer for violating the PWFA. *See* 136 Stat. at 6085–86; 42 U.S.C. § 2000e-5(f); 29 C.F.R. § 1601.28(d). The PWFA contains an explicit waiver of state sovereign immunity to permit suits by private individuals. *See* 136 Stat. at 6089.

## III.    The Instant Lawsuit

On February 15, 2023, Texas filed this suit against the President, the Department of Justice ("DOJ"), EEOC, DHS, ICE, CRCL, and FEMA, as well as officials from those agencies.[11]  Texas seeks a declaratory judgment that the Consolidated Appropriations Act of 2023 was unconstitutionally enacted on the theory that the House of Representatives did not have a quorum when it accepted the Senate's amendments to the Act. Am. Compl. ¶¶ 58–60, Prayer for Relief ¶ 1. Texas's Amended Complaint also seeks a "preliminary and permanent injunction" "enjoining Defendants from

---

[11] In its Amended Complaint, Texas states that it is suing Secretary of Homeland Security Alejandro Mayorkas and FEMA Administrator Deanne Criswell "in [their] individual capacit[ies]," Am. Compl. ¶¶ 7, 13, but counsel for Texas confirmed that the "reference to 'individual capacities' is a drafting error," App1 (Email from Leif Olson to Courtney Enlow). Also, Texas named the "U.S. Customs and Border Enforcement" as a defendant, Am. Compl. ¶ 10, but such an agency does not exist.

enforcing the Pregnant Workers Fairness Act against Texas" and "enjoining Defendants from continuing to fund grants through and otherwise operate DHS's pilot program," even though Texas challenges only one year of funding for that program. *Id.* ¶¶ 61–70, Prayer for Relief ¶¶ 2–3. The Amended Complaint does not seek injunctive relief against any other part of the Act.

Nearly two months later, on April 4, 2023, Texas filed a motion for a preliminary injunction. Mot., ECF No. 37. It is unclear, however, precisely what relief Texas is seeking, as Texas requests that the Court "prohibit[] the Court [sic] from enforcing the Consolidated Appropriations Act, 2023." *Id.* Texas's brief and proposed order are not much clearer, as Texas vaguely asserts that it seeks a preliminary injunction to "prohibit[]" "Defendants and their officers, agents, and employees" "from taking any action to enforce the Consolidated Appropriations Act, 2023." Proposed Order, ECF No. 37-1; Br. 44, ECF No. 38 ("request[ing] that the Court enjoin the Defendants from enforcing the Consolidated Appropriations Act, 2023"). In addition, Texas appears to request that the Court "declare that laws passed [without a majority of congresspersons physically present]—specifically, the Consolidated Appropriations Act here—are unconstitutional." Br. 33.

## LEGAL STANDARDS

### I.     Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction under Federal Rule of Civil Procedure 65 thus bears the burden to show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).

## II.     Motion to Dismiss

A plaintiff's failure to establish a court's jurisdiction warrants dismissal under Rule 12(b)(1). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).  "[I]n examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction."  *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015).  Doing so does not convert the motion to a summary judgment motion.  *Young v. Vannerson*, 612 F. Supp. 2d 829, 836–37 (S.D. Tex. 2009).  In evaluating a Rule 12(b)(6) motion, courts must accept all factual allegations in the complaint as true, but not the legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  The Court may "take judicial notice of matters of public record," such as government records and websites.  *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

"Whether venue is proper is a threshold question," and a case may be dismissed for improper venue pursuant to Rule 12(b)(3).  *Holz v. United States*, No. 3:08-CV-1568-P, 2009 WL 10704725, at *2 (N.D. Tex. Sept. 28, 2009) (citations omitted).  "Once a defendant raises the issue of improper venue, the plaintiff has the burden to prove that the chosen venue is proper."  *Martin, Mason, Stutz, L.L.P. v. Columbia Sussex Corp.*, No. 3:08-CV-2190-O, 2009 WL 10704844, at *3 (N.D. Tex. Apr. 21, 2009).

## ARGUMENT

## I.     Dismissal Is Warranted on Threshold Jurisdictional and Justiciability Grounds.

### A.  Texas Lacks Standing.

The "irreducible constitutional minimum of standing" has "three elements": (1) the "plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly traceable to the challenged action of the defendant"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–

61 (citations omitted).  For a preliminary injunction, "plaintiffs must make a 'clear showing' that they have standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (quoting *Winter*, 555 U.S. at 22). And "at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  Texas has failed to do so here.

### 1.  Texas Lacks Standing to Challenge the Act's Continued Funding of the CMPP.

### a.  Texas Fails to Establish an Imminent Injury to Obtain Prospective Relief.

Even though no noncitizens are released under DHS's case management pilot program, App3 (Dandridge Decl. ¶ 7), Texas attempts to establish standing to challenge the Act by alleging that the third year of funding of the CMPP causes Texas "direct economic harms" because the State will have to spend more money on services for more noncitizens[12,13] and "also harms Texas's quasi-sovereign interests" because an increased number of noncitizens "will increase the amount of crime committed in Texas and reduce the wages paid to Texans."  Am. Compl. ¶¶ 30–39; Br. 21–24.

Texas fails to establish the injury-in-fact prong in several respects.  First, Texas's theory of harm depends upon a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  For Texas to face any purported harm, (i) nonprofit organizations or localities in Texas would have to apply for a grant from the fiscal year 2023 funding, (ii) the National Board would have to decide to award a grant to such organization or locality, (iii) noncitizens would have to come to Texas as a result of that grant award, (iv) ICE would have to use its authority under other statutes to

---

[12] Defendants recognize that the Fifth Circuit has found that *if* a state can establish "an increase in the number of aliens would cause the state to incur significant costs in issuing additional driver's licenses," the state "suffers constitutional injury," and that "[s]imilar logic extends to Texas's obligation to subsidize these additional aliens' healthcare and education costs." *Texas v. United States*, 40 F.4th 205, 217 (5th Cir. 2022).  That case is pending before the Supreme Court, where the federal government has disputed that such claims constitute injuries under Article III.  *See* Brief of Petitioners at 10–24, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022).

[13] Texas argues that it "and its local governments" spend additional monies on noncitizens.  Br. 21–22.  To the extent that Texas attempts to raise claims on behalf of localities, it has provided no basis for doing so.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (noting "the general prohibition on a litigant's raising another person's legal rights").

release those noncitizens, and then (v) Texas would have to spend more resources on services for those noncitizens.  Moreover, for Texas to face any harm to its purported "quasi-sovereign interests" (even assuming a *parens patriae* theory were available[14]), those noncitizens also would have to cause an increase in crime and a reduction in wages for others in Texas.  Such "allegations of *possible* future injury," *id.* at 409, premised on a "highly attenuated chain of possibilities" are insufficient to establish standing, *id.* at 410.

The uncertainty surrounding the first two links of the chain makes clear that Texas faces no certainly impending injury from the Act's continued funding of the CMPP.  *See id.* at 415; *Glass v. Paxton*, 900 F.3d 233, 240 (5th Cir. 2018) ("Each contingency [leading to a plaintiff's alleged harm] must be certainly impending.").  Texas points to no nonprofit organization or locality in Texas that has been awarded *any* money allocated to the CMPP by the Act.  *See generally* Am. Compl.  Nor could Texas do so, as FEMA has not even issued a NOFO for funds appropriated by the Act for fiscal year 2023.  App8 (Farmer Decl. ¶¶ 12–13).  Instead, Texas references a grant awarded with funds from the 2021 Appropriations Act to BakerRipley, a nonprofit organization in Houston, though Texas makes no allegation that the grant brought more noncitizens to Texas or caused the State to spend additional monies on services for them.  *See* Am. Compl. ¶ 32 & Ex. A at 1.  But, even assuming *arguendo* that Texas was somehow harmed by that grant to BakerRipley, "[m]erely having suffered an injury in the past is not enough" to be awarded "prospective relief"; instead, a plaintiff must "show that there is a real and immediate threat of repeated injury."  *Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) (citation omitted); *see also City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983).  Texas has not made—and cannot—make this showing, as grant awards do not automatically renew and instead must be applied

---

[14] *But see Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923); *Florida v. Mellon*, 273 U.S. 12, 18 (1927); *see also Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (Dennis, J.).

for and awarded each year.  App68–69 (Mina Decl. ¶ 10).  Because the grant application process has not yet begun for fiscal year 2023, Texas can only hypothesize that it will be harmed by a future grant award.  But such speculation of a possible future injury cannot establish a certainly impending injury. *See Clapper*, 568 U.S. at 415 (rejecting standing based on "fears of hypothetical future harm that is not certainly impending"); *Lujan*, 504 U.S. at 564 n.2 (stating that the imminence requirement "reduce[s] the possibility of deciding a case in which no injury would have occurred at all"); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019); *Ghedi*, 16 F.4th at 465 n.36.

Texas stacks speculation on top of speculation by further asserting—without citation—that the CMPP will result in additional noncitizens in Texas who will require services from the State and who will cause an increase in crime and a decrease in others' wages.  Am. Compl. ¶ 35; Br. 23–24, 44. But no noncitizens are released from detention under the CMPP.  *See* 136 Stat. at 4726; App3 (Dandridge Decl. ¶ 7).  Texas attempts to get around this fact by asserting that the CMPP "encourages illegal aliens to seek additional spending from States," Am. Compl. ¶ 30; Br. 23–24, and arguing that the federal government has recognized that the availability of public benefits constitutes an incentive for immigration, Am. Compl. ¶ 38; Br. 23 (quoting 8 U.S.C. § 1601(2)).  But 8 U.S.C. § 1601(2) merely states a "general policy goal[]," *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008, 1022 (N.D. Ill. 2019), that "the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2).  The statute does not relieve Texas of its burden of showing that the Act's third year of funding of the CMPP will actually increase the number of noncitizens in Texas and increase the State's cost for providing services to them.  *See Arpaio v. Obama*, 797 F.3d 11, 21–22 (D.C. Cir. 2015) (declining to infer that a specific immigration program triggered migration and that more immigration necessarily leads to more crime).  Texas has done nothing to establish either of these points.  Instead, Texas refers only to past costs of providing services to noncitizens who were not

participants in the CMPP,[15] *see* Am. Compl. ¶¶ 35, 36; Br. 22–23, baldly asserts without support that the CMPP "promote[s]" an "increase in illegal immigration,"[16] Am. Compl. ¶ 39, and will thus cause Texas to spend more money on noncitizens, Br. 21–24.

As the Fifth Circuit found in *Crane v. Johnson*, such scant and conclusory allegations are insufficient to establish an injury-in-fact even at the pleading stage.  783 F.3d 244, 252 (5th Cir. 2015). There, the Court held that Mississippi lacked standing to challenge the Deferred Action for Childhood Arrivals ("DACA") policy under a theory that DACA would cause increases in illegal immigration, which Mississippi alleged would "cost the state money because the state provides social benefits to illegal immigrants." *Id.*  Similar to this case, Mississippi relied on purported past harms by "assert[ing] (based on [a] 2006 study) that DACA will cost the state money because the state provides social benefits to illegal immigrants," but "submitted no evidence that any DACA eligible immigrants resided in the state" or "evidence of costs it would incur if some DACA-approved immigrants came to the state." *Id.*  "Because Mississippi's claim of injury [was] not supported by any facts," the Fifth Circuit concluded that "Mississippi's injury is purely speculative" rather than a "concrete and particularized" injury necessary to establish standing.  *Id.* (further finding that Mississippi failed to establish that any costs were fairly traceable to DACA for the same reasons).  As Texas's claim of future harm is likewise unsupported by any facts, the same result is warranted here.

Finally, Texas's alleged harms are too temporally remote to constitute an imminent injury for Article III standing—let alone for a grant of emergency relief.  The process to award the first grants allocated to the CMPP by the 2021 Appropriations Act took nearly two years.  *Compare* 134 Stat. at

---

[15] The study that Texas relies upon was published before any grants were awarded under the CMPP. *See* Br. 17–18, 22–23 (relying on a May 2020 study).

[16] Texas also claims—without citation—that the CMPP "directly lowers the risk of illegally immigrating by increasing the chances that doing so will result in additional income." Br. 23.  But the CMPP provides case management services to certain noncitizens, *see* 134 Stat. at 1449; it does nothing to provide them with "additional income," as Texas claims.

1449 (enacted December 27, 2020), *with* Am. Compl. ¶ 32 (noting the award of a grant in November 2022).  DHS has until September 30, 2024, to award the $20 million in grant funds appropriated in the Act.  136 Stat. at 4726.  Although "'imminence' is 'a somewhat elastic concept,'" it "'cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending.'"  *E.T. v. Paxton*, 41 F.4th 709, 716 (5th Cir. 2022) (quoting *Lujan*, 504 U.S. at 564 n.2).  Texas cannot establish any imminent harm from events that may—or may not—occur years into the future.  *See Galveston Open Gov't Project v. Dep't of Hous. & Urb. Dev.*, 17 F. Supp. 3d 599, 607 n.6 (S.D. Tex. 2014).

### b.  No Harm Is Fairly Traceable to Continued Funding of the CMPP.

Texas also fails to show that its alleged harms are fairly traceable to the Act's third year of funding of the CMPP.  Causation requires "a causal connection between the injury and the conduct complained of."  *Lujan*, 504 U.S. at 560.  This connection is missing in several respects.

First, as outlined above, because Texas's theory of harm depends upon a "speculative chain of possibilities," Texas has not shown that any harm is "fairly traceable" to the Act.  *Clapper*, 568 U.S. at 414; *see also Crane*, 783 F.3d at 252 (finding that Mississippi's unsupported speculation was insufficient to show that the state will incur costs because of DACA).  Unlike in *Texas v. United States*, where the Fifth Circuit found that Texas's costs were fairly traceable to DACA because the State cited to a survey showing that DACA recipients would leave if the program were rescinded, 50 F.4th 498, 519 (5th Cir. 2022), here, Texas cites nothing to show that more noncitizens are or will be in Texas as a result of the CMPP, *see* Am. Compl. ¶¶ 30–39; Br. 21–24.

Next, any purported harms Texas faces by an increased number of noncitizens in the State are at most traceable to other programs or laws that Texas does not challenge.  Although Texas cites a grant to a nonprofit organization in Houston, Am. Compl. ¶ 31; Br. 16–17, that grant—and another to one in New York—was made with funds allocated to the CMPP from the 2021 Appropriations

Act, *see* Am. Compl. at Ex. A; App68 (Mina Decl. ¶ 10), which Texas does not challenge.  Nor does Texas challenge the second year of CMPP funding that was made pursuant to the 2022 Appropriations Act.[17]  And although Texas theorizes that the CMPP "permit[s] the release of illegal aliens into the interior of the country," Am. Compl. ¶ 24; Br. 24, no noncitizens are released under the CMPP, App3 (Dandridge Decl. ¶ 7).  Rather, ICE releases noncitizens using its authority under the INA, and individuals who have been released pursuant to INA authorities may be enrolled in ICE's Alternatives to Detention program, App3 (Dandridge Decl. ¶¶ 3–4, 7), neither of which Texas challenges.[18]

The Supreme Court's decision in *California v. Texas*, 141 S. Ct. 2104, 2117 (2021), is instructive on this point.  There the Court rejected—on causation grounds—some States' attempt to challenge the Affordable Care Act's "individual mandate" under a theory that the mandate costs the States money in administering their healthcare systems.  *Id.* at 2117–18.  The Court found these allegations insufficient to establish standing because the States failed to trace any increased costs to "the defendants' conduct in enforcing the specific statutory provision they attack as unconstitutional."  *Id.* at 2120.  The same holds true in this case.  Texas's alleged injuries are at most traceable to other laws not challenged here.  *See id.*; *see also El Paso Cnty. v. Trump*, 982 F.3d 332, 342 (5th Cir. 2020).

Texas also fails to recognize that any purported harm it may face depends upon the decisions of independent third parties.  "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party," "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  *California*, 141 S. Ct. at 2117 (quoting *Lujan*, 504 U.S. at

---

[17] Even if Texas did challenge the second year of funding to the CMPP, no grants to any entity—let alone any in Texas—have been awarded.  App69 (Mina Decl. ¶ 12).

[18] Moreover, because these noncitizens would be released regardless of their participation in the CMPP, Texas presumably would spend the same amount in services for those noncitizens in the absence of the CMPP.  While it is true that the CMPP operates to connect noncitizens to available services such as "healthcare" and "schooling," Am. Compl. Ex. A at 2, even Texas agrees that the CMPP does not require states to offer any such services and that any requirements derive from the Constitution, other federal statutes, and regulations, *see* Br. 22–23.

562); *see also Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").  Here, attributing the alleged harm of Texas to the actions of the U.S. Government in funding the third year of the CMPP involves independent decisions by three sets of third parties: the nonprofit organizations that would apply for grants; the nonprofit organizations serving on the National Board that would vote to award the grants; and the noncitizens who would have to decide to relocate to Texas as a result of that grant and subsequently seek services provided by the State.

Texas's argument that it is harmed by its "general increase in spending that results from creating incentives for additional illegal aliens to enter the United States" and "relocate to Texas," Am. Compl. ¶ 37; Br. 23, fares no better.  Texas does not even attempt to show that the CMPP itself has caused or will cause additional noncitizens to enter the United States or relocate to Texas.  *See* Br. 23. While the requirement that an injury be fairly traceable to the challenged conduct of the defendant "does not exclude injury produced by [the] determinative or coercive effect [of the defendant's conduct] upon the action of someone else," *Bennett v. Spear*, 520 U.S. 154, 169 (1997), in general, a plaintiff cannot establish standing simply by showing that the defendant's conduct creates an incentive for third parties to act in a particular way.  For example, in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42 (1976), the Supreme Court held that a group of indigent plaintiffs lacked standing to challenge a revenue ruling concerning the availability of a federal tax benefit that allegedly "encouraged hospitals to deny services to indigents."  The Court found it "purely speculative" that any denial of service would result from the government's "encouragement" rather than from "decisions made by the hospitals without regard to the tax implications."  *Id.* at 43.

Texas's theory that the CMPP "encourages illegal aliens to seek additional spending from the States," Am. Compl. ¶ 30, defies those principles.  Texas does not allege that the CMPP "coerc[ed]" additional noncitizens to relocate to Texas.  *Bennett*, 520 U.S. at 169.  It instead alleges only that the

CMPP "encourages" noncitizens to relocate to Texas.  Am. Compl. ¶ 30.  But an individual's decision to come to the United States may be influenced by any number of factors.  *See Arpaio*, 797 F.3d at 21 (acknowledging "the complex decisions made by non-citizens" in deciding to come to this country). It is purely speculative whether any immigration that may occur will result from the CMPP's alleged "encourage[ment]" or instead from "decisions made by [noncitizens] without regard to the [program]."  *Simon*, 426 U.S. at 43.  Any purported harms that flow from an increased number of noncitizens in Texas would thus be fairly traceable to the noncitizens' independent decisions to enter the State, not to the CMPP.

### c.  Texas Cannot Establish Redressability by Seeking Overbroad Relief.

Even if Texas could satisfy the injury-in-fact and causation requirements, it would still lack standing, because a ruling in Texas's favor would not redress any purported harms.  "To establish redressability, a plaintiff must show a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact."  *El Paso Cnty.*, 982 F.3d at 341 (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)).  In a tacit admission that it cannot establish that any purported harm is fairly traceable to the Act's third year of funding of the CMPP, Texas requests that the Court "enjoin[] the Defendants from continuing to fund grants through and otherwise operate DHS's pilot program."  Am. Compl. Prayer for Relief ¶ 3.  In other words, Texas seeks to enjoin the operation of the CMPP not just from the Act's third year of funding of the CMPP, but also from the funding of the CMPP from the 2021 and 2022 appropriations laws, which Texas does not challenge.  But Texas cannot obtain relief that goes far beyond the conduct it challenges, as "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Cuno*, 547 U.S. at 353; *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016).

Nor can Texas show that any purported injury would be redressed by equitable relief that is tailored to its claim.  Because Texas's assertions of future harm are based on speculation, it is likewise

speculative that a narrower injunction to prevent any grants from being awarded with the money allocated by the Act to the CMPP would redress any purported harms. *See Lujan*, 504 U.S. at 561. Similarly, Texas's "lack of standing to pursue prospective injunctive relief further prevents [the Court] from granting declaratory relief against [Defendants]." *Machete Prods.*, 809 F.3d at 288.

### 2.  Texas Lacks Standing to Bring a Pre-enforcement Challenge to the PWFA.

Texas's second attempt to establish standing to challenge the Act fares no better. Texas alleges that the Pregnant Workers Fairness Act will, once it is in effect at the end of June, subject the State to the "costs, hassles, and attendant risks of administrative proceedings, investigations, and lawsuits." Am. Compl. ¶ 28; Br. 20. Texas does not allege that it has taken any adverse employment action in the past that could violate the PWFA. Nor does Texas allege that it will have to alter its conduct in any way prospectively to comply with the PWFA. To the contrary, Plaintiff asserts that "[t]he State of Texas accommodates the reasonable needs of its pregnant employees as a matter of course." Am. Compl. ¶ 28; Br. 13. Thus, Texas brings this pre-enforcement challenge to the PWFA based solely on a fear of hypothetical future consequences arising from its (unidentified) employment practices despite claiming that it already complies with the PWFA's requirements. *See Clapper*, 568 U.S. at 415.

A plaintiff can demonstrate a cognizable injury sufficient to bring a pre-enforcement challenge only if it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022) (stating that the plaintiff must "establish a serious intention to engage in conduct proscribed by law" (quoting *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018)). Texas has not expressed any intent to engage in any conduct arguably proscribed by the PWFA or identified any of its employment practices that do not comply with the PWFA. *See generally* Am. Compl.; Br. To the contrary, Texas disavows any intent to engage in any conduct proscribed by

the PWFA by claiming that it "accommodates the reasonable needs of its pregnant employees as a matter of course." Am. Compl. ¶ 28; Br. 13. The absence of any intention to engage in conduct proscribed by the PWFA is fatal to Texas's pre-enforcement challenge. *See Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008) ("Without concrete plans or any objective evidence to demonstrate a serious interest in [violating a statute, the plaintiff] suffered no threat of imminent injury."); *Tex. State LULAC*, 52 F.4th at 256–57 (finding that voter registration organizations' argument that a law injects "confusion and uncertainty" into their voter outreach efforts was insufficient to bring a pre-enforcement challenge because "uncertainty is not the same as intent"); *Zimmerman*, 881 F.3d at 382 (finding that a candidate had no standing to challenge campaign funding restrictions when he had demonstrated no intention to accept donations exceeding the limits); *see also In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019) ("To the extent the challenged regulations require Plaintiffs to do what they've already been doing and want to keep doing, they do not have standing to challenge them."). And because Texas does not express an intent to engage in conduct proscribed by the PWFA, Texas also cannot establish that such "conduct is arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 158.

Furthermore, Texas has not established that it faces any substantial threat of being sued under the PWFA. The PWFA does not go into effect until June 27, 2023, and is thus not currently being enforced. *See* 136 Stat. at 6089. "In the absence of contemporary enforcement, . . . a plaintiff claiming standing must show that the likelihood of future enforcement is substantial." *California*, 141 S. Ct. at 2114 (quotation and citation omitted). Unlike *Texas v. Becerra*, where the Court cited agency guidance and another lawsuit the United States had brought to find that "there are enough pre-enforcement actions taken by HHS or the United States to find a substantial threat of enforcement," No. 5:22-CV-185-H, 2022 WL 3639525, at *13 (N.D. Tex. Aug. 23, 2022), here, Texas does not allege any history of past enforcement of the PWFA, complaints based on violations of the PWFA, or warnings about

23

the PWFA—much less a threat of enforcement against Texas in particular.  Nor could it have made

such allegations, as the PWFA is not in effect and the EEOC will not start accepting charges under

the PWFA until June 27, 2023.[19]  *See Texas v. Travis Cnty.*, 272 F. Supp. 3d 973, 979 (W.D. Tex. 2017)

("Because SB 4 does not take effect until September 1, 2017, it is impossible for Defendants to take

any action that would violate the not-yet-effective law."), *aff'd*, 910 F.3d 809 (5th Cir. 2018).  Thus,

Texas has failed to meet its burden of showing a substantial threat of enforcement against it as of the

time it filed its lawsuit in mid-February 2023.  *See Texas v. EEOC*, 933 F.3d 433, 448 (5th Cir. 2019)

("In identifying an injury that confers standing, courts look exclusively to the time of filing.").

Although Texas claims it "may have standing based on '(1) federal assertions of authority to

regulate matters they believe they control, (2) federal preemption of state law, and (3) federal

interference with the enforcement of state law,'" Br. 19 (quoting *Texas v. United States*, 809 F.3d 134,

153 (5th Cir. 2015), *as revised* (Nov. 25, 2015)), Texas does not identify which of these three scenarios

it is purportedly basing its standing upon.  Instead, Texas alleges that "the Act directly inflicts injury

on Texas by opening Texas up to additional lawsuits and attempting to abrogate its sovereign

immunity."  *Id.* at 20.

The mere possibility of a future suit by the federal government against Texas to enforce the

PWFA is not an injury.  "States have no sovereign immunity as against the Federal Government."

*West Virginia v. United States*, 479 U.S. 305, 311, 311 n.4 (1987) (citing *United States v. Texas*, 143 U.S.

621, 646 (1892)); *see also Alden v. Maine*, 527 U.S. 706, 755 (1999) ("In ratifying the Constitution, the

States consented to suits brought by . . . the Federal Government." (citing *Principality of Monaco v.

Mississippi*, 292 U.S. 313, 328–29 (1934))); *EEOC v. Bd. of Sup'rs for Univ. of La. Sys.*, 559 F.3d 270, 272–

---

[19]   EEOC, *What You Should Know About the Pregnant Workers Fairness Act*, https://www.eeoc.gov/wysk/what-you-should-know-about-the-pregnant-workers-fairness-act   (last accessed May 2, 2023).  Once the EEOC begins accepting charges, "[f]or the PWFA to apply, the situation complained about in the charge must have happened on June 27, 2023, or later."  *Id.*

74 (5th Cir. 2009); *United States v. Miss. Dep't of Pub. Safety*, 321 F.3d 495, 498 (5th Cir. 2003). That is not to say that the state could not bring a pre-enforcement challenge against the federal government if it alleged that an enforcement action was likely—as opposed to merely possible in the future because of the change in the law—but, as described above, Texas falls far short of that showing here.

The cases Texas cites are inapposite, as those cases all involved suits brought by private individuals or entities outside of the federal government against states or state entities, in which a state or a state entity asserted sovereign immunity as a defense against suit.[20] *See* Br. 20–21. These cases do nothing to establish that Texas faces a cognizable injury to its sovereign immunity by any action by any agency or official in the federal government, which are the only defendants in this case and thus the only parties that would be bound by any decision in Texas's favor. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock*, 542 F. Supp. 3d 465, 480, 483–84 (N.D. Tex. 2021) (Hendrix, J.) (subsequent history and citations omitted) (stating that "a declaratory judgment declares only the rights of the parties in the case," and "an injunction does not bind unrelated nonparties").

---

[20] Texas relies on those cases to argue that the PWFA's waiver of State sovereign immunity in connection with private lawsuits "is likely without constitutional warrant" because "it was not passed pursuant to the Fourteenth Amendment." Br. 20–21. Texas's Amended Complaint raises only a claim under the Quorum Clause. *See* Am. Compl. ¶¶ 58–70. In any event, Texas is incorrect. "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000)). The first part of this test is easily met—the PWFA contains a clear "waiver of state immunity." 136 Stat. at 6089. The second part is likewise met, as Congress acted pursuant to Section 5 of the Fourteenth Amendment. *See Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 726 (2003). "Valid § 5 legislation must exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 728 (quotation omitted). The PWFA's legislative history demonstrates this connection, as Congress passed the PWFA "to eliminate discrimination and promote women's health and economic security by ensuring reasonable workplace accommodations for workers whose ability to perform the functions of a job are limited by pregnancy, childbirth, or a related medical condition." H.R. Rep. No. 117-27, pt. 1, at 1 (2021); *see also id.* at 11–21 (further explaining why existing protections in the law are insufficient to protect women against discrimination and why additional measures set forth in the PWFA are needed); *see generally Fighting for Fairness: Examining Legislation to Confront Workplace Discrimination: Hearing Before the Subcomm. on Civ. Rights & Human Serv. & Subcomm. on Workforce Protections of the H. Comm. on Educ. & Lab.*, 117th Cong. (2021).

Further, these cases illustrate the path that Texas can take if it is ultimately sued by a private entity: argue as a defense to such suit that the PWFA unconstitutionally waived its sovereign immunity.  But Texas lacks standing to press that claim here, against the federal government, particularly where Texas has alleged no imminent enforcement action by the government.

### 3. Texas Lacks Standing to Seek a Declaration that the Act was Unconstitutionally Enacted or to Enjoin the Entire Act.

Texas has not even attempted to demonstrate that it is harmed by anything other than the two specific provisions of the Act it challenges.  Despite alleging injury resulting from only two provisions of an omnibus law that spans more than 1,600 pages and contains myriad, disparate provisions, Texas seeks a declaratory judgment that the entire Act "was adopted in violation of the Constitution and is therefore unlawful."  Am. Compl. Prayer for Relief ¶ 1.  Further, Texas appears to now seek a preliminary injunction to enjoin enforcement of the entire Act.  *See* Mot.; Br.; Proposed Order.  But Supreme Court and Fifth Circuit precedent makes clear that Texas lacks standing to obtain such massively overbroad declaratory or injunctive relief.

As the Supreme Court and the Fifth Circuit have stated, "standing is not dispensed in gross." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Cuno*, 547 U.S. at 353; *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).  "[A] plaintiff must demonstrate standing for each claim he seeks to press" and must also "'demonstrate standing separately for each form of relief sought.'"  *Cuno*, 547 U.S. at 352 (citations omitted); *Latitude Sols., Inc. v. DeJoria*, 922 F.3d 690, 695 (5th Cir. 2019).  And a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill*, 138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353).

When a plaintiff challenges multiple provisions of a law, it is "beyond cavil that [a] plaintiff[] must establish standing for each and every provision [it] challenge[s]."  *In re Gee*, 941 F.3d at 160.  This is because a litigant cannot, "by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him."  *Cuno*, 547 U.S. at 353 n.5.

Applying these principles, the Supreme Court has found repeatedly that merely because a plaintiff has established standing to challenge one provision of a law does not necessarily mean that the plaintiff has standing to challenge other provisions. For example, in *Davis v. Federal Election Commission*, a political candidate filed suit to challenge the Federal Election Commission's determination that he had violated the Bipartisan Campaign Reform Act ("BCRA"). 554 U.S. 724, 731–32 (2008). After concluding that the candidate had standing to challenge Section 319(b) of the BCRA, the Supreme Court cautioned that "[t]he fact that Davis has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319(a) comes into play" and separately analyzed whether he was injured by Section 319(a). *Id.* at 733–34. Moreover, in *Planned Parenthood of Central Missouri v. Danforth*, physicians challenged a state law that imposed "a structure for the control and regulations of abortions in Missouri during all stages of pregnancy." 428 U.S. 52, 56 (1976). The Supreme Court concluded that the physicians "clearly have standing" to challenge all but one provision of the law. *Id.* at 62. Because the physicians did "not contend that th[e] section of the Act [pertaining to state wardship of an infant] imposes any obligation on them or that its operation otherwise injures them in fact," the Court found that the physicians "do not have standing to challenge [that section] of the Act." *Id.* at 62 n.2.

The Fifth Circuit likewise has stated that "court[s] must analyze Plaintiffs' standing to challenge each provision of law at issue." *In re Gee*, 941 F.3d at 161–62 & 162 n.4. For example, when health care providers brought one claim that a state law imposing liability on anyone who performed an abortion was unconstitutional, the Fifth Circuit noted that because they were in fact challenging two separate provisions of the law, their claim was "at bottom, two separate claims" and analyzed separately whether the providers had standing to challenge each provision. *K.P. v. LeBlanc*, 729 F.3d 427, 437–38 (5th Cir. 2013). Similarly, when charities brought a constitutional challenge to a state statute that contained three similar provisions, the Fifth Circuit rejected the district court's practice of

27

finding standing to challenge one provision and then "extend[ing] standing" to challenge a second provision that could not be severed without creating a "large hole in the regulatory structure." *Nat'l Fed'n*, 647 F.3d at 207. The Fifth Circuit was "cognizant" that the "provisions are seemingly identical in all material respects and that, should the former fall as unconstitutional, a subsequent challenge to the latter will almost certainly succeed," but concluded that "the seemingly intertwined fates of the two provisions does not eviscerate Article III's requirements." *Id.* at 209.

As a third example, in *In re Gee*, an abortion clinic and its physicians challenged "virtually all of Louisiana's legal framework for regulating abortion," including "legal provisions that do not injure them now and could not ever injure them." 941 F.3d at 156. The Fifth Circuit found it "especially problematic" that the district court did not "analyze Plaintiffs' standing to challenge each provision of law at issue" because "at least four categories of Plaintiffs' legal challenges appear to fall short of Article III's demands." *Id.* at 162. For instance, the plaintiffs challenged "provisions that do not appear to do anything," such as the "statutory title," "statutory purpose," and "each and every regulatory definition." *Id.* The Fifth Circuit rejected the plaintiffs' attempt to bootstrap a challenge to those provisions to its complaint, stating that "[i]f Plaintiffs want to include these provisions in their omnibus challenge, they must now plead (and later prove) that they suffer injury traceable to these provisions and redressable by an injunction against them." *Id.* (citing *Lujan*, 504 U.S. at 561). The Fifth Circuit also rejected the plaintiffs' challenge to "a bevy of legal provisions that appear incapable of injuring them," "some legal provisions that theoretically *could* apply to them—but without any allegation that they *would*," and "some legal provisions that benefit rather than harm women seeking abortions." *Id.* at 163–65. Upon remanding the case to "the district court to decide [whether the plaintiffs have standing] on a provision-by-provision basis," the Fifth Circuit "recognize[d] that analyzing standing at this level of granularity can be tedious in a sweeping challenge like this one," but concluded that "it's what Article III requires." *Id.* at 165. This granular analysis is required regardless

of whether "separate legal requirements are grouped together in a single section" or contained in separate laws. *Id.* at 162 n.4.

This precedent makes plain that Texas has failed to establish standing to obtain a declaratory judgment that the Act "was adopted in violation of the Constitution and is therefore unlawful," Am. Compl. Prayer for Relief ¶ 1, or to obtain a preliminary injunction enjoining the enforcement of the entire Act.  Aside from its purported injuries from the PWFA and the funding of the CMPP, Texas has not even attempted to demonstrate that it is harmed by any other provision of the Act.  *See generally* Am. Compl.; Br.  Even assuming *arguendo* that Texas had established injury with respect to one or both of those provisions, Texas cannot "identify one injury and then bootstrap it to complain about others."  *In re Gee*, 941 F.3d at 160 (citing *Lewis*, 518 U.S. at 358).  Because Texas did not allege that any other provision of the Act causes it any injury, Texas has failed to establish standing to challenge any other provision of the Act or seek any relief concerning those provisions.  *See Planned Parenthood of Central Mo.*, 428 U.S. at 62 n.2; *In re Gee*, 941 F.3d at 165.

Moreover, as in *In re Gee*, numerous provisions of the Act are incapable of injuring Texas, including introductory provisions, *see, e.g.*, 136 Stat. at 4459–62, as well as various substantive provisions, such as, for example, the designation of the Kol Israel Foundation Holocaust Memorial as a National Memorial and provisions concerning North Atlantic right whales, *see, e.g.*, *id.* at 5616–17, 6089–93.  And the Act contains many provisions that directly benefit Texas, such as, for example, grants to states for education, FEMA preparedness activities, and airport infrastructure.[21]  *See, e.g.*, *id.* at 4740, 4887, 5105–06; App104–106 (Kinneen Decl. ¶¶ 27, 28).  Thus, when taking the Act on a "provision-by-provision basis"—which is "what Article III requires," *In re Gee*, 941 F.3d at 165—

---

[21] And, of course, the Act funds numerous programs that benefit individuals who live in Texas, such as the veterans who are served by the veterans' health care system, the farmers who rely on Federal assistance, and small business owners who need loans guaranteed by the Small Business Association. *See* App96–99, 103 (Kinneen Decl. ¶¶ 4, 25).

Texas lacks standing to seek a declaratory judgment that the Act was unconstitutionally adopted or a preliminary injunction enjoining enforcement of the entire Act.

Finally, to the extent Texas is asking the Court to "declare that laws passed [without a majority of congresspersons physically present] . . . are unconstitutional," Br. 33, Texas plainly lacks standing to seek such relief. Texas does not even identify any other law passed in such a manner, much less raise any claim or assert any injury as a result of such law. *See generally* Am. Compl. Thus, even if Texas could establish standing to challenge the Act, Texas cannot, "by virtue of [its] standing to challenge one government action, challenge other governmental actions that did not injure [it]." *Cuno*, 547 U.S. at 353 n.5. And "in the absence of standing, the court has no 'power to declare the law.'" *In re Gee*, 941 F.3d at 161 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

## B. This Case Presents a Nonjusticiable Question Regarding the Validity of an Enrolled Bill.

Answering the question presented here—whether the House properly determined that a quorum existed at the time of the Act's passage such that it became an enrolled bill—would require improper second-guessing of the rules governing House proceedings. To avoid improper interference in a co-equal branch's authority to set its own procedures, courts refrain from looking at extrinsic evidence to impeach the validity of an enrolled bill, deferring to the House's implementation of its own rules. Separation-of-powers concerns and the need for finality, which underpin both the enrolled bill and political question doctrines, warrant such forbearance here.

Pursuant to the enrolled bill doctrine, which presents a "non-merits threshold ground for dismissal," *Pub. Citizen v. U.S. Dist. Ct. for D.C.*, 486 F.3d 1342, 1349 (D.C. Cir. 2007), "an enrolled act, . . . attested by the signatures of the presiding officers of the two houses of congress and the approval of the president, is conclusive evidence that it was passed by congress, according to the forms of the constitution," *Marshall Field & Co. v. Clark*, 143 U.S. 649, 673 (1892). A bill thus attested "should be deemed complete and unimpeachable" as one that passed Congress. *Id.* "[T]he enrolled bill rule

provides that if a legislative document is authenticated in regular form by the appropriate officials, the courts treat that document as properly adopted." *OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 203 (2d Cir. 2007); *Melgoza v. Hardin*, No. 1:21-CV-00006-H, 2021 WL 9274497, at *5 (N.D. Tex. Apr. 14, 2021) (Hendrix, J.), *appeal dismissed*, No. 21-10497, 2022 WL 3287977 (5th Cir. Aug. 11, 2022).

The rule reflects two important principles: (1) respect for the separation of powers, *Marshall Field*, 143 U.S. at 672; and (2) the interest in certainty and finality regarding congressional passage of bills, *id.* at 676 (explaining that "[i]f the validity of every act published as law is to be tested by examining its history, . . . there will be an amount of litigation, difficulty, and painful uncertainty appalling in its contemplation, and multiplying a hundred-fold the alleged uncertainty of the law." (quotations omitted)); *see also Pub. Citizen*, 486 F.3d at 1355 (noting the "public policy and separation of powers rationales that undergird the enrolled bill rule"). As Justice Scalia wrote in his concurrence in *United States v. Munoz-Flores*, "[m]utual regard between the coordinate Branches, and the interest of certainty, both demand that official representations regarding . . . matters of internal [congressional] process"—including whether a "bill was passed by the requisite quorum"—"be accepted at face value." 495 U.S. 385, 410 (1990) (Scalia, J., concurring); *see also Noel Canning*, 573 U.S. at 551 ("We generally take at face value the Senate's own report of its actions.").

Consistent with Justice Scalia's admonition that courts may not "gainsay [Congress's] official assertion that the bill was passed by the requisite quorum," *Munoz-Flores*, 495 U.S. at 410 (Scalia, J., concurring), courts have held that the enrolled bill doctrine forecloses the argument that a statute is invalid because it was passed without a quorum. For example, in *United States v. Farmer*, the Second Circuit rejected an argument that a statute was invalid because the "Congressional Record from the date that the Act was passed shows that a quorum was not present." 583 F.3d 131, 151 (2d Cir. 2009). The Second Circuit instead agreed with the government that because "the bill was properly enrolled (signed by the Speaker of the House and President Pro Tempore of the Senate)," there was

31

"'conclusive evidence that it was passed by Congress,'" which "preclude[d] [the] challenge to the validity of the Act." *Id.* at 151–52 (quoting *Pub. Citizen*, 486 F.3d at 1349–50). Other courts have reached the same conclusion. *See, e.g.*, *United States v. Small*, 487 F. App'x 302, 303 (7th Cir. 2012) (finding the defendant's argument that a statute "was passed without a quorum in the House of Representatives and is therefore invalid" to be "foreclosed by the 'enrolled-bill rule'"); *United States v. Gonzalez-Arenas*, 496 F. App'x 866, 867 (10th Cir. 2012). Similarly, here, there is no dispute that the Act was attested by the signatures of the presiding officers of both Houses and was signed by the President. Accordingly, the Court should accept at face value that the Act was "passed by congress according to the forms of the constitution" and dismiss the case. *Marshall Field*, 143 U.S. at 673.

The Supreme Court has never held that federal courts may consider extrinsic legislative history to challenge the validity of a bill's passage, but if the Court expands its inquiry beyond the fact that the bill was enrolled, *see* 168 Cong. Rec. H10529, it must limit its review to the official Congressional Journals,[22] which do not aid Texas here. In *Ballin*, the Court "assum[ed], though without deciding," that courts may look to the official journals of each chamber, but only to "to see whether the yeas and nays were ordered, and if so, what was the vote disclosed thereby." 144 U.S. at 4. The Court assumed without deciding that this inquiry, and only this inquiry, could be permissible because the Constitution specifically requires that the journals record "'the yeas and nays of the members of either house on any question'" where one-fifth of those present so demand. *Id.* (quoting U.S. Const. art. I, § 5); *see also Pub. Citizen v. Clerk, U.S. Dist. Ct. for D.C.*, 451 F. Supp. 2d 109, 120 (D.D.C. 2006) (stating that in *Ballin*, "the Supreme Court 'assumed . . . without deciding' that the journals may be considered and proceeded to consider the journals to determine whether the required quorum was present, finding nothing inconsistent with *Marshall Field*" (quoting *Ballin*, 144 U.S. at 3–4), *aff'd*, 486 F.3d 1342 (D.C.

---

[22] When the Journal has not yet been published (as is the case here), courts have referred to the Congressional Record. *See, e.g.*, *Noel Canning*, 573 U.S. at 552.

Cir. 2007).  By contrast, in *Marshall Field*, the Supreme Court precluded resort to the journals because the Court was being asked to consider matters in the journals "which the Constitution does not require to be entered on" them.  143 U.S. at 679.  Here, if the Court refers to the Congressional Record to review the yeas and the nays—the sole evidence the Court potentially could consider—the Record shows that there were 225 yeas, 201 nays, 1 present, and 4 not voting.  168 Cong. Rec. at H10528.  This count, which must be taken at face value, is sufficient to establish a quorum.

Texas argues that the enrolled bill doctrine does not apply because Texas is bringing a legal dispute concerning a potential violation of the Quorum Clause.  Br. 28–30.  In doing so, Texas relies on "an oblique footnote" in *Munoz-Flores, see Pub. Citizen*, 486 F.3d at 1352 (citing *Munoz-Flores*, 495 U.S. at 391 n.4), where the majority expressed its disagreement with the position expressed in Justice Scalia's concurrence that *Marshall Field* should be extended to Origination Clause challenges, *see Munoz-Flores*, 495 U.S. at 391 n.4.  But "*Munoz-Flores* did not in any way involve the question raised in *Marshall Field*" or the question raised here, which is "whether an authenticated enrolled bill ha[s] passed Congress."  *Pub. Citizen*, 486 F.3d at 1353.  While the footnote "def[ies] easy comprehension," it "is clear on one point: the Court did not mean to overturn or modify the enrolled bill rule of *Marshall Field*."  *Id.*; *see also OneSimpleLoan*, 496 F.3d at 206–08 (agreeing with the D.C. Circuit in *Public Citizen*).  And neither *Marshall Field* itself nor the other cases upon which Texas relies purport to limit the enrolled bill doctrine to preclude judicial review over only factual disputes concerning a bill's validity.  *See Ballin*, 144 U.S. at 3–4 (stating it was "unnecessary to add anything" to *Marshall Field*); *Lyons v. Woods*, 153 U.S. 649, 660, 663–70 (1894) (finding that the rule in *Marshall Field* was "decisive," and, in dicta, stating that even if the Court "extend[ed] [its] examination somewhat further" to consider the journals, the outcome would remain unchanged); *Pub. Citizen*, 451 F. Supp. 2d at 121 (noting that "the appeal to journals in *Lyons* supplied only additional support for the holding that the legislation at issue complied with the bicameral requirement applicable to U.S. territories, and thus represented no

33

limitation on the precedent established by *Marshall Field* and adopted in *Lyons*").   In any event, numerous courts have applied the enrolled bill doctrine after *Ballin*, *Lyons*, and *Munoz-Flores* to preclude constitutional challenges to enacted laws, including Quorum Clause challenges, *see, e.g.*, *Farmer*, 583 F.3d at 151–52, and this Court should do likewise.

This is the paradigmatic case for why the enrolled bill rule must be followed to ensure certainty and finality in the legislative process.   Justice Scalia's admonition that a court should not "gainsay [Congress's] official assertion that the bill was passed by the requisite quorum," *Munoz-Flores*, 495 U.S. at 410 (Scalia, J., concurring), holds special force here, as upending the $3 trillion omnibus appropriations law months after it passed would produce unprecedented challenges and complications for the entire federal government.   *See* Argument, Part II.C, *infra*; *see also* App101–106 (Kinneen Decl. ¶¶ 18–30).   As the Supreme Court in *Marshall Field* recognized, "[s]uch a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable."   143 U.S. at 675.

These same separation-of-powers and finality principles underpin the political question doctrine, which provides a separate basis for dismissal.   *See Baker v. Carr*, 369 U.S. 186, 217 (1962); *Dickson v. Ford*, 521 F.2d 234, 235–36 (5th Cir. 1975).   As the Supreme Court has emphasized, the "constitution has prescribed no method" for determining whether a quorum exists, and instead vests the House with discretion to "prescribe any method which shall be reasonably certain to ascertain the fact."   *Ballin*, 144 U.S. at 6.   This case is thus unlike *Powell v. McCormack*, 395 U.S. 486, 518–49 (1969), where the Supreme Court determined that the Constitution's enumeration of specific qualifications for House Members narrowed the House's otherwise broad authority to determine the qualifications of its Members.   Because the Constitution "commit[s] authority to the House," *Nixon v. United States*, 506 U.S. 224, 237 (1993), to determine whether a quorum is present, judicial review and second-guessing of the means the House used to establish a quorum here cannot be squared with that commitment.   Moreover, the need to ensure "finality" of an omnibus appropriations law passed more

than four months ago further supports the conclusion that the question presented here is nonjusticiable. *See id.* at 236, 229–30 (concluding that the validity of the procedures the Senate uses to try impeachments presented a nonjusticiable political question where the Constitution committed to the Senate the authority "to determine procedures for trying an impeached official" and in light of the need for "finality" in such proceedings).

### C.   The Case Should Be Dismissed for Lack of Venue.

For the reasons described in detail in Defendants' pending motion to transfer, *see* ECF Nos. 10, 34, venue is not proper in this district. Texas alleges only that venue is proper because it "resides" in this district.[23] Am. Compl. ¶ 17. Not so. Pursuant to the plain language of 28 U.S.C. § 1391, which defines residency "[f]or all venue purposes," Texas does not reside for venue purposes in this district, but instead resides in the Western District of Texas, where it "maintains its principal place of business." 28 U.S.C. § 1391(c)(2). Thus, the case should be dismissed for lack of venue.

### D.   The Court Lacks Jurisdiction to Enter Relief Against the President.

Texas has named President Biden as a defendant. Am. Compl. ¶ 15. But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). Because the "Court has no declaratory or injunctive power against President Biden," if the Court does not dismiss the case in its entirety, it should dismiss the President as a

---

[23] Texas alleged that venue is proper in the Northern District of Texas because "a substantial part of the events or omissions giving rise to its claim occurred here," Am. Compl. ¶ 17, but Texas abandoned that claim in its brief, *see generally* Opp., ECF No. 32. And for good reason: *no* events giving rise to Texas's claim concerning the passage of the Act occurred in this district. *See* 28 U.S.C. § 1391(e).

defendant.  *See U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 829 (N.D. Tex. 2022); *Foley v. Biden*, No. 4:21-CV-01098-O, 2021 WL 7708477, at *2 (N.D. Tex. Oct. 6, 2021); *Texas Gen. Land Off. v. Biden*, No. 6:21-CV-00052, 2022 WL 3086333, at *5 (S.D. Tex. Aug. 3, 2022).

Separately, dismissal of the President is warranted because Texas lacks standing to bring suit against him.  Even if the Court concludes that Texas has established standing to sue any of the other federal officials or agencies, "[s]tanding to sue one defendant does not, on its own, confer standing to sue a different defendant." *Daves v. Dallas Cnty., Tex.*, 22 F.4th 522, 542 (5th Cir. 2022).  Texas has not alleged that the President has any direct involvement in the enforcement of the PWFA or the CMPP's grant-making process. *See generally* Am. Compl.  Because Texas has not alleged any injury that is "fairly traceable to the challenged action" of the President, he must be dismissed from this suit. *See Lujan*, 504 U.S. at 560–61.

## II.    The Extraordinary Remedy of a Preliminary Injunction Is Not Warranted.

### A.  The Consolidated Appropriations Act, 2023 Was Lawfully Enacted.

Even if the Court reaches the merits, Texas's complaint should be dismissed for failure to state a claim and, for the same reasons, the motion for a preliminary injunction should be denied because Texas has not demonstrated a substantial likelihood of success on the merits.  Passage of the Act was constitutional.  The Constitution, through the Rulemaking Clause, empowers the House to make rules governing its proceedings, including a rule counting Members voting by proxy toward a quorum.  In arguing to the contrary, Texas misreads the text and purpose of the Quorum Clause, ignores the House's broad constitutional authority to determine rules governing its own proceedings, and overlooks historical practices in both the House and the Senate to act by unanimous consent—including with just a handful of Members present on the floor.

The Quorum Clause defines a "Quorum" as a "Majority" "to do Business."  U.S. Const. art. I, § 5, cl. 1.  According to Founding-era dictionaries, the term "quorum" means the minimum number

36

of participants necessary to transact business.  The debates at the Constitutional Convention confirm this reading, where delegates focused their discussions on how many participants should be required for the House and Senate to act without commenting on the method by which Members would be required to register their participation.  The Quorum Clause therefore establishes that a majority of Members of the House and Senate are required for each chamber "to do Business"—without dictating how or when this majority is to be determined.

The Constitution leaves the questions unanswered by the Quorum Clause to the House and Senate to address.  *See Ballin*, 144 U.S. at 6 ("The constitution has prescribed no method of making this determination [as to whether a quorum exists], and it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact.").  The Rulemaking Clause—which immediately follows the Quorum Clause in Article I—states that each chamber may "determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  The Supreme Court has repeatedly construed that power broadly.  Accordingly, while the Quorum Clause establishes that a "Majority" is required for each House to conduct legislative business, the Rulemaking Clause affords each chamber broad discretion to determine *how* and *when* this quorum may be ascertained.

Supreme Court precedent and the historical practices of the House and Senate confirm that a physical majority of Members is not required to transact business, including to pass legislation.  Texas states that "Congress has never . . . passed a law when a quorum could be achieved only by pretending that absent members were present."  Br. 11.  But for centuries, both the House and the Senate have been passing legislation by unanimous consent, with no more than a few Members physically present on the floor.  Further undermining Texas's argument, the Supreme Court has endorsed this practice, concluding that the Senate has the authority to pass legislation by unanimous consent pursuant to a Senate rule that presumes a quorum even if a majority of Senators is not physically present in the chamber at the time of passage.  *See Noel Canning*, 573 U.S. at 551–54.

The text, history, structure, and purpose of the Quorum and Rulemaking Clauses all point in the same direction: the House is constitutionally empowered to pass legislation pursuant to a rule counting Members voting by proxy toward a quorum.  The House therefore had the power to pass the 2023 Consolidated Appropriations Act when the House determined, pursuant to its own rules, that a quorum was present, when more than 400 Members participated either in person or by proxy.

### 1.   The Quorum Clause Does Not Require Physical Presence.

The text of the Quorum Clause—which Texas calls "unequivocal," Br. 33—does not require that a majority of Members be physically present in the chamber during a vote.  Instead, the Quorum Clause defines "Quorum" as a "Majority" "to do Business."  U.S. Const. art. I, § 5, cl. 1.  By its plain language, this text defines only the minimum number of Members who must participate for either House to conduct business, while being silent on the manner of how Members may participate.

At the founding, "quorum" meant the minimum number of participants necessary to transact business.  For example, one Founding-era dictionary defined quorum as "a number of any officers as is sufficient to do business."  2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ("Johnson").  Others used similar definitions.  *See* John Ash, *New and Complete Dictionary of the English Language* (1795) ("Ash") ("A bench of justices, a number of commissioners sufficient to do business; one or more commissioners without which the rest cannot proceed to business."); James Barclay, *Complete and Universal English Dictionary* (1792) ("a bench of justices; one is a commission without whom the rest cannot act"); Thomas Sheridan, *A Complete Dictionary of the English Language* (1790) ("A bench of justices, such a number of any officers is sufficient to do business.").  These definitions focused not on *how* or from *where* a justice or commissioner could participate, but on *how many* such officers must participate for the body to have the authority to act.  *See* Timothy Cunningham, *A New and Complete Law Dictionary* (1764) (providing numerical example).  Dictionaries published shortly after ratification are in accord.  *See* 1 Noah Webster, *American Dictionary of the English Language* (1828)

("Webster") ("A bench of justices, or such a number of officers or members as is competent by law or constitution to transact business").

As with Founding-era definitions of "quorum," the debates at the Constitutional Convention focused on fixing the minimum number of participants needed to perform legislative business—not on establishing the form of such participation. The Framers debated the Quorum Clause on August 10, 1787. *See* 2 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911), 251–54 ("Farrand"). The Framers wrestled with how to strike the proper balance between the need for the legislature to be able to act, which meant avoiding setting the number of Members required to participate too high, and the need to avoid minority rule, which meant that the number sufficient to conduct business should not be set too low. *Id.* All of this debate at the Convention about the Quorum Clause involved discussion of *how many* Members should be required to establish a quorum; none of it related to the separate question of *how* a Member might be deemed to count towards that quorum. *Id.*

On one side of the debate were Nathaniel Gorham[24] of Massachusetts and John Mercer of Maryland. They worried about setting a quorum too high. Gorham began the discussion by "contend[ing] that less than a Majority (in each House) should be made of Quorum, otherwise great delay might happen in business, and great inconvenience from the future increase of numbers." *Id.* at 251. Mercer agreed, advocating that it be left to "the Legislature to fix the Quorum, as in Great Britain, where the requisite number is small." *Id.* Others agreed that the inability of the legislature to act was the greater concern. *See id.* at 252 (citing statements by Rufus King of Massachusetts).

Oliver Ellsworth[25] of Connecticut and James Wilson of Pennsylvania, meanwhile, feared that setting the requisite number too low would facilitate minority rule. *Id.* at 253. Per Ellsworth, a higher quorum would give "confidence to the people that no law or burden could be imposed on them, by a

---

[24] Madison spells this last name "Ghorum" in his notes. *See* 2 Farrand, 251.
[25] Madison spells this last name "Elseworth" in his notes. *See* 2 Farrand, 253.

few men." *Id.* George Mason shared the same concern about minority control. *Id.* at 251–52. Mason explained that it would be dangerous "to allow a small number of members of the two Houses to make laws." *Id.* Mason further worried that a particular subset would be well positioned to do so: "The Central States," Mason predicted, "could always take care to be on the Spot . . . [and] could carry such measures as they pleased." *Id.* at 252. Ultimately, the delegates decided that a "quorum" would mean a "Majority" "to do business," requiring at least half of each chamber to participate to establish a quorum—without specifying how Members must participate to be counted. *Id.* at 254.

Rather than look to the operative text of the constitutional provision that imposes the quorum requirement, Texas looks to the ancillary phrase that follows that requirement as proof that the Constitution demanded physical presence to establish a quorum. That phrase states that "a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. But "Attendance" in this context means participation in House business—and does not necessarily require physical presence. Indeed, there is no indication that the Framers intended this other clause to limit each House's discretion in determining how to establish a quorum or to require that the House count only those physically present. *See* 2 Farrand, 254. Texas nonetheless asserts that Founding-era dictionaries indicate that "Attendance" necessarily "meant physical presence." *See* Br. 34. But, in fact, such dictionaries make clear that "to attend" could mean, among other things, "[t]o regard; to fix the mind upon," or "[t]o yield attention" to, 2 Johnson; "[t]o regard, to give attention," Ash; "[t]o be present"—*i.e.*, "ready at hand"—"for some duty" or "in business," 1 Webster. *See also* Ash ("attendance": "the act of serving"); 2 Johnson ("attendance" includes "service" and "attention; regard"); *id.* ("to attend" example: "Since man cannot at the same time attend to two objects, if you employ your spirit upon a book or a bodily labour, you have no room left for sensual temptations."). The question, then, is whether one can "attend" to a matter without being physically in a particular

place. Founding-era dictionaries demonstrate that one can do just that. Such a reading accords with the general rule that when a law requires "attendance," but "does not speak in terms of 'physical' or 'actual' attendance," courts do not "engraft such a restriction" onto the text. *Hurtado v. United States*, 410 U.S. 578, 584 (1973) (payment for a witness "attending in any court . . . for each day's attendance" did not require physical presence in courtroom).[26]

Similarly, while Texas acknowledges that Founding-era dictionaries provide "non-physical" definitions of "absent," it asserts that such meanings "would make no sense" in the context of the Quorum Clause. *See* Br. 35 n.3. Texas does not explain why that is so, and there is no apparent reason why "absent" cannot mean, as it did at the Founding, "inattentive," *see* 2 Johnson; Ash, such that "to compel the Attendance of absent Members" means "to require inattentive members to yield their attention to" or partake in the legislative matters at hand. Understanding the Quorum Clause to mean that a minority of Members could require those Members not participating in legislative business to do just that, whether in person or by some other means, is the most reasonable interpretation that gives meaning to the entire text without grafting to it unwritten provisions.

Texas also points to Madison's statements in *The Federalist No. 58* as "further indicat[ion] that the Quorum Clause requires physical presence." Br. 36. But Madison's statements simply reflect the central point of contention at the Constitutional Convention, which was how many Members should be required to establish a quorum—not how those Members must participate in order to be counted towards the requisite majority. In *Federalist No. 58*, Madison is responding to those who "said that

---

[26] Courts frequently refer to "attending" a hearing or deposition by remote means. *See In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 107153, at *2 (W.D. La. Jan. 8, 2014) ("voluntary agreement of the witness to attend trial by video conference"); *see also Antares Mar. Pte Ltd. v. Bd. of Comm'rs of Port of New Orleans*, No. CV 18-12145, 2020 WL 7022752, at *4 (E.D. La. Nov. 30, 2020) ("attending a deposition by remote means"); *In re Broiler Chicken Antitrust Litig.*, No. 1:16-CV-08637, 2020 WL 3469166, at *11 (N.D. Ill. June 25, 2020) ("telephone attendance at a remote deposition"); Court of Appeal, Fifth Circuit, State of Louisiana, *Zoom Webinar Instructions* (Apr. 28, 2020) (providing instructions "[t]o attend oral argument via Zoom"), https://perma.cc/CV8Y-YR77.

more than a majority ought to have been required for a quorum," recognizing that setting the bar higher did have "some advantages," including as "an additional shield to some particular interests, and another obstacle generally to hasty and partial measures." *The Federalist No. 58* (J. Madison). But, in Madison's view, "these considerations are outweighed by the inconveniences" that flow from setting the quorum too high. *Id.* Madison feared that, if just a handful of Members could withhold their participation so as to prevent a quorum from being established such that the House could not act, "[i]t would be no longer the majority that would rule: the power would be transferred to the minority." *Id.* Madison—like other delegates at the Constitutional Convention—was focused on one issue: striking the right balance between requiring too few Members to participate, such that a minority could pass laws without the involvement of most Members, and requiring too many Members to participate, such that the legislature would be hamstrung from doing its work if even a small subset declined to take part in the chamber's business. These debates, like the text of the Quorum Clause itself, did not address how the requisite majority would be required to participate to be counted towards the quorum.

Texas's argument reduces to the idea that the Framers did not subjectively envision Members participating in House business in real-time from afar through the instant transmission of specific voting instructions or by appearing in committee hearings by contemporaneous video feed—both of which would have been technologically impossible at the time. But even if some or all of the Framers assumed that Congress would conduct business in person, "[w]hether by choice or accident, the Framers did not reduce their thoughts . . . to the printed page." *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020). Indeed, where the Framers' "sparse instructions took no position" on a matter, they left that matter "to the future" to be determined. *Id.* Accordingly, "[t]he question is not: Did the Founders at the time think about" alternative methods of participating, like instantaneous proxy voting or videoconference committee hearing appearances. *Noel Canning*, 573 U.S. at 533. "The question is: Did the Founders," through the text of the Constitution itself, "restrict the scope of the" Quorum

Clause "to the form of" participation "then prevalent," or does that text indicate that they intended "a broader scope permitting the Clause to apply, where appropriate, to somewhat changed circumstances?" *Id.*; *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 226 (1986) (recognizing that the Framers, in adopting the Qualifications Clause, were "not contemplating the effects of that provision upon the modern system of party primaries" "any more than they contemplated the application of the commerce clause to interstate telephone, telegraph and wireless communication, which are concededly within it").

The text of the Quorum and Rulemaking Clauses demonstrate that the Framers intended to empower each House to determine, over time, how and when a quorum exists. Accordingly, Texas cannot prevail by showing that the Framers did not subjectively anticipate the technological advances that would permit real-time participation in legislative business from outside the House chamber. Rather, Texas must establish that the text of the Quorum Clause *prohibits* the House from exercising its rulemaking power to count, for purposes of a quorum, Members participating in ways other than being physically present on the House floor. It cannot do so.

Finally, while Texas cites an array of other constitutional provisions, *see* Br. 37–38, it does not allege that any of these provisions is violated. *See* Am. Compl. ¶¶ 58–70. Rather, Texas asserts that these other provisions "lead to the conclusion that physical presence is necessary for the House" to "pass bills." Br. 37. Texas is wrong. None of these provisions even purports to govern when or how a quorum to pass legislation is established. *See, e.g.*, U.S. Const. art. I, § 4, cl. 2 (requiring Congress to "assemble at least once in every Year" without stating that the House or Senate cannot perform legislative business at any other time).

The fact that certain provisions include text that Texas says indicates a physical presence requirement is of no help either. First, it is not clear that use of terms like "present" and "adjourn" in other clauses necessarily refers to physical presence. *See* 1 Webster ("present": "[r]eady at hand";

"[t]o adjourn": to "suspend business for a time."). The Speech or Debate Clause, which Texas cites, provides a good example. That clause states, "for any Speech or Debate in either House, [Members] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The Congressional Record provides a section for "Extensions of Remarks," which are "used only by House of Representatives Members to publish additional statements not actually delivered on the House floor." *About the Congressional Record*, Congress.gov, https://www.congress.gov/help/congressional-record. Under Texas's unyielding focus on physical presence, a Member presumably could be "questioned" and subject to liability for statements made in such a manner because such "Speech or Debate" is not made "in" either House. Second, even if these ancillary clauses unambiguously required physical presence to perform *other* acts addressed by these provisions, the Quorum Clause does not use the words found in these clauses, which only reinforces the limited reach of the Quorum Clause itself.

* * *

The text of the Quorum Clause, as informed by Founding-era dictionaries and debates, does not require that a majority of Members of the House be physically present in the House chamber for the House to proceed to a vote. Rather, the Quorum Clause merely requires that a "Majority" of Members is required to establish a quorum. How those Members must participate to be counted in the quorum, and how long a quorum is presumed to last after it is established, are questions left to each House's discretion pursuant to its exclusive power to determine the rules of its proceedings.

### 2. The House Has Broad Authority to Craft Rules for Establishing a Quorum.

The Rulemaking Clause empowers the House to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, leaving "all matters of method . . . to the determination of the [H]ouse," *Ballin*, 144 U.S. at 5. Pursuant to that broad rulemaking authority, the House has frequently altered its quorum-counting rules to determine those questions left unanswered by the Quorum Clause, including under what circumstances Members are to be counted for quorum purposes, how long a

quorum lasts once established, and what constitutes legislative "Business" necessitating a quorum.

The Constitution provides a "broad delegation of authority to the [House and Senate] to determine how and when to conduct its business." *Noel Canning*, 573 U.S. at 550. "The Constitution explicitly empowers" each House "to 'determine the Rules of its Proceedings.'" *Id.* (quoting U.S. Const. art. I, § 5, cl. 2). The Supreme Court in *Noel Canning* reaffirmed what it held more than 100 years earlier about this expansive power: "'[A]ll matters of method are open to the determination' of the" House and Senate "as long as there is 'a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained' and the rule does not 'ignore constitutional restraints or violate fundamental rights.'" *Id.* at 551 (quoting *Ballin*, 144 U.S. at 5). "The Constitution thus gives the" House and Senate "wide latitude to determine . . . how to conduct" a legislative session. *Id.*

*Ballin* demonstrates the breadth of the House's authority to define a quorum. In *Ballin*, the Court considered a challenge to a law that passed with fewer than a majority of Members voting. *See* 144 U.S. at 3. The House had recently amended its rules so that nonvoting Members "in the hall of the house" were to "be counted . . . in determining the presence of a quorum to do business" along with those who did vote. *See id.* at 5 (quoting the new rule); *see also* House Rule XX.4(b) (current version of same rule). The Court concluded that the House's rule complied with the Quorum Clause. In so holding, the Court explained that the Constitution did not fix the method by which the House determined the existence of a quorum. Instead, the House was free to modify its rules over time: "[I]t is no impeachment of the rule to say that some other way would be better, more accurate, or even more just. It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *Ballin*, 144 U.S. at 5. "The power to make rules," the Court explained, "is not one which once exercised is exhausted." *Id.* Rather, it is a "continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of

any other body or tribunal." *Id.*

Texas argues that *Ballin* shows that the Supreme Court "assumed" that a quorum could only be established through "physical presence." Br. 37. But the Court's reference to the "presence of a majority," *Ballin*, 144 U.S. at 5–6, merely referred to the existence of a majority that was "in a position to do business," *id.* at 5; *see also South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2095–99 (2018) (recognizing that one "may be present in a [place] in a meaningful way without that presence being physical in the traditional sense of the term"). *Ballin* did not consider whether the Quorum Clause requires physical presence because the only issue presented was whether the House could revise its rules for counting those physically present, to which the Court answered emphatically in the affirmative. And while Texas reads *Ballin* as constraining the House's power to enact quorum-setting rules, it did just the opposite, holding that, subject to the broad parameters set forth above, it is "within the competency of the house to prescribe *any* method which shall be reasonably certain to ascertain" whether the requisite majority quorum is established. *Id.* at 6 (emphasis added).

Texas also points to *Christoffel v. United States*, 338 U.S. 84 (1949), but that case is inapposite. *See* Br. 37. In *Christoffel*, the question was whether a jury could convict the defendant of perjurious testimony "before a competent tribunal," which the trial court instructed the jury required a finding that at least 13 members of a House committee were "actually and physically present," based on a House rule that required a majority to be "actually present" to conduct business. 338 U.S. at 86, 88. The Quorum Clause—which was not at issue in *Christoffel*—contains no such "actual[] presen[ce]" requirement. *See* Argument, Part II.A.1, *supra*. The Court in *Christoffel* emphasized the limited scope of the issue presented: the "question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct." *Christoffel*, 338 U.S. at 88. Rather, *Christoffel* addressed only "whether" Congress "ha[d] . . . followed" its own rules. *Id.* The decision therefore does not purport to curtail the House's "wide

46

latitude" to ascertain whether a quorum is present. *See Noel Canning*, 573 U.S. at 551.

Exercising its broad rulemaking authority, the House has frequently altered its quorum-counting rules. *See* Background, Part I, *supra*. For example, as a threshold matter, the House has defined "Business" such that a quorum is not required for debate and a Member can require a call occur only on the eve of a vote. *Id.* The House has also changed its rules regarding how long a quorum, once established, is presumed to last. *See id.* By the late 1800s, it was settled practice that a quorum is "presumed always to be present unless a point of no quorum is made." *Deschler's*, ch. 20, §§ 1.3, 2.1; *see also* 6 *Cannon's* § 624. As discussed in the section below, in accord with this presumption, the House frequently acts by unanimous consent, passing legislation even if a majority of Members is not physically present on the floor at the time of passage.

The House has also modified how it calculated a quorum in the first instance. A quorum originally included only Members voting on a measure such that Members could prevent a quorum by declining to vote. 4 *Hinds'* §§ 2898–2903. In 1890, the Speaker began construing a quorum to include Members "present but not voting," *id.* § 2895, a practice the Supreme Court upheld in *Ballin*. *See* 144 U.S. at 5. The House also revised its practices for determining the whole number out of which a quorum was to be determined. *See* Background, Part I, *supra* (explaining that, during the Civil War, the House began interpreting a quorum as a majority of "chosen"—rather than possible—Members, substantially reducing the number of Members needed for a quorum). Similarly, in response to the September 11 attacks, the House enacted a provisional quorum rule, which, after a series of roll call votes, reduces the total number of Members necessary to establish a quorum to ensure that the House could act during catastrophes. *See* H.R. Res. 5, 109th Cong. (2005); House Rule XX.5(c)(1), (4)(A).

Thus, while the Quorum Clause establishes that a majority constitutes a quorum, the Rulemaking Clause affords the House "wide latitude" to define "Majority" for quorum clause purposes. *See Noel Canning*, 573 U.S. at 551. As set forth below, that includes the power to enact rules

that the enable the passage of legislation by unanimous consent, in which no more than a handful of

Members are physically present on the floor, and to count for quorum purposes all those participating

in a vote, whether in person or by proxy.

### 3. The Supreme Court Has Recognized the Power to Pass Legislation Absent a Majority of Members Physically Present.

Texas's argument rests upon a flawed premise: that "Congress has never . . . passed a law when

a quorum could be achieved only by pretending that absent members were present." Br. 11; *see also*

*id.* at 33 (similarly misstating historical practices). Texas gets its history wrong. For centuries, both

the House and Senate have been passing legislation (and, in the Senate, confirming Article III judges

and other Presidential appointments) by unanimous consent, that is, by a single Member requesting

that the House take "some action that is not in dispute and to which no Member has any objection,"

all of which is accomplished with no more than a few Members physically present on the floor. *House*

*Practice*, ch. 54, § 1; *see also* 4 *Hinds'* § 3155 (describing use of unanimous consent as early as 1832).

"'Long settled and established practice' may have 'great weight in a proper interpretation of

constitutional provisions.'" *Chiafalo*, 140 S. Ct. at 2326 (quoting *The Pocket Veto Case*, 279 U.S. 655,

689 (1929)). And Texas omits from its brief that the Supreme Court has recognized this practice,

explaining that the Senate has the authority to pass legislation by unanimous consent even if, in fact,

a majority of Senators are not present in the chamber at the time of passage. *See Noel Canning*, 573

U.S. at 551–54. This long-standing practice, and the Supreme Court's recognition of it as a valid

exercise of legislative authority, dooms Texas's challenge.

In the House, the practice "of allowing some actions to be taken by unanimous consent began

in the 1830s, when the House, responding to the increased pressure of legislative activity, unanimously

agreed to a special order of business permitting it to consider a bill which was not in the regular order

of business." *House Practice*; *see also* 4 *Hinds* § 3155 (describing use of unanimous consent as early as

1832). Unanimous consent "is applied across a wide range of House business," including to "adopt

or pass a measure." *House Practice*, ch. 54, § 7; *see also Jefferson's Manual*, § 528a (unanimous consent may be used to consider a Senate amendment to a House bill). The unanimous consent practice relies on the House's presumption that a quorum is present even if only a few Members are physically found in the chamber. At the first meeting of each new Congress, the House establishes a majority quorum necessary "to do Business." U.S. Const. art. I, § 5, cl. 1; *Jefferson's Manual* §§ 53, 54, 310; *see also* 168 Cong. Rec. H5. Going forward, "a quorum is presumed always to be present unless a point of no quorum is made." 5 *Deschler's*, ch. 20, § 1.3; *see also id.* § 2.1 (same). Unanimous consent thus "permits many measures to be passed . . . when in fact fewer than a majority of Members" are physically present. William McKay & Charles W. Johnson, *Parliament and Congress* 85 (2010). Indeed, while Texas points to the 1918 flu as a time that "Congress assembled in person" even during a pandemic, *see* Br. 40, Congress passed legislation through unanimous consent—with fewer than 50 Members, far short of a majority, physically present in the House. *See Sick Days*.

The Senate has "been conducting routine business by unanimous consensus since 1789." U.S. Senate, The First Unanimous Consent Agreement, https://perma.cc/WT8Z-N3LZ. "Historically, the Senate confirmed most U.S. circuit and district court nominations by unanimous consent or by voice vote." Cong. Research Serv., *Judicial Nomination Statistics & Analysis: U.S. Circuit & District Courts, 1977-2022*, 33 (Apr. 3, 2023), https://perma.cc/2SK5-SB9L ("*Judicial Nomination Statistics*"). As in the House, acting by unanimous consent in the Senate is possible because Senate rules presume that a quorum is present. *See* Senate Rule VI. "Until a point of no quorum has been raised, the Senate operates on the assumption that a quorum is present, and even if only a few Senators are present, a measure may be passed or a nomination agreed to." *Riddick's* 1038. "Voice votes may be taken on the passage of a bill and if no question of a quorum is raised, that action is final, even though a majority of the Senators did not participate; the Senate operates on the absolute assumption that a quorum is always present until a point of no quorum is made." *Id.*

The Supreme Court has recognized the validity of this practice.  In *Noel Canning*, the Court ruled that the President did not have the power to make recess appointments while the Senate was in a month-long "recess" punctuated by a series of *pro forma* sessions.  573 U.S. at 550.  The Court reached that conclusion because it determined that the Senate was in "session"—and not in recess—during the *pro forma* sessions because the Senate "retain[ed] the capacity to transact Senate business."  *Id.* Even if all but a few Senators were away from Washington, during "any *pro forma* session, the Senate could have conducted business simply by passing a unanimous consent agreement."  *Id.* at 553–54. Noting that the "Senate in fact conducts much of its business through unanimous consent," the Court explained that the Senate could act because "Senate rules presume that a quorum is present unless a present Senator questions it," and "when the Senate has a quorum, an agreement is unanimously passed if, upon its proposal, no present Senator objects."  *Id.* at 553; *see also id.* at 554 ("the Senate operates under the presumption that a quorum is present until a present Senator suggests the absence of a quorum").  The Court approvingly noted that the Senate passed a bill pursuant to this rule during one of the relevant *pro forma* sessions.  *Id.* at 553.  The Court therefore rejected the argument that the Senate was in recess because, during any *pro forma* session, the Senate "could confirm nominees by unanimous consent."  *Id.* at 554.  The actual presence or not of a physical majority of Senators was immaterial.  Rejecting the argument that a "more realistic appraisal" would show "the Senate Chamber was, according to C-SPAN coverage, almost empty" during the *pro forma* sessions, the Court responded that this kind of "factual appraisal" was not "legally or practically appropriate."  *Id.* at 554–55.

The Court's discussion of the power of the Senate to act absent a majority of Senators physically present in the chamber was essential to its holding.  The Court explained that, while it generally deferred "to the Senate's own determination of when it is and when it is not in session," that "deference . . . cannot be absolute."  *Id.* at 552.  Rather, when "the Senate is without the *capacity* to act, under its own rules, it is not in session even if it so declares."  *Id.*  Because the Senate did have the

capacity to act under its own rules, notwithstanding that no more than a few Senators were physically in the Senate chamber during the *pro forma* sessions in question, the Court held that the Senate was not in recess, and that the President lacked the power to make recess appointments. *Id.* at 550.

The Court's conclusion that the Senate had the capacity to confirm nominees and pass legislation via unanimous consent and without the physical presence of a majority of Senators requires dismissal of Texas's claims. There is no way to reconcile the Supreme Court's conclusion that the Senate had the capacity to act in *Noel Canning*, when just a few Senators were physically present on the floor of the Senate, with Texas's core theory that "[t]he Constitution requires that a majority of the Members of either House of Congress be physically present" to conduct business. Br. 1. Rather, *Noel Canning* demonstrates that the House had the authority to pass the 2023 Consolidated Appropriations Act when more than 200 Members participated in the vote from the House chamber and another 200-plus Members participated by proxy.

Texas twice cites *Noel Canning*, *see* Br. 38, 41, but it makes no mention of the Court's lengthy discussion above pertaining to the Senate's capacity to act by unanimous consent. Texas does point to the decision for the proposition that "courts '*put significant weight upon historical practice*'" when interpreting structural provisions of the Constitution. Br. 38 (quoting *Noel Canning*, 573 U.S. at 524). But the historical practice, as outlined above, illustrates that Texas's argument is flawed at its core. Rather than an unbroken streak of "231 years" of enacting legislation only when a majority of Members of the House or Senate is physically present, *id.* at 33, the House and Senate have been acting without a majority of Members physically present since shortly after ratification. Indeed, more than 90% of all confirmed district court judges nominated by Presidents Reagan, George H.W. Bush, and Clinton were confirmed by unanimous consent or voice vote—neither of which require a physical majority of Senators present. *Judicial Nomination Statistics*, 34 (same as to nearly 50% of confirmed district court judges nominated by President George W. Bush, nearly 40% of those nominated by

President Obama, and nearly 20% of those nominated by President Trump).

### 4. The House Had a Quorum, and Therefore the Constitutional Power to Act, When It Passed the 2023 Consolidated Appropriations Act.

On December 23, 2022, more than 400 Members voted on the 2023 Consolidated Appropriations Act, with 225 Members voting in favor and 201 voting against, resulting in the Act's passage. 168 Cong. Rec. at H10528. Pursuant to Resolution 965, the Speaker *pro tempore* determined that a quorum had been established at the time of the vote. *Id.* at H10529 ("Pursuant to [the House proxy voting rule], Members casting their vote or recording their presence by proxy are counted for the purpose of establishing a quorum under the rules of the House.") *Id.* The House's determination that a quorum existed upon passage of the Act was constitutionally sound.

"As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require . . . ." *Nixon*, 506 U.S. at 230 (quoting *Dillon v. Gloss*, 256 U.S. 368, 376 (1921)). Accordingly, the Supreme Court had held that the House has "wide latitude" to determine whether a quorum has been established. *See Noel Canning*, 573 U.S. at 551; *see also Ballin*, 144 U.S. at 5. "'[A]ll matters of method are open to the determination' of the" House and Senate "as long as there is 'a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained' and the rule does not 'ignore constitutional restraints or violate fundamental rights.'" *Noel Canning*, 573 U.S. at 551 (quoting *Ballin*, 144 U.S. at 5).

Counting all Members who are participating in a vote, whether in person or by proxy, meets that test. As described above, a "quorum" means the "number of members of a larger body that must *participate* for the valid transaction of business." *New Process Steel, LP v. NLRB*, 560 U.S. 674, 683–84 (2010) (emphasis added); *see also id.* at 684 (a quorum of two means that "two members must participate to transact business in the name of the group"). In this case, more than 400 Members participated— far exceeding the "Majority" necessary "to conduct Business."

That approximately half of those Members participated by proxy is of no constitutional significance. As previously explained, the Quorum Clause does not require physical presence, and the Rulemaking Clause leaves it to the House to set its own rules for determining the existence of a quorum. The House's choice to count proxy participation for quorum purposes is not a novel idea. Indeed, as multiple courts have held, the "idea that '[a] quorum acting on a matter need not be physically present together' is not" new. *Chamber of Commerce of the U.S. v. NLRB*, 879 F. Supp. 2d 18, 28 (D.D.C. 2012) (quoting *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967)). And a system that allows Members to participate "without actually being together is perfectly appropriate" to satisfy a quorum requirement. *Id.* at 28.

Physical presence often has no bearing on the question of whether a quorum exists. Take 28 U.S.C. § 46(d) as one example. That statute provides that "[a] majority" of a court of appeals or a "panel" therefore "shall constitute a quorum," which the Supreme Court has said "means such a number of the members of the court as may legally transact judicial business." *See Nguyen v. United States*, 539 U.S. 69, 82 n.14 (2003) (cleaned up). But whether a quorum exists from case filing through disposition does not depend on whether a majority of judges remains huddled in a single location, or on whether those judges hold oral argument in person or remotely. What matters is whether the majority *participates* in all stages of the proceedings. *See Comer v. Murphy Oil USA*, 607 F.3d 1049, 1053–54 (5th Cir. 2010) ("Upon this recusal, this en banc court lost its quorum. Absent a quorum, no court is authorized to transact judicial business."). Accordingly, in the Fifth Circuit, when a judge participates in oral argument, but is later recused from the matter, the court explains that the panel retained a quorum—a conclusion that does not turn on the physical presence of the remaining two judges or the physical absence of the third. *See, e.g., Civelli v. J.P. Morgan Sec., LLC*, 57 F.4th 484, 486 n.* (5th Cir. 2023) ("Judge Barksdale took part in oral argument but now stands recused and did not participate in the opinion. This matter is decided by a quorum. *See* 28 U.S.C. § 46(d)."). Similarly,

53

while "any six" of the nine Supreme Court justices "shall constitute a quorum," the Supreme Court retained the power to hear and decide cases throughout the COVID-19 pandemic, when it heard arguments remotely.   28 U.S.C. § 1; Press Release, U.S. Supreme Court (Apr. 13, 2020), https://perma.cc/35SP-NNWL ("In keeping with public health guidance in response to COVID-19, the Justices and counsel will all participate remotely."). As a coequal branch of government, Congress should have no less flexibility in discharging its constitutional responsibilities.

Texas presents a host of arguments as to why counting proxy participants towards a quorum is unconstitutional, but none is persuasive and most contain misstatements of fact or law.

First, Texas argues that if the House does not conduct its business through "physical presence," "a small handful of congressmembers could control the outcome of a bill." Br. 38. It is unclear why that is the case. Counting all participants, whether voting in person or by proxy, does not decrease the *number* of Members required to establish a quorum—the only requirement found in the text of the Quorum Clause itself. Allowing proxy participation merely changes the *means* of participation—a question left to the House to determine pursuant to the Rulemaking Clause. And it does not change the number required to pass a bill, which remains a majority of those participating. Indeed, while unanimous consent allows the House to pass legislation with just a few Members participating at the time of passage, the proxy participation rules continue to require majority participation. Finally, by requiring Members to give their proxies exact written instructions that must be followed for every House matter, the proxy participation rule ensures that Members actually participate in each particular vote.

Second, Texas claims that the "debates surrounding the Constitution's ratification recognized that the Quorum Clause stood as a safeguard to our republican form of government," Br. 36, without explaining how that safeguard is eroded by proxy participation.  As explained above, the Framers enacted the Quorum Clause to ensure that an adequate number of Members participated in

congressional business, without unduly hamstringing congressional action.  Proxy participation does not upend the balance they struck because it does not change the number required to participate in legislative business.  If anything, proxy participation resolves some of the Framers' concerns about minority rule.  As discussed, George Mason worried that, if the quorum requirement were set too low, a particular subset of legislators would be in control: the "Central States"—those closest to the capital city—"could always take care to be on the Spot," establishing a quorum while those unable to be physically present would be cut out of the legislative process.  2 Farrand 254.  That the House continued to require majority participation even during the COVID-19 pandemic, whether through physical presence or otherwise, ensured that House business was not controlled solely by those healthy enough to travel to Washington, D.C. and attend in person.

Third, Texas is wrong that the "United States rejected proxy voting by the legislature . . . in the Constitution."  *See* Br. 39.  Texas claims that "delegates at the Constitutional Convention rejected proposals that would have allowed Representatives to 'vote by proxy.'"  *Id.*  Texas then cites notes from Alexander Hamilton.  But these notes were "not submitted to the Convention and [have] no further value than attaches to the personal opinions of Hamilton."  3 Farrand 619.  And Texas cites no debate at the Constitutional Convention involving proxy voting or whether proxy participation could count for purposes of establishing a quorum.  Texas also alleges that proxy voting was rejected in the Articles of Confederation.  Br. 39.  Texas points to an early proposal for the Articles in which Benjamin Franklin would have allowed proxy voting, but Texas does not cite to any debates about the Articles indicating that this provision was discussed and rejected.  *Id.*  Additionally, the type of proxy voting that Franklin described differs materially from the House procedures at issue.  Franklin proposed that a delegate be permitted to "appoint" "any other Delegate from the same Colony to be" a "Proxy, who may vote for him."  Franklin, Proposed Articles of Confederation, On or Before 21 July 1775, https://perma.cc/J2N4-LPW4 ("Proposed Articles").  Such a rule would have delegated

all voting power to another Member, effectively allowing a single Member to cast multiple votes in the way of his choosing.  That proposed rule would raise very different constitutional questions, none of which are presented here, where the House required that a "Member acting as a proxy must 'obtain an *exact* instruction' in writing that is *specific* to a *particular* vote or quorum call."  *McCarthy*, 5 F.4th at 37 (quoting H.R. Res. 965 § 3(c)(1), (c)(6)) (emphasis added).  Further, Franklin's draft Articles stated that "[o]ne half of the Members return'd *exclusive of Proxies*  be necessary to make a Quorum," suggesting that at least one Founder understood that the word "Quorum" did not require physical presence and could encompass the counting of proxies if not otherwise specified.  *See* Proposed Articles.  As to the final version of the Articles of Confederation, it does not use the word "quorum" and so is of little interpretive use.  *See* Articles of Confederation (1777), https://perma.cc/778H-JJ76. The Articles did permit the legislature to act, in certain circumstances, "by the votes of a majority of the united states in congress assembled"—using a term ("assembled") that Texas argues connotes physical presence, and that the Constitution left out of the Quorum Clause.  *Id.*

Finally, any concern that counting proxy participation for quorum purposes undermines debate in the House, *see* ECF No. 47 at 2 (the House "is supposed to be a deliberative body" and that "[f]or much of our Nation's history, Members have offered floor speeches, engaged in debate, and attempted to persuade their colleagues before casting votes on the most pressing issues facing the country"), is misplaced.  Texas nowhere makes this argument, perhaps because Texas's complaint pertains only to whether the House had the power to *pass* legislation, not whether it had the power to engage in or end debate.  In any event, the House does not require a quorum to debate, *see Jefferson's Manual*, § 1027; House Rule XX.7(a), and, as with the Senate, "according to C-SPAN coverage," the House chamber is frequently "almost empty" during floor statements, *see Noel Canning*, 573 U.S. at 554.  Whatever the reason for that, the change in the House's quorum-counting rules are not to blame.

* * *

56

The Constitution defines a "Quorum to do Business" as a "Majority" of the House.  That clause does not define "Business," it does not dictate how long a quorum, once established, is deemed to last, and it says nothing about how Members must participate in the House's "Business" to count towards a quorum.  All of those unanswered questions are for the House to decide, pursuant to its broad authority under the Rulemaking Clause.  Over its history, the House has adopted a number of quorum-setting rules, including presuming that, once established at the start of a session, the presence of a quorum continues, such that legislation is frequently passed by unanimous consent, with just a handful of Members on the floor.  That long-standing practice has been recognized by the Supreme Court as a valid exercise of legislative authority.  Against that backdrop, there is little doubt that the House was empowered to pass the 2023 Consolidated Appropriations Act when more than 400 Members participated in the vote.  On this basis, Texas's motion for a preliminary injunction should be denied, and this case should be dismissed.

### B.  Texas Has Not Shown Irreparable Harm.

Texas bears the burden of showing that, in the absence of a preliminary injunction, it is "likely to suffer irreparable harm[;]" *i.e.*, harm for which there is no adequate remedy at law.  *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (citation omitted).  To satisfy this requirement, there must be "a significant threat of injury from the impending action" and the injury must be "imminent."  *Humana Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Texas must demonstrate that irreparable harm is likely, not merely possible, *Winter*, 555 U.S. at 20; "[s]peculative injury is not sufficient" "to make a clear showing of irreparable harm," *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).  Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue."  *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (citing *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)).  Texas has not carried its burden here.

As a threshold matter, Texas has not demonstrated that it will suffer *any* harm, let alone irreparable harm, from the vast majority of the Act, *see* Argument, Part I.A.3, *supra*, and therefore Texas is not entitled to the overbroad injunction that it seeks, *see* Mot., Br., Proposed Order.  Texas identifies just two aspects of the Act—an omnibus appropriations law spanning more than 1,600 pages—that it alleges will cause it harm: the PWFA and CMPP provisions.  Texas lacks standing to challenge even those portions, for the reasons stated above, and it has not sufficiently established that those provisions will cause it any irreparable harm, as set forth below.  As to any other portion of the Act, Texas has not even alleged that it will be harmed, irreparably or otherwise.  Because a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill*, 138 S. Ct. at 1934, regardless of how the Court resolves any other aspect of Texas's motion, Texas is not entitled to an order preliminarily enjoining the entire Act.

As to the two provisions at issue in Texas's complaint, Texas identifies two sets of alleged harms: "substantial financial injuries" because of the CMPP and PWFA, and a "sovereign" injury from potentially having to defend itself from suit.  Neither of these is a cognizable Article III injury, as set forth above.  *See* Argument, Part I.A, *supra*.  Even if these alleged injuries were sufficient to establish standing, Texas falls far short of establishing that any such harm is "likely" to occur in the absence of a preliminary injunction or that any such harm is "imminent."

Take the CMPP first.  The Act provided an additional $20 million in grant funds to be awarded by September 30, 2024—that is, by the end of the third quarter of *next* year.  136 Stat. at 4726.  Texas alleges that the eventual downstream effect of the award of these funds is that it will be forced to spend more money on noncitizens because such individuals will be drawn to the State by the prospect of voluntary case management services, and that these noncitizens will then seek assistance from state-funded entities and services.  *See* Am. Compl. ¶¶ 30–38.  Texas fails to show that this speculative chain of events will ever occur let alone occur before this case proceeds to the merits.  *See* Br. 42–43 (two-

paragraph irreparable harm section that does not cite a declaration or any other factual support for the proposition that Texas will imminently suffer irreparable harm absent an injunction).

Consider again the steps that remain: The 2023 fiscal year funds must be granted to the National Board (sometime before September 30, 2024), the Board must then issue grants to organizations or localities in Texas, noncitizens would have to be enticed to Texas *because of* those awards (and not some other reason, *e.g.*, Texas is on the American side of the U.S.-Mexico border), ICE would have to use its authority to release those noncitizens, and then noncitizens would have to seek and receive Texas-funded services. *See* Argument, Part I.A.1, *supra.* Texas offers no proof that any of this will occur. *See Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017) ("[S]peculation built upon further speculation does not amount to a 'reasonably certain threat of imminent harm.'") (citations omitted).  And in asserting that it will imminently suffer irreparable harm if a preliminary injunction does not issue, Texas does not even try to approximate the amount of money that it will have to spend because of CMPP grants.  Similarly, Texas offers no dates—not even an estimate—as to when such harm is anticipated.  All Texas can muster is that, because of prior immigration generally, it has spent additional taxpayer dollars. *See* Am. Compl. ¶¶ 35, 36; Br. 22–23.  But "[i]njunctions are forward looking remedies that may be issued 'only if future injury is certainly impending.'" *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D. Tex. 2020) (quoting *Aransas Project v. Shaw*, 775 F.3d 641, 664 (5th Cir. 2014)).  Texas falls far short of showing that the CMPP will cause irreparable harm absent a preliminary injunction.

Texas does not fare any better with respect to costs related to the PWFA.  First, Texas asserts without support that it already "incurs . . . millions of dollars in costs from the" PWFA.  Br. 42.  Texas does not explain how it has incurred these costs, nor does such statement make sense as the PWFA has not yet taken effect. *See* 136 Stat. at 6089 (PWFA takes effect June 27, 2023).  Second, Texas offers no support for its bald assertion that it "will incur" "millions" in such costs as a result of the

PWFA.  For starters, Texas disavows any intent to engage in any conduct proscribed by the PWFA.  *See* Am. Compl. ¶ 28; Br. 13.  On that basis alone, where Texas has committed not to violate the law it fears will be the source of a future enforcement action, Texas cannot meet its high burden of establishing that it will suffer irreparable harm absent a preliminary injunction.  Even if Texas were less sure about its future intentions, the required causal chain again requires speculation about third-party actors, including whether and when employees will file suit, which can occur only after the PWFA takes effect and Texas refuses to provide a reasonable accommodation.

Even if Texas could show that it imminently faces the prospect of having to defend itself in a lawsuit alleging that it violated the PWFA, that would not constitute irreparable harm.  If Texas is sued, it can raise as a defense its argument that Congress unconstitutionally abrogated its sovereign immunity in passing the PWFA.  If Texas is right, its sovereign immunity will prevent it from having to pay damages.  But having to respond to such a suit and litigate the issue is not itself irreparable harm: "Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."  *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980).  And the opportunity to later raise the argument is a sufficient legal remedy militating against the issuance of a preliminary injunction here.  *See Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").  There may be scenarios where having to appear in court may itself cause some harm—such as in the First Amendment context, where state laws guard against the prospect of "retaliatory lawsuits that seek to intimidate or silence" defendants from exercising their constitutional rights, *see Sw. Airlines Co. v. Roundpipe, LLC*, 375 F. Supp. 3d 687, 695 (N.D. Tex. 2019) (describing Texas's anti-SLAPP law)— but this is not one of them.  The possibility of having to defend against a PWFA claim would not chill any conduct, constitutional or otherwise, that Texas intends to engage in.  Rather, Texas alleges that it will "accommodate the reasonable needs of its pregnant employees," presumably in compliance with

the PWFA.

Because Texas has not demonstrated that it will suffer any imminent, irreparable harm absent a preliminary injunction, Texas's motion should be denied.

### C. A Preliminary Injunction Would Be Contrary to the Public Interest.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a preliminary injunction here, especially against a preliminary injunction that would result in an unprecedented, judicially-imposed government shutdown.

The Supreme Court has cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Although Texas does not specify which parts of the Act it seeks to enjoin, *see* Argument, Part II.D, *infra*, the public consequences of an order enjoining the enforcement of any part of the Act cannot be understated as doing so would cause uncertainty regarding other portions of the omnibus legislation. Such uncertainty concerning an Act that appropriated $3 trillion in funds for domestic programs and foreign policies and that enacted many pieces of permanent legislation would harm a "'vast magnitude' of 'public and private interests' which depend upon the certainty of statutes." *Pub. Citizen*, 486 F.3d at 1355 (quoting *Marshall Field*, 143 U.S. at 670).

With regard to specific provisions in the Act, an injunction preventing enforcement of the PWFA when it takes effect in June would harm pregnant workers who otherwise will be entitled to reasonable accommodations for limitations relating to pregnancy, childbirth, or related medical conditions. *See* 136 Stat. at 6084–89; H.R. Rep. No. 117-27, pt. 1, at 1 (2021) (stating that the purpose of the PWFA is to "to eliminate discrimination and promote women's health and economic security"). And an injunction of the CMPP would disserve noncitizens who qualify for participation in the

61

program.  *See* 134 Stat. at 1449.

A broader injunction preventing DOJ and DHS from enforcing or implementing any part of the Act would disserve the public interest in many more ways, such as, for example, by defunding federal law enforcement agencies, border security, and federal prisons.  136 Stat. at 4521–44, 4725–59; App96–97 (Kinneen Decl. ¶ 4).  And such an injunction against EEOC would stymie its ability to investigate, conciliate, and take other steps to resolve claims of employment discrimination, leaving workers facing discrimination with little or no recourse and depriving employers who want to comply with the law of the EEOC's dispute resolution processes.  *See* 136 Stat. at 4552.

To the extent Texas seeks to enjoin enforcement of the entire Act, under no circumstances would it be in the public interest to inflict the extraordinary consequences that would result from an unexpected lapse in appropriations halfway through the fiscal year, when the federal government and outside actors have already taken countless actions in reliance on the funding provided under the Act.  The Act funds countless agencies and programs that directly affect millions of Americans.  The Act funds, for example, the Department of Defense (including service members' salaries), veterans' health care facilities, federal employees' salaries, the national park system, and the federal courts.  *See, e.g.*, 136 Stat. at 4566–622, 4668–72, 4765, 4951–53.  A shutdown certainly would not benefit Texas, which receives billions in grants from the Act and contains numerous federal facilities, such as the Johnson Space Center, which is set to receive billions from the Act.  App104–106 (Kinneen Decl. ¶¶ 27–29).  Moreover, a shutdown would have wide-ranging economic effects, such as losses incurred by private-sector entities (including, but not limited to those that contract with the government) and a reduction in the country's Gross Domestic Product.  *See* Congressional Budget Office, *The Effects of the Partial Shutdown Ending in January 2019*, https://perma.cc/2WPE-Y57A.  These effects occur even when agencies plan for and expect a lapse in appropriations.  App101–102 (Kinneen Decl. ¶¶ 18–22).  The challenges and disruptions to the federal government, the public, and to Texas from an unexpected

lapse in appropriations resulting from a preliminary injunction would be far worse.  App103–106 (Kinneen Decl. ¶¶ 23–30).   Federal agencies have already legally obligated billions of dollars appropriated under the Act, and private sector actors, foreign allies, and state and local governments across the nation have acted in reliance on the funds provided for by the Act.  App101, App103–04 (Kinneen Decl. ¶¶ 17, 25).  Any uncertainty as to the validity of the Electoral Reform Act of 2022 and the Presidential Transition Improvement Act, *see* 136 Stat. at 5233–46, prior to the election would be detrimental to our democratic processes.  Enjoining the entire Act partway through its implementation would be extraordinarily chaotic, destabilizing to the nation, and contrary to the public interest.

Texas fails to address any of these monumental impacts that would result from an injunction.  Instead, aside from reiterating its assertions concerning its own purported harm, Texas makes only two arguments concerning harm to the federal government, neither of which have merit.  First, Texas makes the curious claim that the federal government would actually benefit from an injunction because it would "save administrative, legal, financial, or other costs associated with enforcing the Act."  Br. 43.  But an injunction against enforcing the entire Act would deprive the Executive Branch, as well as the Legislative and Judicial Branches, of billions of dollars that Congress has appropriated to it.  Moreover, the Executive Branch is not charged with saving funds that Congress has appropriated for various programs; instead, it is charged with faithfully executing the laws.  *See Printz v. United States*, 521 U.S. 898, 922 (1997) (citing U.S. Const. art. II, §§ 2, 3).  Thus, "[w]hen a statute is enjoined, the [government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."  *Veasey v. Abbott,* 870 F.3d 387, 391 (5th Cir. 2017); *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).

Texas's second argument—that the "government has no interest in 'enforcing an unlawful' statute," Br. 43 (quoting *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021))—fails because, as shown above, the Act was not unlawfully enacted.  Texas also ignores that there is a

"presumption of constitutionality which attaches to every Act of Congress," which is "an equity to be considered in favor of [the federal government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivor*s, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). "Given the presumption of constitutionality granted to all Acts of Congress," it is "appropriate that the statute remain in effect pending . . . review." *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers).

Accordingly, regardless of the scope of the injunction sought by Texas, the balance of harms and the public interest factors make plain that the extraordinary remedy is not warranted.

### D.  Texas Failed to Meet the Requirements of Federal Rule of Civil Procedure 65.

Texas's motion should be denied for the additional reason that Texas seeks a preliminary injunction that, if entered, would be vague and would thus violate Rule 65.  A preliminary injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  "The drafting standard has been described as that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."  *Scott*, 826 F.3d at 211.  "Thus, an injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1)."  *Id.*

Texas fails to meet this standard, as it is unclear precisely what relief Texas is seeking.  Texas states that it is seeking to "prohibit[]" "Defendants and their officers, agents, and employees" "from taking any action to enforce the Consolidated Appropriations Act, 2023."[27]  Proposed Order; *see also* Mot. (seeking to "prohibit[] the Court [sic] from enforcing the Consolidated Appropriations Act, 2023"); Br. 44 ("request[ing] that the Court enjoin the Defendants from enforcing the Consolidated Appropriations Act, 2023").  But the Court cannot enter an order containing such "broad generalities,"

---

[27] In its brief, Texas states that its purported injuries are redressable because the Court can "enjoin the Defendants from enforcing the new amendments to Title VII [sic] against Texas," Br. 21, and "enjoin[] the enforcement of the pilot program in Texas," *id.* at 24.  But, based on the vague language used in the Motion, Proposed Order, and other parts of the brief, it is unclear whether this is the entirety of the relief Texas is seeking.

*Scott*, 826 F.3d at 213, especially considering that federal agencies do not "enforce" an appropriations law but instead engage in a multi-step process to obligate and expend the appropriated funds, App100–101 (Kinneen Decl. ¶¶ 8–17).  Because Texas's Proposed Order "is written in terms too vague to be readily understood," *Scott*, 826 F.3d at 213, it "does not satisfy the specificity requirements outlined in [Rule] 65(d)," *id.* at 214, and should not be entered by the Court, *see John Doe #1 v. Veneman*, 380 F.3d 807, 819–20 (5th Cir. 2004).

### E.  Any Relief Granted Must Be Appropriately Limited.

If the Court grants Texas any relief—which it should not—any remedy must be appropriately limited.  Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1933–34.  "Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017).  To the extent the Court grants relief related to the CMPP, such relief must be limited in temporal scope to only apply to the funding appropriated by the Act for that program. *See Dalton v. Little Rock Fam. Plan. Servs.*, 516 U.S. 474, 477 (1996).  More broadly, if the Court were to grant any relief, it should be limited to apply only to Texas and only to the portions of the Act that the Court finds Texas has standing to challenge. *See Planned Parenthood*, 542 F. Supp. 3d at 480 ("[A]n injunction does not bind unrelated nonparties.").

### CONCLUSION

For the foregoing reasons, the Court should deny Texas's motion and dismiss the case.  If the Court enters a preliminary injunction, the Court should automatically stay its order for 30 days to allow Defendants to consider their appellate options.

Dated: May 4, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Branch Director

*/s/ Courtney D. Enlow*
COURTNEY D. ENLOW (NC Bar No. 46578)
Senior Trial Counsel
MICHAEL J. GAFFNEY (D.C. Bar No.
1048531)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8467
Fax: (202) 616-8470
Email: courtney.d.enlow@usdoj.gov

*Counsel for Defendants*

66

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2023, I electronically filed the foregoing paper with the Clerk

of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

*/s/ Courtney D. Enlow*
COURTNEY D. ENLOW
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8467
Fax: (202) 616-8470
Email: courtney.d.enlow@usdoj.gov