**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

STATE OF TEXAS,

|  | |
|---|---|
| *Plaintiff,* | **FILED** |
| | **May 10, 2023** |
| v. | KAREN MITCHELL |
| | CLERK, U.S. DISTRICT |
| | COURT |

MERRICK GARLAND; UNITED STATES DEPARTMENT
OF JUSTICE; CHARLOTTE A. BURROWS; JOCELYN
SAMUELS; KEITH E. SONDERLING; ANDREA R.
LUCAS; CHRISTOPHER W. LAGE; EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION;
ALEJANDRO MAYORKAS; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; TAE D.
JOHNSON; UNITED STATES IMMIGRATIONS AND
CUSTOMS ENFORCEMENT; PETER E. MINA; OFFICE
FOR CIVIL LIBERTIES; DEANNE CRISWELL; FEDERAL
EMERGENCY MANAGEMENT AGENCY; and JOSEPH R.
BIDEN, JR.,

Civil Action No. 5:23-CV-34-H

*Defendants.*

---

**<u>*AMICI CURIAE* BRIEF OF TEN MEMBERS OF CONGRESS WHO WITNESSED THE
HARMS OF PROXY VOTING,
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

TABLE OF AUTHORITIES.......................................................................................... ii

INTEREST OF *AMICI CURIAE* .................................................................................. 1

INTRODUCTION ..................................................................................................... 2

ARGUMENT ........................................................................................................... 4

      I.      COURTS MAY REVIEW LEGISLATIVE PROCEDURES
           FOR THEIR CONSTITUTIONALITY............................................... 5

      II.     ADOPTING A POLICY OF PROXY VOTING WAS
           UNCONSTITUTIONAL .................................................................... 7

      III.    COURTS MUST APPLY THE CONSTITUTION, EVEN
           DURING A PANDEMIC .................................................................. 12

CONCLUSION........................................................................................................ 17

CERTIFICATE OF SERVICE ................................................................................... 18

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                  **Page**

*Agudath Isr. of Am. v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020) ................................................................... 15

*Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.,*
   141 S. Ct. 2485 (2021)............................................................................ 14

*Bell v. Hood,*
   327 U.S. 678 (1946) ................................................................................ 6

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ......................................................................... 12, 14

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969) .............................................................................. 17

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ............................................................................. 3, 5

*Denver Bible Church v. Azar,*
   494 F. Supp. 3d 816 (D. Colo. Oct. 15, 2020)........................................ 16

*Elrod v. Burns,*
   427 U.S. 347 (1976) .............................................................................. 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010) .............................................................................. 13

*Gravel v. United States,*
   408 U.S. 606 (1972) ................................................................................ 2

*I.N.S. v. Chadha,*
   462 U.S. 919 (1983) ................................................................... 4, 5, 6, 13

*Jacobson v. Massachusetts,*
   197 U.S. 11 (1905) ................................................................................ 16

*Kilbourn v. Thompson,*
   103 U.S. 168 (1880) ............................................................................. 5, 6

*Korematsu v. United States,*
   323 U.S. 214 (1944) .............................................................................. 16

*McCarthy v. Pelosi,*
   5 F.4th 34 (D.C. Cir. 2021)................................................................... 4, 6

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ................................................................. 13

*McGirt v. Oklahoma,*
  140 S. Ct. 2452 (2020) ........................................................... 13

*Michel v. Anderson,*
  14 F.3d 623 (D.C. Cir. 1994) ................................................. 5

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
  142 S. Ct. 661 (2022) ............................................................. 14

*Ogden v. Saunders,*
  25 U.S 213 (1827) .................................................................. 13

*On Fire Christian Ctr., Inc. v. Fischer,*
  453 F. Supp. 3d 901 (W.D. Ky. 2020) ................................... 15

*Powell v. McCormack,*
  395 U.S. 486 (1969) ............................................................... 6

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) ................................................... 12, 15, 16

*Schenck v. United States,*
  249 U.S. 47 (1919) ................................................................. 16

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) ........................................................... 15

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) ........................................................... 16

*United States v. Ballin,*
  144 U.S. 1 (1892) ................................................................ 2, 7

*United States v. Yoshida Int'l, Inc.,*
  63 C.C.P.A. 15 (1975) ............................................................ 14

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................... 14

**Constitutional Provisions**

U.S. CONST. art. I, § 2, cl. 1 ..................................................... 5

U.S. CONST. art. I, § 3, cl. 6 ..................................................... 8

U.S. CONST. art. I, § 5, cl. 1 .................................................. 2, 7

U.S. Const. art. I, § 5, cl. 3 ................................................................. 8

U.S. Const. art. I, § 6, cl. 1 ................................................................. 8

U.S. Const. art. II, § 2, cl. 2 ............................................................... 8

**<u>Other Authorities</u>**

Antonin Scalia & Bryan A. Garner, Reading Law: The
Interpretation of Legal Texts (2012) ............................................. 13

Antonin Scalia, United States Supreme Court Justice, Opening Statement
on American Exceptionalism to a Senate Judiciary Committee
(Oct. 5, 2011) ................................................................................. 13

Bryan Metzger, *Most House members didn't show up in person to vote on
a $1.7 trillion government funding bill*, Business Insider (Dec. 23,
2022) ................................................................................................ 3

Callie Patterson, *Pelosi extends House proxy voting despite COVID
pandemic winding down*, The New York Post (Mar. 29, 2022) ......... 11

Chip Roy (@RepChipRoy), Twitter (Dec. 23, 2022) ............................. 4

Diana Glebova, *Citing 'Public Health Emergency,' Pelosi Extends House
Proxy Voting Despite History of Abuse*, National Review
(August 9, 2022) ............................................................................. 10

H.R. Res. 965, 116th Cong. §1(a) (May 15, 2020) ................................. 1

Jordain Carney, *Senators push to allow for remote voting during national
crisis*, The Hill (Apr. 30, 2021) ...................................................... 3

Justin Papp, *Most members phone it in as House clears spending package*,
Roll Call (Dec. 23, 2022) ............................................................... 10

Kevin McCarthy (@kevinomccarthy), Twitter (Feb. 3, 2022, 12:00 PM) ............. 11

Mini Racker, *For Some in Congress, Proxy Voting Was a Game Changer.
It's About to Go Away*, Time Magazine (Dec. 27, 2022) ................... 7

Mychael Schnell, *Pelosi extends remote voting in House through Dec. 25*,
The Hill (Nov. 10, 2022) .................................................................. 12

Nancy Pelosi, Speaker, Transcript of Pelosi Floor Speech on Future Plans,
(Nov. 17, 2022) ................................................................................ 8

Olivier Knox, *Mr. Zelensky goes to Washington in trip packed with
symbolism*, The Washington Post (Dec. 21, 2022) .......................... 12

ROBERT BOLT, A MAN FOR ALL SEASONS (1962).......................................................... 16

THE DECLARATION OF INDEPENDENCE (U.S. 1776) ..................................................... 2, 9

THE FEDERALIST No. 53 (James Madison) ................................................................. 9

Virginia Aabram, *McCarthy marks end of proxy voting: Lawmakers have to 'show up' for 'their vote to count'*, WASHINGTON EXAMINER (Jan. 19, 2023)........................................................................................................... 1

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are ten members of the United States House of Representatives who believe that Speaker Pelosi and the House of Representatives unconstitutionally authorized voting *in absentia* on May 15, 2020, and in several subsequent extensions.[2] *Amici* are: Charles (Chip) Eugene Roy (R-TX), H. Morgan Griffith (R-VA), Andy Ogles (R-TN), Harriet M. Hageman (R-WY), Andy Biggs (R-AZ), Clay Higgins (R-LA), Warren Davidson (R-OH), Gary Palmer (R-AL), Matt Rosendale (R-MT), and John Rose (R-TN). As Members of the House of Representatives, trusted with the responsibility to vote on behalf of their constituents, *amici* have a strong interest in the proper interpretation of the U.S. Constitution, particularly with respect to the meaning of the Quorum Clause in Article I, § 5.

*Amici* took an oath to "support and defend the Constitution of the United States against all enemies, foreign and domestic[,]" and are united by their shared interest in seeing courts properly construe the Constitution to ensure that representative government functions properly, and in accord with our Nation's founding principles. They are also united in the belief that this Court must apply the Constitution, as it is written, even to actions taken in times of national crisis.

---

[1] All parties consented in writing to the filing of this brief, no party's counsel authored this brief in part or in whole, and no person other than *amici* and their counsel made any monetary contribution to fund its preparation or submission.

[2] *See* H.R. Res. 965, 116th Cong. §1(a) (as agreed to in House, May 15, 2020), https://www.congress.gov/bill/116th-congress/house-resolution/965/text ("[A] Member who is designated by another Member as a proxy in accordance with section 2 may cast the vote of such other Member or record the presence of such other Member in the House."). *See also* Virginia Aabram, *McCarthy marks end of proxy voting: Lawmakers have to 'show up' for 'their vote to count'*, WASHINGTON EXAMINER (Jan. 19, 2023), https://www.washingtonexaminer.com/restoring-america/news/house/mccarthy-marks-end-proxy-voting.

**INTRODUCTION**

The House of Representatives is supposed to be a deliberative body. For much of our Nation's history, Members have offered floor speeches, engaged in debate, and attempted to persuade their colleagues before casting votes on the most pressing issues facing the country. While extensive deliberation has lessened in recent years due to politicization and restrictions on offering floor amendments to bills, the constitutional vision of a representative republic has never waned. Importantly, constituents rely on their Representatives hearing their concerns, and being able to consider these concerns when voting, even up to the moment when a vote occurs. *See Gravel v. United States*, 408 U.S. 606, 625 (1972) (the Constitution's Speech and Debate Clause protects, among other things, the "integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings"); THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("Governments are instituted among Men, deriving their just Powers from the Consent of the Governed[.]").

Consistent with the principles surrounding representative government, the Constitution does not permit the House of Representatives to adopt an exception to the rule that one must vote in person. In short, to do business, Congress must have a quorum physically present in the House. *See United States v. Ballin*, 144 U.S. 1, 6 (1892) ("All that the [C]onstitution requires is the *presence* of a majority, and when that majority are *present* the power of the house arises.") (emphases added). That is why, without a quorum present, business simply cannot proceed. U.S. CONST. art. I, § 5, cl. 1 ("[A] smaller Number may adjourn from day to day, and may be authorized

to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.").[3]

The structure of Article I is no small matter. The Nation's Framers understood the power of the Congress when they reduced the insights of their debates to writing. *See Clinton v. City of New York*, 524 U.S. 417, 439 (1998) ("The procedures governing the enactment of statutes set forth in the text of Article I were the product of the great debates and compromises that produced the Constitution itself."); *id.* at 449 (Kennedy, J., concurring) ("The Constitution's structure requires a stability which transcends the convenience of the moment."). Indeed, America survived through over two centuries of crises—including wars, internal strife, and epidemics—without breaching the constitutional principle that the House of Representatives may only do business in person.

Nevertheless, in 2020, the House of Representatives authorized members to vote *in absentia*. Over two years later, on December 23, 2022, the House voted on a $1.7 trillion omnibus spending package, with 235 House members having signed proxy letters, allowing them to vote *in absentia*. *See* Bryan Metzger, *Most House members didn't show up in person to vote on a $1.7 trillion government funding bill*, BUSINESS INSIDER (Dec. 23, 2022)[4] ("It is likely the most poorly-attended vote since the Democratic-led House instituted the procedure in May 2020 in response to the COVID-19 pandemic."). Then-Minority Leader Kevin McCarthy observed at the time that the

---

[3] Notably, the United States Senate has never adopted proxy voting. *See* Jordain Carney, *Senators push to allow for remote voting during national crisis*, THE HILL (Apr. 30, 2021), https://thehill.com/homenews/senate/551177-senators-push-to-allow-for-remote-voting-during-national-crisis/ ("Senators are required to vote in person from the Senate chamber, where they tell their vote—either verbally or frequently with the point of a finger or thumbs down—to Senate floor staff.").

[4] https://www.businessinsider.nl/most-house-members-didnt-show-up-in-person-to-vote-on-a-1-7-trillion-government-funding-bill/

3

absence of a quorum was unprecedented: "'For the first time in history, a bill in the House was passed without a physical quorum present—meaning more people voted from home than in the House Chamber,' said McCarthy." *Id.* (internal brackets omitted). Separately, Representative Chip Roy notified the speaker pro tempore that "[t]here were an [unofficial] 226 proxy votes cast on the $1.7 trillion omnibus in the final hours before Christmas[.]" Chip Roy (@RepChipRoy), Twitter (Dec. 23, 2022).[5]

While Speaker Pelosi's underlying decision to allow proxy voting has been held to be immune from judicial review, *see McCarthy v. Pelosi*, 5 F.4th 34, 41 (D.C. Cir. 2021), courts have not yet passed on the constitutionality of legislation that would not have been enacted, but for the ability of House members to vote *in absentia*. Now, this Court is poised to answer that very question. It should enter a preliminary injunction, holding that Plaintiff is likely to succeed on the merits of the argument that the Consolidated Appropriations Act of 2023 is unconstitutional because Congress lacked a quorum when the House voted to accept the Senate's amendments on December 23, 2022. Put simply: above all else, the Constitution remains our Nation's north star, even during the fog of a pandemic.

## ARGUMENT

Our government is one of checks and balances. For our constitutional structure to work, however, it must be followed. While it may be easy to adopt legislative shortcuts or turn a blind eye to the Constitution in times of crisis, our Framers ensured that no such measures could be taken. *See I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not

---

[5] https://twitter.com/repchiproy/status/1606370791167180801

save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government[.]").

The House of Representatives' adoption of proxy voting rules was unconstitutional on the day that it was announced; this Court therefore has the power—indeed the duty—to review and adjudicate the constitutionality of legislation enacted due only to proxy voting. In doing so, it should hold that the Plaintiff is likely to succeed on the merits, because the Consolidated Appropriations Act of 2023 cannot be sustained as a proper exercise of Congress's power to enact legislation.

## I. COURTS MAY REVIEW LEGISLATIVE PROCEDURES FOR THEIR CONSTITUTIONALITY.

Americans are blessed to live under a written Constitution. And there is no dispute that the Constitution places limits not solely on what legislation may be enacted, but the manner in which it is enacted. *Clinton*, 524 U.S. at 439; *Chadha*, 462 U.S. at 940–41 ("[W]hat is challenged here is whether Congress has chosen a constitutionally permissible means of implementing [its] power."). Consequently, this Court is uniquely positioned to assess the constitutionality of the House's decision to adopt proxy voting for the first time, in 2020. *See Kilbourn v. Thompson*, 103 U.S. 168, 199 (1880) ("Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme[.]"); *see also Michel v. Anderson*, 14 F.3d 623, 627 (D.C. Cir. 1994) ("As House counsel concedes, were the House to create members not 'chosen every second [Y]ear by the People of the several states,' and bestow upon them full voting privileges, such an action, whether or not pursuant to House rules, would be blatantly unconstitutional.") (quoting U.S. CONST. art. I, § 2, cl. 1.).

The case of *Powell v. McCormack,* 395 U.S. 486 (1969) is illustrative. In *Powell*, the Court exhaustively reviewed the ratification debates surrounding Article I, § 5, to limit Congress's power to expel certain members. *Id.* at 519–49. It rejected the argument that disputes surrounding the meaning of the text were non-justiciable, or otherwise committed solely to Congress under Article I. *Id.* at 548 ("For these reasons, we have concluded that Art. I, [§] 5, is at most a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth in the Constitution. Therefore, the 'textual commitment' formulation of the political question doctrine does not bar federal courts from adjudicating petitioners' claims."); *id.* at 514 ("It has long been held that a suit 'arises under' the Constitution if a petitioner's claim 'will be sustained if the Constitution [] (is) given one construction and will be defeated if (it is) given another.'") (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)).

*Powell* relied on the 1880 case of *Kilbourn*, noting that its language "has not dimmed" with the passage of time, for the proposition that "'it is the province and duty of the judicial department to determine . . . whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void.'" *Id.* at 506 (quoting *Kilbourn*, 103 U.S. at 199). Indeed, a law that has not passed both houses of Congress under the strict terms of the Constitution is no law at all. *Chadha*, 462 U.S. at 957 (bicameralism, among other checks and balances, was "intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps").

In response to the motion for preliminary injunction, Defendants are likely to rely on a previous decision of the Court of Appeals for the District of Columbia. *See McCarthy v. Pelosi*, 5 F.4th 34 (D.C. Cir. 2021). That decision, however—which held that the Speech and Debate Clause

prevented judicial review of the 2020 adoption of proxy voting—is inapposite to the question of whether the Consolidated Appropriations Act of 2023 is constitutional. *See id.* at 41 ("[T]he resolution in this case establishes internal rules governing the casting of votes by Members."). On the other hand, it is firmly within this Court's power to decide the fundamental question of the validity of legislation enacted due only to House members voting *in absentia*.

## II.   ADOPTING A POLICY OF PROXY VOTING WAS UNCONSTITUTIONAL.

Physical presence underlies the essence of the House of Representatives. "Since the first session of Congress in 1789 through 2020, members of Congress have had to be present to vote." *See* Mini Racker, *For Some in Congress, Proxy Voting Was a Game Changer. It's About to Go Away*, TIME MAGAZINE (Dec. 27, 2022)[6] (hereinafter "TIME MAGAZINE"). When a majority of Congress is not present in the House, no quorum exists, and the House is limited to either adjourning or compelling "the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. CONST. art. I, § 5, cl. 1. It would make no sense for this clause to mean that absent members need only submit a proxy letter in order to "attend" Congress. Such an argument would prove far too much—it would mean, for instance, that the Speaker of the House, alone, could manage and control the whole of the House, with 217 proxies in hand. That cannot be.

Although each house of Congress is the "Judge of the Elections, Returns and Qualifications of its own Members," U.S. CONST. art. I, § 5, cl. 1, each house is of course still bound by specific provisions of the Constitution. *Ballin*, 144 U.S. at 5 ("It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode

---

[6] https://time.com/6242920/proxy-voting-congress-going-away/

or method of proceeding established by the rule and the result which is sought to be attained.").
Here, the terms of the Constitution were breached.

Article I unmistakably requires that House and Senate members be physically present when conducting certain legislative business. For instance, § 5 of Article I explicitly contains the word "present" with regard to requesting that votes be entered in the journal. *See, e.g.*, U.S. CONST. art. I, § 5, cl. 3 ("[T]he Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those *Present*, be entered on the Journal.") (emphasis added); U.S. CONST. art. I, § 3, cl. 6 ("[N]o Person shall be convicted without the Concurrence of two thirds of the Members *present*.") (emphasis added); U.S. CONST. art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators *present* concur[.]") (emphasis added); Nancy Pelosi, Speaker, Transcript of Pelosi Floor Speech on Future Plans (Nov. 17, 2022)[7] ("*In this room*, our colleagues across history have abolished slavery; granted women the right to vote; established Social Security and Medicare; offered a hand to the weak, care to the sick, education to the young and hope to the many. Indeed, *it is here, under the gaze of our patriarch George Washington in the People's House, that we have done the People's work*.") (emphases added).

Indeed, the Speech and Debate Clause within Article I, U.S. CONST. art. I, § 6, cl. 1, itself speaks of physical movement to do business, and of "other [p]lace[s]" besides each House of Congress: "They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in *going to and returning from the same*; and for any Speech or Debate in either House, they shall not be questioned in any *other Place*." (emphases added). The Constitution's frequent reference to

---

[7] https://pelosi.house.gov/news/press-releases/transcript-of-pelosi-floor-speech-on-future-plans

presence and location should not be treated lightly, as mere accidents of drafting. Instead, they represent what the Framers truly envisioned and required of a deliberative, representative Congress.

The facts on the ground confirm that proxy voting is counter to the deliberative nature of the House of Representatives. The House's adoption of proxy voting, for instance, added a strategic asymmetry to the process of voting on bills in the House. At any time, the Speaker could abruptly call a vote, knowing that casting such a vote would be inconvenient for members who did not vote by proxy, and might be attending to constituent services in their home states. But at the same time, Speaker Pelosi could count on votes from allies who had already submitted proxy letters, and who were free to leave Washington D.C., and attend to their campaigns, or personal matters like graduations, vacations, birthdays, dinners, and reunions. This is contrary to the on-the-job role contemplated by the original meaning of Article I. *See* THE FEDERALIST No. 53 (James Madison) ("Some portion of [a Congressman's] knowledge may, no doubt, be acquired in a man's closet; but some of it also can only be derived from the public sources of information; and all of it will be acquired to best effect by a practical attention to the subject *during the period of actual service in the legislature.*") (emphasis added); *see contra* THE DECLARATION OF INDEPENDENCE para. 6 (U.S. 1776) ("[King George III] has called together Legislative Bodies at Places unusual, uncomfortable, and distant from the Depository of their public Records, for the sole Purpose of fatiguing them into Compliance with his Measures.").

Of course, the adoption of proxy voting allowed former Speaker Nancy Pelosi to successfully manage her party's narrow House majority from 2020 to 2022. *See* TIME MAGAZINE ("Despite a narrow, ten-member majority in the House, Speaker Nancy Pelosi has been able to control her caucus in part because members who couldn't make it to Washington could still vote.").

Yet it is also clear that numerous members of the House used proxy voting not to avoid the risk of COVID-19 infection, but to personally benefit. *See, e.g.*, *id.* ("The *Honolulu Civil Beat* reported earlier this year that proxy voting allowed [Rep. Kai] Kahele to avoid Washington for months as he not only campaigned [for Governor of Hawaii], but worked as a pilot for Hawaiian Airlines."); *see also* Justin Papp, *Most members phone it in as House clears spending package*, ROLL CALL (Dec. 23, 2022)[8] ("'The members have planes to catch, gifts to wrap, toys to assemble, carols to sing, religious services to attend to,' said Speaker Nancy Pelosi, D-Calif., during what would likely be her last speech from the floor as speaker on Friday."); Diana Glebova, *Citing 'Public Health Emergency,' Pelosi Extends House Proxy Voting Despite History of Abuse*, NATIONAL REVIEW (Aug. 9, 2022)[9] ("A host of representatives were caught misusing the pandemic rule to go on vacation or to campaign for reelection while Congress was in session. . . . Democratic New York Representative Mondaire Jones was spotted partying in the French Riviera for a wedding, potentially proxy voting on 17 pieces of legislation, according to the *New York Post*.").

Unsurprisingly, data from 2021 indicates that Representatives frequently used the proxy voting system cast their votes *in absentia*. As one Tweet by current Speaker of the House Kevin McCarthy noted, in 2021, some Representatives cast as many as 400 proxy votes in that year alone:

---

[8] https://rollcall.com/2022/12/23/most-members-phone-it-in-as-house-passes-spending-package/
[9] https://www.nationalreview.com/news/citing-public-health-emergency-pelosi-extends-house-proxy-voting-despite-history-of-abuse/



Lest there be any doubt, the proxy voting system did in fact damage the deliberative nature of the House. *See* TIME MAGAZINE ("[Congressmen] see less of members of their own party and other parties. Because often, if you've gone through a series of votes, and you're on the floor for two or three hours, you're having good facetime with a colleague."). And the proxy voting system was extended long after the Capitol was re-opened to the public, for citizens to tour their place of government. *See* Callie Patterson, *Pelosi extends House proxy voting despite COVID pandemic winding down*, NEW YORK POST (Mar. 29, 2022) [11] ("While tourists can now roam the halls of the Capitol and members of Congress can mingle mask-free, House Speaker Nancy Pelosi has once

---

[10]   Kevin   McCarthy   (@kevinomccarthy),   TWITTER   (Feb.   3,   2022,   12:00   PM), https://twitter.com/kevinomccarthy/status/1489312852972290050?ref_src=twsrc%5Etfw%7Ctw camp%5Etweetembed%7Ctwterm%5E1489312852972290050%7Ctwgr%5E3d6cc99aff02793c6 7abcbc7c8d72cace404a545%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.nationalreview .com%2Fnews%2Fc
[11] https://nypost.com/2022/03/29/pelosi-extends-house-proxy-voting-despite-pandemic-decline/

again extended the COVID-imposed policy of proxy, or remote voting."). In one especially confusing set of circumstances, then-Speaker Pelosi extended proxy voting to December 25, 2022, despite asking members of the House to attend a speech by Ukrainian President Volodymyr Zelensky in person before that date, on December 21, 2022. *Compare* Mychael Schnell, *Pelosi extends remote voting in House through Dec. 25*, THE HILL (Nov. 10, 2022)[12] *with* Olivier Knox, *Mr. Zelensky goes to Washington in trip packed with symbolism*, THE WASHINGTON POST (Dec. 21, 2022)[13] ("'Please be present for a very special focus on Democracy Wednesday night [December 21, 2022],' House Speaker Nancy Pelosi (D-Calif.) teased in a letter to colleagues Tuesday afternoon, before word of Zelensky's visit leaked out.").

Critics will contend that House members of both parties voted *in absentia* during the COVID-19 pandemic. But that is irrelevant to the matter. What is relevant is the constitutional question of whether a bill that is enacted only due to proxy voting is valid. The question must be solely one of fidelity to the Constitution. And only this Court is left to vindicate the integrity of our Republic, by granting Plaintiff's preliminary injunction.

## III.  COURTS MUST APPLY THE CONSTITUTION, EVEN DURING A PANDEMIC.

The United States has endured for nearly 250 years because of our commitments to the Constitution and to representative government. The COVID-19 pandemic is no excuse to abandon these commitments. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) ("Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."); *accord Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("Security

---

[12] https://thehill.com/homenews/house/3730039-pelosi-extends-remote-voting-in-house-through-dec-25/

[13]      https://www.washingtonpost.com/politics/2022/12/21/mr-zelensky-goes-washington-trip-packed-with-symbolism/

depends upon a sophisticated intelligence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles."); Antonin Scalia, United States Supreme Court Justice, Opening Statement on American Exceptionalism to a Senate Judiciary Committee (Oct. 5, 2011)[14] ("Every banana republic in the world has a bill of rights. . . . So, the real key to the distinctiveness of America is the structure of our government.").

That a constitutional question may have significant political consequences is no reason to ignore the concrete limitations on federal power. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 501 (2010) ("The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty. . . . Calls to abandon those protections in light of the era's perceived necessity, . . . are not unusual.") (internal citation, quotation, and brackets omitted); *Chadha*, 462 U.S. 943 ("Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications in the sense urged by Congress."); *see also McCulloch v. Maryland*, 17 U.S. 316, 415 (1819) ("This provision is made in a constitution, intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 355 (2012)[15] ("[I]n a later case, Marshall affirmed that the Constitution was 'an instrument, which was intended to be perpetual.'") (citing *Ogden v. Saunders*, 25 U.S 213, 355 (1827)); *accord McGirt v. Oklahoma*, 140 S. Ct. 2452, 2474 (2020) ("None of these moves would be permitted in any other area of

---

[14] https://www.americanrhetoric.com/speeches/antoninscaliaamericanexceptionalism.htm
[15] https://www.academia.edu/57288184/Reading_Law_The_Interpretation_of_Legal_Texts

statutory interpretation, and there is no reason why they should be permitted here. That would be the rule of the strong, not the rule of law.").

Nor is there cause to push aside the Constitution in a time of national crisis. For example, during the Korean War, a labor dispute threatened the efficient production of steel for the war effort. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). President Truman, in turn, declared a national emergency, and announced a government seizure of steel mills for the purpose of national defense. *Id.* at 583. Still, the judiciary required President Truman to abide by the Constitution, even when it meant sacrificing certainty regarding the continued availability of steel. Despite President Truman's legitimate concerns about the country's war effort and potential labor disputes, the Court held that "[t]he President's power, if any, to issue the order *must stem either from an act of Congress or from the Constitution itself*." *Id.* at 585 (emphasis added); *see also United States v. Yoshida Int'l, Inc.*, 63 C.C.P.A. 15, 35 (1975) ("The mere incantation of 'national emergency' cannot, of course, sound the death-knell of the Constitution."); *Boumediene*, 553 U.S. at 798 ("The laws and Constitution are designed to survive, and remain in force, in extraordinary times."). Even wartime cannot justify a lapse in structural constitutional requirements.

As this Court is aware, the Supreme Court has even addressed constitutional structure in precisely the context of responding to the COVID-19 pandemic. *See Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2490 (2021) ("It is indisputable that the public has a strong interest in combating the spread of the COVID-19 Delta variant. But our system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 670 (2022) (Gorsuch, J., concurring) ("Respecting those demands may be trying in times of stress. But if this Court were to abide them only in more tranquil conditions,

14

declarations of emergencies would never end and the liberties our Constitution's separation of powers seeks to preserve would amount to little.").

The Supreme Court has affirmed the same principles in the context of individual rights and COVID-19. In *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (*per curiam*), for instance, the Court observed that "California treats some comparable secular activities more favorably than at-home religious exercise[.]". *Id.* at 1297. The constitutional violation in *Tandon* was so troubling that even though the state's COVID-19 protocol had been withdrawn, the Court rejected a mootness contention, noting that worshippers "'remain under a constant threat' that government officials will use their power to reinstate the challenged restrictions." *Id.* (quoting *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 68). Though an unprecedented time, the Constitution remains timeless.

Lower courts too, have rightly acknowledged the primacy of constitutional limitations in the context of COVID-19 responses, even when it came to a state's use of its ordinary police powers. For instance, in New York, Governor Cuomo issued an executive order limiting many houses of worship to 10 or 25 people. *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 624 (2d Cir. 2020). Other businesses that the Governor consider[ed] to be 'essential,' however, face[d] no such restrictions." *Id.* In holding the executive order to be unconstitutional, the court stated: *"We grant no special deference to the executive when the exercise of emergency powers infringes on constitutional rights."* *Id.* at 635 (emphasis added).

Similarly, in Kentucky, "churchgoers . . . face[d] an impossible choice: skip Easter Sunday service, in violation of their sincere religious beliefs, or risk arrest, mandatory quarantine, or some other enforcement action for practicing those sincere religious beliefs." *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 914 (W.D. Ky. 2020). But the court rejected the effort to haphazardly respond to the COVID-19 pandemic, noting that "[u]nless a government action is far

more narrowly tailored to a compelling government interest than is Louisville's, that is a choice no one in our nation should ever have to face." *Id.*; *see also id.* at 912 ("But even under *Jacobson*, constitutional rights still exist. Among them is the freedom to worship as we choose.") (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)); *see also Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 70 (Gorsuch, J., concurring) ("But *Jacobson* hardly supports cutting the Constitution loose during a pandemic."); *Fischer*, 453 F. Supp. 3d at 913 ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 822 (D. Colo. 2020) ("But the existence of an emergency, even one as serious as this one, does not mean that the courts have no role to play, or that the Constitution is any less important or enforceable.").

The Constitution was made for times such as this, when government may claim emergency powers or special privileges to respond to extraordinary circumstances. But affording the government such powers undermines our structure of government, and ultimately imperils American citizens even more than infectious disease does. *See, e.g.*, ROBERT BOLT, A MAN FOR ALL SEASONS 66 (1962) ("And when the last law was down, and the Devil turned around on you—where would you hide, Roper, the laws all being flat?").

Indeed, the fog of crisis has occasionally led to judicial folly. *Compare, e.g.*, *Korematsu v. United States*, 323 U.S. 214, 223–24 (1944) ("There was evidence of disloyalty on the part of some, the military authorities considered that the need for action was great, and time was short."); *with Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution.") (internal quotation and citation omitted); *compare also Schenck v. United*

16

*States*, 249 U.S. 47, 52 (1919) ("When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured[.]") *with Brandenburg v. Ohio*, 395 U.S. 444, 449–50 (1969) (Black, J., concurring) ("The 'clear and present danger' doctrine should have no place in the interpretation of the First Amendment."). Here, the House of Representatives was not entitled to abridge the Constitution merely because of the unique circumstances of the times.

## CONCLUSION

This Court may correct a constitutional error, and restore the primacy of the Constitution, by preliminarily enjoining the Consolidated Appropriations Act of 2023. For the foregoing reasons, it should do so.

DATED this 11th day of April 2023.

Respectfully submitted,

*/s/ Kaitlyn D. Schiraldi*
Kaitlyn D. Schiraldi* (TN Bar No. 039737)
William E. Trachman* (CO Bar No. 45684)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Fax: (877) 349-7074
kschiraldi@mslegal.org
wtrachman@mslegal.org

*Attorneys for Amici Curiae*
*\*motion for admission pro hac vice filed*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April 2023, I electronically filed the foregoing using this Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

/s/ *Kaitlyn D. Schiraldi*
Kaitlyn D. Schiraldi