UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS,

    *Plaintiff*,

v.

MERRICK GARLAND, *et al.*,

    *Defendants.*

No. 5:23-cv-34-H

## TEXAS'S COMBINED
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND
## REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Table of Contents ............................................................................................. ii

Table of Authorities ........................................................................................ iii

Introduction ........................................................................................................1

Argument ............................................................................................................ 2

    I.    The Court has jurisdiction over this justiciable case, which Texas has standing to bring.................................................................................... 2

        A.    Texas has standing................................................................................. 2

            1.    As the Defendants admit, the Act's the amendments to Title VII injure Texas. .........................................................................................3

            2.    Texas has standing to challenge the pilot program. ...........................5

        B.    This case is justiciable........................................................................... 8

            1.    The Quorum Clause does not invest the House with discretion. ..... 8

            2.    The enrolled bill doctrine does not prohibit the Court's review. ....10

        C.    This is a proper venue. .......................................................................12

        D.    The President is a proper party whom the Court can, and should, enjoin...................................................................................................12

    II.    The Court should enjoin the challenged parts of the act because Texas has established every element for a preliminary injunction. ...................................13

        A.    Texas is likely to succeed on the merits.............................................13

            1.    The Quorum Clause requires physical presence. ............................13

            2.    Less than a majority of House Members were physically present when the Act passed. .......................................................................16

        B.    Texas will suffer irreparable harm. ....................................................16

        C.    The balance of the equities and public interest favor an injunction. ...17

        D.    Texas's proposed injunction describes the prohibited conduct in reasonable detail and therefore satisfies Rule 65...........................................18

Conclusion .........................................................................................................18

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ................................................................ 4

*BST Holdings, LLC v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ............................................... 17

*California v. Texas,*
  141 S. Ct. 2104 (2021) ............................................................7

*E.T. v. Paxton,*
  41 F.4th 709 (5th Cir. 2022) ................................................ 6

*Frame v. City of Arlington,*
  657 F.3d 215 (5th Cir. 2011) (en banc) ............................ 6

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ............................................................ 12

*Lujan v. Defs. Of Wildlife,*
  504 U.S. 555 (1992) ..............................................................7

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) .............................10, 12, 13

*Mayor & City Council of Baltimore v. Trump,*
  416 F. Supp. 3d 452 (D. Md. 2019) ................................ 13

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) .......................................... 11

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ..............................................................3

*Mississippi v. Johnson,*
  71 U.S. 475 (1866) .............................................................. 12

*Nelson v. NASA,*
  530 F.3d 865, (9th Cir. 2008)
  *rev'd on other grounds* 562 U.S. 134 (2011) ...................... 17

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014). .......................................................... 15

*Peake v. Ayobami (In re Ayobami),*
  879 F.3d 152 (5th Cir. 2018) ............................................ 11

*Powell v. McCormack,*
  395 U.S. 486 (1969) ..............................................................9

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001) .............................................. 2

*Scott v. Schedler,*
  826 F.3d 207 (5th Cir. 2016) ............................................................................18
*Simon v. Eastern Ky. Welfare Rights Organization,*
  426 U.S. 26 (1976)........................................................................................ 8
*St. Joseph Abbey v. Castille,*
  700 F.3d 154 (5th Cir. 2012) ...........................................................................11
*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)....................................................................................3, 4
*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019)...........................................................................3, 5
*Texas v. United States,*
  555 F. Supp. 3d 351 (S.D. Tex. 2021)..................................................................11
*United States v. Ballin,*
  144 U.S. 1 (1892) .......................................................................................9, 16
*United States v. Marlow,*
  278 F.3d 581 (6th Cir. 2002) ...........................................................................11
*United States v. Munoz-Flores,*
  495 U.S. 385 (1990)....................................................................................10, 11
*United States v. Palomares,*
  52 F.4th 640 (5th Cir. 2022) ............................................................................14
*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,*
  529 U.S. 765 (2000) ..................................................................................... 8
*Wages & White Lion Invs., L.L.C. v. FDA,*
  16 F.4th 1130 (5th Cir. 2021)............................................................................16

**Statutes**
42 U.S.C. § 2000e-5 ........................................................................................ 4
Consolidated Appropriations Act, 2023
  Pub. L. 117-328 (Dec. 29, 2022)..........................................................................3

**Other Authorities**
*5 Deschler's Precedents of the House of Representatives*, ch. 20, § 1.3, (1994)............15
Diana Glebova, *Citing 'Public Health Emergency,'*
  *Pelosi Extends House Proxy Voting Despite History of Abuse*, National Review
  (Aug. 9, 2022, 3:46 PM) ...............................................................................15
*ICE Alternatives to Detention Data, FY23,*
  U.S. Immigration and Customs Enforcement (last updated April 28, 2023) ..... 6
Julia Ainsley, *Biden admin to allow for the release of some migrants into the*
  *U.S. with no way to track them*, NBC News (May 10, 2023, 8:44 AM),................7

Justin Papp, *Most members phone it in as House clears spending package*,
    Roll Call (Dec. 23, 2022, 3:18 PM) .................................................................. 15
Mini Racker, *For Some in Congress, Proxy Voting Was a Game Changer.*
    *It's About to Go Away*, Time Magazine (December 27, 2022, 7:00 AM) ........... 15
*Whereas: Stories from the People's House, "Sick Days"*,
    U.S. House of Representatives: Hist., Art & Archives (Dec. 17, 2018) ............. 14

## Regulations
29 C.F.R. § 1601.15–17 ......................................................................................... 4
29 C.F.R. § 1601.23–25 ......................................................................................... 4
29 C.F.R. § 1601.28–29 ......................................................................................... 4

## Constitutional Provisions
U.S. Const. art. I, § 5, cl. 1 .................................................................................... 9

## Congressional Materials
Congressional Record, vol. 167 ........................................................................... 16

## INTRODUCTION

The Constitution is not an obstacle to be sidestepped. It sets forth processes that the federal government is bound to follow and limits on what the federal government can do; it invests federal courts—invests this Court—with the power to decide cases and controversies that arise under it. Rather than honor that limning, however, the Defendants seek validation of their two-step sidestep— sidestepping the Court's power so they can continue reaping the benefits of their sidestep of the Quorum Clause. The Court should deny the motion to dismiss and issue a preliminary injunction to set them back on a straight path.

*First*, this controversy is justiciable, and the Court has jurisdiction over it. The Consolidated Appropriations Act, 2023, exposes Texas to new lawsuits and leads directly and inexorably to education, incarceration, and healthcare costs that Texas and its subsidiary governments must pay with no power to recoup. Those harms are specific injuries in fact that are traceable to the Defendants and can be remedied by orders binding the Defendants, granting Texas standing to challenge those portions of the Act. As Texas discussed in its previous briefing, this case is justiciable; neither the political question doctrine nor the enrolled bill doctrine applies, and neither doctrine prevents the Court from enjoining the challenged portions of the Act and declaring them unconstitutional. *See* ECF 38 at 24–30. And that unconstitutionality is why the Court has jurisdiction over President Biden: the duties he violated are mandatory, not discretionary.

*Second*, Texas has established every element of a preliminary injunction. It is likely succeed on the merits because the House purported to approve the Act while a majority of its members were absent, a direct contradiction of the Quorum Clause's physical presence requirement. No amount of money can remedy that unconstitutionality, nor can Texas be compensated for the injuries it faces from the Act's amendments to Title VII and increased funding of the pilot program. The

public and private interests and the equities also favor an injunction, which would prevent the harms to Texas and impose no harm on the Defendants—and the public interest always favors enforcing the law, melting whatever interests the Defendants claim the Act froze into place.

The Consolidated Appropriations Act is on the books only because the House violated the Constitution. Continuing to enforce it only continues the violation; it does so to the injury of Texas, which can be salved by appropriate relief from the Court. The Court should deny the motion to dismiss and enjoin the Defendants' enforcement of the challenged portions of the Act.

## ARGUMENT

### I.   The Court has jurisdiction over this justiciable case, which Texas has standing to bring.

#### A.   Texas has standing.

The Court can dismiss this case only if Texas "cannot prove any set of facts in support of [its] claim that would entitle [it] to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citing H*ome Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir.1998)). Texas has gone further than that, not only alleging facts, but adducing evidence to support their truth: that the Act's amendments to Title VII and its additional funding of the Defendants' pilot program impose injuries that are traceable to the Act and the Defendants' enforcement and execution of it. Those injuries are also stopped, or at the very least eased, by an order prohibiting the Defendants from continuing to enforce and execute the Act. Texas, in short, Texas has standing.

1.  **As the Defendants admit, the Act's the amendments to Title VII injure Texas.**

Texas's injuries from the amendments to Title VII are real and present. As the Defendants concede, the amendments are operating and influencing employers and employees right now; according to them, the law now "*strengthens*," not "will strengthen," "federal protections for pregnant workers" and "*ensures*," not "will ensure," "that employers reasonably accommodate employees . . . " ECF 55 at 10 (emphasis added). And they concede their role in imposing those injuries upon Texas, acknowledging that the law now "authorizes the [EEOC], the Attorney General, and private individuals to seek redress for any statutory violations" under the amended Title VII. *Id.* at 11.

It is of no moment that the amendments to Title VII don't go into effect until later this year, *see* Pub. L. 117-328, Div. II, § 109 (Act becomes effective "180 days after the date of enactment"); an "enforcement action is *not* a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). And Texas is not required to "expose [itself] to liability before" it challenges "the constitutionally of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). As the Fifth Circuit has summarized in explaining why Texas had standing to challenge another yet-to-be-enforcement employment-law obligation, an "increased regulatory burden typically satisfies the injury in fact requirement" as does "being pressured to change state law . . . because states have a sovereign interest in the power to create and enforce a legal code." *Texas v. EEOC*, 933 F.3d 433, 446–447 (5th Cir. 2019) (quoting *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) (quotations omitted)).

Such pre-enforcement actions are especially warranted when, as here, Texas has expressed an intent to engage in conduct "*arguably* affected with a constitutional interest, but proscribed by a statute." *Susan B. Anthony List*, 573 U.S.

at 159 (emphasis added). There, too, the Defendants concede (albeit inadvertently) Texas's standing. To be sure, Texas in fact "disavow[s] any intent to engage in any conduct proscribed by" the amended Title VII, *see* ECF 55 at 22; as it previously explained, Texas "accommodates the reasonable needs of its pregnant employees as a matter of course." ECF 4 ¶ 28. But the course of action Texas wishes to take is not to refuse to accommodate pregnant employees. It is, as the Defendants acknowledge, to continue its current employment practices without the threat of litigation occasioned by the Act's purported abrogation of Texas's sovereign immunity. *See* ECF 55 at 22 (acknowledging that Texas "does not allege that it will have to alter its conduct in any way" and that it sues based on "future consequences arising from its [current] employment practices"). Before the Act, neither state nor federal law subjected Texas to a legal obligation enforceable through litigation or to charges of discrimination filed with the EEOC or investigations by the EEOC. *See* ECF 38 at 15; 42 U.S.C. § 2000e-5; 29 C.F.R. §§ 1601.15–17, 1601.23–25, 1601.28–29. Now, as the Defendants acknowledge, Texas is subject to the costs, hassles, and attendant risks of litigation, all in violation of its sovereign immunity, and none of which were possible before the amendments set out in the Act. *See* ECF 55 at 23 ("Texas has not established that it faces any substantial threat of *being sued*"), 26 ("these cases illustrate the path that Texas can take if it is *ultimately sued*") (emphases added).

That injury is not just possible; it is probable. Because the amendments to Title VII apply to Texas's conduct, "the threatened injury is certainly impending," or at least, "there is a substantial risk that the harm will occur." *See Susan B. Anthony List*, 573 U.S. at 158 (cleaned up).

Texas has a sovereign interest in "the power to create and enforce a legal code," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); the Act's unconstitutional preemption, regulation, and attempted

4

abrogation of Texas's sovereign immunity pressure it to change that code. Likewise, that unconstitutional preemption, regulation, and attempted abrogation of Texas's sovereign immunity increases the regulatory burden on Texas by requiring it to demonstrate compliance with the amendments to Title VII and to defend against charges of non-compliance. Those injuries are "fairly traceable to the" Act, the EEOC, and the Attorney General—as the Fifth Circuit has held, injuries are "traceable to the Attorney General" as well as EEOC when "[t]he pressure on Texas to change its laws exists, in part, because the Attorney General has prosecutorial power to bring enforcement actions against Texas;" that EEOC and "the Attorney General [have] not attempted to enforce the [law] against Texas does not deprive it of standing." *Texas v. EEOC*, 933 F.3d at 448–49.

In sum, Texas cannot say it better than has the Fifth Circuit:

> Texas has suffered cognizable injuries that are fairly traceable to EEOC and the Attorney General. Defendants' mutual authority to enforce the [amendments] are two sides of the same coin. While the [amendments are] in place, EEOC pressures Texas to comply with the threat of referral to the Attorney General for further legal action. The Attorney General's statutory authority to sue Texas is another source of leverage. Both sources would be redressed by a judgment in Texas's favor.

*Id.* at 450. Texas has standing to challenge the Act's amendments to Title VII, and the motion to dismiss should be denied.

### 2. Texas has standing to challenge the pilot program.

Texas also has standing under the pilot program.

*First*, Texas suffers imminent injuries from the Act's continued, additional funding of the pilot program. This is no "'speculative chain of possibilities,'" *see* ECF 55 at 14 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)); increased harm to Texas from the pilot program began once the Act was signed into

law. In fact, as of April 22, 2023, ICE itself reported approximately 65,870 illegal aliens in the Alternatives to Detention program within Texas—and that in only *five areas* of Texas, not the entire state. *See ICE Alternatives to Detention Data, FY23*, U.S. Immigration and Customs Enforcement (last updated April 28, 2023), https://www.ice.gov/doclib/detention/FY23_detentionStats04282023.xlsx.   By authorizing additional funding, the Act immediately created incentives for at least some of those 65,870 illegal aliens to remain in Texas, to be connected to social services to be furnished at the expense of Texas, *see* ECF 56 at 71. And that funding "*must* be awarded to the National Board by September 30, 2024." ECF 56 at 10 (emphasis added).

It therefore does not deny Texas standing that the "National Board has not [yet] solicited applications for grants or awarded any grants of the money allocated to [the pilot program]" under the Act, *see* ECF 56 at 71; that Board is obliged to spend an additional $20 million by September 30, 2024 to connect illegal immigrants to social services—including at one of the program's pilot locations in Houston, meaning connection to services in Texas that will be furnished at Texas's expense. Texas has not alleged that it will be injured "at some indefinite future time;" rather, it has comported with the "elastic concept" of imminence by alleging it will be injured in the definite timeframe specified in the Act. *See E.T. v. Paxton*, 41 F.4th 709, 716 (5th Cir. 2022) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 564 n.2 (1992)). Texas's continued injuries from the pilot program are real, concrete, and immediate Article III injuries, not "[m]ere 'some day' intentions" to engage in particular conduct "without any description of concrete plans." *See Frame v. City of Arlington*, 657 F.3d 215, 235 (5th Cir. 2011) (en banc).

*Second*, Texas's significant injuries from the Act's continued funding of the pilot program are "fairly traceable to the challenged action." *See Texas v. EEOC*, 933 F.3d at 446 (quoting *Clapper*, 568 U.S. at 409). This is because Texas has shown

"a causal connection between [its] injury and the conduct complained of" that is "not . . . the result of the independent action of some third party not before the court." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation omitted). Indeed, Texas's injuries (*i.e.*, the increase in spending and costs) result from the pilot program connecting illegal aliens to social services and resources in Texas. Without the pilot program, illegal aliens would not be connected to social services or Texas's resources, and without the Act, there would not be funding to continue the pilot program. Put simply, the continued funding directed by the Act will lead to continued social services connections and, consequently, to continued injuries for Texas—until at least September 30, 2024. This satisfies Article III's fair traceability requirements.

Further, actions by third parties—here, actions by illegal immigrants—satisfy traceability standards when those third parties "will likely react in predictable ways." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (citing *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)). Experience and incentives, that is, matter; non-profit organizations in Texas will likely apply for grants under the pilot program because such organizations have done so in the past—and probably will continue to do so in the future now that overcrowding problems from increased immigration will lead to more connections to social services in Texas.[1] Similarly, the National Board of the pilot program will likely vote to award the grants to the non-profit organizations because the National Board's previous solicitations expressly stated that the pilot program "*shall* make available case management and associated services" to immigrants and "*will* provide subawards to service providers." ECF 56 at 74–75 (emphasis added). And it is likely that the illegal aliens eligible for

---

[1]   *See* Julia Ainsley, *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, NBC News (May 10, 2023, 8:44 AM), https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704.

connections to social services under the pilot program will receive them because the National Board itself "anticipated that [pilot program] awardees will provide connection, referral and/or enrollment support to a range of services identified as a priority to the participants," including "access to counsel, affordable housing, childcare, transportation, healthcare, schooling, language classes, and cultural orientation programs," and grant recipients are judged on their talent at making those connections. ECF 56 at 75.

*Third*, Texas's injuries are redressable by the Court. There is a "substantial likelihood" that enjoining the funding of the pilot program will reduce the number of illegal aliens connected to Texas's social services or resources, thus at least easing the injuries Texas faces. *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (redressability requires a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact"); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976). That is all that redressability requires.

### B. This case is justiciable.

Not only does Texas have standing, but it continues to demonstrate that this is a justiciable controversy before this Court. Neither the political question doctrine nor the enrolled bill doctrine precludes this Court's review. On the former, this case does not involve political questions committed to the House of Representatives; it involves, rather, compliance with a concrete, non-discretionary limit on the House's power. On the latter, the factual content of the House's journals is not in dispute; rather, it is the legal effect of the unconstitutional action memorialized in that journal. The Court can proceed to decide this case.

### 1. The Quorum Clause does not invest the House with discretion.

The Quorum Clause is a cemented constitutional restraint that Congress— and the Defendants—cannot ignore. Indeed, the Quorum Clause specifically states

that "a Majority of each *shall* constitute a Quorum to do Business." U.S. Const. art. I, § 5, cl. 1 (emphasis added). "Shall" is not a suggestion; it does not permit wiggle room. It is binding, and the "shall" in the Quorum Clause binds the House to a definite posture: It cannot vote on legislation without a majority of its Members present. It can compel absent Members' attendance; it can adjourn from day to day—but it definitely cannot conduct the "Business" of voting on legislation.

It is of no moment here that the Supreme Court has held that "[t]he constitution has prescribed no method of" determining whether a majority of Members is present and left it to the House "to prescribe any method which shall be reasonably certain to ascertain" that presence. *United States v. Ballin*, 144 U.S. 1, 6 (1892). For as the Court said just the paragraph before, there is no such discretion when it comes to the *existence* of the majority; "the constitution *requires* . . . the *presence* of a majority." *Id.* (emphasis added). Whatever discretion a house of Congress has to prescribe the method of counting its members is limited by the Constitution's requirement that no business be conducted unless the county actually shows that a majority of the chamber's members are present. It may not, that is, " by its rules ignore constitutional restraints or violate fundamental rights." *Id.* at 5.

The Quorum Clause is an identifiable textual limit on Congress's authority regarding the determination of a quorum. And while "[o]ur system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch[,] [t]he alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Powell v. McCormack*, 395 U.S. 486, 549 (1969). Accordingly, the Court should review the constitutional violation of the Quorum Clause at issue here. After all, "[i]t is emphatically the province and duty

of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

### 2. The enrolled bill doctrine does not prohibit the Court's review.

The enrolled bill doctrine announced in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), does not prohibit review because Texas's argument depends on the constitutionality of the Act, not whether the Act was factually passed. *See* ECF 38 at 28–30. The enrolled bill doctrine means that Congress's journals are *factually* indisputably, not *legally* indisputable in determining whether a statute is constitutional. *See* ECF 38 at 28–30; *see also United States v. Munoz-Flores*, 495 U.S. 395, 408 (1990) (Scalia, J., concurring) (*Field* "held that federal courts will not inquire into whether the enrolled bill was the bill actually passed by Congress."). The Supreme Court's most recent pronouncements of the doctrine even explain that, *Field* "[held] that the Constitution left it to Congress to determine how a bill is to be authenticated as having passed" and that "[w]here, as here, a constitutional provision *is* implicated, *Field* does not apply." *Munoz-Flores*, 495 U.S. at 391 n.4 (1990) (emphasis in original). That is, whether "a bill becomes a 'law' . . . does not answer the question whether that 'law' is *constitutional*. To survive [a court's] scrutiny, the 'law' must comply with all relevant constitutional limits." *Id*. at 397 (emphasis in original). Indeed, the Court went out of its way to note both that it did not agree with Justice Stevens's suggestion that "a bill becomes a 'law' even if it is improperly originated" and that, even if it did, "the logical consequence of his view is that the Origination Clause would most appropriately be treated as a constitutional requirement separate from [those] that govern when a bill becomes a 'law'"—a requirement that the "law" in question would nevertheless have to satisfy. *Id.*

The Supreme Court's holding in *Munoz-Flores* that "*Field* does not apply" in a case like this is no mere "oblique footnote" that the Court can disregard. *Cf.* ECF 55 at 33–34. For one, there is no footnote exception to Supreme Court precedent. *See, e.g.*, *St. Joseph Abbey v. Castille*, 700 F.3d 154, 160 (5th Cir. 2012) (referring to "Chief Justice Stone's footnote 4 in *United States v. Carolene Products [Co.*, 304 U.S. 144, 152 n.4 (1938)], etched in the brains of several generations of law students"). But more, that "oblique footnote" explained why the Court was proceeding to consider the merits of the Origination Clause challenge rather than simply construing the House's designation of the "law" as having passed based on how the law was described in the House's journal. It is not dicta, and, if it were, it is considered, reasonable, and persuasive—something "[t]he Court is not free to treat . . . as cavalierly as the [Defendants] suggest[]." *Texas v. United States*, 555 F. Supp. 3d 351, 397 (S.D. Tex. 2021); s*ee also Peake v. Ayobami (In re Ayobami)*, 879 F.3d 152, 154 fn.3 (5th Cir. 2018) (while Fifth Circuit courts are not "bound by dicta," "dicta of the Supreme Court are, of course, another matter") (cleaned up); *United States v. Marlow*, 278 F.3d 581, 588 fn.7 (6th Cir. 2002) (lower courts are "obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale").

Because the Quorum Clause is a "constitutional requirement binding Congress," this case, like *Munoz-Flores*, presents a political question nor a nonjusticiable enrolled bill problem. *See Munoz-Flores*, 495 U.S. at 391 n.4. And because this suit centers on Congress's breaching that constitutional restraint, the Court's power and "painful duty" to decide this case persists. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 423 (1819).

**C.  This is a proper venue.**

In addition to jurisdiction and justiciability, the Defendants continue to argue that this Court should dismiss this case for improper venue. ECF 55 at 35. Texas has already explained why the Defendants are wrong, *see* ECF 32, and it incorporates those arguments here rather than repeat them.

**D.  The President is a proper party whom the Court can, and should, enjoin.**

The Court has jurisdiction to order declaratory and injunctive authority against President Biden because the relief sought concerns a ministerial duty.

While this Court generally "has no jurisdiction of a bill to enjoin the President in the performance of his official duties," *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), the Supreme Court has "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (quoting *Johnson*, 71 U.S. at 498–499). The answer to that question is, "Yes, he is," and the Court has jurisdiction to bind him to a judgment and an injunction.

Even though the President has delegated "apportionment authority to the OMB Director," it is President Biden that "*must* 'apportion' the budget authority to the relevant Federal agencies before each agency may obligate its funds." ECF 56 at 102 (emphasis added). The President's direct implementation of the unconstitutional act at issue is mandatory—that is, it is a "ministerial" duty, one where "nothing is left to discretion." *Johnson*, 71 U.S. at 498. That apportionment "is not a proceeding which may be varied, if the judgment of the executive shall suggest one more eligible; but is a precise course accurately marked out by law, and is to be strictly pursued. . . . It is a ministerial act which the law enjoins on a particular officer for a particular purpose." *Marbury*, 5 U.S. (1 Cranch) at 158). And while "[t]he province of the court is . . . not to enquire how the executive, or

12

executive officers, perform duties in which they have a discretion," this is not such a case, for "[i]t is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of [enjoining a ministerial act] is to be determined." *Id.* at 170. The Act imposes a ministerial duty of apportionment on the President. Texas challenges not the method by which he apportions funds, but his apportionment to enforce the challenged laws and programs *at all*. In that, the President has no discretion, and over that, the Court has jurisdiction.

Put simply, "the buck stops with the President." *See Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 491 (D. Md. 2019) (finding that plaintiffs had standing against the President for alleged violations of equal protection). Accordingly, this Court has jurisdiction—and Texas has standing—against the President.

## II.    The Court should enjoin the challenged parts of the act because Texas has established every element for a preliminary injunction.

### A.  Texas is likely to succeed on the merits.

### 1.    The Quorum Clause requires physical presence.

The Quorum Clause, contra the Defendants, *see* ECF 55 at 38–44, requires physical presence to conduct business.

The text, structure, and longstanding practice of Congress regarding the Quorum Clause demonstrate that to be so. Indeed, founding-era dictionaries establish that the plain meaning of the Quorum Clause in 1787 is substantially the same as it would be today—physical presence is necessary for a quorum. *See* ECF 38 at 33–35. That is why, if Congress does not have enough members for a quorum, each chamber is empowered to force absent members to attend in whatever manner each chamber deems appropriate. Otherwise, the power "to compel the

Attendance of absent members" would be a meaningless phrase. *See United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022) ("The canon against surplusage is the interpretive principal that courts prefer interpretations that give independent legal effect to every word and clause in a statute.").

And other parts of the Constitution lead to the conclusion that physical presence is necessary for the House of Representatives to pass bills. The requirement for Congress to "assemble" at least once a year under Article I, Section 4; the requirement that the Speech or Debate Clause grant certain privileges to Members based on physical presence; and the physical presence requirements for Members found, for example, in the Treaty Clause and the 12th Amendment—each of these demonstrates the requirement of physical presence. *See* ECF 38 at 37– 38.

Against this, the Defendants cite one instance—and only one instance—where Congress passed a law with a majority physically absent during the 1918 flu. *See* ECF 55 at 48–51. But there was no contemporaneous disagreement over whether a quorum was not present; the Members had entered into a unanimous consent agreement to object to its lack of presence. *See Whereas: Stories from the People's House, "Sick Days"*, U.S. House of Representatives: Hist., Art & Archives (Dec. 17, 2018), https://history.house.gov/Blog/2018/December/12-14-Flu/.

That is not the case here. First, unlike the 1918 flu, there was no unanimous consent agreement, and House members did not avoid the House chamber to avoid an national crisis. Rather, they circumvented the Constitution because, in the words of the then-Speaker, they had "planes to catch, gifts to wrap, toys to assemble, carols to sing, religious services to attend to." Justin Papp, *Most members phone it in as House clears spending package*, Roll Call (Dec. 23, 2022, 3:18 PM), https://rollcall.com/2022/12/23/most-members-phone-it-in-as-house-passes-spending-

package; s*ee* ECF 59 at 10–12.[2] Second, unlike in 1918, Members in 2022 objected to the lack of a quorum.[3] As conceded by the Defendants, "unanimous consent practice relies on the House's presumption that a quorum is present," ECF 55 at 49, and "quorum is presumed always to be present *unless a point of no quorum is made*," *5 Deschler's Precedents of the House of Representatives*, ch. 20, § 1.3, (1994), https://www.govinfo.gov/app/details/GPO-HPREC-DESCHLERS-V5/GPO-HPREC-DESCHLERS-V5-3/context (emphasis added). In other words, the basis for a unanimous consent arrangement vanishes when the presumption does—and Members' objections scuttled the presumption.[4] The Defendants' reliance on a single, century-old blip in more than two centuries of continues practice and understanding is unpersuasive.

---

[2]  *See also, e.g.* Mini Racker, *For Some in Congress, Proxy Voting Was a Game Changer. It's About to Go Away*, Time Magazine (December 27, 2022, 7:00 AM), https://time.com/6242920/proxy-voting-congress-going-away ("The *Honolulu Civil Beat* reported earlier this year that proxy voting allowed [Rep. Kai] Kahele to avoid Washington for months as he not only campaigned [for Governor of Hawaii], but worked as a pilot for Hawaiian Airlines."); *see also* Justin Papp, *Most members phone it in as House clears spending package*, Roll Call (Dec. 23, 2022, 3:18 PM), https://rollcall.com/2022/12/23/most-members-phone-it-in-as-house-passes-spending-package ("'The members have planes to catch, gifts to wrap, toys to assemble, carols to sing, religious services to attend to,' said Speaker Nancy Pelosi, D-Calif., during what would likely be her last speech from the floor as speaker on Friday."); Diana Glebova, *Citing 'Public Health Emergency,' Pelosi Extends House Proxy Voting Despite History of Abuse*, National Review (Aug. 9, 2022, 3:46 PM), https://www.nationalreview.com/news/citing-public-health-emergency-pelosi-extends-house-proxy-voting-despite-history-of-abuse ("A host of representatives were caught misusing the pandemic rule to go on vacation or to campaign for reelection while Congress was in session . . . Democratic New York Representative Mondaire Jones was spotted partying in the French Riviera for a wedding, potentially proxy voting on 17 pieces of legislation, according to the *New York Post*.").

[3]  *See, e.g.*, Papp, *supra* ("After the bill's passage by a 225-201 vote, [Rep. Chip] Roy raised an objection, saying that by his count there were 226 votes by proxy, and he asked if there was a 'physical quorum present as required under the Constitution.'").

[4]  The Defendants cite *NLRB v. Noel Canning*, 573 U.S. 513 (2014). That case does not stand for the proposition that "[t]he Supreme Court has recognized the validity of" proxy voting or unanimous-consent agreements. *See* ECF 55 at 50. The Supreme Court there addressed the constitutional meaning of the Recess Appointments Clause; it said nothing about whether unanimous consent agreements allow a chamber of Congress to dodge the Quorum Clause. *See NLRB v. Noel Canning*, 573 U.S. 513, 518–19 (2014).

Supreme Court precedent indicates the exact opposite: the dispositive fact in *Ballin* was "that at the time of the roll-call *there were present* 212 members of the house, more than a quorum." *Ballin*, 144 U.S. at 4 (emphasis added).

### 2. Less than a majority of House Members were physically present when the Act passed.

Only 201 of the 435 voting House members were physically present when the House convened to consider the Senate's amendments to the bill—a fact that the Defendants do not dispute. This means that 226 votes were cast those whom absent Representatives had appointed as proxies. 167 Cong. Rec. H10073–74 (Dec. 23, 2022). The presence of a proxy does not negate a physical absence, though; the undisputed fact that 226 Representatives were physically absent means that there was not a majority of Representatives present when the Act passed the House. The House therefore had no constitutional power to do anything but adjourn or compel the absentees' attendance. Because it nevertheless voted on the Act, which was enrolled only because of that constitutional violation, the Act is unconstitutional.

### B. Texas will suffer irreparable harm.

In absence of a preliminary injunction that enjoins the challenged portions of the unconstitutional Act, Texas will, as discussed above and in its motion, suffer irreparable harm.

The injuries to Texas cannot be undone through monetary means. That is because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," and Texas cannot compel the federal government to reimburse it for injuries it sustains. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (granting stay). As a result, the Act's additional funding to the pilot program will continue to impose millions of dollars in costs on Texas if not enjoined, and the Act's the new amendments to Title VII will continue

to increase both the regulatory burden and maintain the pressure on Texas to change its laws. Likewise, the Act's direct stripping of Texas's sovereign interests is irreparable because, once Texas has to appear to defend itself against a lawsuit brought under the new amendments to Title VII, it has lost the protection of sovereign immunity that it is entitled to enjoy, which no amount of money can restore. The injuries to Texas's financial and sovereign interests are irreparable and should be protected with an injunction.

### C.  The balance of the equities and public interest favor an injunction.

The remaining preliminary injunction factors tilt in Texas's favor. Every countervailing interest the Defendants assert, *see* ECF 55 at 61–64, relates to their enforcement of an unconstitutional Act—an Act they knew was unconstitutional when President Biden signed it. Those interests are thus "illegitimate" because the federal government has no interest "in enforcing an unlawful" statute. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). And even if the interests were legitimate—they are not—they do not outweigh the harm inflicted on the "constitutional structure that safeguards our collective liberty" by the Defendants' continued execution and enforcement of an unconstitutional law, and the public interest is served by "maintaining our constitutional structure." *Id*.

And the asserted interests also do not outweigh the "constitutional violations [that] cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) *rev'd on other grounds* 562 U.S. 134 (2011). Nor do they outweigh the millions of dollars in unrecoverable damages imposed on Texas by the Act. This is especially true because an injunction costs the Defendants neither money nor immunity and actually saves them administrative, legal, financial, or other costs associated with implementing the Act against Texas.

Therefore, an injunction that redresses Texas injuries serves the public interest and does not harm the Defendants. Accordingly, the balance of equities and the public interest weigh in favor of Texas and against the Defendants.

**D.  Texas's proposed injunction describes the prohibited conduct in reasonable detail and therefore satisfies Rule 65.**

The Defendants also wrongly challenge Texas's preliminary injunction motion on the grounds that it is vague and thus violates Rule 65. See ECF 55 at 64– 65 (citing Fed. R. Civ. P. 65(d)). But it is not a motion that needs to satisfy Rule 65; it is the Court's injunction order itself. Fed. R. Civ. P. 65(d)(1); *see, e.g.*, *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (deciding whether the district court's permanent injunction order violates Fed. R. Civ. P. 65(d)(1)). Even if the rule applied, Texas's motion is more than adequate to describe the conduct that the Defendants should be barred from: enforcing the Act's amendments to Title VII against Texas and spending money on the pilot program.

## Conclusion

For these reasons, Texas respectfully requests that the motion to dismiss be denied and that the Court enjoin the Defendants from enforcing the Consolidated Appropriations Act, 2023.

Dated May 18, 2023.                  Respectfully submitted.

KEN PAXTON                           LEIF A. OLSON
Attorney General of Texas            Chief, Special Litigation Division
                                     Texas Bar No. 24032801
BRENT WEBSTER                        leif.olson@oag.texas.gov
First Assistant Attorney General

GRANT DORFMAN                        */s/ Ethan Szumanski*
Deputy First Assistant Attorney      ETHAN SZUMANSKI
General                              Assistant Attorney General
                                     Texas Bar No. 24123966
Office of the Attorney General of Texas   ethan.szumanski@oag.texas.gov
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100


Texas Public Policy Foundation       ROBERT HENNEKE
901 Congress Ave.                    Texas Bar No. 24026058
Austin, Texas 78701                  rhenneke@texaspolicy.com
(512) 472-2700
                                     CHANCE WELDON
                                     Texas Bar No. 24076767
                                     cweldon@texaspolicy.com

                                     MATTHEW MILLER
                                     Texas Bar No. 24046444
                                     mmiller@texaspolicy.com

                                     NATE CURTISI
                                     Arizona Bar No. 033342
                                     ncurtisi@texaspolicy.com

                                     **Counsel for the State of Texas**

## CERTIFICATE OF SERVICE

I certify that on May 18, 2023, this combined opposition and reply was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Ethan Szumanski*