IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **STATE OF TEXAS**,            Plaintiff, <br><br> v. <br><br> **MERRICK GARLAND**, in his official capacity as Attorney General, *et al.*, <br>            Defendants. | Case No. 5:23-cv-00034-H |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................1

I. Texas Lacks Standing to Challenge Any Provision of the Act. ..................................1

    A. Texas Lacks Standing to Challenge the Third Year of Funding of the CMPP. .............2

    B. Texas Lacks Standing to Bring a Pre-enforcement Challenge Against the PWFA. ...........................................................................................................................3

II. This Case Is Not Justiciable. .........................................................................................5

III. The Court Lacks Jurisdiction to Enter Relief Against the President. ............................6

IV. The House's Determination That a Quorum Was Present Was Constitutionally Sound. .............................................................................................................................7

CONCLUSION ..............................................................................................................................10

# TABLE OF AUTHORITIES

**CASES**

*Bodley v. Crabb*,
 2015 WL 12781709 (D.N.M. Mar. 19, 2015) ................................................................. 5

*California v. Texas*,
 141 S. Ct. 2104 (2021) ..................................................................................................... 3

*Colby v. United States*,
 2019 WL 1783052 (D. Me. Apr. 23, 2019) ..................................................................... 5

*Crane v. Johnson*,
 783 F.3d 244 (5th Cir. 2015) ........................................................................................... 3

*Fitzpatrick v. Bitzer*,
 427 U.S. 445 (1976) ......................................................................................................... 4

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ......................................................................................................... 3

*Melgoza v. Hardin*,
 2021 WL 9274497 (N.D. Tex. Apr. 14, 2021) ............................................................... 5

*Mississippi v. Johnson*,
 71 U.S. (4 Wall.) 475 (1866) ........................................................................................... 6

*NLRB v. Noel Canning*,
 573 U.S. 513 (2014) ............................................................................................... 6, 9, 10

*OneSimpleLoan v. U.S. Sec'y of Educ.*,
 496 F.3d 197 (2d Cir. 2007) ............................................................................................ 6

*Pub. Citizen v. U.S. Dist. Ct. for D.C.*,
 486 F.3d 1342 (D.C. Cir. 2007) ...................................................................................... 5

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) ......................................................................................................... 2

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ......................................................................................................... 4

*Swan v. Clinton*,
 100 F.3d 973 (D.C. Cir. 1996) ........................................................................................ 7

*Texas v. EEOC*,
 933 F.3d 433 (5th Cir. 2019) ...................................................................................... 3, 4

*United States v. Anzaldi*,
   2013 WL 393326 (N.D. Ill. Jan. 31, 2013) ..................................................................................5

*United States v. Davis*,
   2013 WL 12204904 (D.S.C. May 7, 2013) ................................................................................5

*United States v. Hornback*,
   2014 WL 2768872 (E.D. Ky. June 18, 2014) .............................................................................5

*United States v. Levy*,
   849 F. Supp. 2d 1353 (S.D. Fla. 2012) .......................................................................................5

*United States v. Miles*,
   244 F. App'x 31 (7th Cir. 2007) ..................................................................................................5

*United States v. Munoz-Flores*,
   495 U.S. 395 (1990) ....................................................................................................................5

*Xerox Corp. v. Genmoora Corp.*,
   888 F.2d 345 (5th Cir. 1989) ......................................................................................................6

*Young v. UPS*,
   575 U.S. 206 (2015) ....................................................................................................................5

## STATUTES

31 U.S.C. § 1512 ..............................................................................................................................6

42 U.S.C. § 2000e ............................................................................................................................5

Religious Freedom Restoration Act of 1993,
   Pub. L. No. 103-141, 107 Stat. 1488 ..........................................................................................8

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, 136 Stat. 4459 (2022) ..............................................................................3

## OTHER AUTHORITIES

168 Cong. Rec. H10529 (Dec. 23, 2022) .................................................................................. 9, 10

*House Session, May 11, 1993*, C-SPAN,
   https://perma.cc/E4A2-ZU5R ....................................................................................................8

Library of Congress, https://www.congress.gov/search?q=%7b%22source%22:%22legislation
   %22,%22search%22:%22\%22pass+the+bill+Agreed+to+by+voice+vote\%22%22,%22bill-
   status%22:%22law%22%7d&pageSize=250&pageSort=dateOfIntroduction%3Adesc ...................8

PN693, 110th Cong. (Nov. 16, 2007),
   https://www.congress.gov/nomination/110th-congress/693 ..............................................8

PN825, 105th Cong. (Mar. 11, 1998),
 https://www.congress.gov/nomination/105th-congress/825 ............................................................. 8

PN1338, 107th Cong. (Aug. 1, 2002),
 https://www.congress.gov/nomination/107th-congress/1338 ........................................................... 8

PN1984, 107th Cong. (Nov. 14, 2002),
 https://www.congress.gov/nomination/107th-congress/1984 ........................................................... 8

**INTRODUCTION**

Defendants' motion to dismiss explained why the Court should reject—on both threshold justiciability grounds and the merits—Texas's invitation to second-guess the House's determination that a quorum was present when it passed the Consolidated Appropriations Act, 2023 ("Act"). Texas's opposition fails to rebut most of those arguments, instead repeating assertions that Defendants have already addressed. Texas does now properly eschew any request that the Court enjoin enforcement of, or declare unconstitutional, the entirety of the Act, conceding that it lacks standing to seek any relief concerning any portion of the Act other than the two it specifically challenges: the Pregnant Workers Fairness Act ("PWFA") and the 2023 Case Management Pilot Program ("CMPP") funds. But Texas continues to rely on speculation and generalized assertions rather than supporting its standing argument with any facts. Texas also ignores cases finding Quorum Clause challenges to be nonjusticiable. On the merits, Texas displays a misunderstanding of the longstanding practices of the House and Senate, and otherwise retreads old ground. Accordingly, the Court should dismiss this case because Texas lacks standing, Texas's claim is not justiciable, venue is improper, and the House's determination that a quorum was present when the Act passed was constitutionally sound.

**ARGUMENT**

**I.    Texas Lacks Standing to Challenge Any Provision of the Act.**

Texas has disavowed any request that the Court enjoin enforcement of the entire Act. *See* Opp'n 18, ECF No. 61. As Texas explains, it seeks an injunction barring Defendants from "enforcing the Act's amendments to Title VII against Texas and spending money on the pilot program." *Id.* And, by failing to respond to Defendants' argument that Texas lacks standing to enjoin the entire Act or seek a declaration that the entire Act was unconstitutionally enacted, *see* Mem. 26–30, ECF No. 52, Texas concedes that it lacks standing to seek any relief concerning any portion of the Act that it has not specifically challenged. Moreover, by failing to address the argument that Texas cannot seek relief

1

concerning the first two years of funding for the CMPP because that funding comes from the unchallenged 2021 and 2022 Appropriations Acts, *see id.* at 21, Texas concedes that point as well.

The Court's standing inquiry is thus limited only to whether Texas has standing to challenge the third year of funding of the CMPP and the PWFA. Am. Compl. ¶¶ 25–39, ECF No. 4. Because Texas fails to "clearly . . . allege facts demonstrating each element" of standing for either provision, the case must be dismissed. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

      **A.**    **Texas Lacks Standing to Challenge the Third Year of Funding of the CMPP.**

Texas's argument that it has standing to challenge the Act's third year of funding for the CMPP rests on unfounded assertions that are refuted by Defendants' sworn declarations. Texas claims that the National Board is "obliged" to spend the Act's $20 million of funding for the CMPP "to connect illegal immigrants to social services—including at one of the program's pilot locations is Houston." Opp'n 6. Not so. Grants to prior awardees, such as the Houston nonprofit, "do not automatically renew, but instead must be applied for and awarded" each year to "afford[] different nonprofit organizations and local governments the opportunity to be considered for the program each time new CMPP funding issues." App68–69 (Mina Decl. ¶¶ 8, 10), ECF No. 53. It is speculative whether the National Board will award any grants from the Act's funding to entities *in Texas* and thus whether any noncitizens *in Texas* will be connected to any services using the Act's funds. *See id.*

Texas also claims that "the continued funding directed by the Act will lead to continued social services connections . . . until at least September 30, 2024." Opp'n 7. Texas has it backwards. The Act's funds must be awarded to the National Board *by* September 30, 2024. App8 (Farmer Decl. ¶ 12). After the National Board is awarded the funding, several more steps must occur before any noncitizen is connected to any social services, and that process takes months. *See* App68–69 (Mina Decl. ¶¶ 9–11). If the timeline for awarding grants from the Act's funds is similar to the first year of funding, *see id.*, nonprofits using the 2023 funds would not contact noncitizens until spring 2025—more than two

years after Texas filed its complaint. To find that Texas established standing based on speculation that a purported injury may occur more than two years in the future would stretch the concept of an "imminent" injury beyond its breaking point. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 564 n.2 (1992).

Finally, Texas offers no argument in support of its allegations that the CMPP causes noncitizens to be released in Texas and encourages noncitizens to immigrate to the U.S. and relocate to Texas. *See* Am. Compl. ¶¶ 24, 37. Instead, Texas now claims—without any support—that the CMPP "immediately" incentivizes "at least some" of the 65,870 noncitizens enrolled in ICE's Alternatives to Detention program in Texas to stay in Texas. Opp'n 6. But Texas's bald speculation that these individuals will decide to stay in Texas merely for the *potential* opportunity to be connected to social services by a program that may or may not exist in the State in coming years is insufficient to establish standing, even at this stage. *See Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

**B.   Texas Lacks Standing to Bring a Pre-enforcement Challenge Against the PWFA.**

By nitpicking the use of a verb tense in a brief, Texas asserts that Defendants have conceded that the PWFA is "operating" "right now."[1] Opp'n 3. Defendants did no such thing. Instead, as Defendants repeatedly stated and consistent with the statutory language, the PWFA is not yet in effect and will not be in effect until June 27, 2023. *See* 136 Stat. 4488, 6089 (2022); Mem. 11, 22–24, 59, 61.

Texas argues that it may challenge the law even though it is not yet in effect. Opp'n 3. But the Supreme Court has recognized that "[i]n the absence of contemporary enforcement, . . . a plaintiff claiming standing must show that the likelihood of future enforcement is substantial." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021). And, "[i]n identifying the injury that confers standing, courts look exclusively to the time of filing." *Texas v. EEOC*, 933 F.3d 433, 448 (5th Cir. 2019). Texas has not met its burden, as nowhere in its brief does Texas explain how, when it filed this case in mid-February,

---

[1] Texas maintains that the PWFA amended Title VII. *See* Opp'n 3. It did not. *See* Mem. 10 n.10.

it faced a substantial threat of enforcement. *See* Mem. 23–24.

While Texas recognizes that it must express "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 159 (2014), Texas fails to identify any such conduct and instead attempts to rely on generalities, *see* Opp'n 3–4. Texas claims it wishes to "continue its"—unspecified—"current employment practices without the threat of litigation occasioned by the Act's purported abrogation of Texas's sovereign immunity," *id.* at 4, but Texas does not explain how its current employment practices could plausibly give rise to such litigation. And does Texas does not explain how being free from a "threat of litigation" by the Federal Government—the only defendants in this case—is "arguably affected by a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 158, nor does it show that an injunction against EEOC or the Department of Justice would redress any injury purportedly caused by potential suits by private individuals.

Instead, Texas claims that because the PWFA "pressure[s]" Texas to "change [its legal] code" and "increases the regulatory burden on Texas by requiring it to demonstrate compliance" with the PWFA, it has standing to challenge the law. Opp'n 4–5. But Texas does not identify any part of its legal code that must be changed as a result of the PWFA and claims that, as an employer, it "accommodates the reasonable needs of its pregnant employees as a matter of course." *Id.* at 4 (quoting Am. Compl. ¶ 28). This case is thus distinguishable from *Texas v. EEOC*, where the Fifth Circuit concluded that Texas had standing to challenge EEOC Guidance that was in effect and had deemed "unlawful the hiring practices of multiple Texas agencies by rejecting across-the-board felon hiring schemes." 933 F.3d at 447. Texas further argues that, before the PWFA, it was not subject to any "legal obligation enforceable through litigation or through charges of discrimination filed with the EEOC or investigations by the EEOC." Opp'n 4. This is incorrect. States have long been subject to Title VII, *see Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), which requires employers to treat employees

4

affected by pregnancy, childbirth, or related medical conditions "the same for all employment-related purposes … as other persons not so affected but similar in their ability or inability to work," 42 U.S.C. § 2000e(k), including, in some cases, by providing accommodations, *see Young v. UPS*, 575 U.S. 206, 229 (2015). In the absence of any explanation as to how the PWFA causes it any cognizable injury, the Court should find that Texas lacks standing to bring a pre-enforcement challenge.

**II.    This Case Is Not Justiciable.**

Texas does not respond to Defendants' argument that the principles underlying non-justiciability doctrines—finality, certainty, and respect for a co-equal branch—warrant judicial forbearance. Instead, Texas merely repeats its argument that the enrolled bill doctrine does not preclude review because that doctrine applies only to factual, not legal, disputes regarding the validity of a bill. *See* Opp'n 10. But, as previously explained, this purported factual versus legal distinction has no basis in the case law. *See* Mem. 33–34. And, in reiterating this argument, Texas entirely ignores the numerous cases that have rejected legal challenges to the validity of statutes pursuant to the enrolled bill doctrine, including challenges brought under the Quorum Clause, *see id.* at 31–32 (citing circuit cases),[2] as well as a challenge that a law was invalid because it was passed after a *sine die* recess, *see Melgoza v. Hardin*, 2021 WL 9274497, at *5 (N.D. Tex. Apr. 14, 2021) (Hendrix, J.).

Texas also criticizes Defendants' arguments concerning a footnote in *United States v. Munoz-Flores*, 495 U.S. 395, 391 n.4 (1990). *See* Opp'n 11. But Defendants have not asked the Court to ignore the *Munoz-Flores* footnote; rather, Defendants explained that two circuit courts have stated that the "oblique footnote" "def[ies] easy comprehension," but is nevertheless clear that "the Court did not mean to overturn or modify the enrolled bill rule." *See* Mem. 33–34 (quoting *Pub. Citizen v. U.S. Dist.*

---

[2] *See also, e.g.*, *United States v. Miles*, 244 F. App'x 31, 33 (7th Cir. 2007); *United States v. Levy*, 849 F. Supp. 2d 1353, 1355–56 (S.D. Fla. 2012); *United States v. Davis*, 2013 WL 12204904, at *1 (D.S.C. May 7, 2013); *Bodley v. Crabb*, 2015 WL 12781709, at *2 (D.N.M. Mar. 19, 2015); *United States v. Hornback*, 2014 WL 2768872, at *16 (E.D. Ky. June 18, 2014); *Colby v. United States*, 2019 WL 1783052, at *3–4 (D. Me. Apr. 23, 2019); *United States v. Anzaldi*, 2013 WL 393326, at *2 (N.D. Ill. Jan. 31, 2013).

*Ct. for D.C.*, 486 F.3d 1342, 1353 (D.C. Cir. 2007); *OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 206–08 (2d Cir. 2007)). The Supreme Court's subsequent decision in *Noel Canning* confirms as much. *See NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (reaffirming the enrolled bill rule of *Marshall Field*).

Finally, the political question doctrine precludes review here. While Defendants do not dispute that "shall" connotes a requirement, as set forth below and in Defendants' opening brief, the Quorum Clause does not define how and when a quorum exists, and the Rulemaking Clause provides a textual commitment to the House to establish the procedures to make such a determination.

### III. The Court Lacks Jurisdiction to Enter Relief Against the President.

Texas erroneously argues that the Court may enter relief against the President in this case because Texas seeks to enjoin him from performing a "ministerial duty." Opp'n 12–13. A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498 (1866). By selectively quoting from one of Defendants' declarations, Texas claims that the President's role in apportioning funds is "ministerial" because the President is obligated to take this action. Opp'n 12. But that declaration makes clear that the President, through his designee, "apportions funds to Executive Branch agencies by time periods, specific activities or projects, or a combination thereof," reflecting that there is discretion in this process. App100 (Kinneen Decl. ¶ 11); *see also* 31 U.S.C. § 1512.

In any event, the Court need not decide whether the President's duty in apportioning funds is ministerial because "[a]s of December 29, 2022, OMB had apportioned all of the funds provided in the 2023 Act." App100 (Kinneen Decl. ¶ 12). Thus, Texas's purported "challenge[]" to the President's "apportionment to enforce the challenged laws and programs" is moot.[3] Opp'n 13.

Even if the funds had not already been apportioned, the President must be dismissed under

---

[3] Texas did not make any claims regarding the President's apportionment actions in its Amended Complaint, which provides another basis for dismissal of the President. *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989) (requiring allegations of injury "on the face of the complaint").

separation-of-powers principles. If the Court determines any relief is warranted, "any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the [alleged] injury at issue can be rectified by injunctive relief against subordinate officials." *Swan v. Clinton*, 100 F.3d 973, 978–79 (D.C. Cir. 1996).

**IV.     The House's Determination That a Quorum Was Present Was Constitutionally Sound.**

Defendants' brief analyzed the text and history of the Quorum and Rulemaking Clauses, and longstanding House and Senate practices that do not require a majority of Members to be physically present to conduct business. *See* Mem. 36–57. Texas barely engages with these arguments.

As to the text and history of the Quorum Clause, Texas does not respond to Defendants' arguments that, at the Founding, "quorum" meant the minimum number of participants necessary to transact business, *see id.* at 38–39, and that the Framers' debates addressed *how many* were needed to establish a quorum, not *how* one must participate to count towards a quorum, *see id.* at 39–40.

Texas looks to other provisions, but it again does not engage—at all—with arguments Defendants already made. Texas asserts that the clause following the Quorum Clause—each house has the power "to compel Attendance of absent members"—"would be a meaningless phrase" if the Quorum Clause itself did not require physical presence. Opp'n 13–14. But Defendants already demonstrated that "Attendance" in this context means participation in House business, whether in person or otherwise. *See* Mem. 40 (at Founding, "attend" meant "[t]o yield" or "give attention"). Texas points to other clauses it says indicate that "physical presence is necessary for the [House] to pass bills," *see* Opp'n 14, but those provisions do not necessarily require physical presence either, *see* Mem. 43–44 (citing Founding-era definitions of "adjourn" and "present"), a point that Texas does not refute. And, even if they did, the absence from the Quorum Clause of the words allegedly requiring physical presence (*e.g.*, "assemble") only reinforces that the Quorum Clause itself does not contain such a requirement. For example, Texas does not say why, even if Article I, Section 4, Clause

7

2—"Congress shall assemble at least once in every Year"—required Congress to physically gather at the same place once each year, Congress could not conduct its business at other times without a majority physically present—*e.g.*, by voice vote, unanimous consent, or proxy vote.

The remainder of Texas's merits response is rooted in a misunderstanding of House and Senate history and tradition. Texas says that "longstanding practice of Congress . . . demonstrate[s] that" the Quorum Clause "requires physical presence to conduct business." Opp'n 13. Texas suggests it is aware of "only one instance" "where Congress passed a law with a majority physically absent," referring to the use of a unanimous consent agreement during the 1918 flu as "a single, century-old blip in more than two centuries of contin[uous] practice." *Id.* at 14–15. Texas then tries to distinguish that example. *Id.* Texas's argument falls flat for two primary reasons.

First, Texas grossly understates the use of unanimous consent and voice votes—which do not require a majority to be physically present, and which routinely permit passage with only a few Members physically present. The use of unanimous consent in 1918 is not a "blip," but rather part of a consistent pattern dating back to 1789 in the Senate and 1832 in the House. *See* Mem. 48–49. The House has passed *thousands* of enacted bills by voice vote,[4] including landmark legislation such as the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, which was passed with the House chamber nearly empty. *See House Session, May 11, 1993*, C-SPAN, https://perma.cc/E4A2-ZU5R (1:30:00). In the Senate, judges are often confirmed by unanimous consent or voice vote, without a majority present in the chamber.[5] *See* Mem. 51.

---

[4] *See* Library of Congress, https://www.congress.gov/search?q=%7b%22source%22:%22legislation%22,%22search%22:%22\%22pass+the+bill+Agreed+to+by+voice+vote\%22%22,%22bill-status%22:%22law%22%7d&pageSize=250&pageSort=dateOfIntroduction%3Adesc.

[5] The Senate confirmed many of the judges in this district—including Chief Judge Godbey and Judges O'Connor, Lindsay, and Kinkeade—by voice vote. *See* PN1338, 107th Cong. (Aug. 1, 2002), https://www.congress.gov/nomination/107th-congress/1338; PN693, 110th Cong. (Nov. 16, 2007), https://www.congress.gov/nomination/110th-congress/693; PN1984, 107th Cong. (Nov. 14, 2002),

Second, Texas does not explain why the presence of a unanimous consent agreement, or the absence of an objection, would be relevant to the Quorum Clause analysis. Texas asserts that the passage of the Act was constitutionally infirm, because "unlike the 1918 flu, there was no unanimous consent agreement" here. Opp'n 14. But the Quorum Clause makes no mention of such agreements, and Texas does not explain why, if the Clause requires a majority of Members to be physically present at the time of passage as Texas claims, that constitutional requirement would be excused because of such an agreement. Relatedly, Texas asserts that "unlike in 1918, Members in 2022 objected to the lack of a quorum." *Id.* at 15. But Representative Roy did not object; he made a parliamentary inquiry that he then withdrew: "Mr. Speaker, withdrawn. No objection." 168 Cong. Rec. H10529 (Dec. 23, 2022) (Speaker *pro tempore*: "The gentleman withdraws his reservation. . . . *There was no objection.*" (emphasis added)). In any event, Texas again fails to explain why an objection, if made, would have been of any constitutional import. If the Quorum Clause must be read to mean a majority must be physically present to do business, there is no reason why a Member failing to object would remedy what Texas otherwise contends is a constitutional violation.

Next, Texas relegates to a footnote its assertion that *Noel Canning* "does not stand for the proposition" that the Supreme Court "recognized the validity of" unanimous consent as a method for passing legislation. *See* Opp'n 15 n.4. But, as Defendants explained, *see* Mem. 50–51, the Court's conclusion that the Senate had "the power to conduct business" via unanimous consent despite nearly all Senators being out of town during the sessions in question was necessary to its holding. 573 U.S. at 552. The Court approvingly noted that the Senate had passed a bill during one of the *pro forma* sessions, and then concluded, as essential to its holding, that the Senate "could confirm nominees by unanimous consent, just as it passed the bill mentioned above." *Id.* at 554. If the Senate did not have

---

https://www.congress.gov/nomination/107th-congress/1984; PN825, 105th Cong. (Mar. 11, 1998), https://www.congress.gov/nomination/105th-congress/825.

such power, the President's recess appointments would have been valid. To the extent Texas is asserting that the Court reached its conclusion about the Senate's authority by merely deferring to the Senate's rules rather than second-guessing whether Senate procedure complied with the Quorum Clause, that is precisely what the Court should do here. *See id.* at 551 ("[W]hen the Journal of the Senate indicates that a quorum was present, under a valid Senate rule, at the time the Senate passed a bill, we will not consider an argument that a quorum was not, in fact, present."); *see also* Part II, *supra.*

Finally, Texas is wrong about how many Members were "present when the Act passed." *See* Opp'n 16. First, the House found that a majority of Members was present. Texas alleges that "no business [may] be conducted unless the count[] actually shows that a majority of the chamber's members are present." *Id.* at 9. But the count did show that a majority was present pursuant to H. Res. 965. 168 Cong. Rec. at H10529. Second, Texas says that Defendants do not dispute that 201 of the 435 voting House Members were physically present. Not exactly. Defendants agree that 226 votes were recorded as cast by proxy. But there is no record of how many Members were physically present on the House floor, in the nearby hallways, or otherwise in the Capitol. No quorum call occurred and there is no other record of physical presence. Accordingly, the record does not indicate whether any other Members whose votes were counted pursuant to the proxy voting rule were physically present at any time during the vote. The challenges with this type of inquiry—looking beyond the final vote and the House's determination that a quorum was present—illustrate why the Court should not second guess the House's ruling here that a "quorum was, indeed, present" at the time the Act passed. *Id.*; *see also* Part II, *supra.* And regardless of how many Members were *physically* present, the House's ruling was sound because nothing in the constitutional text, history, or precedent establishes a physical presence requirement.

## CONCLUSION

The Court should dismiss the case on threshold grounds or on the merits.

10

Dated: June 1, 2023	Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Branch Director

/s/ *Courtney D. Enlow*
COURTNEY D. ENLOW (NC Bar No. 46578)
Senior Trial Counsel
MICHAEL J. GAFFNEY (D.C. Bar No. 1048531)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8467
Fax: (202) 616-8470
Email: courtney.d.enlow@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2023, I electronically filed the foregoing paper with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

                                             */s/ Courtney D. Enlow*
                                             COURTNEY D. ENLOW
                                             Senior Trial Counsel
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W.
                                             Washington, DC 20005
                                             Tel: (202) 616-8467
                                             Fax: (202) 616-8470
                                             Email: courtney.d.enlow@usdoj.gov