UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS,
     Plaintiff,

v.

MERRICK GARLAND, in his official
capacity as Attorney General., et al.,
     Defendants.

No. 5:23-CV-034-H

## MEMORANDUM OPINION AND ORDER

Judges apply rules, not the parties' preferences.  The rule at issue here is longstanding: the plaintiff gets to choose where to file suit from multiple permitted locations.  And since 1962, Congress has permitted suits against the federal government to be brought where the plaintiff resides.  Here, Texas brought suit in the Northern District of Texas, but the defendants seek transfer because, in their view, Texas sues too often in certain divisions.  Notably, however, the defendants do not claim the Court is biased.  To the contrary, they "are not questioning this Court's ability to decide the case fairly."  And each argument the defendants do assert to justify transfer fails.  First, the venue statute, case law, and common sense contradict the claim that Texas resides solely in its capital.  Second, the request to transfer venue based on the parties' and witnesses' convenience is unsupported by evidence, and the applicable balancing test tips decidedly against the defendants.  Finally, the defendants' contention that Texas's choice of forum undermines public confidence in the judiciary rests on several flawed premises: that this is a single-judge division (it is not), that litigation in single-judge divisions is novel (incorrect), and that filing in this division guarantees an outcome (it does not).  Because venue is proper and the defendants have not shown another venue to be more convenient, the motion is denied.

1.    **Procedural History**

The State of Texas—the sole plaintiff in this case—filed suit against various federal agencies and executive officials, challenging two narrow provisions of the Consolidated Appropriations Act of 2023.  Dkt. No. 4.  Specifically, Texas claims that Congress passed the Act in violation of the Constitution's Quorum Clause because less than half of the Members of the House of Representatives were physically present, which prevented the necessary quorum to do business.  *Id.* at 1–2, 4–5, 9–14 (quoting U.S. Const. art. I, § 5, cl. 1).  The House nevertheless accepted the Senate's amendments to the Act based on a House rule that allowed absent members to vote by proxy.  *Id.* at 2–5.

Texas alleges that two particular provisions of the Act cause it harm—one imposing novel obligations on employers and another that will result in Texas spending additional funds for illegal aliens.  *Id.* at 5–9.  First, the Act expands Title VII's protections and obligations to cover pregnant employees.  *Id.* at 5.  Texas asserts that, although it already accommodates the needs of its pregnant employees, the Act would subject it to new litigation exposure, including EEOC complaints and investigations, lawsuits from the Attorney General, and private actions from employees.  *Id.* at 5–6.  Second, Texas complains that the Act "creates a program that encourages illegal aliens to seek additional spending from States."  *Id.* at 6 (quoting Pub. L. 117-328, Div. F, Title I).  In short, the Act allocates $20 million to a case-management pilot program that, among other things, connects illegal aliens released into the United States with various social services provided by Texas, such as education and healthcare.  *Id.* at 7–8.  As a result, Texas alleges that the Act "causes Texas and its local governments to spend additional monies on services to illegal aliens they would not otherwise spend."  *Id.* at 8.

Because these provisions would cause direct economic and quasi-sovereign interest harm—and stem from an Act that Texas believes passed into law in violation of the Constitution—Texas asks the Court to "enjoin[] the Defendants from enforcing the Pregnant Workers Fairness Act against it." *Id.* at 15–16.  Additionally, it asks the Court to "enjoin[] the Defendants from continuing to fund grants through and otherwise operate DHS's pilot program." *Id.*

In response, the defendants filed the instant motion, requesting transfer to the Western District of Texas or the District of Columbia.  Dkt. No. 9.  Texas filed its response (Dkt. No. 32), and the defendants filed their reply (Dkt. No. 34).  The motion is ripe.

## 2.  Analysis

The defendants seek transfer on three grounds.  First, they assert that venue is improper under 28 U.S.C. § 1406 because Texas does not reside in the Northern District of Texas.  Dkt. No. 10 at 10–15.  Second, the defendants contend that, even assuming proper venue, the Court should transfer the case to either Austin, Texas, or Washington, D.C., under 28 U.S.C. § 1404(a) because those locations are more convenient.  *Id.* at 15–18. Finally, regardless of convenience, they claim that the interest of justice justifies transfer under Section 1404(a) to prevent the loss of public confidence in the judicial system.  *Id.* at 18–20.  Each argument, however, is unsupported by the law and the record.  Thus, the defendants fall well short of justifying deviation from the well-established default rule that plaintiffs get to choose their forum.

### A.   Venue is proper in the Northern District of Texas.

The defendants first argue that the Court should transfer this case under the improper-venue provision of Section 1406.  *Id.* at 10.  Their argument rests on the premise

that Texas is not a resident, for venue purposes, of the Northern District of Texas. *Id.* at 12. The statute, precedent, and common sense all indicate otherwise.

The improper-venue statute requires district courts to dismiss or transfer cases filed "in the wrong division or district." 28 U.S.C. § 1406(a).[1] Section 1391 defines proper venue in civil actions filed against the federal government. 28 U.S.C. § 1391(e). It provides that a suit against the federal government may be brought "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject to the action is situated, or (C) the plaintiff resides if no real property is involved in the action." *Id.* Thus, a plaintiff can sue the federal government where it resides—regardless of where the events giving rise to the action occurred. *See id.* The statute defines residency for (1) natural persons; (2) entities "with the capacity to sue and be sued in its common name under applicable law"; and (3) non-residents. *Id.* § 1391(c)(1)–(3). In a separate subsection, it defines residency for corporations in states with multiple districts. *Id.* § 1391(d).

Texas does not argue that any defendant resides in this district, nor does it argue that the events giving rise to the claim occurred here. Dkt. No. 32 at 6. Rather, it contends that "[v]enue is proper here because Texas resides here." *Id.* Thus, the issue is whether Texas resides in the Northern District of Texas. For multiple reasons, the Court concludes that it does.

---

[1] While the defendants take issue with the plaintiff's filing of the case in this division, they argue that venue is improper only because it was brought in the wrong district and do not rely on Section 1406's "wrong division" language. Dkt. No. 10 at 10 (quoting 28 U.S.C. § 1406(a)). Thus, the Court will analyze whether venue is proper within the Northern District of Texas.

First, precedent dictates this outcome.  The Fifth Circuit confirmed more than a century ago that a state "resides at every point within [its] boundaries."  *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892).  Notwithstanding *Atlanta & F.R. Co.*'s posture as assessing jurisdiction in a dispute between corporations, courts have consistently relied on this on-point precedent when addressing a plaintiff state's residency under Section 1391(e).  *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) (quoting *id.* at 791); *Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 2663256, at *3 (N.D. Tex. March 28, 2023) (same); *Texas v. Dep't of Homeland Sec.*, No. 6:23-CV-007, 2023 WL 2457480, at *3 (S.D. Tex. March 10, 2023) (same); *Florida v. United States*, No. 3:21-CV-1066-TKW-EMT, 2022 WL 2431443, at *2 (N.D. Fl. Jan. 18, 2022) (same).  This Court will likewise follow the Fifth Circuit's clear statement and conclude that Texas resides at every point within its boundaries, including in the Northern District of Texas.  Therefore, it can bring suit against the federal government in this district.

Second, common sense—and every court presented with the question—make clear that a state resides in every district and division within its borders.  Nearly 20 years ago, one court explained that "[c]ommon sense suggests that the Plaintiffs are correct" in arguing that a state "'resides' in every district it encompasses."  *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005).  And, more recently, the Northern District of California and the Ninth Circuit agreed.  *California v. Health and Human Servs.*, 281 F. Supp. 3d 806, 824 (N.D. Cal. 2017), *vacated in part on other grounds by Azar*, 911 F.3d 558 ("[C]ommon sense dictates that for venue purposes, a state plaintiff with multiple federal judicial districts resides in any of those districts."); *Azar*, 911 F.3d at 570 (explaining that any "interpretation limiting residency [of a state plaintiff] to a single district in the state

would defy common sense"). Courts in the Eastern District of Pennsylvania and the Northern District of Florida reached the same conclusion. *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 809 (E.D. Pa. 2019), *rev'd on other grounds sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020); *Florida*, 2022 WL 2431443, at *2.

Additionally, in recent months—and in response to similar transfer motions brought by the United States—district courts in this Circuit have joined the chorus of courts finding that states reside in every district within their borders. *Walsh*, 2023 WL 2663256, at *3 (stating that common sense dictates that Texas is a resident of the Northern District of Texas) (quoting both *Alabama*, 382 F. Supp. 2d at 1328–29, and *Azar*, 911 F.3d at 570); *Texas*, 2023 WL 2457480, at *3 (stating that "every court that has considered the residency of a state" has concluded that a state resides in every district within its borders) (citing *Azar*, 911 F.3d 558). Thus, the Court joins every other court to address the issue in concluding that a plaintiff state resides in every district of that state.

Third, the defendants' assertion that the venue statute proves that a state cannot reside in all districts within its borders is undermined by the statute's text and context. Section 1391(c), entitled "Residency," provides that for "all venue purposes":

(1)    a natural person . . . shall be deemed to reside in the judicial district in which that person is domiciled;

(2)    an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, . . . if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

(3)    a defendant not resident in the United States may be sued in any judicial district.

28 U.S.C. § 1391(c).

The defendants contend that subsection (c)(2) governs the residency of a state plaintiff, so "the State of Texas 'resides' for venue purposes in its principal place of business, its capital Austin, located in the Austin Division of [the] Western District of Texas."  Dkt. No. 10 at 12.  More specifically, the defendants claim that the venue statute prescribes the residency of every possible type of litigant, and they characterize Section 1391(c)(2) as a "residual category."  *Id.*; Dkt. No. 34 at 3 (arguing that the "all venue purposes" language covers every possible type of litigant).  Texas disagrees, arguing that (c)(2) "does not purport to include every possible party to every possible action for venue purposes; its definition of 'entity' is not a residuary receptable into which sovereign States fall."  Dkt. No. 32 at 7.

The Court disagrees with the defendants' suggested interpretation.  Section 1391(c)(2) does not reference, let alone define, the residency of a state.  Its reference to "an entity with the capacity to sue and be sued in its common name . . . whether or not incorporated" is a reference to unincorporated associations.  *Azar*, 911 F.3d at 570 (stating that this section "is a response to 'division in authority as to the venue treatment of unincorporated associations'") (citing H.R. Rep. No. 112-10, at 21 (2011)); *Pennsylvania*, 351 F. Supp. 3d at 809 (noting that "Congress was contemplating 'unincorporated associations, such as partnerships and labor unions, and other entities with capacity to sue in their common name'") (citing H.R. Rep. No. 112-10, at 21 (2011)).  Moreover, that phrase—"capacity to sue and be sued in its common name"—is mirrored in Federal Rule of Civil Procedure 17(b), which provides that an "unincorporated association" that has "no [] capacity [to sue] under [] state[] law" may "sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws."  Fed. R. Civ. P. 17(b)(3)(A); *see also Busby v. Elec. Utils. Emps. Union*, 323 U.S. 72, 73 (1944) ("Under these

– 7 –

Rules, a plaintiff may proceed . . . against an unincorporated labor union in its common name . . . .") (citing Rule 17).  Thus, Texas is not an "entity" within the meaning of Section 1391(c)(2), given its plain reference to unincorporated associations.  The defendants fail to cite any authority holding otherwise.

Further, it is clear that Section 1391(c)(2) "makes no reference one way or the other as to the residency of a sovereign state" because states, unlike corporations, do not have a principal place of business.  *Texas*, 2023 WL 2457480, at *3.  The defendants argue that Austin is Texas's principal place of business, citing a number of authorities.  Dkt. No. 10 at 12–13.  But the Court finds these bare citations unpersuasive because none addresses a sovereign state.  *O'Neill v. Battisti* involved state judicial officials, rather than the sovereign state.  472 F.2d 789, 790 (6th Cir. 1973) (noting that the case was filed "by the Chief Justice and the Associate Justices of the Supreme Court of Ohio").  And the remainder of the defendants' citations all relate to public officials—not sovereign states.  *Fla. Hometown Democracy, Inc. v. Browning*, No. 08-CV-80636, 2008 WL 3540607, at *3 (S.D. Fla. Aug. 12, 2008) (Florida Secretary of State); *Leonhart v. McCormick*, 395 F. Supp. 1073, 1078 (W.D. Pa. 1975) (noting that "all defendants are state officers"); *Perkins v. Snider*, No. 94-CV-4785, 1994 WL 530045, at *1 (E.D. Pa. Sept. 2, 1994) (Secretary of the Pennsylvania Department of Public Welfare); *Nestor v. Hershey*, 425 F.2d 504, 521 (D.C. Cir. 1969) (Director of the Selective Service System); *Brinbaum v. Blum*, 546 F. Supp. 1363, 1366 (S.D.N.Y. 1982) (Commissioner of the Oneida County Department of Social Services and Budget Director of New York State).  Thus, the defendants do not cite any case holding that a sovereign state has a principal place of business.  To the contrary, while these cases discuss the residence of state officials, none even uses the term "principal place of business."

Nor is Section 1391(c)(2) a residual clause that captures all litigants that are not natural persons or foreign defendants, as the defendants suggest. The defendants argue that "[i]f Congress intended to limit the entity category described in Section 1391(c)(2) to particular entities that it had in mind, it could have enumerated them individually." Dkt. No. 10 at 14 (cleaned up). But regardless of what Congress allegedly intended, the text of Section 1391(c)(2) is not the "generally phrased . . . catchall" that the defendants claim it is. *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). "A residual clause is just that—something that is 'left over' and considered after the primary question has first been reviewed." *United States v. Castro*, 755 F. App'x 371, 373 (5th Cir. 2018) (quoting the Oxford English Dictionary). Subsection (c)(2), in contrast, is the second in a list of three residency definitions—an odd place to hide a leftover catchall. Nor is it "generally phrased." It addresses specific entities with the capacity to sue and be sued in their common name— even if an entity is not incorporated. Likewise, Supreme Court precedent provides that the statutory language "[f]or all venue purposes" is not phrased as a residual clause. *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. 258, 268 (2017) (rejecting the premise that the statute's "[f]or all venue purposes" language applies in all cases). Finally, Section 1391's saving clause—"[e]xcept as otherwise provided by law"—"expressly contemplates that certain venue statutes may retain definitions of 'resides' that conflict with its default definition." *Id.* at 269.

*Beaty*, the defendants' sole case cited in support of the proposition that Section 1391(c)(2) is a residual clause, involved materially different statutory language. There, the Supreme Court considered the following language:

> The President may suspend the application of any provision of the Iraq Sanctions Act of 1990 . . . *Provided further*, That the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 *or any other provision of law* that applies to countries that have supported terrorism . . . .

*Beaty*, 556 U.S. at 856 (citing 117 Stat. 579) (first emphasis in original, second emphasis added). Because it "supplied an amorphous catchall at the end of a more definite list," the language in *Beaty*, unlike the language of Section 1391(c), looks like other statutory language that has been called a residual clause. *See Brown v. United States*, 139 S. Ct. 14, 15 (2018) (Sotomayor, J., dissenting from denial of certiorari).

It should not be surprising that the venue statute does not define residency for all types of litigants because Congress has never sought to define all possible conceptions of residency. "Venue in the federal courts has been primarily a matter of statute, and not common law, from 1789 until the present." Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3802 (4th ed. 2022 update). And yet, "[u]ntil 1948, Congress made no effort to define the residence of litigants." *Id.* at § 3804. The defendants themselves implicitly recognize that Section 1391(c) is not the exhaustive source of residency for venue purposes, as they note that subsections (d), (e), and (f) define residency for various types of litigants. Dkt. No. 10 at 14 (noting that "Congress recognized six specific entities in the venue statute as 'residing' in a certain district") (citing 28 U.S.C. §§ 1391(c)–(f)). Thus, the defendants' attempt to characterize Section 1391(c)(2) as a residual clause is belied by a fair reading of the statutory text, context, precedent, and tradition.

Finally, the Court is not persuaded by the defendants' reference to *Ironridge Global*—a Northern District of Georgia case concluding that the SEC was "an entity with the capacity to sue and be sued in its common name." *Ironridge Global IV, Ltd. v. SEC*, 146 F. Supp. 3d

1294, 1311 (N.D. Ga. 2015).  First, that case considered the residency of a federal agency, not of a sovereign state.  *See generally id.*  And its posture as an order granting a preliminary injunction means that the court only considered whether the plaintiffs had shown a likelihood of success on the venue question.  *Id.* at 1312.  Second, the Court disagrees with the reasoning.  *Ironridge Global* was decided prior to *TC Heartland* and erroneously concluded that the "for all venue purposes" language applied to all venue determinations.  *Compare TC Heartland LLC*, 581 U.S. at 268 (concluding that "all venue purposes" is not without exception), *with id.* (concluding that in enacting the "[f]or all venue purposes" language, "Congress could not have been clearer").  Moreover, *Ironridge Global* did not consider the cases finding sovereign states are not included under Section 1391(c)(2) or the limitation Congress imposed by adding the principal-place-of-business language.

By its plain terms, Section 1391(c)(2) refers to corporations and unincorporated associations—not sovereign states.  Thus, the Court joins every other court to consider the issue by finding that a state resides, for venue purposes, in every district within its borders.  Venue is proper in the Northern District of Texas.

### B.    Transfer is not appropriate under Section 1404.

Although venue is proper in this Court, the defendants argue in the alternative that the Court should transfer the case to Austin or the District of Columbia for the convenience of the parties and witnesses.  Dkt. No. 10 at 9–12.  The defendants provide no evidence, however, to meet their burden of showing good cause through a clear demonstration that transfer would serve the convenience of the parties and witnesses.  To the contrary, the public- and private-interest factors the Court must consider weigh decidedly against the defendants' request.

If venue is otherwise proper, as it is in this case, transfer is only appropriate under 28 U.S.C. § 1404(a). The statute provides that the Court may transfer a case to another district in which the case "might have been brought" if it is "[f]or the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). To satisfy this statute, a party "must show good cause" by "clearly demonstrat[ing] that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'" *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (quoting 28 U.S.C. § 1404(a)). If the moving party cannot carry its burden to show that the transferee venue is clearly more convenient, "the Plaintiff's choice should be respected." *Id*. And when venue is proper, "the fact that litigating would be more convenient for the defendant elsewhere is not enough to justify transfer." *Def. Distributed v. Bruck*, 30 F.4th 414, 433 (5th Cir. 2022). Thus, to satisfy the burden, the moving party "must adduce evidence and arguments that clearly establish good cause for transfer based on convenience and justice." *Id*.

In light of the statutory language, the "transfer analysis proceeds in two parts." *In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 630 (5th Cir. 2022). "First, the district court must ask whether the case 'might have been brought' in the destination venue." *Id*. (quoting 28 U.S.C. § 1404(a)). "Second, the district court must weigh the public and private interest factors set forth in . . . *Gilbert* . . . to determine whether the destination venue is 'clearly more convenient than the venue chosen by the plaintiff.'" *Id*. (citing *Gilbert*, 330 U.S. 501 and quoting *In re Volkswagen*, 545 F.3d at 315). The defendants argue in favor of a third step—considering the interest of justice as its own factor—but regardless of whether they are right on that point of law, the Court finds the interest of justice does not justify transfer.

The private-interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* (quoting *In re Volkswagen*, 545 F.3d at 315). The public-interest factors are "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflicts of laws or in the application of foreign law." *Id.* (quoting *In re Volkswagen*, 545 F.3d at 315).

Here, Texas does not contend that the case could not have been brought in either of the defendants' preferred venues—the District of Columbia and the Western District of Texas—and rightfully so. The case could have been brought in either district. The presence of federal-official defendants makes the District of Columbia a proper venue under Section 1391(e), and Texas's residency throughout its borders would have allowed it to file suit in the Western District. Therefore, the Court turns to the public- and private-interest factors to determine whether the defendants have shown that the alternative locations are clearly more convenient than the venue chosen by the plaintiff.

### i.    The private-interest factors do not support transfer.

In their initial briefing, the defendants do not attempt to argue the private-interest factors. Instead, they merely state that "[t]he challenged law was enacted in Washington, D.C. and all 17 Defendants reside there." Dkt. No. 10 at 17. In their reply, however, the defendants argue for the first time that two of these factors—the relative ease of access to

sources of proof and the cost of attendance for willing witnesses—require transfer.[2]  Dkt. No. 34 at 7–8.

The Court disagrees.  First, the relative ease of access to sources of proof does not weigh in the defendants' favor because the evidence in this case is overwhelmingly electronic and publicly available.  Where "the vast majority of the evidence [is] electronic, and therefore equally accessible in either forum," the ease-of-access factor does not weigh in favor of transfer.  *In re Planned Parenthood*, 52 F.4th at 630.  The "location of evidence bears much more strongly on the transfer analysis when, as in *Volkswagen*, the evidence is physical in nature."  *Id.* (citing *In re Volkswagen*, 545 F.3d at 316–17).  Here, the defendants fail to refer to any evidence in their motion or brief in support, let alone physical evidence that would impact the convenience of the forum.  And in their reply, the defendants state without support that "[d]ocuments, including those relevant to standing declarations and the enactment of the challenged Act, are also located in the Washington, D.C. area."  Dkt. No. 34 at 8.  Nothing in that last-minute, conclusory assertion alters the Court's analysis because the defendants have not shown, for instance, documents that "are fragile, not easily scanned and transferred electronically" or that "risk damage in being transported during discovery."  *Word to Info, Inc. v. Facebook, Inc.*, No. 3:14-CV-3487-K, 2015 WL 13870507, at *3 (N.D. Tex. July 23, 2015).  To the contrary, this case focuses on the undisputed actions of Congress; thus, extensive testimony, factual disputes, and difficult-to-obtain evidence are

---

[2] The Court's "usual practice is to decline to consider arguments raised for the first time in a reply brief."  *Shah v. Univ. of Tex. Sw. Med. Sch.*, 129 F. Supp. 3d 480, 494 (N.D. Tex. 2015) (Fitzwater, J.).  And while pointing to new sources of evidence and identifying witnesses might not qualify as entirely new arguments, it still interferes with the function of the briefing process and violates "the rule that the nonmovant should be given a fair opportunity to respond to a motion."  *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (Fitzwater, J.).  Nonetheless, because the Court denies the motion, the new arguments will be considered.

all unlikely.  The plaintiff's challenge to the Act's constitutionality is based primarily on legal arguments, and the sources of proof are readily accessible as electronically available public records.  This factor does not weigh in favor of transfer.

Second, the cost of attendance for willing witnesses likewise does not weigh in favor of transfer.  In their reply, the defendants assert that they have "identified witnesses at various agencies in the Washington, D.C. area who will . . . be used in support of their jurisdictional arguments."  Dkt. No. 34 at 8.  While normally a rule applied in the context of compulsory process, the movant should still "specifically identif[y] witnesses," and the Court accords less weight to "vague assertions that witnesses are likely to be found in a particular forum."  *Word to Info, Inc.*, 2015 WL 13870507, at *3.  Nonetheless, even if certain witnesses will need to "travel more than 1,000 miles to Lubbock" and "take time 'away from their regular employment,'" this factor still does not weigh in favor of transfer.  Dkt. No. 34 at 8 (quoting *In re Volkswagen AG*, 371 F.3d at 204–05).  Lubbock is "considerably less expensive to visit than Austin and Washington, D.C. for many reasons."  *Texas*, 2023 WL 2457480, at *5.  "[M]eal and lodging expenses" are significantly lower in Lubbock than in Austin or Washington, D.C.  *In re Volkswagen AG*, 371 F.3d at 205 (stating that the witness-travel distance is relevant because of increased meal and lodging expenses).

The defendants cite *In re Volkswagen* for the proposition that "witness travel more than 100 miles supports transfer" (Dkt. No. 34 at 8 (citing *id.*)), but the distinction between this case and *Volkswagen* is that this case involves a legal challenge to a federal law, while *Volkswagen* involved a car accident with physical evidence and private-party witnesses.  371 F.3d at 202, 206 (stating that "the accident produced a wide array of [private-party] witnesses").  Moreover, by allowing plaintiffs to sue in the district of their residence,

– 15 –

Congress has already decided that suits against the federal government can be heard nationwide. 28 U.S.C. § 1391(e); *see also Stafford v. Briggs*, 444 U.S. 527, 542 (1980) ("What emerges is that the bill's author, the Committees, and the Congress intended nothing more than to provide nationwide venue for the convenience of individual plaintiffs in actions which are nominally against an individual officer but are in reality against the Government."). The potential for increased costs to the government resulting from a congressional choice in favor of plaintiffs is a feature of the statute, not a bug. Thus, the Court finds that neither the relative ease of access to sources of proof nor the cost of attendance for willing witnesses favors transfer.

### ii.   The public-interest factors do not support transfer.

The defendants also fail to justify transfer through reliance on the public-interest factors. They concede that "the public interest factors concerning a conflict of laws or familiarity with the law are inapplicable." Dkt. No. 34 at 8. In their brief in support, the only factor the defendants argue is the "local interest in having localized interests decided at home." Dkt. No. 10 at 18. For the first time in their reply, the defendants also contend that the factor considering court congestion "lean[s] in favor of transfer." Dkt. No. 34 at 8; *see also supra* note 2. Neither consideration supports transfer.

The factor considering court congestion weighs in favor of denying the motion. "To the extent docket efficiency can be reliably estimated, the district court is in the best position to do so." *Walsh*, 2023 WL 2663256, at *2 (citing *In re Planned Parenthood,* 52 F.4th at 631). Texas correctly notes that the median time from commencement of a civil suit to trial is 20% higher in the Western District of Texas and 107% higher in the District of Columbia than in the Northern District of Texas. Dkt. No. 32 at 14 (citing Admin. Off. of U.S. Courts,

*Federal Court Management Statistics—Profiles* (Sep. 30, 2022) (available at

https://www.uscourts.gov/file/62591/download)).  And as of March 31, 2023, the Court

had no motions pending for more than six months and no cases pending longer than three

years.  *Id.*  Notably, after the motion was filed, the Honorable Judge Lee Yeakel retired

from his position, meaning that the Austin Division now has one of its two active

judgeships vacant.  *Judge Lee Yeakel Retiring After 20 Years of Service*, AUSTIN BAR ASS'N,

https://perma.cc/8L5H-CD96; *see also* Western District of Texas, *In re Court Docket

Management* (May 11, 2023).  The defendants quibble with the statistics, but they do not

assert that the Court is unable to resolve this dispute expeditiously nor do they show how

transfer would alleviate court congestion.

    To the contrary, the Court has an established track record of swiftly resolving cases

involving requests for emergency injunctive relief concerning issues of national significance.

For example, the Court recently issued a 55-page Memorandum Opinion and Order in a

case of critical significance for the horseracing industry.  *Nat'l Horsemen's Benevolent and

Protective Ass'n v. Black*, No. 5:21-CV-071, 2023 WL 3293298 (N.D. Tex. May 4, 2023).

That order was entered 23 days after consolidating the cases and eight days after trial.  And

in that case, the Court decided several emergency motions on an expedited timeframe.  *E.g.*,

*Nat'l Horsemen's*, No. 5:21-CV-071, Dkt. No. 134 (resolving an application for temporary

restraining order within five days).  And last fall, a 67-page order was entered in a case of

national significance within eight days of becoming ripe.  *Texas v. Becerra*, No. 5:22-CV-185,

2022 WL 3639525 (N.D. Tex. Aug. 23, 2022).  In 2021, the Court entered a 56-page order

the day after the hearing and within just three days of becoming ripe.  *Texas v. Becerra*, 577

F. Supp. 3d 527, 562 (N.D. Tex. 2021).  Neither side has sought expedited, emergency relief

in this case, but the Court's track record demonstrates that the defendants will receive a thorough decision in an efficient manner.

Finally, the defendants fail to identify the "local interest" that would be better resolved in Austin or Washington, D.C. They argue that Texas is "at home" in Austin, but the Court disagrees. The citizens of the Lubbock Division have no lesser interest in the constitutionality of federal laws than do those in metroplexes such as Austin and Washington, D.C. Texas's statement that "[c]itizens of Lubbock . . . are as offended and affected by the purported, unconstitutional appropriation of $1.7 trillion of public funds as citizens in any other district" (Dkt. No. 32 at 15) does not, as the defendants claim, show that Texas "admits that the citizens of Lubbock have no particular local interest in the outcome of this dispute." Dkt. No. 34 at 8. It simply shows, as Texas admits, that the localized-interest factor is neutral in this case. Dkt. No. 32 at 15 (noting that the case "is not explicitly or closely tied to any one district or division"). Ultimately, it is the defendants who bear the burden of showing that one of the destination venues clearly has a greater local interest than the Lubbock Division, and they fail to meet that burden. *Defense Distributed v. Bruck*, 30 F.4th 414, 433 (5th Cir. 2022) (stating that the party seeking transfer must "clearly establish good cause for transfer based on convenience and justice"). The Court finds that this factor is neutral and, thus, does not favor transfer. As a whole, the public- and private- interest factors weigh decidedly against transfer.

## C.    The defendants fail to establish that the interest of justice requires transfer.

As a final argument, the defendants suggest that "the fair administration of justice would be harmed if a filing with strong indicia of judge shopping were left unchecked." Dkt. No. 10 at 18. But their argument conflicts with the defendants' own concessions that

(1) this Court can fairly and impartially adjudicate the case, and (2) filing this type of motion "exacerbates the very public perception about single-judge divisions that it does not share." Dkt. No. 10 at 12 n.4; *Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2023 WL 2457480, at *8 (S.D. Tex. Mar. 10, 2023). The defendants' speculative assertion that public harm could result—from a misperception that even the defendants do not share—does not justify transfer.

Two primary considerations lead the Court to this conclusion. First, the statutory requirement that courts consider "the interest of justice" in the transfer analysis is already satisfied by applying the public- and private-interest factors. Second, even if the interest of justice were an independent inquiry, the defendants' generic, unsupported assertion of harm to the public does not justify upending Congress's default rule and transferring the case.

### i.    The interest-of-justice analysis is subsumed in the public- and private-interest analysis.

The defendants claim that "it is well settled 'that the interest of justice is a factor . . . to be considered on its own.'" Dkt. No. 10 at 16. In support of their claim, the defendants cite generally to a section of a legal treatise that itself cites hundreds of cases. Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3854 (4th ed. 2022 update); *see* Dkt. No. 10 at 16 (stating that the relevant section of Federal Practice and Procedure "collect[s] cases").

Once analyzed, however, the citation only confirms that the public-interest factors outlined in *Gilbert*—and confirmed to apply in *Volkswagen*—mirror the interest-of-justice analysis. Wright & Miller notes that the interest-of-justice analysis includes consideration of "the desire to avoid multiplicity of litigation," "docket conditions in the two courts," judicial familiarity with state law in diversity cases, "the local interest in having local controversies resolved at home," "the relative means of the parties," and the "possibility of

prejudice against a party." 15 Fed. Prac. & Proc. Juris. § 3854.  Similarly, *Volkswagen* provides that the public-interest factors are (1) administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the governing law; and (4) the avoidance of unnecessary problems of conflicts of laws.  545 F.3d at 315.  Thus, "the 'interest of justice' analysis referenced in Section 1404(a) is already encompassed in the public interest factors that courts consider under existing precedent." *Walsh*, 2023 WL 2663256, at *5 (collecting cases); *see also Terra Intern., Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 696 (8th Cir. 1997) (stating that the interest-of-justice analysis "parallel[s] the factors that courts typically analyze under section 1404(a)").

The Court recognizes, of course, that "the eight private and public interest factors 'are not necessarily exhaustive or exclusive.'" *Walsh*, 2023 WL 2663256, at *6 (quoting *In re Planned Parenthood*, 52 F.4th at 630).  But the Court does not find that an allegation of forum shopping is sufficient on its own to merit transfer of this case, especially when the defendants admit that any forum shopping will not affect this case's outcome.

### ii.   The defendants' argument rests on several flawed premises.

The defendants allege that Texas filed the case in the Lubbock Division to hand-select its judge, "undermin[ing] public confidence in the administration of justice" (Dkt. No. 10 at 7), but the allegation rests on several flawed premises.

First, the Lubbock Division is not a single-judge division.  Rather, Senior Judge Samuel R. Cummings receives one-third of the civil docket, and the undersigned receives the remaining two-thirds.  Northern District of Texas, Special Order No. 3-330.  Moreover, Senior Judge Cummings is a very active Senior Judge.  His 416 opened cases in 2022 were

the third-most of any judge in the district.  *See* Northern District of Texas, Quarterly Civil

Case Assignment Report, at 1 (Oct. 13, 2022).  And any litigant that suggests or assumes

that Senior Judge Cummings would treat his cases with anything but the utmost fairness

and impartiality is unfamiliar with his decades of service to the rule of law.  Moreover, to

the extent the defendants are insinuating that Texas prefers to try cases before judges

appointed by presidents that share the Governor's political party, the Court reminds the

defendants that the undersigned was nominated by two presidents from differing political

parties.  *Presidential Nominations Sent to the Senate*, WHITEHOUSE.GOV (March 15, 2016),

https://perma.cc/X8SV-EMR4; *President Donald J. Trump Announces Nineteenth Wave of

Judicial Nominees*, WHITEHOUSE.GOV (Jan. 16, 2019), https://perma.cc/Z5RW-ZU3Q.

The undersigned was confirmed by a vote of 89–1.  On the Nomination (Confirmation:

James Wesley Hendrix, of Texas, to be U.S. District Judge for the Northern District of

Texas), CONGRESS.GOV (July 30, 2019), https://perma.cc/57LM-BL5Z.

　　　　Second, putting aside that this is not a single-judge division, the defendants' motion

speaks as though litigating in single-judge divisions is somehow a new phenomenon that

requires new remedies.  But single-judge divisions are not new.  *Walsh*, 2023 WL 2663256,

at *6 n.2 ("Single-judge divisions were long the norm in this Nation's history.") (citing

Erwin C. Surrency, *Federal District Court Judges and the History of Their Courts*, 40 F.R.D. 139,

150 (1967)).  Plaintiffs were, of course, permitted to file in these divisions—"[t]he Judiciary

Act of 1789 permitted a plaintiff to file suit in a federal district court if the defendant was 'an

inhabitant' of that district."  *TC Heartland LLC*, 581 U.S. at 263–64; *see also Texas*, 2023 WL

2567480, at *6.  And it is far from novel or surprising that plaintiffs bring suit in their

preferred forum.  In fact, history is replete with examples of plaintiffs repeatedly litigating in

the same court.  For example, the federal government chose to bring numerous Texas public-school desegregation cases before the same judge in the Eastern District of Texas.[3] Similarly, litigants consistently brought redistricting and voting-rights litigation before the same judge in the Western District of Texas.[4]  Recently, the United States sued Texas related to events occurring in the Western District of Texas's Del Rio Division, but it chose to bring suit over 200 miles away in the Austin Division.  *United States v. Abbott*, 1:23-CV-853 (W.D. Tex. July 24, 2023).

Third, the defendants' allegation that keeping the case in this Court would erode public trust is undermined by recent litigation, which makes clear that filing in the Lubbock Division is no guarantee of a certain outcome.  *See, e.g.*, *Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, No. 5:21-CV-071, 2023 WL 3293298, at *25 (denying all relief to Texas and private plaintiffs).  Senior Judge Cummings's record indicates the same.  *See Texas v. EEOC*, No. 5:13-CV-255-C, 2014 WL 4782992, at *1 (N.D. Tex. Aug. 20, 2014), *rev'd and remanded sub nom. Texas v. EEOC*, 827 F.3d 372 (5th Cir. 2016), *opinion withdrawn on reh'g*, 838 F.3d 511 (5th Cir. 2016), *and vacated and remanded sub nom. Texas v. EEOC*, 838 F.3d 511 (5th Cir. 2016) (granting a motion to dismiss Texas's claims for lack of

---

[3] *See United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285 (E.D. Tex. 1969); *United States v. Texas*, 321 F. Supp. 1043 (E.D. Tex. 1970); *United States v. Texas*, 342 F. Supp. 24 (E.D. Tex. 1971); *United States v. Texas*, 356 F. Supp. 469 (E.D. Tex. 1972); *Doe v. Plyler*, 458 F. Supp. 569 (E.D. Tex. 1978); *United States v. Texas*, 498 F. Supp. 1356 (E.D. Tex. 1980); *United States v. Texas*, 523 F. Supp. 703 (E.D. Tex. 1981); *United States v. Texas*, 506 F. Supp. 405 (E.D. Tex. 1981); *United States v. Texas*, 628 F. Supp. 304 (E.D. Tex. 1985); *see also* Frank R. Kemerer, William Wayne Justice: A Judicial Biography 118 (University of Texas Press, 1st ed. 1991).

[4] *See League of United Latin Am. Citizens, Council No. 4836 v. Midland Indep. Sch. Dist.*, 648 F. Supp. 596 (W.D. Tex. 1986); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185 (5th Cir. 1989); *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 902 F.2d 293 (5th Cir. 1990), *on reh'g*, 914 F.2d 620 (5th Cir. 1990); *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 923 F.2d 365 (5th Cir. 1991); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728 (5th Cir. 1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993).

jurisdiction).  Moreover, the Court has stayed judgment in high-profile cases to permit appellate review.  *See Texas v. Becerra*, No. 5:21-CV-300-H, 2023 WL 2754350, at *33 (N.D. Tex. Mar. 31, 2023) (setting aside and vacating an interim final rule nationwide, but staying the judgment).

Fourth, the defendants fault the plaintiff for "provid[ing] no explanation for its decisions" to bring suit in this Court (Dkt. No. 10 at 12), but the defendants confuse the relevant burdens.  It is the plaintiff's burden to demonstrate that venue is proper, which it has done.  As a result, the burden shifts to the defendants to show that the transferee venue is clearly more convenient and in the interest of justice.  *In re Volkswagen II*, 545 F.3d at 315. Given that the defendants fail to meet this burden, "the plaintiff's choice [of forum] should be respected."  *Id.*

Finally, the defendants offer no reliable, workable standard to govern when transfer is appropriate due to the public's potential perception that forum shopping will lead to unjust results—again, a perception that the defendants do not share here.  And the only standard offered cuts both ways.  Even assuming the defendants' unsupported assertion that some in the public would perceive injustice if the case were to proceed here, it is no doubt equally possible that others in the public would perceive injustice if the Court were to transfer the case despite venue otherwise being proper under the rules.  To end where the Court began:  Judges apply rules, not the parties' preferences.  This Court must proceed based on the rules regardless of any potential misperceptions that may result.

In this case, as in every case the Court encounters, the Court will strive to deliver to the parties and public a decision that is fair, impartial, and correct under the law.  The Court will resolve the parties' dispute in a written order that—to the best of the Court's ability—is

right on the law and facts, is sufficiently reasoned to allow for appellate review, and is delivered as efficiently as possible.  It would be a dereliction of the Court's duty to send this dispute to another judge to resolve when the case is already filed in a proper venue, and no evidence indicates—let alone clearly shows—that another forum would be more convenient or in the interest of justice.

### 3.    Conclusion

Plaintiffs get to choose where to file their lawsuits from multiple permissible forums. In suits against the federal government, Congress authorizes plaintiffs to bring suit in their district of residence.  Because Texas resides everywhere within its borders and is suing federal officials, venue is proper in the Northern District of Texas.  Although this case could have been brought in Austin or Washington, D.C., after careful consideration of the public- and private-interest factors, the Court finds that transfer under Section 1404(a) is inappropriate.  The defendants fail to identify evidence that cannot be digitized or specific witnesses who will need to travel, so there is little inconvenience to the parties and witnesses by litigating the case here.  And given that the defendants' interest-of-justice argument rests on flawed premises—and is contradicted by their own admission that this Court can fairly and impartially resolve this case—they fail to justify deviating from the default venue rules. Thus, the Court denies the motion to transfer venue.

So ordered on July 28, 2023.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE