UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS,

    *Plaintiff,*

v.

MERRICK GARLAND, *et al.*,

    *Defendants.*

No. 5:23-cv-34-H

### TEXAS'S OBJECTIONS TO DEFENDANTS' DECLARATIONS

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

**STATE OF TEXAS**,

                      Plaintiff,

      v.

**MERRICK GARLAND**, in his official capacity as
Attorney General, *et al.*,

                 Defendants.

Case No. 5:23-cv-00034-H

## DECLARATION OF PETER MINA

I, Peter Mina, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Deputy Officer for Programs & Compliance at the Office for Civil Rights and Civil Liberties ("CRCL") for the U.S. Department of Homeland Security ("DHS" or "the Department"). I have been employed by CRCL in this position since 2019. I previously served as Chief of the Labor and Employment Law Division ("LELD") in the Office of the Principal Legal Advisor for U.S. Immigration and Customs Enforcement ("ICE") since February 2013. In connection with this matter, I previously prepared and signed a declaration dated May 3, 2023.

2.      I am familiar with the development of the Alternatives to Detention Case Management Pilot Program ("CMPP"), the administration of the program, its requirements for enrollees, and the current status of its funding and enrollment. CMPP was created by the 2021 Appropriations Act to provide voluntary case management and other services to non-detained noncitizens enrolled in ICE's Alternatives to Detention ("ATD") program. CMPP is managed by a National Board and chaired by the Officer for Civil Rights and Civil Liberties. The National Board is responsible for awarding funds to eligible local governments and nonprofit organizations to

provide case management services.  It is comprised of nonprofits with experience providing and evaluating case management programs for immigrants, asylees, and refugees.

**Case Management Pilot Program Enrollment and Funding**

3.      To date, CMPP has enrolled 138 noncitizens in Texas.  However, not all enrollees remain in Texas.  At least two CMPP participants have left Texas, either moving to another state or returning to their country of citizenship.  The number of active participants in CMPP in Texas is therefore less than 138.

4.      CMPP is a voluntary program and there is no requirement to participate in CMPP. Further, there is no requirement for a noncitizen to remain in Texas once they enroll in CMPP. However, if an individual chooses to participate in CMPP and receives services through CMPP, he or she must reside in the geographic location served by the relevant nonprofit subrecipient.  For example, to receive CMPP services from BakerRipley, the Houston CMPP service provider, the CMPP participant must reside in the Houston area.  Similarly, to receive CMPP services from the International Rescue Committee, the New York CMPP service provider, the CMPP participant must reside in the New York area.

5.      The National Board has not awarded any subgrants from the CMPP funding from the Consolidated Appropriations Act, 2022.  CRCL expects the National Board to make awards on November 17, 2023, barring any unforeseen circumstances.

6.      The National Board's subgrant awards to subrecipients do not automatically renew. Instead, to be awarded funds, nonprofit organizations and local governments must apply anew following each NOFO and the National Board's subsequent solicitation of applications.  This affords different nonprofit organizations and local governments the opportunity to be considered for the program each time new CMPP funding is made available.  Annually, the CMPP National Board engages in the funding process which includes, *inter alia*, the Board's review of applications

from sub-recipients throughout the United States.  The National Board assesses each application on its merits.  Subgrants to existing CMPP providers will not be automatically renewed.  Also, the fact that nonprofit organizations in New York and Texas received funds from the 2021 Appropriations Act does not mean that nonprofit organizations in those states will necessarily receive subgrants in the future.  There is no obligation to provide future funding from the 2022 or 2023 Appropriations Acts to past recipients.

7.      CRCL has initiated drafting of the Notice of Funding Opportunity ("NOFO") for the Fiscal Year 2023 funds with the expectation that it will be published by March 1, 2024.  To date, the application process has not formally commenced.  Accordingly, Fiscal Year 2023 funds have not been awarded to the National Board.  Similarly, Fiscal Year 2023 funds have not been awarded by the National Board to any subrecipients.

Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare the foregoing is true and correct to the best of my knowledge and belief.


Dated the 31st day of October 2023.


Peter Mina
Deputy Officer for Programs &
Compliance
Office for Civil Rights and Civil Liberties
2707 Martin Luther King, Jr. Avenue, SE
Washington, D.C. 20528

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **STATE OF TEXAS**, | |
| Plaintiff, | |
| v. | Case No. 5:23-cv-00034-H |
| **MERRICK GARLAND**, in his official capacity as Attorney General, *et al.*, | |
| Defendants. | |

## SECOND DECLARATION OF KELLY KINNEEN

I, Kelly Kinneen, make the following declaration based upon my personal knowledge, upon information provided in my official capacity, and upon conclusions I reached based on that knowledge or information:

1. I am the Assistant Director for Budget of the Office of Management and Budget (OMB) in the Executive Office of the President (EOP), in Washington, D.C.  I have served in this position since 2017, and have worked at OMB since 2006.  In connection with this matter, I previously executed a declaration dated May 4, 2023.  *See* Declaration of Kelly Kinneen (May 4, 2023) ("May 4 Decl."), ECF No. 56.

2. I am the senior-most career official responsible for supporting the OMB Director in developing all aspects of the President's Budget.  Additionally, I advise OMB leadership and Federal agencies on questions relating to implementing laws that provide funding to the Federal government, including annual appropriations acts.

3. The purpose of this declaration is to provide information regarding why any ruling that has the effect of precluding implementation of the entire Consolidated Appropriations Act, 2023, Public Law 117-328 (the "Act" or the "2023 Act"), would present unprecedented challenges and disruptions, notwithstanding that Fiscal Year (FY) 2023 has ended.  Although

FY 2023 ended on September 30, 2023, a significant number of the consequences described in my declaration of May 4, 2023 would still occur if the Federal government were precluded from implementing the entire Act. *See* May 4 Decl. ¶¶ 23-30.

4.      The 2023 Act provided approximately $3 trillion of budget authority for FY 2023. *See* May 4 Decl. ¶ 10. Approximately half of those funds—or approximately $1.5 trillion—could be obligated only in FY 2023 (and thus could no longer be obligated after September 30, 2023), while the remaining half were "multi-year" or "no year" funds that remain available for obligation beyond FY 2023.

5.      In addition to the funds appropriated for use beginning in FY 2023, the 2023 Act provided approximately $680 billion in advance appropriations and indefinite budget authority that could not be obligated until FY 2024 or later. For example, the Department of Veterans Affairs received advance appropriations of $128.1 billion for fiscal year 2024.

6.      Thus, nearly $2.2 trillion ($1.5 trillion + $680 billion) in budget authority appropriated by the Act did not expire on September 30, 2023. Depending on the terms of the particular appropriation, those funds will remain available for another year, for several years, or indefinitely.

7.      Of the $1.5 trillion in unexpired funds appropriated for use beginning in FY 2023 by the 2023 Act, $500 billion was provided for grants to states for Medicaid in the Department of Health and Human Services. Approximately $15 billion of that amount has not yet been expended, of which $1.15 billion would be for the State of Texas.

8.      Because OMB collects agency budget execution reporting by fiscal year and type of budget authority provided, rather than by individual appropriations acts, OMB does not have complete information on how much of the remaining approximately $1 trillion in unexpired funds appropriated for use beginning in FY 2023 has been obligated. However, for $168

2

billion of the unexpired funds, OMB is able to determine whether they have been obligated. Of these $168 billion, approximately 30 percent has yet to be obligated. These unobligated funds include $4.2 billion in the Department of Veterans Affairs' Cost of War Toxic Exposure Fund, $5.1 billion for the State Department's Global Health Program, $3.2 billion in the Department of Defense's Military Construction account for the Navy and Marine Corps, $5.1 billion for Aircraft Procurement account for the Navy, and $3.4 billion for Department of Housing and Urban Development Homeless Assistance Grants.

9.     The vast majority of the $680 billion in advance appropriations and indefinite budget authority that the 2023 Act appropriated for use in FY 2024 or later has not yet been obligated.

10.    Even for funds that were available for obligation only in FY 2023 and thus have expired, a significant amount have not yet been expended (or "outlayed"), despite being obligated. Agencies have five years to outlay expired funds that were obligated—here, until September 30, 2028.

11.    Given the above facts, notwithstanding that FY 2023 has ended, a judicial order that has the effect of precluding implementation of the entire 2023 Act would present enormous challenges and complications.

12.    To the extent that agency operations and programs are being funded with money made available by the 2023 Act that has not expired, those operations would have to immediately cease if an order has the effect of precluding enforcement of the entire 2023 Act. The result would be a partial government shutdown, in which agencies would have to go program-by-program to determine which operations could continue and which must end.

13.    An order that has the effect of precluding enforcement of the entire 2023 Act would also require the Federal government to cease performance and payments on the thousands of

3

obligations already made with funds from the 2023 Act that have not yet been expended. Such an occurrence would have consequences for all of the parties to whom those funds have been obligated, including in the private sector, state and local governments, and foreign governments. *See* May 4 Decl. ¶ 25.

14.   Public and private entities within the State of Texas were also recipients of billions of dollars of funds provided by the 2023 Act. Of the examples listed in paragraphs 27-29 in my May 4 Declaration, the Act made approximately 91% of this funding available for obligation beyond the end of FY 2023. In other words, approximately $9.6 billion of the more than $10.5 billion appropriated to the Texas-based entities and programs described in these three paragraphs, *see* May 4 Decl. ¶¶ 27-29, were not required to be obligated by the end of FY 2023.

## CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Washington, D.C., on the 1st day of November, 2023.

Kelly Kinnean

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| |
|---|
| **STATE OF TEXAS**, |
|                 Plaintiff, |
| v. |
| **MERRICK GARLAND**, in his official capacity as Attorney General, *et al.*, |
|                 Defendants. |

Case No. 5:23-cv-00034-H

**DECLARATION OF KAREN WOODARD**

1.      My name is Karen Woodard.  I am the Chief of the Employment Litigation Section of the Civil Rights Division of the United States Department of Justice.  I am over the age of eighteen and competent to testify about the matters that are the subject of this declaration.

2.      I make the statements in this declaration based on my personal knowledge and based on a review that I directed of the records of the Employment Litigation Section's enforcement activity.

3.      The Attorney General of the United States is responsible for enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* (as amended), and the Pregnant Workers Fairness Act, 42 U.S.C. 2000gg et seq., (PWFA), against state and local government employers.  That authority is delegated to the Assistant Attorney General for the Civil Rights Division.  Within the Civil Rights Division, the Employment Litigation Section is responsible for initiating investigations and litigating cases against state and local government employers under Title VII and the PWFA.

4.      As of the date of this declaration, the Employment Litigation Section has not engaged, and is not presently engaged, in any investigations or litigation against the State of Texas or any of its agencies under the PWFA.

5.      The responsibilities of the Equal Employment Opportunity Commission (EEOC) and of the Attorney General for the enforcement of Title VII and the PWFA are defined in the enforcement provisions of Title VII, which are adopted in Section 104 of the PWFA.   The scope of the Attorney General's authority to enforce Title VII and the PWFA against state and local government employers is defined in Sections 706 and Section 707 of Title VII (as adopted in Section 104 of the PWFA).

6.      When an individual files a charge of discrimination against a state or local government employer under Title VII or the PWFA, the Attorney General can initiate litigation based on such a charge only after the EEOC has found reasonable cause to believe a statutory violation occurred, conciliation fails, and the EEOC refers the charge to the Employment Litigation Section.  As of the date of this declaration, the Employment Litigation Section has not received such a referral from the EEOC of any charge of discrimination against an agency of the State of Texas under the PWFA.

7.      Under Section 707 of Title VII and Section 104 of the PWFA, the Attorney General may, without prior referral from the EEOC, initiate pattern or practice suits against state or local government employers under Title VII and the PWFA.  As of the date of this declaration, the Employment Litigation Section has not initiated any investigations of the State of Texas under the PWFA pursuant to this authority.

2

I declare under penalty of perjury, as required by 28 U.S.C. § 1746, that the foregoing statement is true and correct.

Executed on this 31st day of October, 2023

/s/*Karen D. Woodard*
Karen D. Woodard

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **STATE OF TEXAS**, | |
| Plaintiff, | |
| v. | Case No. 5:23-cv-00034-H |
| **MERRICK GARLAND**, in his official capacity as Attorney General, *et al.*, | |
| Defendants. | |

## DECLARATION OF CAROL R. MIASKOFF

Pursuant to 28 U.S.C. § 1746, I, Carol R. Miaskoff, declare the following to be a true and correct statement of facts:

1. I have been an employee of the U.S. Equal Employment Opportunity Commission (EEOC) continuously since November of 1992. In June of 2021, I was appointed by the EEOC Chair to serve as the Legal Counsel, heading the agency's Office of Legal Counsel, a position I previously held in an acting capacity beginning in February of 2021. From November 2017 until February 2021, I was an Associate Legal Counsel, and before that I served in a number of supervisory roles in the Office of Legal Counsel, including Acting Associate Legal Counsel; Assistant Legal Counsel for the Title VII, ADEA, and EPA Division; and Assistant Legal Counsel for the Coordination Division.[1]

2. One of the responsibilities of the Office of Legal Counsel is to coordinate the process of promulgating agency regulations, a process that includes, among other things, drafting of proposed regulations, publication in the *Federal Register* of notices of proposed

---

[1] In my titles, "Title VII" refers to Title VII of the Civil Rights Act of 1964, "ADEA" refers to the Age Discrimination in Employment Act of 1967, and "EPA" refers to the Equal Pay Act of 1963.

1

rulemaking, and review and analysis of public comments in connection with formulating a final rule.

3.   The Pregnant Workers Fairness Act (PWFA) was signed into law on December 29, 2022, and became effective on June 27, 2023. The PWFA specifically requires the EEOC to promulgate regulations to implement the Act.[2] In 2023, as Legal Counsel, I oversaw the drafting and publication of a notice of proposed rulemaking (NPRM) to implement the PWFA. The NPRM was published in the *Federal Register* on August 11, 2023.[3]

4.   Among other provisions, the PWFA makes it unlawful for a covered entity to "not make reasonable accommodations to the known limitations related to pregnancy, childbirth, or related medical conditions of qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[4]

5.   The PWFA was intended to address gaps in the coverage of other federal statutes, including Title VII of the Civil Rights Act of 1964 (Title VII), as amended by the Pregnancy Discrimination Act of 1978.[5] Title VII protects employees from discrimination based on sex, including "pregnancy, childbirth, or related medical conditions," and requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work."[6] Under Title VII, among other

---

[2] 42 U.S.C. § 2000gg-3(a).
[3] Regulations To Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54,714, (proposed Aug. 11, 2023) (to be codified at 29 CFR pt. 1636) [hereinafter PWFA NPRM].
[4] 42 U.S.C § 2000gg-1(1).
[5] H.R. Rep. No. 117–27, pt.1, at 14–16 (2021) (describing court rulings under Title VII and the Supreme Court's decision in *Young* v. *United Parcel Serv., Inc.,* 575 U.S. 206 (2015)).
[6] 42 U.S.C. § 2000e(k).

protections, an employee affected by pregnancy, childbirth, or related medical conditions is entitled to accommodations under certain circumstances.[7] The NPRM and other EEOC documents discuss how Title VII and the PWFA can overlap, or not, depending upon the circumstances.[8]

6. The NPRM also explains how the EEOC expects the process for a reasonable accommodation will work under the PWFA. First, under the proposed rule, a worker will make a request to their employer.[9] Many of the accommodations that workers will seek under the PWFA will be simple, like additional bathroom breaks or the ability to carry water with them while working. If the accommodation is a simple one, the EEOC expects it will be granted easily and quickly. If the employer needs more information, the worker and the employer can engage in the "interactive process," which is a term from the Americans with Disabilities Act.[10] The interactive process is an informal exchange of information to help the worker and the employer figure out a reasonable accommodation.[11] The employer does not have to provide the accommodation if it would cause an undue hardship.[12]

7. To the extent a worker believes after engaging in the interactive process that the employer has failed to provide a reasonable accommodation, a worker may file a charge with the EEOC. Section 104[13] sets out that the PWFA uses the same charge procedures as

---

[7] *See, e.g., Young* v. *United Parcel Serv., Inc.,* 575 U.S. 206, 229 (2015).
[8] PWFA NPRM, 88 Fed. Reg. at 54,714-15; EEOC, *What You Should Know about the Pregnant Workers Fairness Act,* Q. 3 & 7, available at https://www.eeoc.gov/wysk/what-you-should-know-about-pregnant-workers-fairness-act; EEOC, *Enforcement Guidance on Pregnancy Discrimination*, I(C) (June 25, 2015), available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues.
[9] PWFA NPRM, 88 Fed. Reg. at 54,722.
[10] 42 U.S.C. § 2000gg(7); PWFA NPRM, 88 Fed. Reg. at 54,735.
[11] PWFA NPRM 88 Fed. Reg. at 54,735 (setting out possible steps for the interactive process under the PWFA).
[12] 42 U.S.C. § 2000gg-1(1).
[13] 42 U.S.C. § 2000gg-2(a)(1).

Title VII. Thus, under the PWFA, a worker can file a charge with the EEOC, the EEOC will provide the employer notice of the charge being filed, and the EEOC will use the same steps it uses to process a Title VII charge.

8.  As a result of the overlap between Title VII and the PWFA, a worker may file a charge under either or both statutes based on the same set of facts. Such charges would use the procedures set out in Title VII, which, as noted in paragraph 7 above, the PWFA incorporates by reference. Likewise, should a lawsuit be filed based upon one of these charges – under Title VII, the PWFA, or both statutes – the procedures in Title VII, as adopted by the PWFA,[14] would apply there as well.

9.  As stated in the NPRM, the Office of Management and Budget's (OMB) Office of Information and Regulatory Affairs (OIRA) determined that the rulemaking was significant for purposes of Executive Order (E.O.) 12866. Therefore, the EEOC completed and included in the NPRM an Initial Regulatory Impact Analysis (IRIA) as required by E.O. 12866 and E.O. 13563, as amended by E.O. 14094.[15]

10. In completing the IRIA, the EEOC adhered to the requirements of Executive Orders 12866 and 13563 and OMB Circular A-4,[16] and followed OIRA's published guidelines for completing a regulatory impact analysis.[17]

---

[14] Section 706(f) of Title VII, 42 U.S.C. § 2000e-5(f), governs when a civil action may be filed by an aggrieved person, the EEOC, or the Attorney General, and section 104(a)(1) of the PWFA, 42 U.S.C. § 2000gg-2(a)(1), incorporates the powers, remedies, and procedures provided in various sections of Title VII, including section 706.

[15] PWFA NPRM, 88 Fed. Reg. at 54,750.

[16] Circular A-4, "Regulatory Analysis," (September 17, 2003), available at: https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.

[17] Circular A-4, "Regulatory Impact Analysis: A Primer" (August 15, 2011), available at https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/inforeg/inforeg/regpol/circular-a-4_regulatory-impact-analysis-a-primer.pdf.

11. In light of Circular A-4's admonition that a good analysis is transparent and provides specific references to all sources of data,[18] the EEOC's IRIA as included in the NPRM featured over one hundred footnotes providing citations to sources and further explanations of methodology.

12. The IRIA estimates the costs of employers providing accommodations, but also notes that these cost estimates may be overstated for a variety of reasons.[19] For example, the analysis states that "[t]hese figures are almost certainly overestimates of the costs imposed by the rule, in part because some of the accommodations required by the proposed rule and underlying statute are already required under the ADA [Americans with Disabilities Act] and Title VII and some employers voluntarily provide accommodations. Due to a lack of data, however, the Commission was unable to account for this overlap in the above analysis."[20] The IRIA does not purport to estimate the "[t]he extent of the regulatory burden, if any, that the Pregnant Workers Fairness Act (PWFA) has imposed on Texas, such as costs Texas has incurred or actions Texas has taken in preparation for the PWFA becoming effective and being implemented."[21]

13. As the IRIA made clear, there is relatively little data on how many pregnant workers will require an accommodation or what the cost of a particular accommodation may be; for example, the NPRM states that "not all individuals who become pregnant will need a reasonable accommodation. Because there is very little research on the proportion of

---

[18] Circular A-4, "Regulatory Analysis," p. 3.
[19] PWFA NPRM, 88 Fed. Reg. at 54,763-64.
[20] *Id.* at 54,764.
[21] Notice of Consolidation with Trial on the Merits at 2, *Texas v. Garland,* No. 5:23-CV-034-H, ECF No. 73 (Oct. 20, 2023).

pregnant workers who need workplace accommodations, the Commission has generated a ranged estimate."[22]

14. With respect to the cost of an accommodation, the NPRM notes that "[s]ome of these accommodations, especially additional rest or bathroom breaks and provision of a stool or chair, are expected to impose minimal or no additional costs on the employer. Certain other types of accommodations, such as allowing the employee to avoid heavy lifting or exposure to certain types of chemicals, may be easy to provide in some jobs but more difficult to provide in others, necessitating temporary restructuring of responsibilities or transfer to a different position."[23] The NPRM further states that "[t]he Commission was unable to find any data on the average cost of reasonable accommodations related specifically to pregnancy, childbirth, or related medical conditions. The Commission has therefore relied on the available data on the cost of accommodations for individuals with disabilities for purposes of this analysis."[24]

15. Finally, the PWFA may reduce litigation costs by bringing greater certainty and allowing parties to avoid costly discovery. As the NPRM states, "by clarifying the rules regarding accommodations for pregnant workers, the PWFA and the proposed rule will decrease the need for litigation regarding accommodations under the PWFA. To the extent that litigation remains unavoidable in certain circumstances, the PWFA and the proposed rule are expected to eliminate the need to litigate whether the condition in question is a 'disability' under the ADA, and to limit discovery and litigation costs that arise under

---

[22] PWFA NPRM, 88 Fed. Reg. at 54,758.
[23] *Id.* at 54,759.
[24] *Id.*

Title VII regarding determining if there are valid comparators, thus streamlining the issues requiring judicial attention."[25]

16. The IRIA is not the agency's final assessment of the economic impact of the PWFA. The EEOC included a request for public comment on any aspect of the IRIA, as well as multiple specific requests for comments on a variety of topics, including requests for any existing data quantifying the proportion of pregnant workers who need workplace accommodations,[26] for any existing data quantifying the average cost of accommodations related to pregnancy, childbirth, or related medical conditions,[27] and whether the estimates of time needed for an employer to perform compliance activities to implement the PWFA's requirements are accurate.[28]

---

[25] *Id.* at 54,754
[26] *Id.* at 54,758.
[27] *Id*. at 54,760.
[28] *Id*.

17. In response to the NPRM, the EEOC received over 100,000 public comments, some of which addressed aspects of the IRIA. The EEOC is currently reviewing and analyzing the comments in anticipation of drafting a final rule, which will include an updated regulatory impact analysis informed by those comments. The rule will require a vote of the Commission before it becomes final.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of November, 2023.

*Carol Miaskoff*
_____
CAROL R. MIASKOFF
Legal Counsel
Office of Legal Counsel
U.S. Equal Employment Opportunity Commission

CONFIDENTIAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **STATE OF TEXAS**, | |
| Plaintiff, | |
| v. | Case No. 5:23-cv-00034-H |
| **MERRICK GARLAND**, in his official capacity as Attorney General, *et al.*, | |
| Defendants. | |

## DECLARATION OF TRACY HUDSON

Pursuant to 28 U.S.C. § 1746, I, Tracy Hudson, declare the following to be a true and correct statement of facts:

1.  I have been an employee of the U.S. Equal Employment Opportunity Commission (EEOC) continuously since September 1990. In July 2023, I was selected to serve as Acting Field Management Programs Program Analysis Officer in the EEOC's Office of Field Programs. Prior to July 2023, I served in a number of positions, including Senior Attorney Advisor, Program Analyst/Attorney Advisor, Acting Washington Field Office Deputy Director, and Supervisory Trial Attorney.

2.  Among other responsibilities, the Office of Field Programs, and specifically the Field Management Programs Division of the Office of Field Programs, oversees the EEOC's intake and processing by staff in the agency's 53 field offices of charges of discrimination under laws including the Pregnant Workers Fairness Act (PWFA) and Title VII of the Civil Rights Act of 1964 (Title VII).

1

CONFIDENTIAL

3.  The EEOC's administrative process begins when an individual (charging party) files a charge of employment discrimination with the EEOC.[1] Within 10 days of a charge being filed, the EEOC informs the employer (respondent) that a charge has been filed[2] and, if appropriate, requests a position statement from the employer. The EEOC has a robust voluntary mediation program that parties are invited to use. If the parties decline to mediate or if the mediation is unsuccessful, depending upon the information in the charge and the position statement, the EEOC may conduct a further investigation, and may request documents from and interview the charging party, relevant decision makers at the respondent company, and other witnesses. The EEOC generally relies on voluntary compliance with its investigation requests, although it does have statutory authority to examine or copy evidence relevant to its investigation,[3] and may issue and seek judicial enforcement of administrative subpoenas if evidence is not voluntarily produced.[4]

4.  At any point during the charge process, the parties may settle the charge or the charging party may ask for the charge to be withdrawn. The EEOC may also dismiss the charge if, for example, it determines that the charge was filed outside of the statute of limitations.

5.  If the charge is not closed for one of the reasons described above, based on the information received during its investigation, the EEOC makes a determination on the merits of the charge. If the EEOC determines that further investigation is not warranted, the agency will dismiss the charge and issue a Determination and Notice of Rights to the charging party, notifying them of their right to file suit in court. If the EEOC makes a determination of "reasonable cause" to believe discrimination occurred, it endeavors to

---

[1] *See* 42 U.S.C. § 2000e-5(b).
[2] *See id.*
[3] *See* 42 U.S.C. § 2000e-8(a).
[4] *See* 42 U.S.C. § 2000e-9; 29 U.S.C. § 161(1)-(2).

resolve the charge through conciliation, which is an informal process through which the

EEOC works with the parties in an attempt to facilitate a resolution.[5] Participation in

conciliation is voluntary.

6. If conciliation is not successful, the EEOC either files a lawsuit or issues the charging

   party a Determination and Notice of Rights. However, when the respondent to a charge is

   a state employer, under both Title VII and the PWFA, the EEOC is required to refer the

   matter to the Department of Justice to make its own determination of whether to file suit.[6]

7. When an individual worker or the EEOC (or the Attorney General in situations involving

   a public employer) brings a lawsuit under Title VII or the PWFA, the proceeding is *de

   novo*. The findings of the EEOC's investigation, including any finding of "reasonable

   cause," do not bind the court or receive deference.

8. Of the charges the EEOC resolved in fiscal year 2022, approximately 2.2% received

   "reasonable cause" determinations. The remainder did not result in a finding of

   "reasonable cause" (61.4%), were administratively closed (19.4%), were successfully

   conciliated (1.0%), were unsuccessfully conciliated (1.2%), or were resolved through

   withdrawals with benefits (7.7%) or voluntary settlements (8.7%).[7]

9. The EEOC maintains electronic records of all charges it receives in an online database.

   On October 24, 2023, EEOC personnel conducted a search of the online database for any

   charges received after June 27, 2023, the effective date of the PWFA, alleging violations

---

[5] *See* 42 U.S.C. § 2000e-5(b).
[6] Section 706(f)(1) of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-5(f)(1), states that for a respondent that is a government, governmental agency, or political subdivision, where conciliation is unsuccessful the EEOC "shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent…" Section 104(a)(1) of the PWFA, 42 U.S.C. § 2000gg-2(a)(1), incorporates the powers, remedies, and procedures provided in various sections of Title VII, including section 706.
[7] *See* "All Statutes (Charges filed with EEOC) FY 1997 - FY 2022 | U.S. Equal Employment Opportunity Commission," available at https://www.eeoc.gov/data/all-statutes-charges-filed-eeoc-fy-1997-fy-2022.

CONFIDENTIAL

of the PWFA in the State of Texas, excluding any charges filed against private employers

or private employment agencies. The search results indicated that the EEOC has not

received any charges naming the State of Texas or a component thereof as a respondent

in any charge involving the PWFA during the relevant timeframe. Due to statutory

confidentiality provisions, the EEOC cannot make public information about the existence

or non-existence of charges filed under Title VII and the PWFA.[8]

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this 1st day of November, 2023.

*Tracy Hudson*
_____
Tracy Hudson
Acting Field Management Programs
    Program Analysis Officer
Office of Field Programs
U.S. Equal Employment Opportunity Commission

---

[8] Section 709(e) of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-8(e), prohibits any employee of the Commission from making public any information obtained by the Commission pursuant to its statutory investigative authority prior to the institution of a lawsuit involving that information; section 104(a)(1) of the PWFA incorporates the powers, remedies, and procedures provided in various sections of Title VII, including section 709. In observance of these confidentiality requirements, when asked to publicly disclose information covered by section 709(e) of Title VII, the agency's position is to neither confirm nor deny the existence of any charges. We provide the charge information herein to Plaintiff not as a member of the public, but as the entity that is the subject of the charge information.