UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br> *Plaintiff*,<br>v.<br>MERRICK GARLAND, *et al.*,<br> *Defendants*. | No. 5:23-cv-34-H |

### TEXAS'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE

On November 7, 2023, Defendants sought to exclude four declarations from Texas's witnesses on the grounds that they are irrelevant or lack proper foundation. *See* ECF No. 77. But each of these declarations offers evidence that establishes Texas's standing to sue based on the injuries claimed.

*First*, the declarations of Rebecca Waltz ("Ms. Waltz"), Susan Bricker ("Ms. Bricker"), and Mike Meyer ("Mr. Meyer") are relevant and admissible because they demonstrate the injury Texas suffers from the Case Management Pilot Program ("CMPP"). The Department of Homeland Security's "Alternatives to Detention Program," which connects illegal aliens with social services, announced the CMPP program with Houston, Texas as one of its first two sites. CMPP, http://www.cmpp.org (last visited November 15, 2023). U.S. Immigration and Customs Enforcement is required by law to "*ensure* that any individual released from ICE custody on parole, bond, or into the ATD program who resides in an area covered by the pilot program is made aware of these case management services *and* is referred for services unless they formally decline such services in writing[.]" 166 Cong. Rec. H8472 (Dec. 21, 2020) (emphasis added). Because of this program, Texas is spending more money on social services than it would otherwise. In addition, the pilot program encourages additional illegal immigration into Texas by creating an incentive structure that promotes illegal entry into the United States in general and into Texas in particular.

The challenged declarations demonstrate the monetary injury to Texas caused by these programs and, therefore, are both relevant and admissible.

*Second*, the declaration of Henry De La Garza ("Mr. De La Garza") is well within the parameters of Federal Rule of Evidence 701(a) for a company officer to testify as a lay witness to facts within his purview. The De La Garza declaration estimates the cost to the State of Texas for compliance with the "Pregnant Workers Fairness Act." Pub. L. 117-328, Div. II, § 101, 136 Stat. 4459, 6084 (2022). His position offers a sufficient foundation, and his testimony should be thus admitted.

Accordingly, pursuant to this Court's orders, *see* ECF No. 75; ECF No. 91, Texas hereby files its response to Defendants' motion to exclude to show that this Court should deny Defendants motion to exclude.

### Argument

### I. The Declarations of Rebecca Waltz, Susan Bricker, and Mike Meyer are Relevant and Admissible.

Defendants attempt to challenge these declarations on the grounds that they fail to establish a causal connection between the Consolidated Appropriations Act of 2023 and immigrations costs. But Defendants misunderstand the standard for establishing injury and causal connection. Under Fifth Circuit precedent, the inclusion of these declarations is completely proper.

*First*, a prospective injury will suffice for standing purposes. The United States Supreme Court has recognized that "the injury required for standing need not be actualized." *Davis v. FEC*, 554 U.S. 724, 734 (2008). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Id.* Moreover, "an allegation of future injury may suffice if the threatened injury is 'certainly impending' or if there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, (2014) (citing *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013)). At a minimum, the challenged declarations are relevant to establishing a prospective cost injury from the CMPP based on previous cost injuries.

Defendants assert that the declarations describe the state's costs before the Houston-based pilot program began, therefore, the costs are irrelevant to injuries caused by CMPP. *See* ECF No. 77 at 3. But because Texas need only prove a prospective injury for standing purposes, the fact that cost data predates CMPP offers no grounds for its exclusion.

*Second*, if *any* additional illegal immigrants use Texas's social services, it is an injury. "[An identifiable trifle is enough for standing." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (citation and internal quotation marks omitted); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an injury."). The declarations do not need to establish that *all* of the cost is traceable to CMPP—only that the costs are sufficient to demonstrate on the margin that each additional illegal immigrant using Texas's social services will cost Texas money. The declarations are relevant for this purpose.

*Third*, Texas does not have to trace specific dollars to specific CMPP participants to establish causation. Indeed, this would be an impossible standard as Texas does not have any data about the specific identity of CMPP participants—only the federal government has that. After all, Defendants' declarations appear to have information regarding CMPP participants in Texas readily available. *See, e.g.*, ECF No. 93-3 (Mr. Mina's declaration states that, "[t]o date, CMPP has enrolled 138 noncitizens in Texas"). Moreover, under Fifth Circuit precedent, standing would not be defeated were CMPP participants to receive benefits in Texas by virtue of some other program:

> The Government says that's not enough because Texas has not shown it has already issued licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*Texas v. Biden (MPP)*, 20 F.4th 928, 971 (5th Cir. 2021). Defendants' assertion that "none of the declarations even mentions the CMPP, much less estimates its actual impact" misunderstands the applicable Fifth Circuit precedent. *See* ECF No. 77 at 2. It is enough for Texas to "use[] large-scale statistics and figures." *Id.*

*Third*, Defendants' own program establishes causation. Here, the CMPP has a pilot program in Texas designed to connect illegal immigrants with social services they might not otherwise receive. CMPP, http://www.cmpp.org. The entire point of the CMPP is to increase the number of illegal immigrants in Texas receiving social services. The challenged declarations are relevant for establishing that the resulting increase in illegal immigrants using Texas's social services from the success of CMPP's stated goals will cost Texas money.

*Fourth*, Texas does not have to eliminate every other variable that might impact causation or prove directly that the CMPP is the reason for an increase in illegal immigrants using social services in Texas. Because the CMPP is in Texas and is designed to increase the use of Texas's social services, Texas's proof of causation "does not rest on mere speculation about the decisions of third parties" but "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct 2551, 2566 (2019). And while CMPP "is not the sole cause of [Texas's] injury," Texas's declarations establish that the CMPP program "has exacerbated it," meaning that such increased injury "is sufficient." *Texas v. United States (DACA)*, 50 F.4th 498, 519 (5th Cir. 2022). Indeed, the CMPP's stated goal—and predictable effect—is to increase (*i.e.*, exacerbate) the number of illegal immigrants using social services in Texas. Texas has, therefore, established causation.

*Fifth*, even if there were offsetting benefits from Federal funds, *see* ECF No. 77 at 3, these benefits negate neither Texas's injury nor the relevance of the declarations. The Fifth Circuit has held that once an "injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *General Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (citing *Texas v. United States (DAPA)*, 809 F.3d 134, 155-56 (5th Cir. 2015)). And "[i]n resolving standing," the Fifth Circuit has determined that "courts

4

do not engage in such an 'accounting exercise.'" *DACA*, 50 F.4th at 518 (quoting *DAPA*, 809 F.3d at 156). Indeed, the Fifth Circuit has specifically rejected the idea that an offsetting benefit could negate injury in the immigration context:

> Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state. It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and buy auto insurance, reducing the expenses associated with uninsured motorists. . . . *Even if the government is correct, that does not negate Texas's injury* . . . .

*DAPA*, 809 F.3d at 155 (emphasis added).

Thus, Defendants' assertion that the Ms. Waltz's declaration did not include federal reimbursement carries no weight in this Court's evaluation of Defendants' motion. *Contra* ECF No. 77 at 3. Nor is that assertion important when the CMPP funds were disbursed—both because prospective injury is an independently valid basis for standing and because these federal reimbursement funds would not impact Texas's injury.

## II. The Declaration of Henry De La Garza Has a Proper Foundation and Is Admissible.

Mr. De La Garza's declaration offers lay testimony rather than expert testimony. As such, his testimony should be "rationally based on the witness's perception." Fed. R. Evid. 701(a). And while Defendants challenge Mr. De La Garza's declaration on the grounds that it lacks a proper foundation, *see* ECF No 77 at 4–6, their position ignores the fact that most Fifth Circuit and federal district court cases to have considered the issue of company officers testifying to facts relating to their duties have held to the contrary. Indeed, a "highly placed executive may testify to what his broad responsibility and familiarity with the company or industry have taught him." *Metro Hospitality Partners, Ltd. v. Lexington Ins. Co.*, 84 F. Supp. 3d 553, 564 (S.D. Tex. 2015). Moreover, the drafters of the Federal Rules of Evidence themselves disagree with Defendants' position. After all, it is the quintessential example of lay testimony under Rule 701(a) to allow "a business officer or owner to testify as to the value or the projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701(a), *Committee Notes—2000 Amendment*.

Here, Mr. De La Garza is the Human Resources Director and Chief of the Human Resources Division at the Office of the Attorney General of Texas. He has had that title since November of 2020. Hence, Mr. De La Garza is a "highly placed executive" with "broad responsibility and familiarity" with his division.

In addition, "[t]he Federal Rules of Evidence . . . confirm that [a witness's] position as company president permits [him] a broader range of testimony than a traditional law witness would possess when testifying to matters concerning [his] business." *Versai Mgmt. Corp. v. Clarendon Am. Ins. Co.*, 597 F.3d 729, 737 (5th Cir. 2010) (per curiam). Further, "[c]orporate officers may testify as laypersons based on knowledge and analysis derived from duties held at the company." *Servicios Comerciales Lamosa, S.A. de C.V. v. De la Rosa*, 328 F. Supp. 3d 598, 618 (N.D. Tex. 2018) (citing *United States v. Valencia*, 600 F. 3d 389, 416 (5th Cir. 2010) (per curiam). And "business owners or officers may offer lay testimony on lost profits because they have personal knowledge of their business." *Id.* (citing *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002)). The Fifth Circuit has also upheld the ability of a company officer to testify, based on personal knowledge, as a lay witness about lost profits, the value of certain company property, and projected costs for paying employees. *Merritt Hawkins & Assoc., LLC v. Gresham*, 861 F.3d 143, 153 (5th Cir. 2017). Indeed, in *Merritt*, the court found it appropriate for a company officer to testify that "he would have to pay an employee at least $100 an hour" to perform a task, as well as about training expenses because "[c]ourts regularly allow company officer testimony about routine cost incurred." *Id.* at 153-54.

Mr. De La Garza's declaration is well within this precedent. He is testifying as to projected costs (analogous to lost profits) that his division will incur as a result of the new regulation. And like *Merritt*, the projection of future costs based on paying employees to perform tasks is exactly what Mr. De La Garza's declaration does here.  It projects the costs of paying employees to do tasks related to compliance with the new regulation based on hourly wages multiplied by estimated hours to complete tasks.  Thus, Mr. De La Garza's role as the Chief of the Human Resources Division entitles him to opine on this topic.

And although Defendants further assert that "De La Garza offers no explanation for why Texas would have to expend the time he claims to ensure compliance when, by Texas's own account, it already voluntarily did what it now says the PFWA requires," ECF No. 77 at 5–6, Defendants miss the point. As Mr. De La Garza's declaration explained, "Because the Act imposes new requirements on OAG as a government employer," OAG must engage in a number of tasks such as legal research and reviewing and updating OAG policies as well as addressing litigation claims. ECF No. 77-4 at ¶ 6. Even if Texas already did essentially what the PFWA requires in substance, it still must comply with the letter of the law, and it is reasonable to expect that such compliance will require additional work. For an agency with "over 4,000 employees throughout the State of Texas," *id.* at ¶ 2, it seems hardly unreasonable to expect that OAG would "initially spend around $6,674.01 and . . . over 100 hours of time to comply with the Act's new requirements for the first year." *Id.* at ¶ 8.

## Conclusion

For these reasons, the Court should deny Defendants' motion to exclude Texas's declarations.

Dated November 22, 2023.

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100


Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700

Respectfully submitted.

RYAN WALTERS
Chief, Special Litigation Division
Texas Bar No. 240105085

*/s/ Ethan Szumanski*
ETHAN SZUMANSKI
Special Counsel
Texas Bar No. 24123966
ethan.szumanski@oag.texas.gov

KATHLEEN HUNKER
Special Counsel
Texas Bar No. 24118415
kathleen.hunker@oag.texas.gov

ROBERT HENNEKE
Texas Bar No. 24026058
rhenneke@texaspolicy.com

CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com

MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com

NATE CURTISI
Arizona Bar No. 033342
ncurtisi@texaspolicy.com

COUNSEL FOR THE STATE OF TEXAS

**CERTIFICATE OF SERVICE**

I certify that on November 22, 2023, this motion to exclude was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Ethan Szumanski*
ETHAN SZUMANSKI
